# EXHIBIT A



City of San Mateo
Public Works Department
330 West 20th Avenue
San Mateo, CA 94403-1388
(650) 522-7300

**Wireless Communications Permit WC-2024-000243**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Permit Type:** | PW - Wireless Communications | **Project:** | | **App Date:** | 10/23/2024 |
| **Work Class:** | Major | **District:** | San Mateo | **Issue Date:** | 01/17/2025 |
| **Status:** | Issued | **Square Feet:** | 0.00 | **Exp Date:** | 01/16/2035 |
| **Description:** | Location: 124 Warren Rd; Install a new wireless radio facility and associated equipment on an existing wood utility pole. | **Valuation:** | $0.00 | **Final Date:** | NOT FINALED |
| **Location:** | | **PA:** | | **Parcel:** | |

All work in accordance with City of San Mateo's General Conditions for Contractors and Standard Drawing(s):

Permittee must follow stormwater BMP for:

| **Applicant** | **Applicant** |
|---|---|
| Erica Plute | Jason Camarena |
| Crown Castle Fiber Llc | Crown Castle |
| 148000 Frye Rd | 1 Park Place |
| Suite: Lockbox 301439 | Dublin, CA 94568 |
| Fort Worth, TX 76155 | Home: |
| Home: | |
| Business: 7244162571 | Business: 9252015806 |
| Mobile: | Mobile: |

| Invoice No. | Fee | | Fee Amount | Amount Paid |
|---|---|---|---|---|
| NOT INVOICED | Wireless - Permit Application Drawdown Deposit | | $4,500.00 | $0.00 |
| | | Total for Invoice NOT INVOICED | $4,500.00 | $0.00 |
| | | **Grand Total for Permit** | **$4,500.00** | **$0.00** |

The holder of this permit shall comply with all City ordinances and State laws relating to street and sidewalk encroachment and maintain adequate safe passage for pedestrian and vehicular traffic, all as may be required by the particular work in progress. All work shall conform to the City of San Mateo General Conditions for Contractors, Standard Drawings and the Standard Specifications for Public Works Construction "Green Book." Failure to comply with the provisions under which this permit is issued may be basis for rejecting work. Deposit refunded when work has been completed to the satisfaction of the City Engineer.

Applicant: _____ Date:_____

Permit Issued By: _____ Date:_____

**STANDARD CONDITIONS OF APPROVAL FOR WIRELESS COMMUNICATIONS FACILITIES IN THE PUBLIC RIGHTS-OF-WAY PURSUANT TO SAN MATEO MUNICIPAL CODE SECTION 17.10.080**

A.    **Standard Conditions for Wireless Facilities Permits.**

1.    **Permit Term.** This permit will automatically expire 10 years and one day from its issuance if a new permit has not been applied for in writing at least 120 days prior to permit expiration, except when California Government Code § 65964(b), as may be amended or superseded in the future, authorizes the City to establish a shorter term for public safety or substantial land use reasons. Any other permits or approvals issued in connection with any collocation, modification or other change to this wireless facility, which includes without limitation any permits or other approvals deemed-granted or deemed-approved under federal or state law, will not extend this term limit unless expressly provided otherwise in such permit or approval or required under federal or state law.

2.    **Compliance with Approved Plans.** Before the Department of Public Works issues any encroachment permit and/or other ministerial permits required to commence construction in connection with this permit, the permittee must incorporate this permit, all conditions associated with this permit and the approved photo simulations into the project plans (the "**Approved Plans**"). The permittee must construct, install and operate the wireless facility in substantial compliance with the Approved Plans. Any alterations, modifications or other changes to the Approved Plans, whether requested by the permittee or required by other departments or public agencies with jurisdiction over the wireless facility, must be submitted in a written request subject to the City's prior review and approval, who may refer the request to the original approval authority if the City finds that the requested alteration, modification or other change deviates from the Approved Plans or implicates a significant or substantial land-use concern.

3.    **Post-Installation Certification.** Within 60 calendar days after the permittee commences full, unattended operations of a wireless facility approved or deemed-approved under San Mateo Municipal Code Chapter 17.10, the permittee shall provide the City with documentation that the wireless facility has been installed and/or constructed in compliance with the Approved Plans.  Such documentation must include as-built drawings,  GIS data, post installation RF study, and site photographs.

4.    **Build-Out Period.** This permit will automatically expire one (1) year from the approval or deemed-granted date. The City may grant one written extension to a date certain, but not to exceed one (1) additional year, when the permittee shows good cause to extend the limitations period in a written request for an extension submitted at least 30 days prior to the automatic expiration date in this condition.

5.    **Maintenance Obligations; Vandalism**. During any maintenance or repair operations, the permittee shall keep the site, which includes without limitation any and all improvements, equipment, structures, access routes, fences and landscape features, in a neat, clean and safe condition. The permittee, at no cost to the City, shall remove and remediate any graffiti or other vandalism on its equipment within 48 hours after the permittee receives notice or otherwise becomes aware that such graffiti or other vandalism occurred.

6.  **Compliance with Laws.** The permittee shall maintain compliance at all times with all federal, state and local statutes, regulations, orders or other rules that carry the force of law ("**Laws**") applicable to the permittee, the subject property, the wireless facility or any use or activities in connection with the use authorized in this permit, which includes without limitation any Laws applicable to human exposure to RF emissions. The permittee expressly acknowledges and agrees that this obligation is intended to be broadly construed and that no other specific requirements in these conditions are intended to reduce, relieve or otherwise lessen the permittee's obligations to maintain compliance with all Laws. In the event that the City fails to timely notice, prompt or enforce compliance with any applicable provision in the San Mateo Municipal Code, any permit, any permit condition or any applicable law or regulation, the applicant or permittee will not be relieved from its obligation to comply in all respects with all applicable provisions in the San Mateo Municipal Code, any permit, any permit condition or any applicable law or regulation.

7.  **Cooperation with RF Compliance Evaluations.** At all times relevant to this permit, the permittee and the property owner shall reasonably cooperate with efforts by the City to evaluate whether the wireless facility complies with all applicable FCC rules and regulations for human exposure to RF emissions. Such cooperation shall be at no cost to the City and may include, but is not limited to: (1) furnishing the City with a written affidavit signed by an RF engineer certifying the wireless facility's compliance with applicable FCC rules and regulations; (2) providing technical data such as the frequencies in use, power output levels and antenna specifications, reasonably necessary to evaluate compliance with maximum permissible exposure levels set by the FCC; (3) allowing the City or its designee to have supervised access to the areas near the wireless facility for inspections and field measurements; and (4) promptly responding to all requests by the City or its designee for information and/or cooperation with respect to any of the foregoing.

8.  **Adverse Impacts on Other Properties.** The permittee shall use all reasonable efforts to avoid any and all undue or unnecessary adverse impacts on nearby properties that may arise from the permittee's or its authorized personnel's construction, installation, operation, modification, maintenance, repair, removal and/or other activities at the site. The permittee shall not perform or cause others to perform any construction, installation, operation, modification, maintenance, repair, removal or other work that involves heavy equipment or machines except during normal construction work hours authorized by the San Mateo Municipal Code. The restricted work hours in this condition will not prohibit any work required to prevent an actual, immediate harm to property or persons, or any work during an emergency declared by the City. The City may issue a stop work order for any activities that violates this condition.

9.  **Backup Power; Generators.** The permittee shall operate backup power generators only during (a) commercial power outages or (b) for maintenance purposes during normal construction hours in accordance with the San Mateo Municipal Code. The City may approve a temporary power source and/or generator in connection with initial construction, major repairs or in the event of an emergency. The permittee shall not operate any permanent backup generators located in the public right-of-way.

10. **Inspections; Emergencies.** The permittee expressly acknowledges and agrees that the City's officers, officials, staff or other designee may enter onto the site and inspect the improvements and equipment upon reasonable prior notice to the permittee,  or promptly after  an emergency. The City's officers, officials, staff or other designee may, but will not be obligated to, enter onto the site area without prior notice to support, repair, disable or remove any improvements or equipment in emergencies or when such improvements or

equipment threatens actual, imminent harm to property or persons. The permittee, if present, may observe the City's officers, officials, staff or other designee while any such inspection or emergency access occurs.

11. **Permittee's Contact Information.** The permittee shall furnish the City with accurate and up-to-date contact information for a person responsible for the wireless facility, which includes without limitation such person's full name, title, direct telephone number, facsimile number, mailing address and email address. The permittee shall keep such contact information up to date at all times and immediately provide the City with updated contact information in the event that either the responsible person or such person's contact information changes.

12. **Indemnification.** The permittee shall defend, indemnify and hold harmless the City, City Council and City boards, commissions, agents, officers, officials, volunteers, and employees from any and all (1) damages, liabilities, injuries, losses, costs and expenses and from any and all claims, demands, law suits, writs and other actions or proceedings ("**Claims**") brought against the City or its agents, officers, officials, volunteers, and/or employees to challenge, attack, seek to modify, set aside, void or annul the City's approval of this permit, and (2) other Claims of any kind or form, whether for personal injury, death or property damage, that arise from or in connection with the permittee's or its agents', directors', officers', employees', contractors', subcontractors', licensees', or customers' acts or omissions in connection with this permit or the wireless facility. Permittee's duty to defend and indemnify shall not apply to the extent such Claims are caused by the sole or active negligence or willful misconduct of the City. In the event the City becomes aware of any Claims, the City will use best efforts to promptly notify the permittee and the private property owner and shall reasonably cooperate in the defense. The permittee expressly acknowledges and agrees that the City shall have the right to approve, which approval shall not be unreasonably withheld, the legal counsel providing the City's defense, and the property owner and/or permittee (as applicable) shall promptly reimburse City for any costs and expenses directly and necessarily incurred by the City in the course of the defense. The permittee expressly acknowledges and agrees that the permittee's indemnification obligations under this condition are a material consideration that motivates the City to approve this permit, and that such indemnification obligations will survive the expiration or revocation of this permit.

13. **Performance Bond.** Before the Department of Public Works issues any encroachment permit and/or other ministerial permits required to commence construction in connection with this permit, the permittee shall post a performance bond from a surety and in a form acceptable to the City in an amount reasonably necessary to cover the cost to remove the improvements and restore all affected areas based on a written estimate from a qualified contractor with experience in wireless facilities removal. The written estimate must include the cost to remove all equipment and other improvements, which includes without limitation all antennas, radios, batteries, generators, utilities, cabinets, mounts, brackets, hardware, cables, wires, conduits, structures, shelters, towers, poles, footings and foundations, whether above ground or below ground, constructed or installed in connection with the wireless facility, plus the cost to completely restore any areas affected by the removal work to a standard compliant with applicable laws. In establishing or adjusting the bond amount required under this condition, and in accordance with California Government Code § 65964(a), the City shall take into consideration any information provided by the permittee regarding the cost to remove the wireless facility to a standard compliant with applicable laws. The performance bond shall expressly survive

the duration of the permit term to the extent required to effectuate a complete removal of the subject wireless facility in accordance with this condition.

14.     **Permit Revocation.** The City may review this permit at any time due to complaints about noncompliance with applicable laws or any approval conditions attached to this permit. In accordance with all applicable laws, the City may revoke this permit or amend these conditions as the City deems necessary or appropriate to correct any such noncompliance.

15.     **Record Retention.** The permittee must maintain, for the duration of the permit term, complete and accurate copies of all permits and other regulatory approvals issued in connection with the wireless facility, which includes without limitation this approval, the approved plans and photo simulations incorporated into this approval, all conditions associated with this approval and any ministerial permits or approvals issued in connection with this approval. In the event that the permittee does not maintain such records as required in this condition, any ambiguities or uncertainties that would be resolved through an inspection of the missing records will be construed against the permittee. The permittee may keep electronic records; provided, however, that copies kept in the City's possession will control over any conflicts, and originals will control over all other copies in any form.

16.     **Undergrounded Utilities.** In the event that other public utilities or cable television operators in the public right-of-way underground their facilities where the permittee's wireless facility is located, the permittee must underground its equipment except the antennas and antenna supports, to the extent technically feasible. Such undergrounding shall occur at the permittee's sole cost and expense except as reimbursed pursuant to law. In areas with existing overhead lines, new communication lines shall be "overlashed" with existing communication lines to the extent technically feasible.

17.     **Electric Meter Removal.** In the event that the commercial electric utility provider adopts or changes its rules obviating the need for a separate or ground-mounted electric meter and enclosure, the permittee on its own initiative and at its sole cost and expense shall apply to the City for permission to remove the separate or ground-mounted electric meter and enclosure and restore the affected area to its original condition.

18.     **Rearrangement and Relocation.** The permittee acknowledges that the City, in its sole discretion and at any time, may: (1) change any street grade, width or location; (2) add, remove or otherwise change any improvements in, on, under or along any street, sidewalk, or right of way owned by the City or any other public agency, which includes without limitation any sewers, storm drains, conduits, pipes, vaults, boxes, cabinets, poles and utility systems for gas, water, electric or telecommunications; and/or (3) perform any other work deemed necessary, useful or desirable by the City (collectively, "**City Work**"). The City reserves the rights to do any and all City Work without any admission on its part that the City would not have such rights without the express reservation in this permit. In the event that the City determines that any City Work will require the permittee's facility to be rearranged and/or relocated, the permittee shall, at its sole cost and expense, do or cause to be done all things necessary to accomplish such rearrangement and/or relocation. If the permittee fails or refuses to either permanently or temporarily rearrange and/or relocate the permittee's facility within a reasonable time after the City's notice, the City may (but will not be obligated to) cause the rearrangement or relocation to be performed at the permittee's sole cost and expense. The City may exercise its rights to rearrange or relocate the permittee's facility without prior notice to permittee when the

City determines that the City Work is immediately necessary to protect public health or safety. The permittee shall reimburse the City for all costs and expenses in connection with such work within 10 calendar days after a written demand for reimbursement and reasonable documentation to support such costs. In addition, the permittee shall indemnify, defend and hold the City, its agents, officers, officials, employees and volunteers harmless from and against any Claims in connection with rearranging or relocating the permittee's facility, or turning on or off any water, oil, gas, electricity or other utility service in connection with the permittee's facility, except to the extent such Claims are caused by the sole or active negligence or willful misconduct of the City.

19. **Landscaping.** The permittee shall replace any landscape features damaged or displaced by the construction, installation, operation, maintenance or other work performed by the permittee or at the permittee's direction on or about the site. In the event that any trees are damaged or displaced, the permittee shall hire and pay for a licensed arborist to select, plant and maintain replacement landscaping in an appropriate location for the species. Only ISA Certified workers under the supervision of a licensed arborist shall be used to install the replacement tree(s). The box size and other standards for any replacement trees shall be subject to the City's approval in consultation with the licensed arborist. The permittee shall, at all times, be responsible to maintain any replacement landscape features.

20. **Encroachment Permit General Conditions**. The permittee shall comply with the City of San Mateo's Encroachment Permit General Conditions.

21. **Insurance Requirements.** Commercial general liability (or comprehensive) and property damage insurance indicating the City of San Mateo as an additional insured is required.

Coverage shall be at least as broad as:

   i.   Commercial General Liability (CGL):  Insurance Services Office (ISO) Form CG 00 01 covering CGL on an "occurrence" basis, including products-completed operations, personal & advertising injury, contractual liability, property damage, death, bodily injury, and limited pollution liability endorsement, with limits no less than $5,000,000 per occurrence; $10,000,000 aggregate.  If a general aggregate limit applies, either the general aggregate limit shall apply separately to this project/location or the general aggregate limit shall be twice the required occurrence limit.

   ii.  Limited Pollution Liability Coverage: Insurance in the amount of $5,000,000 per claim and in the aggregate covering third party claims for bodily injury, property damage or cleanup costs as required by law, where the pollution is caused during and by permittee's work and for permittee's products and completed operations. (This may satisfy the requirement for a limited pollution liability endorsement on the Commercial General Liability insurance policy.)

   iii. Automobile Liability:  ISO Form Number CA 00 01 covering any auto (Code 1), or if permittee has no owned autos, hired, (Code 8) and non-owned autos (Code 9), with limit no less than $1,000,000 per accident for bodily injury and property damage.

   iv.  Workers' Compensation:  as required by the State of California, with Statutory Limits, and Employer's Liability Insurance with limit of no less than $1,000,000 per accident for bodily injury or disease. The Workers Compensation policy shall be endorsed with a waiver of subrogation in favor

        of City (and its elected and appointed officials, employees, and volunteers). The insurers shall agree to waive all rights of subrogation against City and its officials, officers, employees, and volunteers for all work performed by permittee and its employees, agents, and contractors.

    v.   Professional Liability: (Applicable to all permittee's contractors and subcontractors of any tier performing any professional services including engineers, surveyors, or consultants relating to this agreement) with limits of $2,000,000 per claim, and $2,000,000 policy aggregate.

    vi.   Contractors' Pollution Liability: (Applicable to all permittee's contractors and subcontractors of any tier performing any removal, remediation, abatement, transportation or disposal of any hazardous materials and/or projects involving environmental hazards relating to permit) with limits of $2,000,000 per occurrence and $2,000,000 policy aggregate.

    vii.   "All Risk" Property Insurance: against all risks of loss or damage to any wireless communication facility(ies) or betterments, personal property, trade fixtures, equipment, and/or merchandise located in, on, at, under, above, or about the City's right of way, license area, and/or City-owned pole(s) (including, but not limited to, loss resulting from fire, windstorm, hail, lightning, vandalism, malicious mischief, and such other perils ordinarily included in extended coverage casualty insurance policies). Such insurance shall be maintained in an amount sufficient to cover not less than one hundred percent (100%) of the full replacement value thereof (whichever is greater) with no coinsurance penalty provision. Permittee may self-insure this risk with prior notice to the City.

If the permittee maintains higher limits than the minimums shown above, the City requires and shall be entitled to coverage for the higher limits maintained by the permittee.

Other Insurance Provisions
The insurance policies are to contain, or be endorsed to contain, the following provisions:

Additional Insured Status
The City, its elected and appointed officials, employees, volunteers, and agents are to be covered as insureds on the auto policy for liability arising out of automobiles owned, leased, hired or borrowed by or on behalf of the permittee; and on the COL policy with respect to liability arising out of work or operations performed by or on behalf of the permittee including materials, parts or equipment furnished in connection with such work or operations. General liability coverage can be provided in the form of an endorsement to the permittee's insurance (at least as broad as ISO Form CG 20 10, 11 85 or both CG 20 10 and CG 20 37 forms if later revisions used).

Primary Coverage
For any claims related to the permit, the permittee's insurance coverage shall be primary insurance as respects the City, its elected and appointed officials, employees, volunteers, and agents. Any insurance or self-insurance maintained by the City, its elected and appointed officials, employees, volunteers, or agents shall be excess of the permittee's insurance and shall not contribute with it.

Notice of Cancellation

Each insurance policy required above shall provide that coverage shall not be canceled, except after thirty (30) days' prior written notice (10 days for non-payment) has been given to the City.

## Waiver of Subrogation

Permittee hereby grants to City a waiver of any right to subrogation, which any commercial general liability, automobile liability, and worker's compensation insurer of said permittee may acquire against the City by virtue of the payment of any loss under such insurance. Permittee agrees to obtain any endorsement that may be necessary to affect this waiver of subrogation, but this provision applies regardless of whether or not the City has received a waiver of subrogation endorsement from the insurer.

## Self-Insured Retentions

Any self-insured retentions must be declared to and approved by the City. The City may require the permittee to purchase coverage with a lower retention or provide proof of ability to pay losses and related investigations, claim administration, and defense expenses within the retention.

Claims Made Policies. If any insurance coverage required herein is written on a "claims made" policy: (a) the retroactive date must be shown, and this date must be before the execution date of the permit or the beginning of the permitted project or work; (b) insurance must be maintained and evidence of insurance must be provided for at least the duration of any applicable Master License Agreement and/or the applicable permit(s)) and five (5) years after completion of the subject work; and (c) if coverage is canceled or non-renewed, and not replaced with another claims-made policy form with a retroactive date prior to the permit effective, or start of work date, permittee must purchase extended reporting period coverage for a minimum of five (5) years after completion of any work; and (d) a copy of the claims reporting requirements must be submitted to the City for review upon request.

## Acceptability of Insurers

Insurance is to be placed with insurers with a current A.M. Best's rating of no less than A:VII, unless otherwise acceptable to the City.

## Verification of Coverage

Permittee shall furnish the City with original certificates and amendatory endorsements or copies of the applicable policy language effecting coverage required by this clause. All certificates and endorsements are to be received and approved by the City before work commences. However, failure to obtain the required documents prior to the work beginning shall not waive the permittee's obligation to provide them. The City reserves the right to require complete, certified copies of all required insurance policies, including endorsements required by these specifications, at any time.

Contractors and Subcontractors. Permittee shall require and verify that all contractors and subcontractors (if any) maintain the same insurance limits as required of permittee, unless otherwise agreed to by the City.

Special Risk or Circumstances. City, upon prior written notice to, review and written acceptance by permittee, reserves the right to modify these insurance requirements at any time, including, but not limited to, limits, based on the nature of the risk, prior experience, insurer, coverage, or other special circumstances.

22. **Traffic Control.** Traffic control per Caltrans standards. No street closures allowed, must allow through traffic at all times. Permittee must notify City of San Mateo's Police (650) 522-7700, Fire (650) 522-7940, and San Mateo County Communications (650) 363-4961, at least 24 – 48 hours in advance of lane closures or detours; and immediately upon removal of lane closure or detour.

23. **Traffic Control Plans (TCPs).** Site-specific TCP's are required where any of the following criteria are met, and shall be prepared in accordance with the "Guidelines for Submittal of Site-Specific TCP's" found in the Encroachment Permit Packet:
    i. Any roadway that is classified as a collector or arterial. Roadway classifications are defined in the Circulation Element of the General Plan. A map of roadway classifications can be seen here: http://www.cityofsanmateo.org/DocumentCenter/Home/View/7192 and is attached to this document.
    ii. Any roadway (including local roadways) that requires full road closures or detours.
    iii. Any roadway with a speed limit over 25 mph.

    The City reserves the right to require site-specific TCP's where deemed necessary.

24. **Underground Service Alert (USA).** Forty-eight (48) hours before commencing work, the permittee shall contact Underground Service Alert (USA) at 1-800-227-2600 to verify elevations and locations of all existing utilities

25. **Private Sewer Laterals.** The City of San Mateo does not mark private sewer laterals in the public right-of-way as part of the Underground Service Alert (USA) program. Permittee is to take precautions to locate and protect private sewer laterals from damage during construction. In the event any damage is discovered, the Permittee is required to immediately dig and repair the sewer lateral to restore sewer service. If new facilities are being installed by the boring method the Permittee is also required to video inspect any sewer and storm mains that are crossed by their facilities as part of this project, a copy of this video is to be provided to the City.

The above conditions are in addition to all other standards, requirements, and conditions adopted by the City, all wireless facilities permits, whether approved by the City or deemed approved by the operation of law, shall be automatically subject to the conditions in this section. The City (or the appellate authority on appeal) shall have discretion to modify or amend these conditions on a case-by-case basis as may be necessary or appropriate under the circumstances to protect public health and safety or allow for the proper operation of the approved facility consistent with the goals and applicable provisions of San Mateo Municipal Code Chapter 17.10.

B. **Standard Conditions for Section 6409 Approvals.** In addition to all other conditions adopted by the City, all section 6409 approvals, whether approved by the City or deemed approved by the operation of law, shall be automatically subject to the conditions in this section. The City (or the appellate authority on appeal) shall have discretion to modify or amend these conditions on a case-by-case basis as may be necessary or appropriate under the circumstances to protect public health and safety or allow for the proper operation of the approved facility consistent with the goals and applicable provisions of San Mateo Municipal Code Chapter 17.10.

1. **Permit Term.** The City's grant or grant by operation of law of a section 6409 approval constitutes a federally-mandated modification to the underlying permit or other prior regulatory authorization for the subject tower or base station, and will be regarded as a modification to the underlying approval for the subject tower or base station. The City's grant or grant by operation of law of a section 6409 approval will not extend the permit term, if any, for any underlying permit or other underlying prior regulatory authorization. Accordingly, the term for a section 6409 approval shall be coterminous with the underlying permit or other prior regulatory authorization for the subject tower or base station. This condition shall not be applied or interpreted in any way that would cause the term of the underlying permit for the modified facility to be less than 10 years in total length.

2. **Compliance Obligations Due to Invalidation.** In the event that any court of competent jurisdiction invalidates all or any portion of Section 6409 or any FCC rule that interprets Section 6409 such that federal law would not mandate approval for any section 6409 approval(s), such approval(s) shall automatically expire one year from the effective date of the judicial order, unless the decision would not authorize accelerated termination of previously approved section 6409 approvals or the City grants an extension upon written request from the permittee that shows good cause for the extension, which includes without limitation extreme financial hardship. Notwithstanding anything in the previous sentence to the contrary, the City may not grant a permanent exemption or indefinite extension. A permittee shall not be required to remove its improvements approved under the invalidated section 6409 approval when it has obtained the applicable permit(s) or submitted an application for such permit(s) before the one-year period ends.

3. **City's Standing Reserved.** The City's grant or grant by operation of law of a section 6409 approval does not waive, and shall not be construed to waive, any standing by the City to challenge Section 6409, any FCC rules that interpret Section 6409 or any section 6409 approval.

4. **Compliance with Approved Plans.** Before the Department of Public Works issues any permits required to commence construction in connection with this section 6409 approval, the permittee must incorporate this section 6409 approval, all conditions associated with this section 6409 approval and any approved photo simulations into the project plans (the "**Approved Plans**"). The permittee must construct, install and operate the wireless facility in substantial compliance, as determined by the City, with the Approved Plans. Any alterations, modifications or other changes to the Approved Plans, whether requested by the permittee or required by other departments or public agencies with jurisdiction over the wireless facility, must be submitted in a written request subject to the City's prior review and approval.  The City may revoke the section 6409 approval if the City finds that the requested alteration, modification or other change may cause a substantial change as that term is defined by the FCC in 47 C.F.R. § 1.6100(b)(7), as may be amended.

5. **Post-Installation Certification.** Within 60 calendar days after the permittee commences full, unattended operations of a wireless facility approved or deemed-approved under San Mateo Municipal Code Chapter 17.10, the permittee shall provide the City with documentation reasonably acceptable to the City that the wireless facility has been installed and/or constructed in substantial compliance with the Approved Plans. Subject to the City's discretion, such documentation may include, but shall not be limited to, as-built drawings, site surveys, GIS data and site photographs.

6. **Build-Out Period.** This section 6409 approval will automatically expire one (1) year from the approval or deemed-granted date unless the permittee obtains all other permits and

approvals required to install, construct and/or operate the approved wireless facility, which includes without limitation any permits or approvals required by any federal, state or local public agencies with jurisdiction over the subject property, the wireless facility or its use. The City may grant one written extension up to one (1) year when the permittee shows good cause to extend the limitations period in a written request for an extension submitted at least 30 calendar days prior to the automatic expiration date in this condition.

7.  **Maintenance Obligations; Vandalism.** The permittee shall keep the site, which includes without limitation any and all improvements, equipment, structures, access routes, fences and landscape features, in a neat, clean and safe condition in accordance with the Approved Plans and all conditions in this permit. Any concealment elements shall be kept in "like new" condition at all times. The permittee shall keep the site area free from all litter and debris at all times. The permittee, at no cost to the City, shall remove and remediate any graffiti or other vandalism at the site within 48 hours after the permittee receives notice or otherwise becomes aware that such graffiti or other vandalism occurred. The permittee and property owner shall maintain any and all landscape features in accordance with an approved landscape plan, if any, and shall replace dying or dead trees, foliage or other landscape elements shown on the Approved Plans within 30 calendar days after written notice from the City.

8.  **Compliance with Laws.** The permittee shall maintain compliance at all times with all federal, state and local statutes, regulations, orders or other rules that carry the force of law ("**Laws**") applicable to the permittee, the subject property, the wireless facility or any use or activities in connection with the use authorized in this section 6409 approval, which includes without limitation any Laws applicable to human exposure to RF emissions. The permittee expressly acknowledges and agrees that this obligation is intended to be broadly construed and that no other specific requirements in these conditions are intended to reduce, relieve or otherwise lessen the permittee's obligations to maintain compliance with all Laws. In the event that the City fails to timely notice, prompt or enforce compliance with any applicable provision in the San Mateo Municipal Code, any permit, any permit condition or any applicable law or regulation, the applicant or permittee will not be relieved from its obligation to comply in all respects with all applicable provisions in the San Mateo Municipal Code, any permit, any permit condition or any applicable law or regulation.

9.  **Cooperation with RF Compliance Evaluations.** At all times relevant to this permit, the permittee and the property owner shall reasonably cooperate with efforts by the City to evaluate whether the wireless facility complies with all applicable FCC rules and regulations for human exposure to RF emissions. Such cooperation shall be at no cost to the City and may include, but is not limited to: (1) furnishing the City with a written affidavit signed by an RF engineer certifying the wireless facility's compliance with applicable FCC rules and regulations; (2) providing technical data such as the frequencies in use, power output levels and antenna specifications, reasonably necessary to evaluate compliance with maximum permissible exposure levels set by the FCC; (3) allowing the City or its designee to have supervised access to the areas near the wireless facility for inspections and field measurements; and (4) promptly responding to all requests by the City or its designee for information and/or cooperation with respect to any of the foregoing.

10.  **Adverse Impacts on Other Properties.** The permittee shall use all reasonable efforts to avoid any and all undue or unnecessary adverse impacts on nearby properties that may arise from the permittee's or its authorized personnel's construction, installation, operation, modification, maintenance, repair, removal and/or other activities at the site.

The permittee shall not perform or cause others to perform any construction, installation, operation, modification, maintenance, repair, removal or other work that involves heavy equipment or machines except during normal construction hours authorized by the San Mateo Municipal Code. The restricted work hours in this condition will not prohibit any work required to prevent an actual, immediate harm to property or persons, or any work during an emergency declared by the City. The City may issue a stop work order for any activities that violates this condition.

11. **Backup Power; Generators.** The permittee shall operate backup power generators only during (a) commercial power outages or (b) for maintenance purposes during normal construction hours in accordance with the San Mateo Municipal Code. The City may approve a temporary power source and/or generator in connection with initial construction, major repairs or in the event of an emergency. The permittee shall not operate any permanent backup generators located in the public right-of-way.

12. **Inspections; Emergencies.** The permittee expressly acknowledges and agrees that the City's officers, officials, staff or other designee may enter onto the site and inspect the improvements and equipment upon reasonable prior notice to the permittee, or at any time during an emergency. The City's officers, officials, staff or other designee may, but will not be obligated to, enter onto the site area without prior notice to support, repair, disable or remove any improvements or equipment in emergencies or when such improvements or equipment threatens actual, imminent harm to property or persons. The permittee, if present, may observe the City's officers, officials, staff or other designee while any such inspection or emergency access occurs.

13. **Permittee's Contact Information.** The permittee shall furnish the City with accurate and up-to-date contact information for a person responsible for the wireless facility, which includes without limitation such person's full name, title, direct telephone number, facsimile number, mailing address and email address. The permittee shall keep such contact information up to date at all times and immediately provide the City with updated contact information in the event that either the responsible person or such person's contact information changes.

14. **Indemnification.** The permittee shall defend, indemnify and hold harmless the City, City Council and City boards, commissions, agents, officers, officials, employees and volunteers from any and all (1) damages, liabilities, injuries, losses, costs and expenses and from any and all claims, demands, law suits, writs and other actions or proceedings ("**Claims**") brought against the City or its agents, officers, officials, employees or volunteers to challenge, attack, seek to modify, set aside, void or annul the City's approval of this section 6409 approval, and (2) other Claims of any kind or form, whether for personal injury, death or property damage, that arise from or in connection with the permittee's or its agents', directors', officers', employees', contractors', subcontractors', licensees', or customers' acts or omissions in connection with this section 6409 approval or the wireless facility. Permittee's duty to defend and indemnify shall not apply to the extent such Claims are caused by the sole or active negligence or willful misconduct of the City.  In the event the City becomes aware of any Claims, the City will use best efforts to promptly notify the permittee and the private property owner and shall reasonably cooperate in the defense. The permittee expressly acknowledges and agrees that the City shall have the right to approve, which approval shall not be unreasonably withheld, the legal counsel providing the City's defense, and the property owner and/or permittee (as applicable) shall promptly reimburse City for any costs and expenses directly and necessarily incurred by the City in the course of the defense. The permittee expressly

acknowledges and agrees that the permittee's indemnification obligations under this condition are a material consideration that motivates the City to approve this section 6409 approval, and that such indemnification obligations will survive the expiration or revocation of this section 6409 approval.

15. **Performance Bond.** Before the Department of Public Works issues any encroachment permit and/or other ministerial permits required to commence construction in connection with this section 6409 approval, the permittee shall post a performance bond from a surety and in a form acceptable to the City in an amount reasonably necessary to cover the cost to remove the improvements and restore all affected areas based on a written estimate from a qualified contractor with experience in wireless facilities removal. The written estimate must include the cost to remove all equipment and other improvements, which includes without limitation all antennas, radios, batteries, generators, utilities, cabinets, mounts, brackets, hardware, cables, wires, conduits, structures, shelters, towers, poles, footings and foundations, whether above ground or below ground, constructed or installed in connection with the wireless facility, plus the cost to completely restore any areas affected by the removal work to a standard compliant with applicable laws. In establishing or adjusting the bond amount required under this condition, and in accordance with California Government Code § 65964(a), the City shall take into consideration any information provided by the permittee regarding the cost to remove the wireless facility to a standard compliant with applicable laws. The performance bond shall expressly survive the duration of the permit term to the extent required to effectuate a complete removal of the subject wireless facility in accordance with this condition.

16. **Recall to Approval Authority; Permit Revocation.** The City may recall this section 6409 approval for review at any time due to complaints about noncompliance with applicable laws or any approval conditions attached to this section 6409 approval after notice and an opportunity to cure the violation is provided to the permittee. If the noncompliance continues after notice and reasonable opportunity to cure the noncompliance, the City may revoke this section 6409 approval or amend these conditions as the City deems necessary or appropriate to correct any such noncompliance.

17. **Record Retention.** The permittee must, for the duration of the permit term, maintain complete and accurate copies of all permits and other regulatory approvals issued in connection with the wireless facility, which includes without limitation this approval, the approved plans and photo simulations incorporated into this approval, all conditions associated with this approval and any ministerial permits or approvals issued in connection with this approval. In the event that the permittee does not maintain such records as required in this condition, any ambiguities or uncertainties that would be resolved through an inspection of the missing records will be construed against the permittee. The permittee may keep electronic records; provided, however, that hard copies or electronic records kept in the City's regular files will control over any conflicts between such City-controlled copies or records and the permittee's electronic copies, and complete originals will control over all other copies in any form.

18. **Undergrounded Utilities.** In the event that other public utilities or cable television operators in the public right-of-way underground their facilities where the permittee's wireless facility is located, the permittee must underground its equipment except the antennas and antenna supports, to the extent technically feasible. Such undergrounding shall occur at the permittee's sole cost and expense except as reimbursed pursuant to law. In areas with existing overhead lines, new communication lines shall be "overlashed" with existing communication lines to the extent technically feasible.

19.   **Electric Meter Removal.** In the event that the commercial electric utility provider adopts or changes its rules obviating the need for a separate or ground-mounted electric meter and enclosure, the permittee on its own initiative and at its sole cost and expense shall apply to the City for permission to remove the separate or ground-mounted electric meter and enclosure and restore the affected area to its original condition.

20.   **Rearrangement and Relocation.** The permittee acknowledges that the City, in its sole discretion and at any time, may: (1) change any street grade, width or location; (2) add, remove or otherwise change any improvements in, on, under or along any street owned by the City or any other public agency, which includes without limitation any sewers, storm drains, conduits, pipes, vaults, boxes, cabinets, poles and utility systems for gas, water, electric or telecommunications; and/or (3) perform any other work deemed necessary, useful or desirable by the City (collectively, "**City Work**"). The City reserves the rights to do any and all City Work without any admission on its part that the City would not have such rights without the express reservation in this permit. In the event that the City determines that any City Work will require the permittee's facility to be rearranged and/or relocated, the permittee shall, at its sole cost and expense, do or cause to be done all things necessary to accomplish such rearrangement and/or relocation. If the permittee fails or refuses to either permanently or temporarily rearrange and/or relocate the permittee's facility within a reasonable time after the City's notice, the City may (but will not be obligated to) cause the rearrangement or relocation to be performed at the permittee's sole cost and expense. The City may exercise its rights to rearrange or relocate the permittee's facility without prior notice to permittee when the City determines that the City Work is immediately necessary to protect public health or safety. The permittee shall reimburse the City for all costs and expenses in connection with such work within 10 days after a written demand for reimbursement and reasonable documentation to support such costs. In addition, the permittee shall indemnify, defend and hold the City, its agents, officers, officials, employees and volunteers harmless from and against any Claims in connection with rearranging or relocating the permittee's facility, or turning on or off any water, oil, gas, electricity or other utility service in connection with the permittee's facility.

21.   **Landscaping.** The permittee shall replace any landscape features damaged or displaced by the construction, installation, operation, maintenance or other work performed by the permittee or at the permittee's direction on or about the site. In the event that any trees are damaged or displaced, the permittee shall hire and pay for a licensed arborist to select, plant and maintain replacement landscaping in an appropriate location for the species. Only ISA Certified workers under the supervision of a licensed arborist shall be used to install the replacement tree(s). The box size and other standards for any replacement trees shall be subject to the City's approval in consultation with the licensed arborist. The permittee shall, at all times, be responsible to maintain any replacement landscape features.

# Wireless Communications Permit



Public Works Department
www.cityofsanmateo.org
pweng@cityofsanmateo.org
(650) 522-7300

Engineering Division
330 West 20th Avenue
San Mateo, CA  94403

*Revised: March 2021*

# Wireless Communications Facilities Permit Application

**INSTRUCTIONS:**
Prior to submittal of this Application, the Application Checklist and all other required materials, a meeting with staff is strongly encouraged. This voluntary informational meeting with City staff does not cause the FCC Shot Clock to begin.

City staff may deem the application incomplete if the applicant fails to include any required information or materials. Applications shall comply with SMMC 17.10 and the Design Standards and Application Requirements.

Applicants may submit applications by appointment only. Please contact the Public Works Department for an appointment.

---

**Applicant:**

Name: _____

Company: _____

Mailing Address: _____

City, State, Zip: _____

Phone: _____ Fax: _____

E-mail: _____

**Pole Owner:**

Name: _____

Company: _____

Mailing Address: _____

City, State, Zip: _____

Phone: _____ Fax: _____

E-mail: _____

**Authorized Representative:**

Name: _____

Company: _____

Mailing Address: _____

City, State, Zip: _____

Phone: _____ Fax: _____

E-mail: _____

**Pole Owner's Signature:**

See Attachment 05
_____

Printed Name: _____ Date: _____

**Applicant's Signature:** (if different from Property Owner)

_____

Printed Name: _____ Date: _____

---

**Proposed Site Location and Description:**

Proposed Project Address: _____    Pole Number [a]: _____

Zoning District (for ROW, provide nearest zoning district): _____    [a] If in the ROW, provide the pole number for the streetlight or pole.

Latitude/Longitude of Location: _____

Construction Value ($)/Project Description: _____

_____

_____

---

**Applicant's Request:**

□ WIRELESS PERMIT        □ SECTION 6409 APPROVAL        □ OTHER _____

---

**STAFF USE ONLY**

Applicable Shot Clock Period (for informational purposes only):    □ **60 days**    □ 90 days    □ **OTHER:** _____

Pre-App Submittal Meeting _____        Application Deemed Complete _____

Neighborhood Meeting _____              Shot Clock Expiration _____

Application Submittal _____              Conditionally Approved _____

                                                           Appeal _____



Public Works Department
www.cityofsanmateo.org
pweng@cityofsanmateo.org
(650) 522-7300

Engineering Division
330 West 20th Avenue
San Mateo, CA  94403

*Revised: March 2021*

# Wireless Communications Facilities
# Permit Application Checklist

**INSTRUCTIONS:**
Prior to submittal of this Application Checklist, Application and all other required materials, a meeting with City staff is strongly encouraged.  The City also recommends applicant holds a voluntary neighborhood meeting. These voluntary meetings shall not cause the FCC Shot Clock to begin.

City staff may deem the application incomplete if the applicant fails to include any required information or materials. Applications shall comply with SMMC 17.10 and Design Standards and Application Requirements.

*Underline: All starred (*) items in the checklist below are not required for a Section 6409 Approval.*

Applicants may submit applications by appointment only. Please contact the Public Works Department for an appointment.

---

**Applicant:**

Name: _____

Company: _____

Mailing Address: _____

City, State, Zip: _____

Phone: _____  Fax: _____

E-mail: _____

**Proposed Site Location and Description:**

Proposed Project Address: _____

Project Description: _____

Pole Number [a]:_____
[a] If in the ROW, provide the pole number for the streetlight or pole.

**Applicant's Request:**

☐ WIRELESS PERMIT    ☐ SECTION 6409 APPROVAL

☐ OTHER(describe request)    _____

---

## APPLICATION CHECKLIST – REQUIRED MATERIALS

☐ APPLICATION FORM AND DEPOSIT

☐ PROJECT PLANS

☐ VOLUNTARY NEIGBORHOOD MEETING SUMMARY
[Attachment 1]

☐ PHOTO SIMULATIONS
[Attachment 2]

☐ PUBLIC NOTICE, AFFIDAVIT, LOG OF COMMENTS
[Attachment 3]
*Notice to be sent within 5 business days of application

☐ PRIOR PERMITS & REGULATORY APPROVALS
[Attachments 4a, 4b, 4c, 4d]

☐ PROPERTY OWNER'S AUTHORIZATION
[Attachment 5]

☐ INITIAL CEQA ASSESSMENT
[Attachment 6]

☐ RF COMPLIANCE REPORT
[Attachment 7]

☐ NOISE COMPLIANCE REPORT
[Attachment 8]

☐ SECTION 6409 EVALUATION (if applicable)
[Attachment 9]

☐ PROJECT PURPOSE AND TECHNICAL OBJECTIVES INFORMATION*
[Attachment 10]

☐ ALTERNATIVE SITES ANALYSIS*
[Attachment 11]

☐ STRUCTURAL CERTIFICATION (if applicable)
[Attachment 12]

## APPLICATION REQUIREMENTS – REQUIRED MATERIALS

The following Application Requirements contain the requirements for a complete wireless facility permit application. For the application to be deemed complete, the applicant must submit **all** the applicable application materials in the Application Checklist in accordance with the Application Requirements along with all other generally applicable materials required for the requested permit or approval.

**Notes:** *All starred (\*) items are **not required** for a Section 6409 Approval. After the City issues the requested permit, the applicant must obtain all other required permits (including, without limitation and as applicable, building, electrical, plumbing, encroachment, etc.) prior to performing the installation.*

## APPLICATION FORM AND DEPOSIT

**Instructions:** Complete the Wireless Facilities Permit Application available on the City's website or at the Public Works Department and submit the corresponding application deposit for the requested permit or approval. You may find the City's fee schedule on the City's website or contact the Public Works Department for appropriate filing fees.

## PROJECT PLANS

**Instructions:** Provide two sets of complete 24 x 36-inch project plans drawn to a scale of not less than 1/16" equals one foot and a digital file of such plans in portable document format (PDF). Project plans must contain all the following:

1. Cover Sheet
   A complete cover sheet must include at a minimum:
   - ☐ a detailed project description that specifies the proposed installation and/or modifications including without limitation all physical elements such as antennas, radios, power services, all cables, mounts, and all other elements of the proposed project
   - ☐ site information that includes the proposed site address, site latitude and longitude (WGS 84 datum), zoning classification of the nearest private property, project team contact information site map, and pole number (if applicable)

2. Site Survey (Only required for proposed ground mounted equipment)
   Only a California-registered Civil Engineer or licensed surveyor may prepare the site survey. A complete site survey must include:
   - ☐ property and right-of-way boundaries with all bearings, distances, monuments, iron rods, caps or other markers clearly shown and called out
   - ☐ boundaries for all easements and/or dedications with all dimensions clearly shown and called out
   - ☐ approximate topographical contour lines with elevations called out

   - ☐ any trees at least 4 inches in diameter at a point approximately 4.5 feet above ground
   - ☐ all structures or improvements on the property or within the right of way within any block partially or entirely occupied by the project and any elements thereof
   - ☐ all structures or improvements on adjacent parcels within 15 feet from the property line
   - ☐ a north arrow, date, scale and legend
   - ☐ wet stamp and wet signature from the licensed preparer
       - ☐ general specifications and notes identifying the applicable public health and safety codes and standards

3.  Site Development Plan

A complete site development plan must include:

☐ plan-view drawings, which include:

☐ the entire property or right-of-way block with the proposed project improvements

☐ detailed before-and-after views for any equipment pads, enclosures, cabinets, pedestals and/or vaults

☐ all existing and proposed equipment with all dimensions, labels and ownership identifications clearly called out

☐ boundaries for all easements, encroachments and/or other rights-of-way for access and utilities in connection with the wireless site with all dimensions clearly shown and called out

☐ all existing and proposed primary and backup utilities, including without limitation all cables, connectors, risers, conduits, cable shrouds, trays, bridges and/or doghouses, transformers, disconnect switches, panels, meters, pedestals, cabinets, vaults, generators and/or generator sockets

☐ detailed before-and-after elevation drawings from all four cardinal directions, which include:

☐ all existing and proposed structures, improvements and/or fixtures with all dimensions clearly called out

☐ all existing and proposed equipment with all dimensions, labels and ownership identifications clearly called out

☐ all existing and proposed fiber optic cables, conduits, risers, guy wires, anchors, primary and secondary power lines clearly called out

☐ callouts and notes for any proposed new or extended concealment elements

☐ a north arrow, date, scale and legend

4.  Equipment Inventory

The equipment inventory does not need to include primary utility cables, panels or cabinets, or any other objects not primarily designed or intended for radio communications purposes. All other equipment must be inventoried with the following information for each component:

☐ manufacturer and model number

☐ basic dimensions (height, width, length and weight)

☐ table showing volumes of all equipment

## VOLUNTARY NEIGHBORHOOD MEETING SUMMARY

**Instructions:** Provide a summary of neighborhood meeting if conducted. Label the summary as "**Attachment 1 – Neighborhood Meeting Summary**" and attach it to the application. If a meeting is not conducted, mark the checklist box with an "X".

## PHOTO SIMULATIONS

**Instructions:** Provide photo simulations of the proposed project as constructed. The photo simulations must be in a high-resolution format and show the proposed facility from reasonable line-of-sight locations that would accurately and reliably reflect the appearance of the proposed facility and/or modifications as-built. Label these photo simulations "**Attachment 2 – Photo Simulations**" and attach them to this application. Except as otherwise provided, photo simulations must contain all the following:

1. Current Site Photographs
   Current site photographs must include:

   - ☐ photographs of the existing site from at least two different reasonable line-of-sight locations from public streets or other adjacent viewpoints;
   - ☐ a map detail showing each location where a photograph was taken, the proposed site and the direction to the site from each photo location;
   - ☐ Include a close-up view of the equipment, including all wires, conduits, equipment, etc.

2. Photo Simulations
   Photo simulations must include:

   - ☐ an accurate and reliable visual representation of the proposed facility from the same reasonable line-of-sight locations used in the current site photographs and must include without limitation all interconnecting cables, conduits, brackets, and electronic equipment such as antennas, radio units, powering, and the like;
   - ☐ a map detail showing each location where a photograph was taken, the proposed site and the direction to the site from each photo location;
   - ☐ Include a close-up view of the equipment, including all wires, conduits, equipment, etc.

3. Section 6409 Photo Simulation
   For Section 6409 Approval applications, the applicant must provide at least one photo simulation that demonstrates the impact of the proposed modification on all concealment elements of the support structure. Concealment elements include but are not limited to radomes, cable shrouds, painting, landscaping, equipment enclosures and designs and/or techniques intended to blend with the surrounding built and/or natural environment.

## PUBLIC NOTICE, AFFIDAVIT, LOG OF COMMENTS

**Instructions:** Provide a copy of the notice mailed to all property owners and residents within 500' of the proposed project, proof of notification mailing (affidavit), and log of concerns, comments, questions with response in accordance with the Application Requirements and Design Standards.  Label the notice, affidavit and log "**Attachment 3 – PUBLIC NOTICE, AFFIDAVIT, LOG**" and attach it to this application.

## PRIOR PERMITS AND REGULATORY APPROVALS

**Instructions:** Provide true and correct copies of all the following:

1. Prior Permits
   If the applicant requests a Section 6409 Approval, provide copies of all prior local regulatory approvals (original siting permits and any modification permits) issued for the facility with any corresponding conditions of approval and project plans approved by the applicable regulatory authority. Alternatively, the applicant may submit a written justification that sets forth the reasons why prior regulatory approvals were not required for the wireless facility at the time it was constructed or modified. Label this documentation "**Attachment 4a – Prior Permits**" and attach it to this application.

2. FCC Licenses
   If the applicant or service provider proposes to operate in FCC-licensed spectrum, provide proof of licenses for all planned operating bands. If there are federal build-out requirements, indicate which and whether they have been fully satisfied. If not satisfied, indicate what remains to be satisfied. Label this documentation "**Attachment 4b – FCC Licenses**" and attach it to this application.

3. FAA Forms

If the proposed facility requires the applicant to file FAA form 7460 or other documentation under Federal Aviation Regulation Part 77.13 *et seq.*, or under the FCC rules, provide such documentation. Label this documentation "**Attachment 4c – FAA Forms**" and attach it to this application.

4. Certificate of Public Convenience and Necessity (CPCN) / Wireless ID Registration (WIR)

For all applications for facilities in the public right-of-way, provide a true and correct copy of the applicant's CPCN and/or WIR issued by the California Public Utilities Commission or its successor agency. Label this documentation "**Attachment 4d – CPCN / WIR**" and attach it to this application.

## POLE OWNER'S AUTHORIZATION

**Instructions:** For privately owned poles, provide a letter of authorization from the pole owner that authorizes the applicant to perform the installation or modification. The letter must be signed by the owner. In lieu of a letter of authorization for facilities in the public right-of-way, the applicant may submit the property owner's standard authorization form issued in the property owner's regular course of business to demonstrate that the applicant has the authority to perform the installation or modification. Label this authorization "**Attachment 5 – Property Owner's Authorization**" and attach it to this application.

## INITIAL CEQA ASSESSMENT

**Instructions:** Complete, sign and attach to this application a fully executed Environmental Information Form. Label this form "**Attachment 6 – Environmental Information Form**" and attach it to this application. The Environmental Information Form may be obtained electronically on the City's website or by contacting the Public Works Department.

## RF COMPLIANCE REPORT

**Instructions:** Provide an RF exposure compliance report prepared and certified by an RF engineer that certifies that the proposed facility, as well as any collocated facilities and any cumulative emissions from adjacent areas, will comply with applicable federal RF human exposure standards and limits. At a minimum, the RF exposure compliance report must provide the same information and in the same form as the FCC LSGAC Appendix A form for each band of operations. For projects on or attached to poles subject to CPUC General Order 95 regulation, provide evidence of compliance with CPUC General Order 95, Rule 94. Label this report "**Attachment 7 – RF Compliance Report**" and attach it to this application.

The RF compliance report must include:

☐ the actual frequency, actual or maximum power levels (in watts effective radiated power (ERP)), and the actual or maximum transmitting channels for all existing and proposed antennas at the site.

☐ exhibits that show:

☐ the location and orientation of all transmitting antennas;

☐ the boundaries of areas with RF exposures (whether individually or cumulatively) in excess of the uncontrolled/general population limit (as that term is defined by the FCC);

☐ the boundaries of areas with RF exposures (whether individually or cumulatively) in excess of the controlled/occupational limit (as that term is defined by the FCC).

**Note:** Each such boundary must be clearly marked and identified for every transmitting antenna at the project site, whether owned/operated by the applicant or another licensee. To the extent that the project site contains collocated transmitters from multiple operators, the RF exposure compliance report must evaluate all the transmitting antennas that may cause cumulative emissions.

<u>NOISE COMPLIANCE REPORT</u>

**Instructions:** Provide a noise compliance report for the proposed facility and all associated equipment including all environmental control units, sump pumps, temporary backup power generators, and permanent backup power generators in order to demonstrate compliance with the City's noise regulations. The noise compliance report must be prepared and certified by an engineer and include an analysis of the manufacturers' specifications for all noise-emitting equipment and a depiction of the proposed equipment relative to all adjacent property lines. In lieu of a noise compliance report, the applicant may submit evidence from the equipment manufacturer that the ambient noise emitted from all the proposed equipment will not, both individually and cumulatively, exceed the applicable limits. Label this analysis "**Attachment 8 – Noise Compliance Report**" and attach it to the application.

<u>SECTION 6409 EVALUATION</u>

**Instructions:** If the applicant requests approval pursuant to Section 6409(a) of the Middle Class Tax Relief and Job Creation Act of 2012 (codified as 47 U.S.C. § 1455(a)), the applicant must complete and submit justification whether the proposed modification is an eligible facilities request that complies with the applicable FCC substantial change thresholds. Label this worksheet "**Attachment 9 – Section 6409 Evaluation**" and attach it to the application.

<u>PROJECT PURPOSE AND TECHNICAL OBJECTIVES*</u>

**Instructions:** For applications not subject to Section 6409, provide the following information to demonstrate the intended technical service objectives and the nature of the existing service capabilities of the applicant's network in the area that would be served by the proposed facility or enhanced by the proposed modification. Label this analysis "**Attachment 10 – Project Purpose and Technical Objectives**" and attach it to the application.

1. Project Purpose
   Identify and describe the project purpose. Possible responses analyze whether the proposed facility or modification will:
   - ☐ add new personal wireless *service coverage* to an area in which the licensee does not currently provide any personal wireless service coverage;
   - ☐ add new personal wireless *service capacity* to an area in which the licensee currently provides personal wireless service coverage.

   If the project has a different purpose from the options described above, provide such purpose in full detail.

2. Technical Objectives
   Provide a detailed written statement that describes the technical objectives the applicant intends the proposed wireless facility to achieve and the factual reasons why the proposed location, centerline height and equipment configuration are necessary to achieve those objectives. In addition, the statement must include all the following required information and/or materials:
   - ☐ a street-level map that shows the general geographic area of the service area(s) to be improved through the proposed wireless facility (the "Service Area");
   - ☐ a written narrative that describes the uses (commercial, residential, primary thoroughfare, highway, etc.) within the Service Area, and the manner in which those uses would be negatively affected if the Service Area were to remain unaddressed;
   - ☐ a statement as to whether the applicant conducted any drive test(s) and, if so, all drive test results and data (in .XLS or .CSV or similar format) together with a report that describes how and when the applicant conducted such test(s).

3. Network Map
   Provide an overview map of the applicant's network within the City's jurisdictional and territorial boundaries that shows (1) all the existing wireless facilities that applicant currently owns and/or operates and (2) all future wireless facilities that are reasonably foreseeable within two years of the application submission. The map must provide a legend that

distinguishes between "macro" cells and small cell facilities.

<u>ALTERNATIVE SITES ANALYSIS\*</u>

**Instructions:** For applications not subject to Section 6409, provide a detailed written analysis that describes how the proposed wireless facility complies with all the applicable requirements in the San Mateo Municipal Code, which includes without limitation the provisions specific to wireless facilities, and all the alternative locations and designs considered before submitting this application. Label this analysis "**Attachment 11 – Alternative Sites Analysis**" and attach it to the application. The Alternative Sites Analysis shall be included as part of the neighborhood meeting, if conducted.  In addition, the analysis must include all the following required information and/or materials:

- ☐ a street-level map that shows the general geographic area surrounding the proposed location annotated to show:
  - ☐ all existing wireless facilities within the relevant geographic area
  - ☐ the search ring used for this particular project.  The search ring shall be a minimum radius of 500'.
  - ☐ all locations for each alternative considered for this particular project
- ☐ for each alternative site considered, a detailed written description that includes, without limitation all the following:
  - ☐ the nearest physical address
  - ☐ zoning district designation for the nearest private property
  - ☐ support structure type considered
  - ☐ general design concept and concealment elements/techniques considered
  - ☐ overall height and achievable antenna centerline height
  - ☐ the factual reasons why the applicant considered the potential alternative site location and/or design to be unacceptable, infeasible, unavailable or not in accordance with the development standards in San Mateo Municipal Code Chapter 17.10. *Note:* This explanation must include a meaningful comparative analysis and such technical information and other factual justification as are necessary to document the reasons why each alternative is unacceptable, infeasible, unavailable or not as consistent with the development standards in Chapter 17.10. Conclusory statements that a particular alternative is unacceptable, infeasible, unavailable or not in accordance with the development standards in Chapter 17.10 will be deemed incomplete.

- ☐ If the applicant did not locate any alternatives within the search ring, the analysis must expressly state that no such alternatives were considered.

STRUCTURAL CERTIFICATION

**Instructions:** Provide certification prepared and stamped by a professionally licensed structural engineer certifying that the pole foundation and attachments meet or exceed design parameters detailed in the design standards. Label this analysis "**Attachment 12 – Structural Certification**" and attach it to the application.

Project Plans



# CROWN CASTLE

| Sheet # | T1.1-Sheet Index Sheet Description | Page |
|---|---|---|
| T1.1 | TITLE SHEET | 1 |
| A1.1 | EXISTING SITE PLAN | 2 |
| A1.2 | PROPOSED SITE PLAN | 3 |
| A1.3 | POLE ELEVATIONS | 4 |
| A1.4 | POLE ELEVATIONS | 5 |
| A1.5 | EXISTING PHOTOS | 6 |
| D1.1 | CONSTRUCTION DETAILS | 7 |
| D1.2 | ELECTRICAL DETAILS | 8 |
| D1.3 | EQUIPMENT SPECIFICATIONS | 9 |

**PROJECT NAME:** VCA2_ECR TROUSDALE (SAN MATEO)

**PROJECT ADDRESS:** 124 WARREN RD, SAN MATEO, CA 94401

**COORDINATES:** LAT: 37.572725°   LONG: -122.343308°

**POLE ID #:** 110074648

**PROJECT TYPE:** EXISTING WOOD POLE

**CUSTOMER NODE ID #:** 580720

**CROWN NODE ID #:** CA_SF_SANMATEO_245M2

**HUB NAME:** SAN MATEO HUB

**CARRIER:** VERIZON

**CROWN CASTLE BILLING / SCU #:** 509087



**USA North**
Know what's below.
Call before you dig.
California and Nevada
Call Two Working Days Before You Dig!
811 / 800-227-2600

## PROJECT TEAM

**PROJECT TEAM**

**CIVIL:**
Company: KIMLEY-HORN
Address: 3875 EMBASSY PKWY, SUITE 280
AKRON, OH 44333
Contact: TYLER REISETTER
Phone: 216.273.8299
Email: tyler.reisetter@kimley-horn.com

**APPLICANT INFO**
Company: CROWN CASTLE
Address: 1 PARK PLACE
DUBLIN, CA 94568
Contact: JASON CAMARENA
Phone: 925.201.5806
Email: jason.camarena@crowncastle.com

**CROWN CASTLE UTILITY CONTACT**
Contact: EARLE CARRION
Phone: 408.466.5538
Email: earle.carrion@crowncastle.com

## PROJECT SUMMARY

**JURISDICTION:**
CITY OF SAN MATEO

**HANDICAPPED REQUIREMENTS**
-FACILITY IS UNMANNED AND NOT FOR HUMAN HABITATION.

**HANDICAPPED ACCESS:**
REQUIREMENTS ARE NOT REQUIRED.

**POWER COMPANY:**
PACIFIC GAS AND ELECTRIC (PG&E)

**POLE OWNER INFO:**
PACIFIC GAS & ELECTRIC
COMPANY (PG&E)
P.O. BOX 997300
SACRAMENTO, CA 95899

**STREET CLASSIFICATION:**
LOCAL

**ADJACENT PARCEL INFORMATION:**
PARCEL ID 032061070
ZONING CLASSIFICATION: R1A

**PLUMBING REQUIREMENTS:**
FACILITY HAS NO PLUMBING

**CODES:**
ALL WORK AND MATERIALS SHALL BE PERFORMED AND INSTALLED IN ACCORDANCE WITH THE CURRENT EDITIONS OF THE FOLLOWING CODES AS ADOPTED BY THE LOCAL GOVERNMENT AUTHORITIES. NOTHING IN THESE PLANS IS TO BE CONSTRUED TO PERMIT WORK NOT CONFORMING TO THESE AREAS GOVERNING CODES.

1. CALIFORNIA BUILDING CODE CBC-2019.
2. CALIFORNIA ADMINSTRATIVE CODE. (INCL. TITLES 24 & 25) 2019.
3. ANSI/EIA-222-F LIFE SAFETY CODE NFPA.
4. BUILDING OFFICIALS AND CODE ADMINISTRATORS (BOCA).
5. CALIFORNIA ELECTRICAL CODE CEC-2019.
6. CALIFORNIA MECHANICAL CODE CMC-2019.
7. CALIFORNIA PLUMBING CODE CPC-2019.
8. LOCAL BUILDING CODES.
9. COUNTY AND/OR COUNTY ORDINANCES.
10. MUST COMPLY TO LATEST CALIFORNIA FIRE CODE (AND LATEST MUNICIPAL FIRE CODE.)
11. CALIFORNIA GENERAL ORDER 95 AND 128.

## PROJECT DESCRIPTION

THIS PROJECT WILL INCLUDE THE INSTALLATION OF A NEW WIRELESS RADIO FACILITY AND ASSOCIATED EQUIPMENT TO AN EXISTING WOOD POLE (ALL POLE ATTACHMENTS TO BE APPROVED BY POLE OWNER).

NEW EQUIPMENT WILL INCLUDE (REFER TO DETAIL PAGES FOR SPECIFICATION):
(1)  5G RADIOS/ANTENNAS
(1)  65A CT RATED SMART POLE METER

EXCAVATION/RESTORATION WILL INCLUDE:
(3)  GROUND WELLS
(3)  TRENCH

## NODE VICINITY MAP

CA_SF_SANMATEO_245M2

**CROWN CASTLE**
CROWN CASTLE
ONE PARK PLACE, STE. 300
DUBLIN, CA 94568

**RECORD DRAWINGS ISSUE DATE:**
03/05/2024

Exp. 03/31/24

**PREPARED BY:**

Kimley»Horn
3875 EMBASSY PARKWAY, SUITE 280
AKRON, OH 44333
PHONE: (216) 525-7775
WWW.KIMLEY-HORN.COM

THIS DRAWING IS COPYRIGHTED AND IS THE SOLE PROPERTY OF THE OWNER. IT IS PRODUCED SOLELY FOR USE BY THE OWNER AND ITS AFFILIATES. REPRODUCTION OR USE OF THIS DRAWING AND/OR THE INFORMATION CONTAINED IN IT IS FORBIDDEN WITHOUT THE WRITTEN PERMISSION OF THE OWNER.

**RELEASE**

| DATE | SUBMITTAL |
|---|---|
| | |

**REVISIONS**

| NO. | DATE | COMMENT |
|---|---|---|
| 4 | 03/05/2024 | ISSUED FOR CONSTRUCTION |
| 3 | 08/30/2023 | ISSUED FOR CONSTRUCTION |
| 2 | 08/25/2023 | ISSUED FOR CONSTRUCTION |

**PROJECT NAME**
VCA2_ECR TROUSDALE (SAN MATEO)

**CROWN NODE ID NUMBER**
CA_SF_SANMATEO_245M2

**NODE ADDRESS**
124 WARREN RD
SAN MATEO, CA 94401

**HUB NAME**
SAN MATEO HUB

| KH JOB NUMBER | IN HOUSE |
|---|---|
| KHCLE-37293 | DRAWN BY: DRD |
| | CHECKED BY: TDR |

**SHEET TITLE**
TITLE SHEET

| SHEET NUMBER | PAGE |
|---|---|
| T1.1 | 1 OF 9 |

PLOT SCALE: 1:1 @ 24"x36", 1:2 @ 11"x17"



**GENERAL PROJECT NOTES**

1. RIGHT-OF-WAY USE PERMIT SHALL BE OBTAINED BY CONTRACTOR PRIOR TO COMMENCING WORK.
2. ALL WORK TO BE CONDUCTED IN CITY RIGHT OF WAY, U.N.O.
3. ALL DISTURBED LANDSCAPING SHALL BE REPLACED TO SIMILAR EXISTING CONDITION.
4. ANY SIDEWALK CLOSURE SHALL BE COORDINATED WITH THE CITY AND PROPER SIGNAGE WILL BE PLACED.
5. TEMPORARY LIGHTING WILL BE COORDINATED WITH CITY AND PROVIDED WHENEVER EXISTING LIGHTING IS REMOVED OR UNAVAILABLE AS REQUIRED.
6. NO MATERIALS OR EQUIPMENT SHALL BE STORED ON PRIVATE PROPERTY OR BLOCK ACCESS TO PRIVATE PROPERTY.
7. CLEANUP OF THE WORK AREA WILL BE COMPLETED EACH EVENING AND THE PROJECT AREA WILL BE RETURNED TO EXISTING CONDITION AT THE COMPLETION OF CONSTRUCTION AT EACH NODE LOCATION.
8. ALL WORK TO COMPLY WITH OSHA AND CITY GUIDELINES.
9. THE CONTRACTOR SHALL BE RESPONSIBLE TO REMOVE AND REPLACE, AT THEIR COST, ANY AND ALL DAMAGED PAVEMENT, SIDEWALK, CURB AND GUTTER OUTSIDE THE PAY LIMIT. DAMAGE DUE TO THEIR ACTIVITIES ON THE PROJECT. THIS INCLUDES, BUT IS NOT LIMITED TO THE REMOVAL AND REPLACEMENT OF NEWLY CRACKED. THE REMOVAL AND REPLACEMENT OF EXISTING CRACKS WHERE THE CRACKS HAVE BEEN ENLARGED DUE TO THE CONTRACTORS OPERATIONS. THE REMOVAL AND REPLACEMENT OF DEFORMED PAVEMENT, CURB AND GUTTTER, SIDEWALK, ETC. ALL SAW CUTS USED FOR THE REMOVAL OF THESE ITEMS SHALL BE PERPENDICULAR AND PARALLEL TO THE CENTERLINE CONTROLLING THAT ITEM, OR AT THE DISCRETION OF THE CITY INSPECTOR.

**ABBREVIATIONS AND SYMBOLS**

| | | CENTER LINE |
|---|---|---|
| | | PROPERTY LINE |
| —ROW— | ROW | RIGHT-OF-WAY |
| —F— | F | FIBER |
| —G— | G | GAS |
| —P— | P | POWER |
| —S— | S | SANITARY SEWER |
| —SD— | SD | STORM DRAIN |
| —W— | W | WATER |
| —LCP— | LCP | LIGHT CIRCUIT POWER |
| —OHU— | OHU | OVERHEAD UTILITY LINE |

**POLE RISER PLAN**

CLIMBING SPACE TO BE PROVIDED PER GO95 STANDARDS

POLE ID# 110074648

24"x36" PLOT:  3/4" = 1'-0"
11"x17" PLOT: 1 1/2" = 1'-0"

EXISTING WOOD POLE
(OWNER: PG&E)

**CROWN CASTLE NODE #: CA_SF_SANMATEO_245M2**

GPS COORDINATES:

LAT: 37.572725'
LONG: -122.343308'

POLE TYPE: EXISTING WOOD POLE

POLE ID #: 110074648

SUBJECT POLE IS LOCATED IN:
CITY OF SAN MATEO R.O.W.

**CROWN CASTLE**
CROWN CASTLE
ONE PARK PLACE, STE. 300
DUBLIN, CA 94568

RECORD DRAWINGS ISSUE DATE:
03/05/2024

Exp.  03/31/24

PREPARED BY:

**Kimley›Horn**
3675 EMBASSY PARKWAY, SUITE 280
AKRON, OH 44333
PHONE: (216) 505-7775
WWW.KIMLEY-HORN.COM

THIS DRAWING IS COPYRIGHTED AND IS THE SOLE PROPERTY OF THE OWNER. IT IS PRODUCED SOLELY FOR USE BY THE OWNER AND ITS AFFILIATES. REPRODUCTION OR USE OF THIS DRAWING AND/OR THE INFORMATION CONTAINED IN IT IS FORBIDDEN WITHOUT THE WRITTEN PERMISSION OF THE OWNER.

| RELEASE | |
|---|---|
| DATE | SUBMITTAL |
| | |
| | |
| | |
| | |
| | |

| REVISIONS | | |
|---|---|---|
| NO. | DATE | COMMENT |
| 4 | 03/05/2024 | ISSUED FOR CONSTRUCTION |
| 3 | 08/30/2023 | ISSUED FOR CONSTRUCTION |
| 2 | 08/25/2023 | ISSUED FOR CONSTRUCTION |

**PROJECT NAME**
VCA2_ECR TROUSDALE (SAN MATEO)

**CROWN NODE ID NUMBER**
CA_SF_SANMATEO_245M2

**NODE ADDRESS**
124 WARREN RD
SAN MATEO, CA 94401

**HUB NAME**
SAN MATEO HUB

| **KH JOB NUMBER** | **IN HOUSE** |
|---|---|
| KHCLE-37293 | DRAWN BY:  DRD |
| | CHECKED BY: TDR |

**SHEET TITLE**
EXISTING SITE PLAN

| **SHEET NUMBER** | **PAGE** |
|---|---|
| A1.1 | 2  OF 9 |

PLOT SCALE: 1:1 @ 24"x36", 1:2 @ 11"x17"

PROPOSED POWER POC:
(37.572747', -122.342753')
STRUCTURE ID: 100304505

CROWN CASTLE NODE #:
CA_SF_SANMATEO_245M2
POLE ID #: 110074648
OWNER: PG&E

WARREN RD.

EQUIPMENT AND ANTENNA PLAN       24"x36" PLOT: 1/2" = 1'-0"       OVERALL SITE PLAN
                                  11"x17" PLOT: 1/4" = 1'-0"
8                                                                  24"x36" PLOT:  1" = 10'-0"
                                                                   11"x17" PLOT:  1" = 20'-0"      20



**GENERAL PROJECT NOTES**

1. RIGHT-OF-WAY USE PERMIT SHALL BE OBTAINED BY CONTRACTOR PRIOR TO COMMENCING WORK.
2. ALL WORK TO BE CONDUCTED IN CITY RIGHT OF WAY, U.N.O.
3. ALL DISTURBED LANDSCAPING SHALL BE REPLACED TO SIMILAR EXISTING CONDITION.
4. ANY SIDEWALK CLOSURE SHALL BE COORDINATED WITH THE CITY AND PROPER SIGNAGE WILL BE PLACED.
5. TEMPORARY LIGHTING WILL BE COORDINATED WITH CITY AND PROVIDED WHENEVER EXISTING LIGHTING IS REMOVED OR UNAVAILABLE AS REQUIRED.
6. NO MATERIALS OR EQUIPMENT SHALL BE STORED ON PRIVATE PROPERTY OR BLOCK ACCESS TO PRIVATE PROPERTY.
7. CLEANUP OF THE WORK AREA WILL BE COMPLETED EACH EVENING AND THE WORK AREA WILL BE RETURNED TO EXISTING CONDITION AT THE COMPLETION OF CONSTRUCTION AT EACH NODE LOCATION.
8. ALL WORK TO COMPLY WITH OSHA AND CITY GUIDELINES.
9. THE CONTRACTOR SHALL BE RESPONSIBLE TO REMOVE AND REPLACE, AT THEIR COST, ANY AND ALL DAMAGED PAVEMENT, SIDEWALK, CURB AND GUTTER OUTSIDE THE PAY LIMIT. DAMAGE DUE TO THEIR ACTIVITIES ON THE PROJECT. THIS INCLUDES, BUT IS NOT LIMITED TO THE REMOVAL AND REPLACEMENT OF NEWLY CRACKED. THE REMOVAL AND REPLACEMENT OF EXISTING CRACKS WHERE THE CRACKS HAVE BEEN ENLARGED DUE TO THE CONTRACTORS OPERATIONS. THE REMOVAL AND REPLACEMENT OF DEFORMED PAVEMENT, CURB AND GUTTER, SIDEWALK, ETC. ALL SAW CUTS USED FOR THE REMOVAL OF THESE ITEMS SHALL BE PERPENDICULAR AND PARALLEL TO THE CENTERLINE CONTROLLING THAT ITEM, OR AT THE DISCRETION OF THE CITY INSPECTOR.

**ABBREVIATIONS AND SYMBOLS**

| | | |
|---|---|---|
| — ¢ — | CENTER LINE | |
| | PROPERTY LINE | |
| — ROW — | ROW — | RIGHT-OF-WAY |
| — F — | F — | FIBER |
| — G — | G — | GAS |
| — P — | P — | POWER |
| — SS — | SS — | SANITARY SEWER |
| — SD — | SD — | STORM DRAIN |
| — W — | W — | WATER |
| — LP — | LP — | LIGHT CIRCUIT POWER |
| — OHU — | OHU — | OVERHEAD UTILITY LINE |

**POLE RISER PLAN**

POLE ID# 110074648

24"x36" PLOT:   3/4" = 1'-0"
11"x17" PLOT: 1 1/2" = 1'-0"

CLIMBING SPACE TO BE PROVIDED PER GO95 STANDARDS
-ELECT. EQUIPMENT AT 12:00
-(1) 1/2" POWER CONDUIT AT 2:00
-(1) 1/2" CROWN CASTLE FIBER CONDUIT AT 1:00
-(1) 1.25" CROWN CASTLE FIBER & POWER CONDUIT AT 1:00
-(2) ANTENNA / RADIOS AT 6:00

**PROPOSED ANTENNA AZIMUTHS**

SECTOR 1: 40
SECTOR 2: 160
SECTOR 3: 280

**CROWN CASTLE NODE #: CA_SF_SANMATEO_245M2**

GPS COORDINATES:

LAT: 37.572725'
LONG: -122.343308'

POLE TYPE: EXISTING WOOD POLE
POLE ID #: 110074648

ANTENNA RAD CENTER: 19'-11"

SUBJECT POLE IS LOCATED IN:
CITY OF SAN MATEO R.O.W.

**CROWN CASTLE**
CROWN CASTLE
ONE PARK PLACE, STE. 300
DUBLIN, CA 94568

RECORD DRAWINGS ISSUE DATE:
03/05/2024

Exp.  03/31/24

**PREPARED BY:**

**Kimley»Horn**
Expect More. Experience Better.

3675 EMBASSY PARKWAY, SUITE 280
AKRON, OH 44333
PHONE: (216) 525-7775
WWW.KIMLEY-HORN.COM

THIS DRAWING IS COPYRIGHTED AND IS THE SOLE PROPERTY OF THE OWNER. IT IS PRODUCED SOLELY FOR USE BY THE OWNER AND ITS AFFILIATES. REPRODUCTION OR USE OF THIS DRAWING AND/OR THE INFORMATION CONTAINED IN IT IS FORBIDDEN WITHOUT THE WRITTEN PERMISSION OF THE OWNER.

**RELEASE**

| DATE | SUBMITTAL |
|---|---|
| | |
| | |
| | |
| | |
| | |

**REVISIONS**

| NO. | DATE | COMMENT |
|---|---|---|
| 4 | 03/05/2024 | ISSUED FOR CONSTRUCTION |
| 3 | 08/30/2023 | ISSUED FOR CONSTRUCTION |
| 2 | 08/25/2023 | ISSUED FOR CONSTRUCTION |

**PROJECT NAME**

VCA2_ECR TROUSDALE (SAN MATEO)

**CROWN CASTLE NODE ID NUMBER**

CA_SF_SANMATEO_245M2

**NODE ADDRESS**

124 WARREN RD
SAN MATEO, CA 94401

**HUB NAME**

SAN MATEO HUB

| KH JOB NUMBER | IN HOUSE |
|---|---|
| KHCLE-37293 | DRAWN BY: DRD / CHECKED BY: TDR |

**SHEET TITLE**

PROPOSED SITE PLAN

| SHEET NUMBER | PAGE |
|---|---|
| A1.2 | 3  OF 9 |

PLOT SCALE: 1:1 @ 24"x36", 1:2 @ 11"x17"

NOTE
ALL BLUE COLORED EQUIPMENT IS NEW OR EXISTING-TO-BE-MODIFIED

PROPERTY LINE (TYP.)

APPROX. ROW LINE

CONCRETE SIDEWALK. (TYP.)

TREE, (TYP.)

REMOVE VEGETATION TO PROVIDE CLEAR 3'x3' WORKING SPACE IN FRONT OF METER AS REQUIRED BY PG&E

GROUND WELL ( TYP.) (OWNER: CROWN CASTLE)

EXISTING WOOD POLE (OWNER: PG&E)

OVERHEAD UTILITY LINES, (TYP.)

FACE OF CURB (TYP)

WARREN RD.

PROPERTY LINE (TYP.)

BUILDING FOOTPRINT, (TYP.)
BUILDING WINDOW (TYP.)

POLE MOUNTED SMART METER (OWNER: CROWN CASTLE)

PROPOSED POWER POC =
(37.572747', -122.342753')
STRUCTURE ID: 100304505

EXISTING DRIVEWAY (TYP)

CROWN CASTLE NODE #:
CA_SF_SANMATEO_245M2
POLE ID #: 110074648
OWNER: PG&E

WARREN RD.

OVERHEAD UTILITY LINES. (TYP.)

8" STORM DRAIN

CONCRETE SIDEWALK. (TYP.)

TREE, (TYP.)

MEDIAN AREA

FACE OF CURB (TYP)

WARREN RD.

TREE, (TYP.)

APPROX. ROW LINE

EQUIPMENT AND ANTENNA PLAN

24"x36" PLOT: 1/2" = 1'-0"
11"x17" PLOT: 1/4" = 1'-0"      8

OVERALL SITE PLAN

24"x36" PLOT: 1" = 10'-0"
11"x17" PLOT: 1" = 20'-0"      20



(E) POLE TYPE: WOOD POLE
(E) POLE HEIGHT: 34'-0"
(E) POLE OWNER: PG&E

(E) POLE ID #: 110074648

| POLE INFORMATION | SCALE: N.T.S. | 1 |

NOTES:
1. ALL BLUE COLORED EQUIPMENT IS NEW OR EXISTING-TO-BE-MODIFIED
2. ALL AZIMUTHS SHOWN ON THIS PAGE ARE GENERIC - SEE PAGE A1.1 FOR SPECIFIC AZIMUTH DETAILS
3. ALL NEW EQUIPMENT TO BE PAINTED / WRAPPED TO MATCH POLE COLOR

NOTES:
1. ALL BLUE COLORED EQUIPMENT IS NEW OR EXISTING-TO-BE-MODIFIED
2. ALL AZIMUTHS SHOWN ON THIS PAGE ARE GENERIC - SEE PAGE A1.1 FOR SPECIFIC AZIMUTH DETAILS
3. ALL NEW EQUIPMENT TO BE PAINTED / WRAPPED TO MATCH POLE COLOR

CROWN CASTLE
CROWN CASTLE
ONE PARK PLACE, STE. 300
DUBLIN, CA 94568

RECORD DRAWINGS ISSUE DATE:
03/05/2024

Exp. 03/31/24

PREPARED BY:

Kimley»Horn

3675 EMBASSY PARKWAY, SUITE 280
AKRON, OH 44333
PHONE: (216) 555-7775
WWW.KIMLEY-HORN.COM

THIS DRAWING IS COPYRIGHTED AND IS THE SOLE PROPERTY OF THE OWNER. IT IS PRODUCED SOLELY FOR USE BY THE OWNER AND ITS AFFILIATES. REPRODUCTION OR USE OF THIS DRAWING AND/OR THE INFORMATION CONTAINED IN IT IS FORBIDDEN WITHOUT THE WRITTEN PERMISSION OF THE OWNER.

| RELEASE | |
| DATE | SUBMITTAL |
| | |

| REVISIONS | | |
| NO. | DATE | COMMENT |
| 4 | 03/05/2024 | ISSUED FOR CONSTRUCTION |
| 3 | 08/30/2023 | ISSUED FOR CONSTRUCTION |
| 2 | 08/25/2023 | ISSUED FOR CONSTRUCTION |

PROJECT NAME
VCA2_ECR TROUSDALE (SAN MATEO)

CROWN NODE ID NUMBER
CA_SF_SANMATEO_245M2

NODE ADDRESS
124 WARREN RD
SAN MATEO, CA 94401

HUB NAME
SAN MATEO HUB

| KH JOB NUMBER | IN HOUSE |
| KHCLE-37293 | DRAWN BY: DRD |
| | CHECKED BY: TDR |

SHEET TITLE
POLE ELEVATIONS

| SHEET NUMBER | PAGE |
| A1.3 | 4 OF 9 |

PLOT SCALE: 1/2 @ 24"x36", 1:2 @ 11"x17"

| POLE ELEVATIONS - EXISTING (LOOKING NORTHEAST) | 24"x36" PLOT: 3/8" = 1'-0" 11"x17" PLOT:3/16" = 1'-0" | 4 |
| POLE ELEVATIONS - PROPOSED (LOOKING NORTHEAST) | 24"x36" PLOT: 3/8" = 1'-0" 11"x17" PLOT:3/16" = 1'-0" | 8 |
| POLE ELEVATIONS - EXISTING (LOOKING SOUTHEAST) | 24"x36" PLOT: 3/8" = 1'-0" 11"x17" PLOT:3/16" = 1'-0" | 12 |
| POLE ELEVATIONS - PROPOSED (LOOKING SOUTHEAST) | 24"x36" PLOT: 3/8" = 1'-0" 11"x17" PLOT:3/16" = 1'-0" | 20 |



(E) POLE TYPE: WOOD POLE
(E) POLE HEIGHT: 34'-0"
(E) POLE OWNER: PG&E

(E) POLE ID #: 110074648

POLE INFORMATION          SCALE: N.T.S.   1

NOTES:
1. ALL BLUE COLORED EQUIPMENT IS NEW OR EXISTING-TO-BE-MODIFIED
2. ALL AZIMUTHS SHOWN ON THIS PAGE ARE GENERIC - SEE PAGE A1.1 FOR SPECIFIC AZIMUTH DETAILS
3. ALL NEW EQUIPMENT TO BE PAINTED / WRAPPED TO MATCH POLE COLOR

NOTES:
1. ALL BLUE COLORED EQUIPMENT IS NEW OR EXISTING-TO-BE-MODIFIED
2. ALL AZIMUTHS SHOWN ON THIS PAGE ARE GENERIC - SEE PAGE A1.1 FOR SPECIFIC AZIMUTH DETAILS
3. ALL NEW EQUIPMENT TO BE PAINTED / WRAPPED TO MATCH POLE COLOR

CROWN CASTLE
CROWN CASTLE
ONE PARK PLACE, STE. 300
DUBLIN, CA 94568

RECORD DRAWINGS ISSUE DATE:
03/05/2024

Exp. 03/31/24

PREPARED BY:

Kimley»Horn
Expect More. Experience Better.
3875 EMBASSY PARKWAY, SUITE 280
AKRON, OH 44333
PHONE: (216) 505-7775
WWW.KIMLEY-HORN.COM

THIS DRAWING IS COPYRIGHTED AND IS THE SOLE PROPERTY OF THE OWNER. IT IS PRODUCED SOLELY FOR USE BY THE OWNER AND ITS AFFILIATES. REPRODUCTION OR USE OF THIS DRAWING AND/OR THE INFORMATION CONTAINED IN IT IS FORBIDDEN WITHOUT THE WRITTEN PERMISSION OF THE OWNER.

| RELEASE | |
|---|---|
| DATE | SUBMITTAL |
| | |
| | |
| | |
| | |

| REVISIONS | | |
|---|---|---|
| NO. | DATE | COMMENT |
| 4 | 03/05/2024 | ISSUED FOR CONSTRUCTION |
| 3 | 08/30/2023 | ISSUED FOR CONSTRUCTION |
| 2 | 08/25/2023 | ISSUED FOR CONSTRUCTION |

PROJECT NAME
VCA2_ECR TROUSDALE
(SAN MATEO)

CROWN NODE ID NUMBER
CA_SF_SANMATEO_245M2

NODE ADDRESS
124 WARREN RD
SAN MATEO, CA 94401

HUB NAME
SAN MATEO HUB

| KH JOB NUMBER | IN HOUSE |
|---|---|
| KHCLE-37293 | DRAWN BY: DRD |
| | CHECKED BY: TDR |

SHEET TITLE
POLE ELEVATIONS

| SHEET NUMBER | PAGE |
|---|---|
| A1.4 | 5 OF 9 |

PLOT SCALE: 1.0 @ 24"x36", 1.2 @ 11"x17"

POLE ELEVATIONS - EXISTING (LOOKING SOUTHWEST)   24"x36" PLOT: 3/8" = 1'-0"   11"x17" PLOT:3/16" = 1'-0"   4

POLE ELEVATIONS - PROPOSED (LOOKING SOUTHWEST)   24"x36" PLOT: 3/8" = 1'-0"   11"x17" PLOT:3/16" = 1'-0"   8

POLE ELEVATIONS - EXISTING (LOOKING NORTHWEST)   24"x36" PLOT: 3/8" = 1'-0"   11"x17" PLOT:3/16" = 1'-0"   12

POLE ELEVATIONS - PROPOSED (LOOKING NORTHWEST)   24"x36" PLOT: 3/8" = 1'-0"   11"x17" PLOT:3/16" = 1'-0"   20



POLE PHOTO - EXISTING | SCALE: N.T.S. | 8



POLE PHOTO - EXISTING | SCALE: N.T.S. | 20



**CROWN CASTLE**

CROWN CASTLE
ONE PARK PLACE, STE. 300
DUBLIN, CA 94568

RECORD DRAWINGS ISSUE DATE:
03/05/2024

Exp. 03/31/24

PREPARED BY:

**Kimley»Horn**
Expect More. Experience Better.

3675 EMBASSY PARKWAY, SUITE 280
AKRON, OH 44333
PHONE: (216) 505-7775
WWW.KIMLEY-HORN.COM

THIS DRAWING IS COPYRIGHTED AND IS
THE SOLE PROPERTY OF THE OWNER. IT IS
PRODUCED SOLELY FOR USE BY THE
OWNER AND ITS AFFILIATES.
REPRODUCTION OR USE OF THIS DRAWING
AND/OR THE INFORMATION CONTAINED IN
IT IS FORBIDDEN WITHOUT THE WRITTEN
PERMISSION OF THE OWNER.

| RELEASE | |
|---|---|
| DATE | SUBMITTAL |
| | |
| | |
| | |
| | |
| | |
| | |

| REVISIONS | | |
|---|---|---|
| NO. | DATE | COMMENT |
| 4 | 03/05/2024 | ISSUED FOR CONSTRUCTION |
| 3 | 08/30/2023 | ISSUED FOR CONSTRUCTION |
| 2 | 08/25/2023 | ISSUED FOR CONSTRUCTION |

**PROJECT NAME**
VCA2_ECR TROUSDALE
(SAN MATEO)

**CROWN NODE ID NUMBER**
CA_SF_SANMATEO_245M2

**NODE ADDRESS**
124 WARREN RD
SAN MATEO, CA 94401

**HUB NAME**
SAN MATEO HUB

| KH JOB NUMBER | IN HOUSE |
|---|---|
| KHCLE-37293 | DRAWN BY: DRD |
| | CHECKED BY: TDR |

**SHEET TITLE**
EXISTING PHOTOS

| SHEET NUMBER | PAGE |
|---|---|
| A1.5 | 6  OF 9 |

PLOT SCALE: 1:1 @ 24"x36", 1:2 @ 11"x17"

## CAUTION

**Keep Back ____ FT From this Antenna. FCC RF Public Exposure Limits May Be Exceeded Within This Distance. Call 888-632-0931 for Instructions.**

**Qualified Workers: FCC Occupational Limits May Be Exceeded Within This Distance.**

Site ID #

Rev. A

| RF CAUTION SIGNAGE | SCALE: NTS | 1 |

## NOTICE

### POLE WORKERS

There is an antenna operation high on this pole.  Please follow guidance on signs near the antenna or call the number below.

Site ID #

**888-632-0931**

Rev. A

| RF NOTICE SIGNAGE | SCALE: NTS | 5 |



| ITEM NO. | PART NUMBER | DESCRIPTION PART NAME | DIMENSIONS | MATERIAL | QTY | UNIT WT. LBS |
|---|---|---|---|---|---|---|
| 1 | SAB-RW4-40" | Side Arm Bracket Raceway 4" Square 40" Length | Length  40" Width  4.375" Height  10" Square 4" | Hot Rolled Steel Galvanized | X1 | 22 lbs. |

**NYM**

8 Cairn Street  Rochester, NY 14611
P: 585-254-9353   NYMFG.COM

**PROPRIETARY AND CONFIDENTIAL**
THE INFORMATION IN THIS DRAWING IS THE SOLE PROPERTY OF NEW YORK MANUFACTURING. ANY REPRODUCTION IN PART OR AS A WHOLE WITHOUT WRITTEN PERMISSION OF NEW YORK MANUFACTURING IS PROHIBITED.

FILE:

COMMENTS:

DESCRIPTION:
Side Arm Bracket Raceway 4" Square 40" Length

DRAWN BY:          DATE
SAL ANSELMO        8/17/2023

REVISIONS:
| REV | DESCRIPTION | DATE | BY |

PAGE:  2 of 3

PART NUMBER:
SAB-RW4-40"

40.00"
10.00"
40.00"

Wire Exit
Wire Entrance

14" sq. Wire Fill Space

(x2) 3/8-16 Grounding Lugs Holes

| SIDE-ARM (NYM SAB-RW4-40") | SCALE: NTS | 11 |



MATCH EXISTING

P.C. CONCRETE PAVEMENT

6" x 6"-W1.4 x W1.4 WWF

MATCH EXISTING
4"MIN.

4"

SUBGRADE-SCARIFIED AND COMPACTED TO AT LEAST 95% OF THE MODIFIED PROCTOR MAXIMUM DRY DENSITY

NO. 53 STONE

NOTES:

1. ALL SIDEWALK SHALL BE CONSTRUCTED WITH CONCRETE WITH A MINIMUM COMPRESSIVE STRENGTH OF 4,500 PSI AT 14 DAYS.
2. PROVIDE 1/2" EXPANSION JOINTS AT 20', MAXIMUM. SPACING AND FILLED WITH PREMOLDED BITUMINOUS EXPANSION JOINT FILLER MATERIAL OR REDWOOD. EXPANSION JOINTS SHALL HAVE #4 DOWELS, LUBRICATED, 18" LONG, AT 12" CENTERS, 6" FROM EDGE.
3. PROVIDE 3/8" GROOVED CONTROL JOINTS AT 5' CENTERS.
4. PROVIDE 1/2" BITUMINOUS EXPANSION JOINT FILLER MATERIAL WHERE WALK ABUTS EXISTING IMPROVEMENTS AND AT ALL CHANGES IN GRADE.
5. USE 2-#4 REINFORCING BARS, 10' LONG OVER ALL UTILITY TRENCHES FOR NEW SIDEWALK AND CONNECTIONS TO EXISTING SIDEWALK.
6. AT DRIVE APPROACHES, THE CONCRETE PCC AND BASE THICKNESS SHALL MATCH THAT OF THE DRIVE.

| CONCRETE SIDEWALK STANDARD | SCALE: NTS | 10 |

---

ALL AZIMUTHS SHOWN ON THIS PAGE ARE GENERIC; SEE PAGE A1.1 FOR SPECIFIC AZIMUTH DETAILS



COAX CABLE
SLIP-ON HOSTING GRIP
APPROVED U-GUARD PROTECTION

TO ANTENNA
TO EQUIPMENT

WOOD UTILITY POLE

| COAX HANGER DETAIL | SCALE: NTS | 9 |

4'-9" MAX
36" MIN.

WOOD UTILITY POLE

RADIO / ANTENNA - SEE DTL. 10/D1.3

SIDE ARM (SHOWN DASHED FOR CLARITY)

CENTERLINE OF WOOD POLE

NEW METAL SIDE ARM DASHED FOR CLARITY

**PLAN VIEW**

36" MIN.
24" MIN.

WOOD UTILITY POLE

NEW METAL SIDE ARM ASSEMBLY

10"

CENTERLINE OF WOOD POLE

CONCEAL CONNECTORS TO MAXIMUM EXTENT FEASIBLE

CONDUIT FOR POWER, FIBER & GROUNDING

**SIDE VIEW**

NOTES:
1. CONTRACTOR TO INSTALL WEATHERPROOF WRAP AT ALL CONNECTORS. WRAP TO BE APPROVED BY CROWN CASTLE.
2. COLOR-CODE COAX CABLES PER CROWN CASTLE WIRING DIAGRAM.

| RADIO / ANTENNA MOUNTING DETAIL | SCALE: NTS | 18 |



ALUMINUM CHANNEL
60A CT RATED SMART POLE METER
Z BRACKET
WOOD POLE
4"

**SIDE VIEW**

NOTE: CONTRACTOR TO SUPPLY ADDITIONAL HARDWARE FOR ATTACHMENT AS NEEDED.

| EQUIPMENT MOUNTING DETAIL | SCALE: NTS | 8 |

---

**CROWN CASTLE**

CROWN CASTLE
ONE PARK PLACE, STE. 300
DUBLIN, CA 94568

RECORD DRAWINGS ISSUE DATE:
03/05/2024

Exp.  03/31/24

PREPARED BY:

**Kimley » Horn**

3675 EMBASSY PARKWAY, SUITE 280
AKRON, OH 44333
PHONE: (216) 565-7775
WWW.KIMLEY-HORN.COM

THIS DRAWING IS COPYRIGHTED AND IS THE SOLE PROPERTY OF THE OWNER. IT IS PRODUCED SOLELY FOR USE BY THE OWNER AND ITS AFFILIATES. REPRODUCTION OR USE OF THIS DRAWING AND/OR THE INFORMATION CONTAINED IN IT IS FORBIDDEN WITHOUT THE WRITTEN PERMISSION OF THE OWNER.

| RELEASE | |
|---|---|
| DATE | SUBMITTAL |

| REVISIONS | | |
|---|---|---|
| NO. | DATE | COMMENT |
| 4 | 03/05/2024 | ISSUED FOR CONSTRUCTION |
| 3 | 08/30/2023 | ISSUED FOR CONSTRUCTION |
| 2 | 08/25/2023 | ISSUED FOR CONSTRUCTION |

PROJECT NAME
**VCA2_ECR TROUSDALE (SAN MATEO)**

CROWN NODE ID NUMBER
**CA_SF_SANMATEO_245M2**

NODE ADDRESS
124 WARREN RD
SAN MATEO, CA 94401

HUB NAME
SAN MATEO HUB

| KH JOB NUMBER | IN HOUSE |
|---|---|
| KHCLE-37293 | DRAWN BY:  DRD   CHECKED BY:  TDR |

SHEET TITLE
**CONSTRUCTION DETAILS**

| SHEET NUMBER | PAGE |
|---|---|
| D1.1 | 7  OF 9 |

PLOT SCALE: 1:1 @ 24"x36", 1:2 @ 11"x17"



FOR ALL COAX WATERPROOFING INSTALLATIONS, SEE INSTALLATION INSTRUCTIONS FOR

***JMA WIRELESS "JMA WEATHER PROTECTION SYSTEM"***

1. FOR 1/2" CONNECTIONS TO ANTENNA OR DEVICE
2. FOR 1/2" CONNECTIONS TO ANTENNA OR DEVICE USING WPS-DF-CUTTER
3. FOR WPS-N, 1/2" NM CONNECTOR TO PORT
4. FOR WPS-DRA, MALE TO PORT
5. FOR 1/4" CONNECTIONS TO ANTENNA OR DEVICE

COAX WATERPROOFING - FUSION TAPE TYPE | SCALE: NTS | 5

GRADE
12" MIN. (OR BELOW FROST LINE)
5 11/16" MIN.
CADWELD GROUNDING WIRE TO ROD (TYP. GT OR GR) - GROUND CONDUCTORS #2 SOLID BARE TINNED COPPER PER PLAN
5/8"DIA. LONG MIN. @ 8'-0" OC CLAD GROUND ROD CADWELD CONNECTION (3/4"DIA. x 10' LONG - ACCEPTABLE), 6'-8" SEPARATION; XIT CAN BE USED IN LIEU OF ROD IF REQ'D DUE TO SOIL TYPE; INSTALL PER MFR. SPEC'S.

COAX WATERPROOFING - FUSION TAPE TYPE | SCALE: NTS | 9

NOTES:
1. ALL CONNECTORS MUST BE DOUBLE LUG.
2. MOUNT ANTENNA GROUND BUSS VERTICALLY BEHIND LOWER ANTENNA ARRAY

COPPER GROUND BUSS BAR
PLASTIC INSULATOR
3"
1 1/2"
#6 CU GROUND KIT (TYP. FOR EA. COAX RUN)
TO MGB
ANTENNA GROUND BUSS 3" x 6" x 1/4" THICK, TINNED COPPER BUSS BAR - PROVIDED BY CONTRACTOR

GROUND BUS BAR DETAIL | SCALE: NTS | 13

■ CADWELD - SEE DETAIL 1/E1.1
▲ MECHANICAL CONNECTION
GROUND BAR - COPPER - SIZE AS NEEDED
⊙ GROUND ROD - SEE DETAIL 9/E1.1

ELEC. DISCONNECT
5/8"DIA. x 8' COPPER CLAD STEEL GROUND ROD - TYP.
FIBER VAULT
#6 SOLID
POLE
ADDITIONAL #2 TINNED SOLID AND GROUND ROD - IF NEEDED TO ACHIEVE REQUIRED TESTING RESULTS OF 5 Ohms
6'-0" MIN.
#2 SOLID TINNED
MASTER BUS BAR

EQUIPMENT GROUNDING SCHEMATIC DETAIL | SCALE: NTS | 17

STEP 1
REMOVE CABLE INSULATION
2"
STEP 2
GROUNDING CLAMP ASSEMBLY
#6 GROUND LEAD
STEP 3
PUTTY TAPE
STEP 4
ELECTRICAL TAPE OVER MASTIC TAPE

COAXIAL CABLE GROUNDING | SCALE: N.T.S. | 2

1. ALL ELECTRICAL WORK SHALL BE PERFORMED IN ACCORDANCE WITH THE NATIONAL ELECTRIC CODE AND ALL OTHER APPLICABLE LOCAL CODES.
2. CONTRACTOR SHALL OBTAIN ALL PERMITS, PAY ALL PERMIT FEES, AND SCHEDULE ALL REQUIRED INSPECTIONS. CONTRACTOR SHALL OBTAIN LOCAL POWER COMPANY APPROVAL AND COORDINATE SERVICE ENTRANCE REQUIREMENTS.
3. CONTRACTOR SHALL VERIFY SERVICE LOCATIONS AND CONTACT PROJECT MANAGER WITH DISCREPANCIES FROM PLAN.
4. CONTRACTOR SHALL PROVIDE ALL LABOR AND MATERIAL DESCRIBED ON THIS DRAWING, AND 4. ALL ITEMS INCIDENTAL TO COMPLETING AND PRESENTING THIS PROJECT AS FULLY OPERATIONAL. ALL ELECTRICAL ITEMS SHALL BE U.L. APPROVED OR LISTED.
5. CONDUCTORS SHALL BE INSTALLED IN SCHEDULE 40 CONDUIT (UNDERGROUND) AND IMC OR SCH 80 PVC CONDUIT ABOVE GROUND.
6. PROVIDE 2" OR 2 1/2" SCHEDULE 40 PVC UNDERGROUND CONDUIT WITH PULL WIRE BETWEEN ELECTRICAL UTILITY DEMARCATION POINT AND APS JUNCTION BOX. CONTRACTOR SHALL DETERMINE REQUIRED NUMBER AND LOCATION OF JUNCTION BOXES PER UTILITY STANDARDS.
7. USE 1" SCHEDULE 40 PVC CONDUIT AND APPROPRIATE FITTINGS TO ENTER N3R LOAD CENTER.
8. CONTRACTOR TO NOTIFY ALL APPROPRIATE PARTIES PRIOR TO CONSTRUCTION AND SHALL PROVIDE AND MAINTAIN A TRAFFIC CONTROL PLAN PER NDOT REQUIREMENTS.
9. CONTRACTOR TO LOCATE ALL UTILITIES IN PROJECT AREA PRIOR TO CONSTRUCTION THROUGH BLUE STAKE.
10. VERIFY DEPTH OF EXISTING UTILITY CROSSING POINTS VIA APPROVED POTHOLING METHODS AND NOTE ON PLAN SETS FOR AS-BUILT CLOSE OUT.
11. NOTE DEPTH AND LOCATIONS OF ALL INSTALLED UTILITIES ON AS-BUILT REDLINE DRAWINGS.
12. IF EXISTING IRRIGATION LINES ARE ENCOUNTERED, CONTRACTOR SHALL NOTIFY OWNER PRIOR TO DISTURBING OR MODIFYING.
13. CONTRACTOR SHALL NOT RELOCATE PROPOSED EQUIPMENT OR POLE LOCATIONS WITHOUT WRITTEN APPROVAL FROM CROWN CASTLE AND PROJECT ENGINEERS
14. MATERIAL SUBSTITUTIONS ARE SUBJECT TO CROWN CASTLE AND ENGINEERING REVIEW PRIOR TO CONSTRUCTION.

ELECTRICAL NOTES | SCALE: NONE | 6

| POWER CONSUMPTION TABLE | | | | |
|---|---|---|---|---|
| | DESCRIPTION | QTY | (VA) | WIRE SIZE |
| 1 | STREETMACRO 6705 | 1 | 500 | #12 |
| 2 | STREETMACRO 6705 | 1 | 500 | #12 |
| 3 | STREETMACRO 6705 | 1 | 500 | #12 |
| TOTAL NON-CONTINUOUS | | | 1500 | |
| TOTAL KVA | | | 1.500 | |
| TOTAL AMPS @ 120V | | | 12.50 | |
| SINGLE PHASE | | | | |
| TWO WIRE | | | | |
| FRAME SIZE | | | 60A | |
| FUSE SIZE | | | 15A | |

POWER CONSUMPTION TABLE | SCALE: NTS | 14

■ CADWELD - SEE DETAIL 1/E1.1
▲ MECHANICAL CONNECTION
GROUND BAR - COPPER - SIZE AS NEEDED
GROUND ROD - SEE DETAIL 9/E1.1

EXISTING WOOD POLE
PROPOSED RADIO/ANTENNAS
INSULATED #6 STRANDED
ELECT. SMART METER / DISCONNECT
#6 SOLID
MASTER BUS BAR
#2 TINNED SOLID
5/8"DIA. x 8' COPPER CLAD STEEL GROUND ROD AND TEST WELL, TYP. - SEE DETAIL 9/- THIS SHEET

EQUIPMENT GROUNDING SCHEMATIC DETAIL | SCALE: NTS | 19

(N) STREET MACRO 6705
(N) STREET MACRO 6705
(N) STREET MACRO 6705
FROM POWER SOURCE
60A CT RATED SMART POLE METER (SINGLE PHASE, TWO WIRE, 120V, 60AMP) WITH 15A FUSES AND FUSE REDUCERS AS NECESSARY.
(2) #12 AWG COPPER STRANDED THWN-2
(1) #12 COPPER STRAND GROUND PER CIRCUIT
#6 WIRE AWG TO GROUND ROD

ONE-LINE DIAGRAM | SCALE: NTS | 4

PART 2 - EXECUTION

2.1 EXECUTION

A. PROVIDE (1) MAIN GROUND FROM THE ANTENNA MOUNTING BRACKET AT THE TOP OF THE POLE, TO THE MAIN GROUND BUS BAR (TMGB) (LOCATION DEFINED BELOW). MAIN VERTICAL GROUND SHALL CONSIST OF A # 2 SOLID BARE COPPER CABLE. SAID GROUND SHALL BE PROTECTED BY A PVC U-GUARD TO THE TOP OF THE POLE AND STAPLED EVERY 24" WITH CORROSION RESISTANT (DIPPED GALVANIZED) STAPLES.

B. 2 SOLID BARE COPPER CABLE IS HIGHLY SUSCEPTIBLE TO THEFT AND MAY BE A BIT EXCESSIVE TO RUN TO TOP OF POLE. #2 TIN COATED IS RECOMMENDED BY OPS. AS IT'S CHEAPER AND LESS LIKELY TO BE STOLEN. BUSS BARS MAY ALSO BE TIN COATED TO MAKE THEM LESS SUSCEPTIBLE TO THEFT.

C. PROVIDE (1) MAIN GROUND FROM THE MAIN GROUND BUS BAR (TMGB) (LOCATION DEFINED BELOW) TO A GROUND ROD AT THE POLE BASE. MAIN GROUND VERTICAL SHALL CONSIST OF A # 2 SOLID BARE COPPER CABLE. SAID GROUND SHALL BE PROTECTED BY A PVC U-GUARD TO THE BOTTOM OF THE POLE AND STAPLED EVERY 24" WITH CORROSION RESISTANT (DIPPED GALVANIZED) STAPLES.

D. GROUND ROD SHALL BE 8' IN DEPTH MINIMUM AND COPPER CLAD.

E. GROUND ROD SHALL BE PLACED PER NEC CODE WITH REGARDS TO DEPTH AND DISTANCE FROM WOOD POLE.

F. GROUND ROD SHALL BE BURIED MINIMUM OF 30" BELOW GRADE.

G. # 2 GROUND SHALL BE ATTACHED DIRECTLY TO THE GROUND ROD VIA CAD WELD.

H. MAIN GROUND VERTICAL SHALL BE ATTACHED DIRECTLY TO A GROUND BUS BAR (TMGB) MOUNTED TO THE FACE OF THE UTILITY POLE. METHOD OF CONTACT SHALL BE 2 HOLE SLOTTED LUG (BROWN) TO THE MAIN GROUND BUS (TMGB) ON THE LEFT OR TOP SLOT DEPENDING ON THE ORIENTATION OF THE TMGB.

I. MAIN GROUND VERTICAL TO THE ANTENNA MOUNTING BRACKET SHALL BE ATTACHED DIRECTLY TO THE ANTENNA BRACKET VIA A SELF-TAPPING BOLT OR SCREW. A WASHER MUST BE ADDED TO THE THRU BOLT OR SCREW TO AVOID DAMAGE TO THE LUG WHILE MAINTAINING A SECURE BOND.

J. TMGB SHALL BE MOUNTED ABOVE THE CHARLES' CABINET BELOW THE RRH STANDOFF, DIRECTLY TO THE WOOD POLE STRUCTURE.

K. ALL POLE MOUNTED DEVICES, INCLUDING BUT NOT LIMITED TO: (ANTENNA MOUNTS AND ANTENNAS, MOUNTING BRACKETS, CABINETS) SHALL BE CONNECTED TO THE TMGB WITH A #6 COPPER STRANDED CABLE UV COATED AND GREEN IN COLOR.

L. ALL POLE MOUNTED DEVICES, INCLUDING BUT NOT LIMITED TO: (ANTENNA MOUNTS AND ANTENNAS, MOUNTING BRACKETS, CABINETS) SHALL BE CONNECTED TO THE TMGB USING COMPRESSION TYPE, 2 HOLE CONNECTOR LUGS.

1. CONNECTOR LUGS MUST ATTACH TO THE BUS BAR WITH TWO HOLES FACING UP AND OUT WITH THE BOLT HEADS ARE ON THE BACK SIDE OF THE BUS BAR.
2. STACKING OF CONNECTOR LUGS IS PROHIBITED.
3. PLACEMENT OF CONNECTOR LUGS ON FRONT AND REAR FACE OF GROUNDING BAR IS PERMITTED.
4. ANY MODIFICATIONS TO THE CONNECTOR LUGS IS PROHIBITED, INCLUDING BUT NOT LIMITED TO GRINDING, CUTTING OR BENDING.
5. CONNECTOR LUGS MUST BE PLACED WITH EVEN SPACING AND MUST NOT COME IN CONTACT WITH ANOTHER CONNECTOR LUG.
6. SLOTTED SIDE OF THE CONNECTOR LUG SHOULD BE PLACED ON THE SLOTTED SIDE OF THE BUS BAR.
7. ALL CONNECTOR LUGS SHALL HAVE TWO (2) COMPRESSIONS PER LUG.
8. ALL CONNECTOR LUGS MUST HAVE NO-OX APPLIED TO ANY SIDES WHICH CONTACT ANOTHER METAL TO RETARD OXIDATION INCLUDING AND ESPECIALLY THE CONDUCTOR IN THE COMPRESSION END.
9. ALL CONNECTOR LUGS MUST BE PROPERLY SEALED FROM WEATHER WITH HEAT SHRINK.
10. ALL CONNECTOR LUGS MUST BE ATTACHED USING 3/8" HARDWARE X 2 PER EACH LUG AND IN THE FOLLOWING MANNER:
    a. FLAT WASHER ON THE BACKSIDE OF THE LUG
    b. BOLT THRU THE LUG HOLE FACING OUTWARD.
    c. FLAT WASHER ON THE FRONT SIDE OF THE LUG.
    d. LOCK WASHER ON THE FRONT SIDE OF THE FLAT WASHER
    e. NUT ON THE BOLT, TURNED TO "THREE THREADS SHOWING AT MAXIMUM TORQUE"
    f. ALL NUTS ON CONNECTOR BOLTS MUST BE TIGHTENED SO THAT THE LOCK WASHERS ARE COMPLETELY COMPRESSED.

M. NO MECHANICAL CONNECTIONS ARE ACCEPTABLE EXCEPT IN THE EVENT OF MECHANICAL FITTINGS BEING A INTEGRAL PART OF THE PRODUCT FROM THE FACTORY. IE: CHARLES CABINET # 6 GROUND LUGS ON EACH SIDE OF THE CABINET.

N. EXCESS WELDS ON CADWELDS MUST BE GROUND OFF TO A SAFE TAPER.

O. ALL EXPOSED METALLIC SURFACES MUST BE SPRAYED WITH A PROTECTIVE COATING SUCH AS ZINC-IT.

P. ALL FITTINGS EXPOSED TO ENVIRONMENT MUST BE SEALED WITH SHRINK WRAP.

1. EXPOSED "SHINERS" CONDUCTORS ARE PROHIBITED IF IN EXCESS OF 1/16TH OF AN INCH.

PART 3 – TESTING AND DOCUMENTATION

3.1 TESTING

A. 5 OHMS TO GROUND IS REQUIRED FOR ACCEPTANCE. IF 5 OHMS CANNOT BE MET WITH ABOVE REQUIREMENTS, ADDITIONAL GROUND RODS WILL BE ADDED TO THE FIELD UNTIL 5 OHMS IS ACHIEVED.

3.2 DOCUMENTATION

A. PHOTOS OF THE TESTS ARE REQUIRED AS WELL AS TEST RESULTS IN FORMAL DOCUMENT FORMAT. SUBMIT RESULT OF TEST TO CC CONSTRUCTION MANAGER PRIOR TO FINAL WALKTHROUGH. SUBMIT ALL PHOTOS AND TESTS WITH CLOSEOUT PACKAGE PER SECTION 017700 – CLOSEOUT PROCEDURES AND REQUIRED DOCUMENTS

GROUNDING SPECIFICATIONS | SCALE: NTS | 12

CROWN CASTLE

CROWN CASTLE
CROWN CASTLE
ONE PARK PLACE, STE. 300
DUBLIN, CA 94568

RECORD DRAWINGS ISSUE DATE: 03/05/2024

REGISTERED PROFESSIONAL ENGINEER
DUSTIN JAMES COLWELL
No. E 22100
Exp. 09/30/25
ELECTRICAL
STATE OF CALIFORNIA

PREPARED BY:
Kimley»Horn
Expect More. Experience Better.
3875 EMBASSY PARKWAY, SUITE 280
AKRON, OH 44333
PHONE: (216) 505-7775
WWW.KIMLEY-HORN.COM

THIS DRAWING IS COPYRIGHTED AND IS THE SOLE PROPERTY OF THE OWNER. IT IS PRODUCED SOLELY FOR USE BY THE OWNER AND ITS AFFILIATES. REPRODUCTION OR USE OF THIS DRAWING AND/OR THE INFORMATION CONTAINED IN IT IS FORBIDDEN WITHOUT THE WRITTEN PERMISSION OF THE OWNER.

| RELEASE | |
|---|---|
| DATE | SUBMITTAL |
| | |
| | |
| | |
| | |
| | |

| REVISIONS | | |
|---|---|---|
| NO. | DATE | COMMENT |
| 4 | 03/05/2024 | ISSUED FOR CONSTRUCTION |
| 3 | 08/30/2023 | ISSUED FOR CONSTRUCTION |
| 2 | 08/25/2023 | ISSUED FOR CONSTRUCTION |

PROJECT NAME
VCA2_ECR TROUSDALE (SAN MATEO)

CROWN NODE ID NUMBER
CA_SF_SANMATEO_245M2

NODE ADDRESS
124 WARREN RD
SAN MATEO, CA 94401

HUB NAME
SAN MATEO HUB

KH JOB NUMBER: KHCLE-37293
IN HOUSE
DRAWN BY: DRD
CHECKED BY: TDR

SHEET TITLE
ELECTRICAL DETAILS

SHEET NUMBER: D1.2
PAGE: 8 OF 9

PLOT SCALE: 1:1 @ 24"x36", 1:2 @ 11"x17"



**METER SPEC. (TESCO - CAT. 703)**

DIMENSIONS: 4.4" x 8.7" x 21.5"
WEIGHT: 40.0 LBS
VOLUME: 0.48 CF

SCALE: NTS    14

**SHROUD ADAPTER PLATE (AT-PTA-MK217)**

SCALE: NTS    9

**Streetmacro 6705**

DIMENSIONS: 5.9" x 7.9" x 14.4"
WEIGHT: 31.0 LBS
VOLUME: 0.39 CF

**ANTENNA / RADIO SPEC (ERICSSON - STREETMACRO 6705)**

SCALE: NTS    10



CROWN CASTLE
CROWN CASTLE
ONE PARK PLACE, STE. 300
DUBLIN, OS IN 94568

RECORD DRAWINGS ISSUE DATE:
03/05/2024

Exp.  03/31/24

PREPARED BY:

Kimley»Horn

3675 EMBASSY PARKWAY, SUITE 280
AKRON, OH 44333
PHONE: (216) 585-7775
WWW.KIMLEY-HORN.COM

THIS DRAWING IS COPYRIGHTED AND IS
THE SOLE PROPERTY OF THE OWNER. IT IS
PRODUCED SOLELY FOR USE BY THE
OWNER AND ITS AFFILIATES.
REPRODUCTION OR USE OF THIS DRAWING
AND/OR THE INFORMATION CONTAINED IN
IT IS FORBIDDEN WITHOUT THE WRITTEN
PERMISSION OF THE OWNER.

**RELEASE**

| DATE | SUBMITTAL |
|------|-----------|
| | |

**REVISIONS**

| NO. | DATE | COMMENT |
|-----|------|---------|
| 4 | 03/05/2024 | ISSUED FOR CONSTRUCTION |
| 3 | 08/30/2023 | ISSUED FOR CONSTRUCTION |
| 2 | 08/25/2023 | ISSUED FOR CONSTRUCTION |

**PROJECT GROUP**

VCA2_ECR TROUSDALE
(SAN MATEO)

**CROWN NODE ID NUMBER**

CA_SF_SANMATEO_245M2

**NODE ADDRESS**

124 WARREN RD
SAN MATEO, CA 94401

**HUB NAME**

SAN MATEO HUB

**KH JOB NUMBER**    IN HOUSE

KHCLE-37293    DRAWN BY: DRD
              CHECKED BY: TDR

**SHEET TITLE**

EQUIPMENT
SPECIFICATIONS

**SHEET NUMBER**    PAGE

D1.3    9  OF 9

PLOT SCALE: 1:1 @ 24"x36", 1:2 @ 11"x17"

---

| MANUFACTURER | MODEL | DEPTH (IN) | WIDTH (IN) | HEIGHT (IN) | VOLUME (CF) | QUANTITY | TOTAL VOLUME (CF) |
|--------------|-------|------------|------------|-------------|-------------|----------|-------------------|
| ERICSSON | STREETMACRO 6705 | 5.9 | 7.9 | 14.4 | 0.39 | 3 | 0* |
| NYM | SAB-RW4-40" | 40.0 | 4.4 | 10.0 | 1.01 | 1 | 1.01 |
| TESCO | CAT. 703 | 4.4 | 8.7 | 21.5 | 0.48 | 1 | 0.48 |
| CHARLES | SHRD5-2818 | 18.0 | N/A | 28.3 | 4.17 | 1 | 4.17 |
| N/A | ALUMINUM CHANNEL | 2.0 | 4.0 | 20.0 | 0.09 | 1 | 0.09 |
| CHARLES | AT-PTA-MK217 | 10.0 | N/A | 0.5 | 0.02 | 1 | 0.02 |
| | | | | | | SUM | 5.77 |

*STREETMACRO 6705 ANTENNAS ARE WITHIN CONFINES OF CANISTER, VOLUME NOT COUNTED TOWARDS TOTAL.

**EQUIPMENT INVENTORY TABLE**

SCALE: NTS    12

---

WEIGHT
EMPTY: APPROX. 61 LBS
WITH EQUIPMENT: APPROX. 134 LBS

Ø 18.0

28.3

(12X) Ø .516 SLOTS
ON Ø 8.5625 B.C.D.

**ANTENNA CANISTER (CHARLES SHRD6-2818)**

SCALE: NTS    8

<u>Photosimulations</u>



CLOSE UP

CROWN CASTLE

**CA_SF_SANMATEO_245M2**

124 WARREN RD.

SAN MATEO, CA 94401

**PHOTO SIMULATION**

View 1 Existing



CLOSE UP

CROWN CASTLE

CA_SF_SANMATEO_245M2

124 WARREN RD.

SAN MATEO, CA 94401

PHOTO SIMULATION

View 1 Proposed



CLOSE UP

## CROWN CASTLE

**CA_SF_SANMATEO_245M2**

124 WARREN RD.

SAN MATEO, CA 94401

**PHOTO SIMULATION**

View 2 Existing



CLOSE UP

CA_SF_SANMATEO_245M2

124 WARREN RD.

SAN MATEO, CA 94401

**PHOTO SIMULATION**

View 2 Proposed



**CA_SF_SANMATEO_245M2**

124 WARREN RD.

SAN MATEO, CA 94401

**PHOTO SIMULATION**

Aerial View

Notification Affidavits



DECLARATION OF SERVICE BY MAIL

---

**COMPANY NAME**:    KIMLEY-HORN

**CUSTOMER NAME**:    TAYLOR BLANFORD

**COMPANY ADDRESS**:    1300 CLAY ST, STE 325, OAKLAND, CA 94612

**SITE:**    SAN MATEO SITE 245M2

**SITE ADDRESS:**    Near 124 WARREN RD, SAN MATEO, CA 94401 (Pole ID #: 110074648)

---

**DECLARATION:**

I, Sean Wilson, Of, Title Pro Information Systems, do hereby declare that on, OCTOBER 23RD, 2024, I served by mail upon each ☒ OCCUPANT & OWNER WITHIN THE MAILING LIST PROVIDED BY THE CLIENT, of the above-designated premises/subject property area, by depositing in the United States Mail, with postage fully prepaid, copy of the **PUBLIC NOTICE OF WIRELESS PERMIT APPLICATION SUBMITTED ,** a copy of which is attached hereto, giving the name(s) of the notice giver, site address of the subject property where the business is to be conducted, addressed to the Owner AND/OR Occupant for each of the following addresses: (see attached sheet(s)). (Note: Depending on the noticing requirements, we may have removed Duplicate Property Owners, Owner/Occupants from applicable address lists to prevent multiple notification.)

I declare under the penalty of perjury that the foregoing is true and correct.

Executed at San Diego, California, this 23RD, day of OCTOBER, 2024.

_____*Sean Wilson*_____
Signature

---

# <u>PUBLIC NOTICE</u>

## Wireless Permit Application Submitted
### Near 124 WARREN RD, SAN MATEO, CA 94401
### Pole ID #: 110074648

**Dear Property Owner or Resident:**

This is a notice that Crown Castle has submitted a wireless permit application to the City of San Mateo Public Works Department for a small wireless facility to be located on an existing utility pole with an associated meter pedestal in the public right-of-way at the location below. Construction for the site is currently anticipated to begin January, 2025 and end by March, 2025.

A "small wireless facility" is a low-powered, compact device used to provide wireless communications services. Crown Castle will be the owner and operator of the proposed facility, but Verizon, the carrier customer, will be using this specific facility to improve the coverage and capacity for their network in your neighborhood.

The application is <u>currently under review</u> by Public Works and a decision has not been made.

<div style="display:flex">

**Location of Proposed Facility**



**Photo Simulation of Proposed Facility**



</div>

<u>**Questions and comments**</u> can be sent to the contacts below until a City Decision Notice is posted:

| **Applicant Contact** | **City of San Mateo Contact** |
|---|---|
| Crown Castle | Public Works – Permitting Division |
| Taylor Blanford – Permitting Agent | 330 W. 20th Avenue, |
| 1300 Clay Street, Suite 325, Oakland, CA 94612 | San Mateo, CA 94403 |
| Taylor.Blanford@kimley-horn.com | pwencroachment@cityofsanmateo.org |
| (510) 210-3221 | (650) 522-7300 |

The City will act on the application without a public hearing. Members of the public interested in receiving information on application decisions should sign up for notifications on the Small Cell Infrastructure website, **as no additional notices will be mailed.**

**SMALL CELL PERMITTING INFO HERE >** https://www.cityofsanmateo.org/3865/

**SIGN UP FOR ALERTS HERE >** https://www.cityofsanmateo.org/4707



Crown Castle
One Park Place
Suite 300
Dublin, CA 94568

# THIS IS A NOTICE THAT
# AN APPLICATION WAS SUBMITTED



*Figure 1: Photo Simulation of Proposed Facility*

## CITY DECISION NOTICE

A Decision Notice will be posted on the website and an email newsletter will be sent when the Public Works Director approves or denies an application. Members of the public interested in receiving information on application decisions should sign up for notifications on the Small Cell Infrastructure website, **as no additional noticing will be mailed.**

**SIGN UP FOR ALERTS HERE:**
https://www.cityofsanmateo.org/4707/
Be sure to select this Email List
"**Small Cell Infrastructure Updates**"

## APPEALS

Appeals may be filed by the Applicant or any person who is a property owner or resident within 500-feet of the project site within five (5) calendar days <u>after</u> the Decision Notice. The appeal shall be scheduled for public hearing on the agenda for the next regular or special meeting of the Sustainability and Infrastructure Commission, or otherwise within a time frame needed to comply with all applicable state or federal laws. **The FCC does not allow appeals when based solely on the environmental effects from radio frequency emissions that are compliant with applicable FCC regulations and guidelines.**



**Crown Castle**
One Park Place
Suite 300
Dublin, CA 94568

# THIS IS A NOTICE THAT
# AN APPLICATION WAS SUBMITTED



## CITY DECISION NOTICE

A Decision Notice will be posted on the website and an email newsletter will be sent when the Public Works Director approves or denies an application. Members of the public interested in receiving information on application decisions should sign up for notifications on the Small Cell Infrastructure website, **as no additional noticing will be mailed.**

**SIGN UP FOR ALERTS HERE:**
https://www.cityofsanmateo.org/4707/
Be sure to select this Email List
"**Small Cell Infrastructure Updates**"

## APPEALS

Appeals may be filed by the Applicant or any person who is a property owner or resident within 500-feet of the project site within five (5) calendar days <u>after</u> the Decision Notice. The appeal shall be scheduled for public hearing on the agenda for the next regular or special meeting of the Sustainability and Infrastructure Commission, or otherwise within a time frame needed to comply with all applicable state or federal laws.
**The FCC does not allow appeals when based solely on the environmental effects from radio frequency emissions that are compliant with applicable FCC regulations and guidelines.**

*Figure 2: Photo Simulation of Proposed Facility Alternate View*

| PROPERTY APN | RECIPIENT | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 32061120 | THE OCCUPANT | 101 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32062040 | THE OCCUPANT | 108 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 32061050 | THE OCCUPANT | 110 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32062090 | THE OCCUPANT | 111 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32061060 | THE OCCUPANT | 114 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32062050 | THE OCCUPANT | 116 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 32061020 | THE OCCUPANT | 12 WARREN RD | SAN MATEO | CA | 94401-3718 |
| 32062080 | THE OCCUPANT | 121 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32062060 | THE OCCUPANT | 122 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 32061070 | THE OCCUPANT | 124 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32062070 | THE OCCUPANT | 127 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32083010 | THE OCCUPANT | 130 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 32061190 | THE OCCUPANT | 131 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32083200 | THE OCCUPANT | 131 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32061100 | THE OCCUPANT | 133 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32061200 | THE OCCUPANT | 134 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32083190 | THE OCCUPANT | 135 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32083020 | THE OCCUPANT | 136 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 32081270 | THE OCCUPANT | 136 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32083180 | THE OCCUPANT | 139 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32081020 | THE OCCUPANT | 140 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32081260 | THE OCCUPANT | 141 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32081030 | THE OCCUPANT | 142 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32083030 | THE OCCUPANT | 144 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 32083170 | THE OCCUPANT | 145 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32083160 | THE OCCUPANT | 149 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32061150 | THE OCCUPANT | 15 BARROILHET AVE | SAN MATEO | CA | 94401-3703 |
| 32083230 | THE OCCUPANT | 150 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 32081040 | THE OCCUPANT | 150 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32081250 | THE OCCUPANT | 151 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32081240 | THE OCCUPANT | 157 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32083150 | THE OCCUPANT | 159 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32081050 | THE OCCUPANT | 160 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32081230 | THE OCCUPANT | 161 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32081220 | THE OCCUPANT | 163 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32083220 | THE OCCUPANT | 165 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32081060 | THE OCCUPANT | 166 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32081210 | THE OCCUPANT | 167 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32081070 | THE OCCUPANT | 170 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32081200 | THE OCCUPANT | 173 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32061030 | THE OCCUPANT | 20 WARREN RD | SAN MATEO | CA | 94401-3718 |
| 32061140 | THE OCCUPANT | 21 BARROILHET AVE | SAN MATEO | CA | 94401-3703 |
| 32061130 | THE OCCUPANT | 25 BARROILHET AVE | SAN MATEO | CA | 94401-3703 |
| 32061170 | THE OCCUPANT | 5 BARROILHET AVE | SAN MATEO | CA | 94401-3703 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 101 | SAN MATEO | CA | 94401-3702 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 102 | SAN MATEO | CA | 94401-3702 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 103 | SAN MATEO | CA | 94401-3702 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 104 | SAN MATEO | CA | 94401-3701 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 105 | SAN MATEO | CA | 94401-3701 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 201 | SAN MATEO | CA | 94401-3702 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 202 | SAN MATEO | CA | 94401-3754 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 203 | SAN MATEO | CA | 94401-3754 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 204 | SAN MATEO | CA | 94401-3701 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 205 | SAN MATEO | CA | 94401-3701 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 206 | SAN MATEO | CA | 94401-3725 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 301 | SAN MATEO | CA | 94401-3754 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 302 | SAN MATEO | CA | 94401-3754 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 303 | SAN MATEO | CA | 94401-3754 |

| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 304 | SAN MATEO | CA | 94401-3725 |
|----------|--------------|------------------------------|-----------|----|------------|
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 305 | SAN MATEO | CA | 94401-3725 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL APT 306 | SAN MATEO | CA | 94401-3725 |
| 32063010 | THE OCCUPANT | 651 N EL CAMINO REAL OFC | SAN MATEO | CA | 94401-3756 |
| 32063010 | THE OCCUPANT | 701 N EL CAMINO REAL APT 101 | SAN MATEO | CA | 94401-3771 |
| 32063010 | THE OCCUPANT | 701 N EL CAMINO REAL APT 102 | SAN MATEO | CA | 94401-3771 |
| 32063010 | THE OCCUPANT | 701 N EL CAMINO REAL APT 103 | SAN MATEO | CA | 94401-3771 |
| 32063010 | THE OCCUPANT | 701 N EL CAMINO REAL APT 201 | SAN MATEO | CA | 94401-3771 |
| 32063010 | THE OCCUPANT | 701 N EL CAMINO REAL APT 202 | SAN MATEO | CA | 94401-3771 |
| 32063010 | THE OCCUPANT | 701 N EL CAMINO REAL APT 203 | SAN MATEO | CA | 94401-3771 |
| 32063010 | THE OCCUPANT | 701 N EL CAMINO REAL APT 204 | SAN MATEO | CA | 94401-3772 |
| 32063010 | THE OCCUPANT | 701 N EL CAMINO REAL APT 301 | SAN MATEO | CA | 94401-3772 |
| 32063010 | THE OCCUPANT | 701 N EL CAMINO REAL APT 302 | SAN MATEO | CA | 94401-3772 |
| 32063010 | THE OCCUPANT | 701 N EL CAMINO REAL APT 303 | SAN MATEO | CA | 94401-3772 |
| 32063010 | THE OCCUPANT | 701 N EL CAMINO REAL APT 304 | SAN MATEO | CA | 94401-3772 |
| 32062030 | THE OCCUPANT | 709 HURLINGHAM AVE | SAN MATEO | CA | 94402-1029 |
| 32063160 | THE OCCUPANT | 714 HURLINGHAM AVE | SAN MATEO | CA | 94402-1030 |
| 32062020 | THE OCCUPANT | 715 HURLINGHAM AVE | SAN MATEO | CA | 94402-1029 |
| 32063170 | THE OCCUPANT | 718 HURLINGHAM AVE | SAN MATEO | CA | 94402-1030 |
| 32063180 | THE OCCUPANT | 722 HURLINGHAM AVE | SAN MATEO | CA | 94402-1030 |
| 32062010 | THE OCCUPANT | 725 HURLINGHAM AVE | SAN MATEO | CA | 94402-1029 |
| 32062010 | THE OCCUPANT | 725 HURLINGHAM AVE UNIT B | SAN MATEO | CA | 94402-1029 |
| 32063190 | THE OCCUPANT | 726 HURLINGHAM AVE | SAN MATEO | CA | 94402-1030 |
| 32063010 | THE OCCUPANT | 751 N EL CAMINO REAL APT 101 | SAN MATEO | CA | 94401-3773 |
| 32063010 | THE OCCUPANT | 751 N EL CAMINO REAL APT 102 | SAN MATEO | CA | 94401-3773 |
| 32063010 | THE OCCUPANT | 751 N EL CAMINO REAL APT 103 | SAN MATEO | CA | 94401-3773 |
| 32063010 | THE OCCUPANT | 751 N EL CAMINO REAL APT 201 | SAN MATEO | CA | 94401-3773 |
| 32063010 | THE OCCUPANT | 751 N EL CAMINO REAL APT 202 | SAN MATEO | CA | 94401-3773 |
| 32063010 | THE OCCUPANT | 751 N EL CAMINO REAL APT 203 | SAN MATEO | CA | 94401-3773 |
| 32063010 | THE OCCUPANT | 751 N EL CAMINO REAL APT 204 | SAN MATEO | CA | 94401-3774 |
| 32063010 | THE OCCUPANT | 751 N EL CAMINO REAL APT 301 | SAN MATEO | CA | 94401-3774 |
| 32063010 | THE OCCUPANT | 751 N EL CAMINO REAL APT 302 | SAN MATEO | CA | 94401-3774 |
| 32063010 | THE OCCUPANT | 751 N EL CAMINO REAL APT 303 | SAN MATEO | CA | 94401-3774 |
| 32063010 | THE OCCUPANT | 751 N EL CAMINO REAL APT 304 | SAN MATEO | CA | 94401-3774 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 101 | SAN MATEO | CA | 94401-3775 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 102 | SAN MATEO | CA | 94401-3775 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 103 | SAN MATEO | CA | 94401-3775 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 104 | SAN MATEO | CA | 94401-3775 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 201 | SAN MATEO | CA | 94401-3775 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 202 | SAN MATEO | CA | 94401-3775 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 203 | SAN MATEO | CA | 94401-3776 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 204 | SAN MATEO | CA | 94401-3776 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 301 | SAN MATEO | CA | 94401-3776 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 302 | SAN MATEO | CA | 94401-3776 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 303 | SAN MATEO | CA | 94401-3776 |
| 32063010 | THE OCCUPANT | 801 N EL CAMINO REAL APT 304 | SAN MATEO | CA | 94401-3776 |
| 32063010 | THE OCCUPANT | 811 N EL CAMINO REAL APT 101 | SAN MATEO | CA | 94401-3777 |
| 32063010 | THE OCCUPANT | 811 N EL CAMINO REAL APT 102 | SAN MATEO | CA | 94401-3777 |
| 32063010 | THE OCCUPANT | 811 N EL CAMINO REAL APT 103 | SAN MATEO | CA | 94401-3777 |
| 32063010 | THE OCCUPANT | 811 N EL CAMINO REAL APT 201 | SAN MATEO | CA | 94401-3777 |
| 32063010 | THE OCCUPANT | 811 N EL CAMINO REAL APT 202 | SAN MATEO | CA | 94401-3777 |
| 32063010 | THE OCCUPANT | 811 N EL CAMINO REAL APT 203 | SAN MATEO | CA | 94401-3777 |
| 32063010 | THE OCCUPANT | 811 N EL CAMINO REAL APT 204 | SAN MATEO | CA | 94401-3778 |
| 32063010 | THE OCCUPANT | 811 N EL CAMINO REAL APT 301 | SAN MATEO | CA | 94401-3778 |
| 32063010 | THE OCCUPANT | 811 N EL CAMINO REAL APT 302 | SAN MATEO | CA | 94401-3778 |
| 32063010 | THE OCCUPANT | 811 N EL CAMINO REAL APT 303 | SAN MATEO | CA | 94401-3778 |
| 32063010 | THE OCCUPANT | 811 N EL CAMINO REAL APT 304 | SAN MATEO | CA | 94401-3778 |
| 32063010 | THE OCCUPANT | 821 N EL CAMINO REAL APT 101 | SAN MATEO | CA | 94401-3779 |
| 32063010 | THE OCCUPANT | 821 N EL CAMINO REAL APT 102 | SAN MATEO | CA | 94401-3779 |

| | | | | | |
|---|---|---|---|---|---|
| 32063010 | THE OCCUPANT | 821 N EL CAMINO REAL APT 103 | SAN MATEO | CA | 94401-3779 |
| 32063010 | THE OCCUPANT | 821 N EL CAMINO REAL APT 201 | SAN MATEO | CA | 94401-3779 |
| 32063010 | THE OCCUPANT | 821 N EL CAMINO REAL APT 202 | SAN MATEO | CA | 94401-3779 |
| 32063010 | THE OCCUPANT | 821 N EL CAMINO REAL APT 203 | SAN MATEO | CA | 94401-3779 |
| 32063010 | THE OCCUPANT | 821 N EL CAMINO REAL APT 204 | SAN MATEO | CA | 94401-3780 |
| 32063010 | THE OCCUPANT | 821 N EL CAMINO REAL APT 301 | SAN MATEO | CA | 94401-3780 |
| 32063010 | THE OCCUPANT | 821 N EL CAMINO REAL APT 302 | SAN MATEO | CA | 94401-3780 |
| 32063010 | THE OCCUPANT | 821 N EL CAMINO REAL APT 303 | SAN MATEO | CA | 94401-3780 |
| 32063010 | THE OCCUPANT | 821 N EL CAMINO REAL APT 304 | SAN MATEO | CA | 94401-3780 |
| 32061040 | THE OCCUPANT | 88 WARREN RD | SAN MATEO | CA | 94401-3718 |
| 32061160 | THE OCCUPANT | 9 BARROILHET AVE | SAN MATEO | CA | 94401-3703 |
| 32083230 | 150 SYCAMORE LLC | 150 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 32083020 | ADAMS JOHN C TR | 136 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 28302170 | AGARD IRVING HOWARD III TR | 19 E CAROL AVE | BURLINGAME | CA | 94010-5232 |
| 32083200 | AIELLO PETER F TR | 131 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 28302160 | AITKEN BRITTNEY PATRICE BECK TR | 11 EAST CAROL AVENUE | BURLINGAME | CA | 94010-5232 |
| 32081240 | ALLEN WILLIAM III | 157 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32083150 | ATKINSON BRUCE LEKAS TR | 159 WARREN RD | SAN MATEO | CA | 94402-1034 |
| 28303110 | BARNARD DENNIS C | 1541 CAROL AVE | BURLINGAME | CA | 94010-5249 |
| 32061070 | BARULICH STEPHEN A TR | 124 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32062010 | BERLINER PETER D TR | 725 HURLINGHAM AVE | SAN MATEO | CA | 94402-1029 |
| 32062040 | BESSETTE ANDRE P TR | 108 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 32083190 | BLUMBERG BRUCE D TR | 135 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32061100 | BRADFORD WILLIAM N TR | 702 PRESCOTT LN | FOSTER CITY | CA | 94404-3731 |
| 28303030 | BRUSH JAMES ARTHUR TR | 11121 CHADWICK PLACE | CUPERTINO | CA | 95014-4705 |
| 32083170 | CALLEN THOMAS PETER TR | 145 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32062050 | CAMPODONICO SHARON TR | 116 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 28302270 | CASE CASEY & SUSAN TRS | 605 BARROILHET AVE | SAN MATEO | CA | 94402-1042 |
| 28302250 | CHAN PHILIP W L & EMMY LILI TRS | 361 31ST AVE | SAN FRANCISCO | CA | 94121-1706 |
| 32081260 | CLARK SHARON ANN | 141 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 28303100 | CLINE BILLI TR | 1545 CAROL AVE | BURLINGAME | CA | 94010-5249 |
| 32061190 | COFFEY DEVIN T | 131 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32083160 | COLANTUONO DOROTHY K TR | 149 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32061020 | CONNOLLY JOHN TR | 12 WARREN RD | SAN MATEO | CA | 94401-3718 |
| 32083220 | CROSS ELIZABETH T TR | 165 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32083030 | DEGROSZ KURT M TR | 144 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 32062030 | DOLL ALEXANDER P TR | 709 HURLINGHAM AVE | SAN MATEO | CA | 94402-1029 |
| 28303010 | EBERLY BRUCE J | 1529 CAROL AVE | BURLINGAME | CA | 94010-5249 |
| 32081050 | ELLINGSON GLENN E JR TR | 427 PARROTT DR | SAN MATEO | CA | 94402-2231 |
| 28302180 | FRANCESCONI GARY A TR | 25 E CAROL AVE | BURLINGAME | CA | 94010-5232 |
| 32063010 | G W WILLIAMS CO | 3190 CLEARVIEW WAY # 200 | SAN MATEO | CA | 94402-3751 |
| 28302260 | GAO WEN TR | 1 E CAROL AVE | BURLINGAME | CA | 94010-5232 |
| 28302150 | GAVIN PATRICK J TR | 387 PONDEROSA RD | SOUTH SAN FRANCISCO | CA | 94080-4221 |
| 32081200 | GRECO GUSTAVO & GLADYS | 1121 PEBBLEWOOD WAY | SAN MATEO | CA | 94403-4915 |
| 32061140 | GUREVICH DAVID B TR | 21 BARROILHET AVE | SAN MATEO | CA | 94401-3703 |
| 32081070 | HALIM EMIL KURNIAWAN TR | 170 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32061170 | HAZLEWOOD TERRENCE M TR | 5 BARROILHET AVE | SAN MATEO | CA | 94401-3703 |
| 32063160 | HILL GERALD ALBERT TR | 714 HURLINGHAM AVE | SAN MATEO | CA | 94402-1030 |
| 32063170 | HOUGH MICHAEL G | 3332 C 22ND ST | SAN FRANCISCO | CA | 94110-3067 |
| 32061050 | HUI KENNETH TR | 110 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32081030 | JAMES JACQUELINE A TR | 142 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32061040 | JENNER ROBERT K | 88 WARREN RD | SAN MATEO | CA | 94401-3718 |
| 32061200 | JONES STEPHEN P TR | 134 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32061150 | KANG WILLIAM PING YU TR | 15 BARROILHET AVE | SAN MATEO | CA | 94401-3703 |
| 28303040 | KELLEHER DANIEL J TR | 8 EAST CAROL AVENUE | BURLINGAME | CA | 94010-5233 |
| 32063190 | KIELY THOMAS TR | 726 HURLINGHAM AVE | SAN MATEO | CA | 94402-1030 |
| 32062060 | KIRSCHNER BRUCE I TR | 122 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 28303070 | LARIOS EDWARDJ TR | 1536 BARROILHET AVE | BURLINGAME | CA | 94010-5253 |
| 28303060 | LEE LINDA CAROL | 1532 BARROILHET AVE | BURLINGAME | CA | 94010-5253 |

| 32062090 | LI YE | 111 WARREN RD | SAN MATEO | CA | 94401-3719 |
|---|---|---|---|---|---|
| 32063180 | LINCE BOBBIE TR | 722 HURLINGHAM AVE | SAN MATEO | CA | 94402-1030 |
| 32081230 | LOK PETER K S TR | 161 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32083180 | MAURER FREDERICK A TR | 7203 NORTH 117TH AVE | OMAHA | NE | 68142-1620 |
| 28303090 | MEAKIN THOMAS E TR | 740 EDGEWOOD RD | SAN MATEO | CA | 94402-1051 |
| 32062070 | MENTULA ART TR | 127 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 28303120 | MERICS ELLEN A TR | 1537 CAROL AVENUE | BURLINGAME | CA | 94010-5249 |
| 32061120 | MESSINGER KATHERINA | 449 WISNOM AVE | SAN MATEO | CA | 94401-3704 |
| 32081060 | MOLUMPHY THOMAS J | 166 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 28303130 | MUSTACHIA LINDA LEE TR | 1533 CAROL AVE | BURLINGAME | CA | 94010-5249 |
| 32062020 | NUKALA MURTHY V R K N TR | 715 HURLINGHAM AVE | SAN MATEO | CA | 94402-1029 |
| 32062080 | PIZZI ELLIS F TR | 121 WARREN RD | SAN MATEO | CA | 94401-3719 |
| 32061060 | POLIDOROFF CONSTANTINE TR | 114 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 28302120 | PURI SEAN | 2955 MORGAN DR | SAN RAMON | CA | 94583-2424 |
| 32081250 | QUALE KATHLEEN TR | 151 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32081220 | ROBBINS CLIFFORD S TR | 163 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 28302130 | SANTERO LISA | 1504 BARROILHET AVE | BURLINGAME | CA | 94010-5226 |
| 28303020 | SEETHARAMAN SHIV KUMAR | 16 E CAROL AVE | BURLINGAME | CA | 94010-5233 |
| 28303050 | SMITH DONALD R TR | 4 E CAROL AVE | BURLINGAME | CA | 94010-5233 |
| 32061160 | SPAULDING ELSA IRENE TRS ET AL | 9 BARROILHET AVE | SAN MATEO | CA | 94401-3703 |
| 32081270 | STEELE GARY T TR | 136 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32083010 | TUTHILL GORDON BRADLEY TR | 130 SYCAMORE AVE | SAN MATEO | CA | 94402-1034 |
| 32061130 | VANDEVELD ANDREW | 25 BARROILHET AVE | SAN MATEO | CA | 94401-3703 |
| 28303080 | WILLIAMSON DAVID K | 1540 BARROILHET AVE | BURLINGAME | CA | 94010-5253 |
| 32081040 | WINTERS JOSEPH P TR | 150 WARREN ROAD | SAN MATEO | CA | 94403 |
| 32081020 | WONG CHI K | 140 WARREN RD | SAN MATEO | CA | 94401-3720 |
| 32081210 | WONG DANIEL | 167 BARROILHET AVE | SAN MATEO | CA | 94401-3704 |
| 32061030 | YANG JESSE | 20 WARREN RD | SAN MATEO | CA | 94401-3718 |

Log of Comments

| Name | Address | Comment Date | Comment | Response Date | Response |
|---|---|---|---|---|---|
| Alicia Woodfall-Jones | | 11/7/2024 | Please see our response to cell tower application WC-2024-000243 at 124 Warren Road. Please confirm receipt.<br>*See pdf of referenced comment letter | 11/7/2024 | Confirming receipt. The attached comments will be included with the public comment log associated with Wireless Permit application WC-2024-000243 for a proposed wireless facility near 124 Warren Road. |
| Alicia Woodfall-Jones | | 10/29/2024 | We received a letter from Kimely Horn that Crown Castle submitted a second application for a cell tower installation located 124 and 134 Warren Road. I checked the Small Cell Infrastructure site for information on this application, but it is not reflected there. The notice says installation will begin January 2025! That seems extremely fast in light of all that is happening on this issue. We are aware the proposed new ordinance is being presented to City Council in November, for approval in December. This new application would not conform with the requirements in the proposed new ordinance.<br>How does the new ordinance affect this most recent application?<br>What do you recommend we do as impacted residents?<br>How can we access the application and be informed of deadlines to respond? | 10/29/2024 | The Wireless Permit application WC-2024-000243 for a proposed wireless facility near 124 Warren Road is currently under review and a decision has not been made yet. Applications received prior to approval and adoption of the new ordinance are subject to the existing ordinance, design standards and application requirements. Application materials are not posted online until a decision has made because it is common for the application materials to be revised during the review process. We are more than happy to share the current application materials upon request. I went ahead and uploaded the materials we have received so far in a file for you to download. Warren Rd (124) - 000243<br>Please be aware that these files are still under review and there is a chance they will be revised and resubmitted prior to the City making a decision. The final application files will be posted online once a decision is made.<br>We do not provide a specific timeframe for providing comments because they will be accepted up until the City makes a decision on the application. We don't expect to make a decision on this application for at least another two weeks. Hopefully that is enough time for you to provide any comments you would like to be included in the public comment log. Please let me know if you have any issues accessing the link. |
| Alicia Woodfall-Jones | | 11/1/2024 | We are yet again under attack by Crown Castle and their repeated cell tower applications. On October 23, Crown Castle submitted a third application for a cell tower installation in front of our home at the lot line between 124 and 134 Warren Road (WC-2024-000243.) Each application largely the same as the previous, including the hostility, disregard for design standard, and steamrolling approach to meet their own business objectives. We are writing to urge the Director of Public Works to immediately revise the current code to require 300 foot set backs for cell towers. It is not necessary to wait until the new cell tower ordinance is approved. It is more critical that this be done NOW, as Crown Castle has launched a campaign to reapply for a large number of new cell towers across the city. Director Fabry has the authority under our current code to require 300 foot set backs for cell tower applications in residential areas. He should do this NOW! Independent legal council. Tripp May, has deemed this authority to be lawful and reasonable. We simply cannot wait for December. We are under attack now! 1) 10,000 Standard Conditions of Approval (a) Standard Conditions. All wireless facilities, whether approved by the Director or deemed approved or deemed granted by law shall be automatically subject to all standard conditions of approval as provided in Appendix C of the Design Standards and Application Requirements. (b) Modifications to Standard Conditions. The Director (or the Sustainability and Infrastructure Commission on appeal) shall have discretion to modify or amend any standard conditions of approval on a case-by-case basis as may be necessary or appropriate to protect and promote the public health. safety and welfare. allow for the proper operation of the approved wireless facility, maintain compliance with applicable laws and/or to advance the goals or policies in the General Plan and any specific plan. the San Mateo Municipal Code and/or this Chapter. Please exercise your legal authority to modify the current code and not wait until the final approval of the new ordinance in December. We need to stop Crown Castle's "Hail Mary" campaign against the residents and the City of San Mateo to get their applications through before the new ordinance is approved. Now is not the time to let up. This most recent assault cannot be ignored and we need your help! | | |
| Jeffrey Adams | | 11/29/2024 | I hope you had a wonderful Thanksgiving! Thanks again for taking the time to meet with us this week, it realy means a lot and is making a huge difference. As we discussed there are a number of permits that CC has submitted that are/have been outstanding prior to the council's adoption of the new Policy on the 18th. CC desperately has been trying to get these permits in under the old Design Standard rules and prior to adoption of the new Policy. As you know, several of them were filed right before the 18th and in the case of the permit on our street they re-filed the day that the S&I Commission met in October to adopt the new Policy. 5-0. CC is clearly trying to get these permits in under the Wire under the old rules. We strongly urge the City to deny these permits as they contain violations of the old Design Standards rather than putting the burden onto the residents and the S&I Commission to have to go thru the old appeal process yet again (which would likely result in CC just pulling the permit prior to appeal and being forced to re-submit under the new Policy anyway). The permit locations for those include (Lindsey/Irene if I am missing any pls add): WC-2023-000200 724 W Poplar, WC-2024-000291 1 Tilton, WC-2024-000241 124 Warren, WC-2024-000241 201 W Bellevue Importantly most if not all of these permits have major violations of our old Design Standards and thus should not be approved by the City staff. For example in the case of the 721 Edgewood permit, the application is in violation of 4 Design Standards. Importantly 2 of these 4 Design Standard violations (which are an issue on many applications on utility pole tops) are objective and measurable and relate to perhaps. other than RF considerations which are handled differently. the most important thing to consider for any wireless facilities going up on a pole in San Mateo—how big is it and what does it look like? 1) Volume Restriction—there is a 3 cu ft limitation for all equipment on top of the pole and per the CC application submitted the proposed facilities are 4.2 cu ft. This is clearly a cost issue for CC as they are proposing to use a standard off the shelf antenna radome that violates our policy rather than either customizing one or seeking another vendor. If I per my discussion with Ariel the 3 cu ft limit was established/supported by the FCC so we are very well protected legally to stand at exactly 3.0 cu ft. 2) Shrouding—All pole top facilities must have a shroud that tapers down to the pole top for a more seamless appearance. There are many examples of this (CC has done it many times in San Mateo on street light pole tops). The proposed facilities in many applications targeting utility pole tops including Edgewood do not have this tapered look. Note that adding the required shrouding/tapering will increase the total facilities volume even more above 4.2 cu ft. 3) Least Obtrusive—While a subjective evaluation, the notion of Least Obtrusive is obviously meant to say that facilities must go where they are least visible/have the least aesthetic impact provided that there are no technical (ie PGE) restrictions. Reduced coverage or reduced network efficiency is not a consideration. True interference is not a consideration even though they repeatedly cite it in the alternative sites. The revised Policy does a better job of detailing the need for technical analysis and 'proof' that one location is superior to another. 4) View Obstruction—Also a subjective evaluation in the old Design Standards (which state that the facilities can't obstruct views from office, balcony or living areas). The old Design Standards do not detail what 'obstruct views' means in detail so the City has wide latitude in specifying that something does in fact obstruct views. Importantly, in the new Policy we get more detail on what this means and what is permissible from a legal and practical perspective. The new Policy states that 'views are obstructed if the proposed facilities are in front of a window when viewed perpendicular to the structure from the street.' The new Policy also separately says that proposed facilities may not be at the same height as any windows (even if not directly in front of the window.) If the structure is within 50 ft. So while the old Design Standards do not have these specifics (which again gives the City the latitude to say whether or not a view is Obstructed) we can know what the City Council's intentions are and what is legal/practical in terms of how to interpret this under the 'old rules' given we have gotten guidance on this from outside council and provided more details and definitions in the new Policy. The permit up on 721 Edgewood violates both of these (facilities at window level and also directly in front of 1st floor and second floor windows). This certainly gives the City conditions that define 'obstructs views' under the old Design Standards. These same 4 Design Standard points (and others) are likely violated in the other permits as well. As we discussed this is the 3rd time the permit has been applied for on Edgewood and, much like we have seen on Clark and Poplar and other permits, CC is playing a bit of a 'cat and mouse' game in submitting applications that don't comply with the City's Design Standards and when those are highlighted/detailed by residents on appeal, CC withdraws the permit at the last minute retaining their right to re-apply at any time. This costs the City money and places an undue burden on staff. While it has been frustrating to see City staff approve applications that have violated Design Standards in the past, it is somewhat understandable given the volume of apps they have to review. their lack of subject matter expertise and the gamesmanship approach that CC has taken. However now that staff have had the benefit of additional guidance from City Council and especially outside council Tripp. staff should be much more comfortable taking a very hard line on violations given much of what has been learned. while only codified in the new Policy, is also very applicable under the old Design Standards. Now that the City has done so much work to develop a new Policy that protects what the residents and the City want while still complying with all applicable Federal and State laws. it makes sense that we/the City should do everything possible to make sure that any facilities that get installed comply with it. Denying the above permits doesn't preclude CC from still pursuing installation of those facilities in the desired locations: it will just force them to reapply and conform to our rules and policies rather than them trying to game the system by overburdening staff and the Commission. hoping they can circumvent the City's hard work. Thanks Lisa and I'm happy to follow up with a discussion if there are any questions. Feel free to call [REDACTED] or text or email if you need anything.<br><br>Also lastly two other quick items we discussed: 1. We did briefly discuss an issue at the end of our discussion which hasn't really been addressed anywhere that I'm aware of. Unless there is a legal restriction, the entire application should be publicly available as soon as it is submitted to the City. Currently, as you know the application is only accessible publicly once it has been approved. This only gives the public (including anyone who wants to appeal) 5 days to review and respond. While this was extended to 10 days in the new Policy, there is no good reason to not make the applications publicly available and in fact actually hinders residents from helping each other-benefiting from each others work. If possible we should require the applicant to provide the application electronically/accessible to public. This would have the further advantage of giving City staff the help of the public in reviewing open applications for violations and/or missing or incorrect information and make us not so down on appeals. I think this is something we should consider if it is legal/possible. 2. RE Mandatory Use of Technical Expert. While mandatory requirement of an outside technical expert would be ideal I believe where the new Policy ended up was to have usage of an outside technical expert be the norm but give the Director the flexibility to forgo usage of an outside expert if he/she felt it was not necessary given the facts and circumstances of the particular situation in order to save on costs and time. I understand the need for this flexibility. however it should be mandatory and communicated very clearly to the Director that forgoing usage of the outside technical expert should definitely be the exception and whenever this happens the Director should be required to provide a detailed description of what the issue is/was and why they felt the outside expert was not required. This should be of sufficient detail such that any outside technical expert brought in subsequently to review it would view it as complete and satisfactory and would stand up to any investigation. | | |







<u>Prior Permits and Approvals</u>



Crown Castle
One Park Place
Suite 300
Dublin, CA 94568

10/22/2024

Ryan Brunmeier
The City of San Mateo
Public Works Department
330 W. 20th Ave
San Mateo, Ca. 94403
(650) 522-7300

Dear Mr. Brunmeier,

Crown Castle submits this memo to comply with Section 2, Prior Permits and Regulatory Approval, from the 2021 San Mateo Design Standards, Application Requirements and Conditions of Approval for Wireless Facilities in the Public Right of Way. This memo certifies that there is no additional federal build out requirements for Crown Castle Node ID, **508720**, and the provided copies of the FCC licenses, Attachment 4b, will reflect all planned operating bans designated for this project.

Sincerely,

Jason Camarena
Crown Castle – Network Permitting Specialist



**One Verizon Way**
**Basking Ridge, NJ 07920**

### VERIZON COMMUNICATIONS INC.

### ASSISTANT SECRETARY'S CERTIFICATE

I, Brandon N. Egren, do hereby certify that I am a duly elected, qualified and acting Assistant Secretary of Verizon Communications Inc., a Delaware corporation ("Verizon"), and as such I am authorized to execute this certificate. In such capacity, I further certify that:

Verizon Wireless Network Procurement LP ("VZW Network") is a Delaware limited partnership and is indirectly wholly owned by Verizon.

Cellco Partnership ("Cellco") is a Delaware general partnership and is indirectly wholly owned by Verizon.

Straight Path Spectrum, LLC ("Straight Path") is a Delaware limited liability company and is directly wholly owned by Verizon.

GTE Mobilnet of California Limited Partnership ("GTEM of California") is a California limited partnership and is indirectly wholly owned by Verizon.

VZW Network, Cellco, Straight Path and GTEM of California are affiliates of Verizon.

Dated: September 21, 2022

Brandon N. Egren
Assistant Secretary

2904559

**REFERENCE COPY**

This is not an official FCC license. It is a record of public information contained in the FCC's licensing database on the date that this reference copy was generated. In cases where FCC rules require the presentation, posting, or display of an FCC license, this document may not be used in place of an official FCC license.



# Federal Communications Commission

## Wireless Telecommunications Bureau

### RADIO STATION AUTHORIZATION

LICENSEE:  STRAIGHT PATH SPECTRUM, LLC

ATTN: LICENSING MANAGER
STRAIGHT PATH SPECTRUM, LLC
5055 NORTH POINT PKWY, NP2NE NETWORK ENGINEERING
ALPHARETTA, GA 30022

| Call Sign | File Number |
|---|---|
| WRAZ876 | 0008225993 |
| **Radio Service** | |
| UU - Upper Microwave Flexible Use Service | |

**FCC Registration Number (FRN):** 0012576435

| Grant Date | Effective Date | Expiration Date | Print Date |
|---|---|---|---|
| 07-24-2018 | 07-24-2018 | 08-10-2028 | 07-25-2018 |

| Market Number | Channel Block | Sub-Market Designator |
|---|---|---|
| BTA404 | L1 | 3 |

| Market Name |
|---|
| San Francisco-Oakland-San Jose |

| 1st Build-out Date | 2nd Build-out Date | 3rd Build-out Date | 4th Build-out Date |
|---|---|---|---|
| 06-01-2024 | | | |

**Waivers/Conditions:**

Special Condition for AU/name change (6/4/2016): Grant of the request to update licensee name is conditioned on it not reflecting an assignment or transfer of control (see Rule 1.948); if an assignment or transfer occurred without proper notification or FCC approval, the grant is void and the station is licensed under the prior name.

The authority granted herein is subject to any future applicable international frequency coordination agreements between the administrations of the United State and Canada.

**Conditions:**
Pursuant to §309(h) of the Communications Act of 1934, as amended, 47 U.S.C. §309(h), this license is subject to the following conditions:  This license shall not vest in the licensee any right to operate the station nor any right in the use of the frequencies designated in the license beyond the term thereof nor in any other manner than authorized herein.  Neither the license nor the right granted thereunder shall be assigned or otherwise transferred in violation of the Communications Act of 1934, as amended.  See 47 U.S.C. § 310(d).  This license is subject in terms to the right of use or control conferred by §706 of the Communications Act of 1934, as amended.  See 47 U.S.C. §606.

This license may not authorize operation throughout the entire geographic area or spectrum identified on the hardcopy version. To view the specific geographic area and spectrum authorized by this license, refer to the Spectrum and Market Area information under the Market Tab of the license record in the Universal Licensing System (ULS).  To view the license record, go to the ULS homepage at http://wireless.fcc.gov/uls/index.htm?job=home and select "License Search".  Follow the instructions on how to search for license information.

FCC 601-MB
**August 2021**

**Licensee Name:**  STRAIGHT PATH SPECTRUM, LLC

**Call Sign:** WRAZ876          **File Number:**  0008225993          **Print Date:** 07-25-2018

**700 MHz Relicensed Area Information:**

| Market | Market Name | Buildout Deadline | Buildout Notification | Status |
|--------|-------------|-------------------|----------------------|--------|

Reference Copy

**FCC 601-MB**
**August 2021**

**REFERENCE COPY**

This is not an official FCC license. It is a record of public information contained in the FCC's licensing database on the date that this reference copy was generated. In cases where FCC rules require the presentation, posting, or display of an FCC license, this document may not be used in place of an official FCC license.



# Federal Communications Commission

## Wireless Telecommunications Bureau

### RADIO STATION AUTHORIZATION

LICENSEE:  STRAIGHT PATH SPECTRUM, LLC

ATTN: LICENSING MANAGER
STRAIGHT PATH SPECTRUM, LLC
5055 NORTH POINT PKWY, NP2NE NETWORK ENGINEERING
ALPHARETTA, GA 30022

| Call Sign | File Number |
|---|---|
| WRAZ877 | 0008225878 |
| **Radio Service** | |
| UU - Upper Microwave Flexible Use Service | |

**FCC Registration Number (FRN):**  0012576435

| Grant Date | Effective Date | Expiration Date | Print Date |
|---|---|---|---|
| 07-24-2018 | 07-24-2018 | 08-10-2028 | 07-25-2018 |

| Market Number | Channel Block | Sub-Market Designator |
|---|---|---|
| BTA404 | L2 | 3 |

| Market Name |
|---|
| San Francisco-Oakland-San Jose |

| 1st Build-out Date | 2nd Build-out Date | 3rd Build-out Date | 4th Build-out Date |
|---|---|---|---|
| 06-01-2024 | | | |

**Waivers/Conditions:**

Special Condition for AU/name change (6/4/2016): Grant of the request to update licensee name is conditioned on it not reflecting an assignment or transfer of control (see Rule 1.948); if an assignment or transfer occurred without proper notification or FCC approval, the grant is void and the station is licensed under the prior name.

The authority granted herein is subject to any future applicable international frequency coordination agreements between the administrations of the United State and Canada.

**Conditions:**
Pursuant to §309(h) of the Communications Act of 1934, as amended, 47 U.S.C. §309(h), this license is subject to the following conditions:  This license shall not vest in the licensee any right to operate the station nor any right in the use of the frequencies designated in the license beyond the term thereof nor in any other manner than authorized herein.  Neither the license nor the right granted thereunder shall be assigned or otherwise transferred in violation of the Communications Act of 1934, as amended.  See 47 U.S.C. § 310(d).  This license is subject in terms to the right of use or control conferred by §706 of the Communications Act of 1934, as amended.  See 47 U.S.C. §606.

This license may not authorize operation throughout the entire geographic area or spectrum identified on the hardcopy version. To view the specific geographic area and spectrum authorized by this license, refer to the Spectrum and Market Area information under the Market Tab of the license record in the Universal Licensing System (ULS).  To view the license record, go to the ULS homepage at http://wireless.fcc.gov/uls/index.htm?job=home and select "License Search".  Follow the instructions on how to search for license information.

FCC 601-MB
**August 2021**

**Licensee Name:**  STRAIGHT PATH SPECTRUM, LLC

**Call Sign:** WRAZ877          **File Number:**  0008225878          **Print Date:** 07-25-2018

**700 MHz Relicensed Area Information:**

| Market | Market Name | Buildout Deadline | Buildout Notification | Status |
|--------|-------------|-------------------|----------------------|--------|

**FCC 601-MB**
**August 2021**



**Crown Castle**
One Park Place
Suite 300
Dublin, CA 94568

06/21/2022

City of San Mateo
Tracy Scramaglia
Public Works
330 West 20th Ave
San Mateo, CA 94403

<u>RE: FAA Filing for Wireless Facilities</u>

Dear City of San Mateo Public Works,

Crown Castle's proposed Small Wireless Communication Facilities do not require the completion and filing of FAA Form 7460 due to this project not meeting the requirements of the Federal Aviation Code Title 14, Chapter 1, Subchapter E, Part 77. Crown Castle's proposed Small Wireless Communication Facilities do not meet the FAA requirements for facilities that must file with the FAA which is listed below.

§ 77.9 — Any person/organization who intends to sponsor any of the following construction or alterations must notify the Administrator of the FAA:

- Any construction or alteration exceeding 200 ft above ground level
- Any construction or alteration
    - within 20,000 ft of a public use or military airport which exceeds a 100:1 surface from any point on the runway of each airport with at least one runway more than 3,200 ft.
    - within 10,000 ft of a public use or military airport which exceeds a 50:1 surface from any point on the runway of each airport with its longest runway no more than 3,200 ft.
    - within 5,000 ft of a public use heliport which exceeds a 25:1 surface
    - Any highway, railroad or other traverse way whose prescribed adjusted height would exceed that above noted standards
    - When requested by the FAA
    - Any construction or alteration located on a public use airport or heliport regardless of height or location

Furthermore, the FAA Code states that one does not need to file notice for construction or alteration of any object that will be shielded by existing structures of a permanent and substantial nature or by natural terrain or topographic features of equal or greater height and will be located in the congested area of a city, town, or settlement where the shielded structure will not adversely affect safety in air navigation. All of Crown Castle's proposed locations meet this requirement.

Sincerely,


Jason Camarena
Sr. Network Permitting Relations Specialist
1 Park Pl, Suite 300
Dublin, CA 94568

The CPCN was granted in the name of NTC Network, LLC ("NTC") by the California Public Utilities Commission's ("CPUC") Decision 99-06-083 on June 24, 1999 (Order starts on page 11 of the Decision PDF) and assigned the Utility Number U-6190-C.

NTC merged into Freedom Telecommunications LLC ("Freedom" - Utility Number U-7110-C) by way of a pro forma consolidation.  NTC's Utility Number was transferred to Freedom as the surviving entity.  The CPUC accepted NTC's Advice Letter No. 6 dated May 12, 2014 and Freedom's Advice Letter No. 4 dated May 12, 2014.

Freedom was merged into Crown Castle Fiber LLC ("Crown Castle Fiber") with Freedom's CPCN and Utility Number (U-6910-U) being transferred to Crown Castle Fiber – Freedom's Advice Letter No. 13 accepted on November 24, 2018

STATE OF CALIFORNIA                                                    EDMUND G. BROWN JR., *Governor*

**PUBLIC UTILITIES COMMISSION**
505 Van Ness Avenue
San Francisco CA 94102-3298



# Freedom Telecommunications, Llc
# IEC (Corp ID 6190)
# Status of Advice Letter 13
### As of November 27, 2018

Subject:    Pro Forma Consolidation including assumption of CPCN and Utility Number

        Division Assigned:    Telecommunications

        Date Filed:    10-26-2018

        Date to Calendar:    10-31-2018

        Authorizing Documents:    None

| **Disposition:** | **Accepted** |
|---|---|
| **Effective Date:** | **11-24-2018** |

        Resolution Required:    No

        Resolution Number:    None

        Commission Meeting Date:    None

        CPUC Contact Information:
                415-703-1565
                TD_PAL_COORDINATOR@cpuc.ca.gov

        AL Certificate Contact Information:
                Tamar Finn
                202-739-3000
                tamar.finn@morganlewis.com

STATE OF CALIFORNIA                                             EDMUND G. BROWN JR., *Governor*

**PUBLIC UTILITIES COMMISSION**
**505 Van Ness Avenue**
**San Francisco CA 94102-3298**



To:  Telecommunications Carrier Filing Advice Letter

From:  Telecommunications Division PAL Coordinator

Subject:  Your Advice Letter Filing

The Telecommunications Division of the California Public Utilities Commission has
processed your recent Advice Letter (AL) filing and is returning an AL status certificate for
your records.

The AL status certificate indicates:

      Advice Letter Number
      Name of Filer
      CPUC Corporate ID number of Filer
      Subject of Filing
      Date Filed
      Disposition of Filing (Accepted, Rejected, Withdrawn, etc.)
      Effective Date of Filing
      Other Miscellaneous Information (e.g., Resolution, if applicable, etc.)

The Telecommunications Division has made no changes to your copy of the Advice Letter
Filing; please review your Advice Letter Filing with the information contained in the AL
status certificate, and update your Advice Letter and tariff records accordingly.

All inquiries to the California Public Utilities Commission on the status of your Advice
Letter Filing will be answered by Telecommunications Division staff based on the
information contained in the Telecommunications Division's PAL database from which the
AL status certificate is generated. If you have any questions on this matter please contact
the:

      Telecommunications Division PAL Coordinator at **(415) 703-1565**, or by
      e-mail to ***td_pal_coordinator@cpuc.ca.gov***

**STATE OF CALIFORNIA**                                    **EDMUND G. BROWN JR.,** *Governor*

**PUBLIC UTILITIES COMMISSION**
505 Van Ness Avenue
San Francisco CA 94102-3298



**Ntc Network, Inc**
**IEC (Corp ID 6190)**
**Status of Advice Letter 6**
**As of August 11, 2014**

Subject:    Pro Forma consilidation of NTC and Freedom Telecommunications, LLC (U-7110-C)

Division Assigned:    Telecommunications

Date Filed:    05-13-2014

Date to Calendar:    05-16-2014

Authorizing Documents:    None

---

**Disposition:**              **Accepted**

**Effective Date:**           **06-12-2014**

---

Resolution Required:    No

Resolution Number:    None

Commission Meeting Date:    None

CPUC Contact Information:
415-703-1565
TD_PAL_COORDINATOR@cpuc.ca.gov

AL Certificate Contact Information:
Douglas Orvis
202-373-6000
douglas.orvis@bingham.com

STATE OF CALIFORNIA                                    EDMUND G. BROWN JR., *Governor*

**PUBLIC UTILITIES COMMISSION**
**505 Van Ness Avenue**
**San Francisco CA 94102-3298**

To:  Telecommunications Carrier Filing Advice Letter

From:  Telecommunications Division PAL Coordinator

Subject:  Your Advice Letter Filing

The Telecommunications Division of the California Public Utilities Commission has processed your recent Advice Letter (AL) filing and is returning an AL status certificate for your records.

The AL status certificate indicates:

        Advice Letter Number
        Name of Filer
        CPUC Corporate ID number of Filer
        Subject of Filing
        Date Filed
        Disposition of Filing (Accepted, Rejected, Withdrawn, etc.)
        Effective Date of Filing
        Other Miscellaneous Information (e.g., Resolution, if applicable, etc.)

The Telecommunications Division has made no changes to your copy of the Advice Letter Filing; please review your Advice Letter Filing with the information contained in the AL status certificate, and update your Advice Letter and tariff records accordingly.

All inquiries to the California Public Utilities Commission on the status of your Advice Letter Filing will be answered by Telecommunications Division staff based on the information contained in the Telecommunications Division's PAL database from which the AL status certificate is generated. If you have any questions on this matter please contact the:

        Telecommunications Division PAL Coordinator at **(415) 703-1565**, or by e-mail to ***td_pal_coordinator@cpuc.ca.gov***

| Filed By | Advice Letter Number | Tier | Date Filed | Subject | Protested | Date Closed | Effective Date | Days Open | Disposition |
|---|---|---|---|---|---|---|---|---|---|
| Freedom Telecommunications, Inc. | 4 | 1 | 5/13/2014 | Pro Forma Consilidation of Freedom and NTC Network, LLC (U-6190-C) | No | 08/11/14 | 05/13/14 | 90 | Accepted |

ALJ/TRP/avs                                          **Mailed 6/24/99**

Decision 99-06-083  June 24, 1999

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking on the Commission's Own Motion into Competition for Local Exchange Service. | Rulemaking 95-04-043 (Filed April 26, 1995) |
| Order Instituting Investigation on the Commission's Own Motion into Competition for Local Exchange Service. | Investigation 95-04-044 (Filed April 26, 1995) (Petition Nos. 132, 133, 134, 135, 136, 137,138, 139 140, and 142) |

**FORMAL FILE COPY**

## O P I N I O N

By this decision, we grant the petitions for certificates of public convenience and necessity (CPCN) to operate as facilities-based competitive local carriers (CLCs) and to offer resold local exchange services within the territories of Pacific Bell (Pacific), GTE California Incorporated (GTEC), Roseville Telephone Company (RTC), and Citizens Telephone Company (CTC), for those petitioners as set forth in Appendix B of this decision, subject to the terms and conditions included herein.  We also grant petitioners' requests for intrastate interLocal Access and Transport Areas (interLATA) and intraLATA authority on a statewide basis as designated in Appendix B.

## I.  Background

We initially established rules for entry of facilities-based CLCs in Decision (D.) 95-07-054.  Under those procedures, we processed a group of candidates that filed petitions for CPCNs by September 1, 1995, and granted authority effective January 1, 1996, for qualifying CLCs to provide facilities-based competitive local

45871                                    - 1 -

R.95-04-043, I.95-04-044 ALJ/TRP/avs

exchange service in the territories of Pacific and GTEC. We authorized CLCs seeking to provide resale-based services to begin operations on March 1, 1996. We further advised prospective entrants that any filings from nonqualifying CLCs, and any filing for CLC operating authority made after September 1, 1995, would be treated as standard applications and processed in the normal course of the Commission's business.

By D.96-12-020, effective January 1, 1997, we instituted quarterly processing cycles for granting CPCN authority for facilities-based CLCs in order to streamline the approval process for these particular carriers. Since we had been processing the environmental impact review required under the California Environmental Quality Act (CEQA) on a consolidated basis for groups of qualifying facilities-based CLCs, we concluded in D.96-12-020 that it would be more efficient and consistent to process other aspects of the CLC filings on a consolidated basis, as well. Accordingly, we directed that any CLC filing on or after January 1, 1997, for facilities-based CPCN authority was to make its filing in the form of a petition to be docketed in Investigation (I.) 95-04-044 that would be processed quarterly on a consolidated basis. CLCs seeking only resale authority continued to file individual applications.

On September 24, 1997, we adopted D.97-09-115 in which we extended the coverage of our adopted rules for local exchange competition to include the service territories of California's two midsized local exchange carriers (MSLECs), RTC and CTC. In that decision, we also authorized candidates seeking CLC CPCN authority within the MSLECs' territories to immediately begin making filings following the applicable entry rules previously adopted in D.95-07-054 and subsequent decisions. Specifically, requests for CLC CPCN authority for facilities-based service were to be filed in the form of a petition docketed in I.95-04-044, while resellers have sought authority through applications. In

R.95-04-043, I.95-04-044  ALJ/TRP/avs

D.98-01-055, we approved the first group of petitions for facilities-based CPCNs to offer local exchange service within the MSLEC territories.

In this decision, we approve CPCNs for those facilities-based CLCs which filed petitions during the first quarter of 1999 and satisfied all applicable rules for certification as established in Rulemaking (R.) 95-04-043.  The Petitioners identified in Appendix B will be authorized to begin offering service upon the filing of tariffs and compliance with the terms and conditions set forth in this order.

## II.  CEQA Review

We have reviewed the petitions for compliance with CEQA.  CEQA requires the Commission to assess the potential environmental impact of a project in order that adverse effects are avoided, alternatives are investigated, and environmental quality is restored or enhanced to the fullest extent possible. To achieve this objective, Rule 17.1 of the Commission's Rules requires the proponent of any project subject to Commission approval to submit with the petition for approval of such project a Proponent's Environmental Assessment (PEA).  The PEA is used by the Commission to focus on any impacts of the project which may be of concern, and prepare the Commission's Initial Study to determine whether the project needs a Negative Declaration or an Environmental Impact Report (EIR).

Based on its assessment of the facilities-based petitions and PEAs, the Commission staff prepared a Negative Declaration and Initial Study generally describing the facilities-based Petitioners' projects and their potential environmental effects.  The Negative Declaration prepared by the Commission staff is considered a Mitigated Negative Declaration (MND).  This means that, although the initial study identified potentially significant impacts, revisions

R.95-04-043, I.95-04-044  ALJ/TRP/avs

which mitigate the impacts to a less than significant level have been agreed to by the Petitioners.  (Pub. Res. Code § 21080(c)(2).)

## A. Results of the Negative Declaration

On April 29, 1999, the Negative Declaration and Initial Study were sent to various city and county planning agencies, as well as public libraries throughout the state for review and comment by May 28, 1999.  The Commission staff prepared a public notice which announced the preparation of the draft negative declaration, the locations where it was available for review, and the deadline for written comments.  The public notice was advertised in newspapers throughout the state.  The draft Negative Declaration was also submitted to the Governor's Office of Planning and Research where it was circulated to affected state agencies for review and comment.

Public comments on the draft Negative Declaration were reviewed and answered, as necessary.  The Commission staff then finalized the MND covering all facilities-based CLC petitions listed in Appendix B.  The finalized MND includes a list of mitigation measures with which the CLCs must comply as a condition of their CPCN authority.  The MND includes a Mitigation Monitoring Plan to ensure that the mitigation measures are followed and implemented as intended.  A copy of the MND is attached to this decision as Appendix D.  We hereby approve the MND as finalized by staff.  Concurrently with our approval of the MND, we grant the request of the Petitioners in Appendix B for CPCN authority subject to the terms and conditions set forth in our order below.

## B. Required Payment of CEQA Deposit

Commission Decision 97-04-046 stipulates that all petitioners for CLC authority must submit with their filing an initial payment of $2000 to cover CEQA costs.  The $2000 payment is used to cover the Commission's costs for

R.95-04-043, I.95-04-044  ALJ/TRP/avs

preparing and publishing the Mitigated Negative Declaration for each qualifying petitioner, as required by CEQA law. As of the date of this order, the Commission has received payment of the required $2000 deposit from each of the CLCs, as identified in Appendix B.

## III. Review of CPCN Petitions

### A. Overview

The CLC petitions have been reviewed for compliance with the certification-and-entry rules (Rules) adopted in Appendices A and B of D.95-07-054 and subsequent decisions in R.95-04-043/I.95-04-044. Consistent with our goal of promoting a competitive market as rapidly as possible, we are granting authority to all of the facilities-based CLCs that filed during the first quarter of 1999 and met the Rules. The Rules are intended to protect the public against unqualified or unscrupulous carriers, while also encouraging and easing the entry of CLC providers to promote the rapid growth of competition.

Petitioners had to demonstrate that they possessed the requisite managerial qualifications, technical competence, and financial resources to provide facilities-based local exchange service. Petitioners were also required to submit proposed tariffs which conform to the consumer protection rules set forth in Appendix B of D.95-07-054. In response to a notice of tariff deficiencies, the various petitioners submitted tariff corrections. Except for the outstanding deficiencies noted in Appendix C, the petitioners' proposed tariffs are found to be satisfactory with no deficiencies noted.

As prescribed in Rule 4.B.(1), prospective facilities-based CLCs must also show that they possess a minimum of $100,000 in cash or cash-equivalent resources, as defined in the Rules. In order to demonstrate that they possess the requisite financial resources, petitioners submitted copies of recent financial

R.95-04-043, I.95-04-044  ALJ/TRP/avs

statements.  Because the financial statements contain commercially sensitive information, the petitioners filed motions for limited protective orders to restrict the financial statements and related documents containing commercially sensitive information from public disclosure pursuant to General Order (GO) 66-C.  We grant those motions as prescribed in our order below.

Based upon our review, we conclude that each of the facilities-based Petitioners identified in Appendix B, has satisfactorily complied with our certification requirements for entry, including the consumer protection rules set forth in D.95-07-054, subject to correcting any tariff deficiencies in Appendix C, payment of the required CEQA deposit, and satisfying the additional conditions set forth in the ordering paragraphs below.  Accordingly, we grant these Petitioners authority to offer facilities-based and resold local exchange service within the territories of Pacific and GTEC and, where requested, within the CTC and RTC territories.  We also grant the statewide inter- and intraLATA authority as requested.

Pursuant to D.97-09-115, CLC resale authority within the RTC and CTC territories was authorized to become effective on or after April 1, 1998.  As we stated in D.97-09-115, until the time that tariffed wholesale discount rates are adopted for RTC and CTC, individual CLCs certificated to resell local service within the CTC/RTC territories may enter into negotiations with each of the MSLECs to seek agreement on an interim wholesale discount rate.  Disputes over the terms of resale arrangements may be submitted to the Commission for arbitration pursuant to the provisions of Section 252(b)(1) of the Telecommunication Act of 1996 and Commission Resolution ALJ-174.

R.95-04-043, I.95-04-044  ALJ/TRP/avs

### B. Motion of DSLnet

DSLnet Communications, LLC ("DSLnet"), attempted to file a petition (# 142) for CLC local exchange authority on March 31, 1999, with the intention of being included in the Commission's quarterly "batch" review of such petitions filed during the first quarter of 1999.  However, DSLnet subsequently learned that, due to certain confusion surrounding whether DSLnet's Petition was complete for purposes of the Commission's review, the Commission did not technically accept DSLnet's petition until April 13, 1999.  As a result, it is now too late for DSLnet's Petition to be included in the Commission's quarterly review process for such petitions filed during the first quarter of 1999, at least to the extent DSLnet seeks facilities-based authority.

Nonetheless, in order to allow DSLnet to initiate competitive telecommunications service in California as soon as possible, DSLnet filed a motion on May 4, 1999, asking the Commission to:  (1) immediately consider the portion of DSLnet's Petition seeking authority to resell local exchange telecommunications services, and (2) consider the portion of DSLnet's Petition seeking facilities-based authority in the Commission's quarterly review process for Petitions filed during the second quarter of 1999.

No party has objected to the motion of DSLnet.  We consider the request of DSLnet for consideration of the resale portion of its petition in the current quarterly review to be reasonable, under the circumstances and shall grant it.

Due to the timing requirements relating to the Mitigated Negative Declaration, DSLnet's request for facilities-based authority cannot be considered during the current quarter, but shall be deferred to the subsequent quarterly review period.

R.95-04-043, I.95-04-044  ALJ/TRP/avs

## IV. Compliance With Section 311

In compliance with Pub. Util. Code Section 311 (g)(2), this is an uncontested matter in which the decision grants the relief requested. Accordingly, pursuant to Pub. Util. Code Section 311(g)(2), the otherwise applicable 30-day period for public review and comment is being waived.

## Findings of Fact

1.  Nine petitioners filed requests during the first quarter of 1999 seeking a CPCN to provide competitive local exchange services in the territories of various California incumbent local exchange carriers as set forth in Appendix B.

2.  An additional petitioner, DSLnet attempted to file during the first quarter, but the filing was not actually docketed until April 13, 1999.  DSLnet subsequently filed an uncontested motion seeking to have its request for CLC resale authority to be considered as part of the first quarterly group of CLCs.

3.  No protests to the CLC petitioners have been filed.

4.  A hearing is not required.

5.  By prior Commission decisions, we authorized competition in providing local exchange telecommunications service within the service territories of Pacific, GTEC, RTC, and CTC for carriers meeting specified criteria.

6.  The Petitioners listed in Appendix B have demonstrated that each of them has a minimum of $100,000 in cash or cash equivalent reasonably liquid and readily available to meet its start-up expenses.

7.  Petitioners' technical experience is demonstrated by supporting documentation which provides summary biographies of their key management personnel.

8.  Except as noted in Appendix C, Petitioners have each submitted a complete draft of their initial tariff which complies with the requirements

R.95-04-043, I.95-04-044  ALJ/TRP/avs

established by the Commission, including prohibitions on unreasonable deposit requirements.

9.  Commission D.97-04-046 stipulates that all petitioners for CLC authority must submit with their filing an initial payment of $2,000 to cover the Commission's costs for preparing and publishing the Mitigated Negative Declaration pursuant to CEQA.

10.  Each of the CLCs, as identified in Appendix B, has submitted the required $2,000 CEQA deposit as of the date of this order.

11.  By D.97-06-107, petitioners or applicants for CLC authority are exempt from Rule 18(b).

12.  Exemption from the provisions of Pub. Util. Code §§ 816-830 has been granted to other nondominant carriers.  (*See*, e.g., D.86-10-007 and D.88-12-076.)

13.  The transfer or encumbrance of property of nondominant carriers has been exempted from the requirements of Pub. Util. Code § 851 whenever such transfer or encumbrance serves to secure debt.  (*See* D.85-11-044.)

**Conclusions of Law**

1.  Each of the Petitioners listed in Appendix B has the financial ability to provide the proposed services, and has made a reasonable showing of technical expertise in telecommunications.

2.  Public convenience and necessity require the competitive local exchange services to be offered by Petitioners subject to the terms, conditions, and restrictions set forth below.

3.  Each Petitioner is subject to:

   a.  The current 0.0% surcharge applicable to all intrastate services except for those excluded by D.94-09-065, as modified by D.95-02-050, to fund the Universal Lifeline Telephone Service (Pub. Util. Code § 879; Resolution T-16245, December 3, 1998);

- 9 -

R.95-04-043, I.95-04-044  ALJ/TRP/avs

b. The current 0.192% surcharge applicable to all intrastate services except for those excluded by D.94-09-065, as modified by D.95-02-050, to fund the California Relay Service and Communications Devices Fund (Pub. Util. Code § 2881; Resolution T-16234; D.98-12-073, , December 17, 1998);

c. The user fee provided in Pub. Util. Code §§ 431-435, which is 0.11% of gross intrastate revenue for the 1998-1999 fiscal year (Resolution M-4789);

d. The current surcharge applicable to all intrastate services except for those excluded by D.94-09-065, as modified by D.95-02-050, to fund the California High Cost Fund-A (Pub. Util. Code § 739.30; D.96-10-066, pp. 3-4, App. B, Rule 1.C; Resolution T-16242 at 0.0% for 1999, December 3, 1998);

e. The current 3.8% surcharge applicable to all intrastate services except for those excluded by D.94-09-065, as modified by D.95-02-050, to fund the California High Cost Fund-B (D.96-10-066, p. 191, App. B, Rule 6.F., Resolution T-16244, December 3, 1998); and,

f. The current 0.05% surcharge applicable to all intrastate services except for those excluded by D.94-09-065, as modified by D.95-02-050, to fund the California Teleconnect Fund (D.96-10-066, p. 88, App. B, Rule 8.G, Resolution T-16165; August 1, 1998).

4. Petitioners should be exempted from Rule 18(b).

5. Petitioners should be exempted from Pub. Util. Code §§ 816-830.

6. Petitioners should be exempted from Pub. Util. Code § 851 when the transfer or encumbrance serves to secure debt.

7. Each of the Petitioners must agree to, and is required to, carry out any specific mitigation measures adopted in the Mitigated Negative Declaration (MND), attached as Appendix D, in compliance with CEQA.

R.95-04-043, I.95-04-044  ALJ/TRP/avs

8.  With the incorporation of the specific mitigation measures in the final MND, the Petitioners' proposed projects will not have potentially significant adverse environmental impacts.

9.  The Petitioners should be granted CPCNs subject to the terms, conditions, and restrictions set forth in the order below.

10.  Any CLC which does not comply with our rules for local exchange competition adopted in R.95-04-043 shall be subject to sanctions including, but not limited to, revocation of its CLC certificate.

## O R D E R

**IT IS ORDERED** that:

1.  A certificate of public convenience and necessity (CPCN), shall be granted to each of the Petitioners listed in Appendix B (Petitioners) to permit each of them to operate as a facilities-based provider of competitive local exchange telecommunications services, as a reseller of competitive local exchange telecommunications services within the service territories as noted in Appendix B and, as a statewide nondominant interexchange carrier (NDIEC), as noted in Appendix B, contingent on compliance with the terms identified in Appendix B and in the remainder of this order.

2.  Each Petitioner shall file a written acceptance of the certificate granted in this proceeding prior to commencing service.

3.  a.  The Petitioners are authorized to file with this Commission tariff schedules for the provision of competitive local exchange, intraLATA (Local Access Transport Area) toll and intrastate interLATA services, as applicable.  The Petitioners may not offer these services until tariffs are on file, and until any applicable deficiencies as noted in Appendix C have been corrected.  Petitioners'

R.95-04-043, I.95-04-044  ALJ/TRP/avs

initial filing shall be made in accordance with General Order (GO) 96-A, excluding Sections IV, V, and VI, and shall be effective not less than one day after approval by the Telecommunications Division.

     b.  The Petitioners are competitive local carriers (CLCs).  The effectiveness of each of their future tariffs is subject to the schedules set forth in Decision (D.) 95-07-054, Appendix A, § 4E.

     A.  "E.  CLCs shall be subject to the following tariff and contract-filing, revision and service-pricing standards:

      "(1)  Uniform rate reductions for existing tariff services shall become effective on five (5) working days' notice to the Commission. Customer notification is not required for rate decreases.

      "(2) Uniform major rate increases for existing tariff services shall become effective on thirty (30) days' notice to the Commission, and shall require bill inserts, or a message on the bill itself, or first class mail notice to customers at least 30 days in advance of the pending rate increase.

      "(3) Uniform minor rate increases, as defined in D.95-07-054, shall become effective on not less than five (5) working days' notice to the Commission. Customer notification is not required for such minor rate increases.

      "(4) Advice letter filing for new services and for all other types of tariff revisions, except changes in text not affecting rates or relocations of text in the tariff schedules, shall become effective on forty (40) days' notice to the Commission.

      "(5) Advice letter filings revising the text or location of text material which do not result in an increase in any rate or charge shall become effective on not less than five (5) days' notice to the Commission.

      "(6) Contracts shall be subject to GO 96-A rules for NDIECs, except interconnection contracts.

R.95-04-043, I.95-04-044  ALJ/TRP/avs

>"(7) CLCs shall file tariffs in accordance with Public Utilities
>     (Pub. Util.) Code Section 876."

4.  The Petitioners may deviate from the following provisions of GO 96-A:
(a) paragraph II.C.(1)(b), which requires consecutive sheet numbering and
prohibits the reuse of sheet numbers, and (b) paragraph II.C.(4), which requires
that "a separate sheet or series of sheets should be used for each rule."  Tariff
filings incorporating these deviations shall be subject to the approval of the
Commission's Telecommunications Division.  Tariff filings shall reflect all fees
and surcharges to which Petitioners are subject, as described in Conclusion of
Law 3.  Petitioners are also exempt from GO 96-A Section II.G.(1) and (2) which
require service of advice letters on competing and adjacent utilities, unless such
utilities have specifically requested such service.

5.  Each Petitioner shall file as part of its initial tariffs, after the effective date
of this order and consistent with Ordering Paragraph 3, a service area map.

6.  Prior to initiating service, each Petitioner shall provide the Commission's
Consumer Services Division with the Petitioner's designated contact persons for
purposes of resolving consumer complaints and the corresponding telephone
numbers.  This information shall be updated if the names or telephone numbers
change or at least annually.

7.  Where applicable, each Petitioner shall notify this Commission in writing
of the date local exchange service is first rendered to the public within five days
after service begins.  The same procedure shall be followed for the authorized
intraLATA and interLATA services, where applicable.

8.  Each Petitioner shall keep its books and records in accordance with
generally accepted accounting principles.

R.95-04-043, I.95-04-044  ALJ/TRP/avs

9.  Petitioners shall each file an annual report, in compliance with GO 104-A, on a calendar-year basis using the information-request form developed by the Commission Staff and contained in Appendix A.

10.  Petitioners shall ensure that its employees comply with the provisions of Pub. Util. Code § 2889.5 regarding solicitation of customers.

11.  The certificate granted and the authority to render service under the rates, charges, and rules authorized will expire if not exercised within 12 months after the effective date of this order.

12.  The corporate identification number assigned to each Petitioner, as set forth in Appendix B, shall be included in the caption of all original filings with this Commission, and in the titles of other pleadings filed in existing cases.

13.  Within 60 days of the effective date of this order, each Petitioner shall comply with Pub. Util. Code § 708, Employee Identification Cards, reflecting its authority, and notify the Director of the Telecommunications Division in writing of its compliance.

14.  Each Petitioner is exempted from the provisions of Pub. Util. Code §§ 816-830.

15.  Each Petitioner is exempted from Pub. Util. Code § 851 for the transfer or encumbrance of property, whenever such transfer or encumbrance serves to secure debt.

16.  If any Petitioner is 90 days or more late in filing an annual report or in remitting the fees listed in Conclusion of Law 4, Telecommunications Division shall prepare for Commission consideration a resolution that revokes that Petitioner's CPCN, unless that Petitioner has received written permission from Telecommunications Division to file or remit late.

R.95-04-043, I.95-04-044  ALJ/TRP/avs

17.  The Final Mitigated Negative Declaration, including the Mitigation Monitoring Plan, attached as Appendix D of this decision is hereby approved and adopted.

18.  Each of the Petitioners listed in Appendix B shall comply with the conditions and carry out the mitigation measures outlined in the adopted Mitigated Negative Declaration.

19.  Each of the Petitioners shall provide the Director of the Commission's Energy Division with reports on compliance with the conditions and implementation of mitigation measures under the schedule outlined in the Mitigated Negative Declaration.

20.  Petitioners shall comply with the consumer protection rules set forth in Appendix B of D.95-07-054.

21.  Petitioners shall comply with the Commission's rules for local exchange competition in California that are set forth in Appendix C of D.95-12-056, including the requirement that CLCs shall place customer deposits in a protected, segregated, interest-bearing escrow account subject to Commission oversight.

22.  Petitioners shall comply with the customer notification and education rules adopted in D.96-04-049 regarding the passage of calling party number.

23.  Petitioners' respective motions for a limited protective order keeping designated documents containing financial and other operating information confidential are granted.  Such documents will remain under seal for one year from today unless a petitioner makes a timely request for extension of confidential treatment of its documents by filing a separate motion with good cause shown.

24.  The motion of DSLnet to have the resale portion of its CLC petition considered in the current quarterly cycle is granted.

- 15 -

R.95-04-043, I.95-04-044  ALJ/TRP/avs

25.  The petitions listed in Appendix B are granted only as set forth above.

This order is effective today.

Dated June 24, 1999, at San Francisco, California.

RICHARD A. BILAS
President
HENRY M. DUQUE
JOSIAH L. NEEPER
JOEL Z. HYATT
CARL W. WOOD
Commissioners

Certified as a True Copy
of the Original

*[signature]*

ASST. EXECUTIVE DIRECTOR, PUBLIC UTILITIES COMMISSION
STATE OF CALIFORNIA

R.95-04-043, I.95-04-044  ALJ/TRP/avs

## APPENDIX A
### Page 1 of 2

TO:  ALL COMPETITIVE LOCAL CARRIERS AND INTEREXCHANGE
     TELEPHONE UTILITIES

Article 5 of the Public Utilities Code grants authority to the California Public
Utilities Commission to require all public utilities doing business in California to
file reports as specified by the Commission on the utilities' California operations.

A specific annual report form has not yet been prescribed for the California
interexchange telephone utilities. However, you are hereby directed to submit an
original and two copies of the information requested in Attachment A no later
than March 31st of the year following the calendar year for which the annual
report is submitted.

Address your report to:

            California Public Utilities Commission
            Auditing and Compliance Branch, Room 3251
            505 Van Ness Avenue
            San Francisco, CA 94102-3298

Failure to file this information on time may result in a penalty as provided for in
§§ 2107 and 2108 of the Public Utilities Code.

If you have any question concerning this matter, please call (415) 703-1961.

R.95-04-043, I.95-04-044  ALJ/TRP/avs

## APPENDIX A
### Page 2 of 2

Information Requested of California Competitive Local Carriers and Interexchange Telephone Utilities.

To be filed with the California Public Utilities Commission, 505 Van Ness Avenue, Room 3251, San Francisco, CA 94102-3298, no later than March 31st of the year following the calendar year for which the annual report is submitted.

1. Exact legal name and U # of reporting utility.

2. Address.

3. Name, title, address, and telephone number of the person to be contacted concerning the reported information.

4. Name and title of the officer having custody of the general books of account and the address of the office where such books are kept.

5. Type of organization (e.g., corporation, partnership, sole proprietorship, etc.).

    If incorporated, specify:

    a. Date of filing articles of incorporation with the Secretary of State.

    b. State in which incorporated.

6. Commission decision number granting operating authority and the date of that decision.

7. Date operations were begun.

8. Description of other business activities in which the utility is engaged.

9. A list of all affiliated companies and their relationship to the utility. State if affiliate is a:

    a. Regulated public utility.

    b. Publicly held corporation.

10. Balance sheet as of December 31st of the year for which information is submitted.

11. Income statement for California operations for the calendar year for which information is submitted.

### (END OF APPENDIX A)

R.95-04-043, I.95-04-044  ALJ/TRP/avs

## APPENDIX B
### Page 1 of 1

## LISTING OF PETITIONERS GRANTED CPCN AUTHORITY

| Name of Petitioner | Petition No. | Utility U-No. | Local Exchange[1] Facilities-based | Resale | Statewide Inter/Intra-LATA |
|---|---|---|---|---|---|
| 1. Eagle Communications of California, LLC | 132 | U-6182C | X | X | |
| 2. US Data Highway Corp.[2], | 133 | U-6183C | X | | |
| 3. Seren Innovations, Inc. [2] | 133 | U-6184C | X | X | X |
| 4. HTC Communications, LLC [2] | 135 | U-6185C | X | X | X |
| 5. Network Plus, Inc. | 136 | U-6186C | X | X | X |
| 6. Campuslink Communications Systems, Inc. [2] | 137 | U-6187C | X | X | X |
| 7. XL Networks, Inc. | 138 | U-6188C | X | X | X |
| 8. Triad Communications Corporation[2], | 139 | U-6189C | X | X | X |
| 9. NTC Network, LLC[2] | 140 | U-6190C | X | X | X |
| 10. DSLnet Communications, LLC [3] | 142 | U-6191C | | X | |

(Requested Authority Granted)

---

[1] Unless otherwise indicated, the authorized local exchange service territory of each CLC petitoner is limited to the ILEC service territories of Pacific, GTEC.

[2] The authorized local exchange territory for this carrier encompasses the ILEC service territories of Pacific, GTEC, RTC, and CTC.

[3] The facilities-based portion of the DSLnet petition shall be considered during the next quarterly review period.

R.95-04-043, I.95-04-044  ALJ/TRP/avs*

**APPENDIX C**
**LIST OF CLC Tariff Deficiencies**
**Page 1 of 4**

**Eagle Communications, Pet. 132**

Eagle Communications was to file a supplement to its petition as previously requested by the Telecommunications Staff to correct the many deficiencies to its tariffs.  To date, it has not filed a supplement to correct the identified deficiencies.  Eagle must file a revised set of tariffs that fully comply with D.95-07-054, D.95-12-056, D.95-12-057, D.96-04-049.

**Network Plus – Pet. 136**

**Deficiencies in Network Plus's Proposed Tariffs**

1.  On each tariff sheet, (1) replace the phrase above the top horizontal line "Local Exchange Services" to "Competitive Local Carrier Tariff" and (2) add a vertical line on both the left and right margins.

2.  Sheet No. 3, Preliminary Statement, 1.1, last paragraph.  Replace the phrase "to resell local exchange telecommunications services within the State of California" to "*to provide facilities-based and resale local exchange services as a competitive local carrier in the service areas of Pacific Bell, GTEC, Citizens and Roseville Telephone Companies.*"

3.  Sheet No. 13, Rule 1, Definitions.  Include the definitions adopted in Decision 95-07-054 for:  (1) Major Rate Increase, and (2) Minor Rate Increase.

4.  Sheet No. 17, Rule 3, Customer Application for Service.  Revise tariffs to fully comply with the provisions of Rule 2, Appendix B of Decision 95-07-054, (e.g., service initiation based on a written or oral agreement; confirmation letter

R.95-04-043, I.95-04-044  ALJ/TRP/avs*

## APPENDIX C
## LIST OF CLC Tariff Deficiencies
## Page 2 of 4

5.  briefly describing services, in case of an oral agreement; statement of terms/conditions for all new customers, etc.).

6.  Sheet No. 18, Rule 5, Contracts and Agreements.  Delete language re effectivity on five days' notice for "subsequent completed contracts."  *All* contracts shall be subject to the 40-day notice until revised by the Commission.

7.  Sheet No. 19.  (1) Rule 6, Special Information Required on Forms.  Revise tariff language to fully comply with the provisions of Rule 3 (A) and (B), Appendix B of Decision 95-07-054.   (2) Rule 7, Establishment and Re-establishment of Credit.  Include language on situations when deposits are not required.  (See Rule 4, Appendix B of Decision 95-07-054.)

8.  Sheet No. 20.  (1) Rule 8, Advance Payments.  Revise tariff language to indicate that advance payments shall be credited on the customer's first bill. (2) Deposits.  Include language on the interest rate to be added to deposits. (See Rule 5, Appendix B of Decision 95-07-054.)

9.  Sheet No. 21, Rule 9, Notices.  (1) Revise tariff to indicate that cancellation of service by customers may be either verbal or written.  (2) Include tariff language on rates and rate revisions and information on notices of discontinuance by a competitive local carrier.  (See Rule 6, Appendix B of Decision 95-07-054.)

10.  Sheet No. 22, Rule 10, Cancellation of Service by Company.  Revise tariff to indicate that notice of discontinuance of service by a company for nonpayment of bills shall be provided in writing by first class mail to the customer not less than 7 calendar days prior to termination.

R.95-04-043, I.95-04-044  ALJ/TRP/avs*

## APPENDIX C
## LIST OF CLC Tariff Deficiencies
## Page 3 of 4

11.  Sheet No. 25, Rule 16, Rendering and Payment of Bills.  Note that a five-month back billing period for error files and  one and one-half years back billing period for fraud are applicable only to interexchange service providers.  Revise tariff accordingly.  (See Decision 88-09-061.)

12.  Sheet Nos. 27 through 31, Liability of the Company.  Adopt either Pacific Bell's or GTEC's limitation of liability.  The limitation of liability of these companies are appended to Decision 95-12-057.

13.  Sheet 36, Rule 25, Additional Provisions, etc., Section D.  Include language to indicate that deposits will be refunded *with interest within 30 days* after discontinuance of service or 12 months of service, whichever comes first.

14.  Sheet 37, Rule 26, Additional Provisions, etc.  Comply with the back billing provisions of Decision 88-09-061 for local exchange service providers.

15.  Sheet 68, Custom Calling Services.  Briefly describe each feature.  Delete any reference to Caller ID service.  This service can only be provided upon compliance with the customer notification and education rules adopted in Decision 96-04-049.

16.  Sheet 72, Taxes and Surcharges.  Update the applicable California surcharges.  The current surcharges are:  (1) Reimbursement Fee - 0.11%; (2) ULTS - 0.00%; (3) CHCF-A- 0.00%; (4) CHCF-B - 3.8%; (5) California Relay Service & Communications Devices Fund - 0.192%; (6) California Teleconnect Fund - 0.05%.

17.  Include tariffs on:  (1) Directories, (2) Non-published service, (3) Demarcation points, (4) Pro-rating of bills, (5) Change of service provider,

R.95-04-043, I.95-04-044  ALJ/TRP/avs**

**APPENDIX C**
**LIST OF CLC Tariff Deficiencies**
**Page 4 of 4**

18.  (6) Blocking of 976/900 calls, (7) Access to 911 by residential customers
disconnected for nonpayment, (8) Switched access, (9) Number portability,
(10) Privacy, (11) Universal Lifeline Telephone Service (ULTS) rates and income
limitations, and (12) Sample forms.  The forms may be filed with the company's
initial tariff filing.  (See Decision 95-07-054.)

**NTC Network, LLC – Pet. 140**

NTC has to file a full set of tariffs in compliance with D.95-07-054, etc.


**(END OF APPENDIX C)**

95-04-043, I.95-04-044  ALJ/TRP/avs

**APPENDIX D**

## NEGATIVE DECLARATION (14)

### Competitive Local Carriers' (CLCs)
### Projects for Local Exchange Telecommunications Service throughout California.

**The subject of this Negative Declaration are nine current petitions/applications for authorization to provide facilities based local telephone services. (See Appendix B).**

The California Public Utilities Commission is the lead agency in approving these petitioners' intent to compete in the local exchange market. Additional approvals by other agencies may be required depending upon the scope and type of construction proposed by the petitioner (e.g. federal, other state agencies, and ministerial permits by local agencies).

Because the subject projects of the nine current petitioners are similar, with some modifications, to the projects proposed by the past petitioners, the Commission incorporates, in whole, Negative Declaration 13 for these nine petitions/applications, and will refer to the incorporated documents as "Negative Declaration 14" (Section 15150 of CEQA Guidelines). **The public comment period for the Draft Negative Declaration 14 begins on April 29, 1999 and expires on May 28, 1999.** Comments should be addressed to: John Boccio, Project Manager, California Public Utilities Commission, Energy Division, 505 Van Ness Avenue, San Francisco, CA 94102, Fax: (415) 703-2200, E-Mail: jbx@cpuc.ca.gov. For further information call Mr. Boccio at (415) 703-2641.

## BACKGROUND

The California Public Utilities Commission's Decision 95-07-054 enables telecommunications companies to compete with local telephone companies in providing local exchange service. Previous to this decision, local telephone service was monopolized by a single utility per service territory. The Commission initially received 66 petitions from companies to provide competitive local telephone service throughout areas presently served by Pacific Bell and GTE California. The 66 petitioners included cable television companies, cellular (wireless) companies,[1] long-distance service providers, local telephone service providers, and various other telecommunication companies that specialize in transporting data.

Forty of the sixty-six petitions were for approval of facilities-based services, which means that the petitioners proposed to use their own facilities in providing local telephone service. The remaining 26 petitions were strictly for approval of resale-based services, meaning that telephone

---

[1] Wireless companies covered in the Negative Declarations adopted by the Commission for entry in the local telephone market are also subject to Commission General Order (G.O. 159A). G.O. 159A delegates to local governments the authority to issue discretionary permits for the approval of proposed sites for wireless facilities. Commission adoption of the Negative Declarations is not intended to supersede or invalidate the requirements contained in General Order 159A.

service will be resold using another competitor's facilities. (Most of the facilities-based petitioners offer resale-based services as well.) The 40 facilities-based petitions indicated that physical modifications to existing facilities may be required, and construction of new facilities was a possibility in the long-term. The 26 resale-based petitions were strictly financial and billing arrangements that involved no construction and were therefore considered to be exempt from the California Environmental Quality Act (CEQA) (Public Resources Code Sections 21000 et seq.).

The Commission issued a draft Negative Declaration for the initial 40 facilities-based petitioners in October 1995. Comments on the draft Negative Declaration covered issues such as traffic congestion, public safety, cumulative impacts, aesthetic impacts, and physical wear on streets. These comments were addressed and the Negative Declaration was modified to some extent in response to the comments. In December 1995, Commission Decision D.95-12-057 adopted a final mitigated Negative Declaration finding that the proposed projects of the initial 40 facilities-based petitioners would not have potentially significant environmental effects with specified mitigation measures incorporated by the projects.

Following the adoption of D.95-12-057, the Commission received eight additional petitions for facilities-based services. The eight petitioners included cable television companies, resale-based providers approved by D.95-12-057, and other telecommunication companies. Following the public comment period, the Commission made minor modifications to the first Negative Declaration, and in September 1996, the Commission adopted the second Negative Declaration for these eight companies (D.96-09-072). (This Negative Declaration is sometimes referred to as "Negative Declaration II"). In January 1997, the Commission adopted a third Negative Declaration for eight more facilities-based petitioners. "Negative Declaration III" is virtually the same document as Negative Declaration II because the proposed projects of the eight petitioners were no different from the projects proposed by the two groups of petitioners that preceded them. Following the issuance of Negative Declaration III, ten subsequent Negative Declarations, Negative Declaration IV (D.97-04-011), Negative Declaration V (D.97-06-100), Negative Declaration VI (D.97-09-110), Negative Declaration VII (D97-12-084), Negative Declaration IX (D.98-03-066), Negative Declaration X (D. 98-06-067), Negative Declaration 11 (D.98-09-66), and Negative Declaration 12 (D.98-12-083) and Negative Declaration 13 (D.99-03-050) have been adopted by the Commission in granting authority to provide facilities based local telecommunication services under essentially the same circumstances. (Negative Declaration VIII addressed telecommunication companies petitioning to provide services in the Roseville Telephone Company and Citizens Telephone Company of California service areas only). Negative Declaration IV addressed nine petitioners, Negative Declaration V addressed six petitioners, Negative Declaration VI addressed eight petitioners Negative Declaration VII addressed five petitioners, Negative Declaration VIII addressed eleven petitioners, Negative Declaration IX addressed eleven petitioners, Negative Declaration X addressed, two petitioners and Negative Declaration 11 addressed eight petitioners and Negative Declaration 12 addressed twelve petitioners.

## PROJECT DESCRIPTION

Following the adoption of Negative Declaration 13, the Commission received nine more petitions/applications for facilities-based services. These petitioners are the subject of this Negative Declaration. *(See Appendix B for a list of the current facilities-based petitioners.)*

Similar to the earlier petitioners, most of the current petitioners are initially targeting local telephone service for areas where their telecommunications infrastructure is already established, and therefore only minor construction is envisioned. Services provided will include but not be limited to voice, data, video, internet and other telecommunications services. The petitioners will need to make some modifications to their existing facilities; these modifications are minor in nature, the most common being the installation of a switch that connects potential customers to outside systems. Switch installation is necessary because customers receiving a particular type of service may not have access to local telephone networks. For example, customers receiving cable television service are presently unable to connect to local telephone networks because of the differences in modes of service. A switch installation by a cable television provider is one step that makes the connection possible. Switch installation is considered a minor modification because it typically involves a single installation within an existing central communication facility or building.

Besides the minor modifications, some of the companies are planning to install their own fiber optic cables to provide adequate service. Cables will be installed within existing utility underground conduits or ducts, or attached to utility poles with existing overhead lines whenever possible. Fiber optic cables are extremely thin, and existing conduits will likely be able to hold multiple cables. However, if existing conduits or poles are unable to accommodate additional cables, then new conduits or poles will need to be constructed by the petitioner. In this case, the petitioners will construct within existing utility rights-of-way. There is also the possibility that the petitioners may attempt to access other rights-of-way (such as roads) to construct additional conduits. Extension of existing rights-of-way into undisturbed areas is not likely, but a possibility.

The installation of fiber optic cables into underground conduits will vary in complexity depending upon the conditions of the surrounding area. For example, in urban, commercial areas, utility conduits can be accessible with minimal groundbreaking and installation simply requires stringing the cable through one end of the conduit and connecting it to the desired end. In this case, major excavation of the right-of-way is unnecessary. However, there may also be conditions where access to the conduit will require trenching and excavation.

Some of the petitioners have plans to construct service boxes or cabinets which contain batteries for the provision of power or emergency power. The dimensions of the boxes vary, but basically range from three to five feet in height. Depending upon the type of technology and facilities operated by the petitioner, smaller service boxes (approximately 3 inches in height) would be used for power supply and backup power. Those petitioners who have no plans to use such

3

boxes already have capable power and backup power within their existing facilities. The petitioners who will need such boxes, have committed to placing the boxes in existing buildings, or in underground vaults. If conditions do not permit building or underground installation, the petitioners would use small low-profile boxes that are landscaped and fenced.

While most of the petitioners will initially compete for customers in urban, commercial and residential zones where telecommunication infrastructure is already in place, some petitioners state their intention or right to compete on a state wide basis wherever competition is permitted. However it is unclear at this time if all areas will be affected by the projects because many petitioners are not specific where they intend to compete in the long-run.

## ENVIRONMENTAL DETERMINATION

An Initial Study was prepared to assess the projects' potential effects on the environment, and the respective significance of those effects. Based on the Initial Study, the CLCs' projects for competitive local exchange service have the potential to cause significant adverse effects on the environment in the area of Land Use and Planning, Geological Resources, Water, Air Quality, Transportation and Circulation, Hazards, Noise, Public Services, Aesthetic and Cultural Resources. The projects will have less than a significant effect in other resource areas of the checklist. It should be noted that Findings 2 through 10 are for those projects which require work within existing utility rights-of-way for the purpose of modifying existing facilities or installing new facilities. Finding 1 is applicable for work outside of the existing utility rights-of-way.

In response to the Initial Study, the following specific measures should be incorporated into the projects to assure that they will not have any significant adverse effects on the environment. *(See Public Resources Code Section 21064.5.)*

As a general matter, many of the mitigation measures rely on compliance with local standards and the local ministerial permit process. Although local safety and aesthetic input is essential in minimizing the impact of the petitioner's construction, local jurisdictions cannot impose standards or permit requirements which would prevent petitioners from developing their service territories, or otherwise interfere with the statewide interest in competitive telecommunication service. Therefore, the petitioners' required compliance with local permit requirements is subject to this limitation.

*The findings of the draft Negative Declaration were modified in response to comments filed during the public comment period from Negative Declarations II and IV. Changes are marked by italics.*

1. The proposed projects could have potentially significant environmental effects for all environmental factors if a proposed project extends beyond the utility right-of-way into undisturbed areas or into other rights-of-way. ("Utility right-of-way" means any utility

4

right-of-way, not limited to only telecommunication utility right-of-way.) For the most part, the petitioners do not plan to conduct projects that are beyond the utility right-of-way. However, should this occur, the petitioner shall file a Petition to Modify its Certificate for Public Convenience and Necessity (CPCN). An appropriate environmental analysis of the impacts of these site specific activities shall be done.

2. The proposed projects will not have any significant effects on Population and Housing, Biological Resources, Energy and Mineral Resources, and Recreation if the proposed projects remain within existing utility right-of-way. There are no potential environmental effects in these areas, or adequate measures are incorporated into the projects to assure that significant effects will not occur.

3. The proposed projects could have potentially significant environmental effects on Geological Resources because possible upgrades or installations to underground conduits may induce erosion due to excavation, grading and fill. It is unclear as to how many times underground conduits may be accessed by the petitioners, but it is reasonable to assume that constant excavation by various providers could result in erosion in areas where soil containment is particularly unstable.

In order to mitigate any potential effects on geological resources, the petitioners shall comply with all local design, construction and safety standards by obtaining all applicable ministerial permits from the appropriate local agencies. In particular, erosion control plans shall be developed and implemented for areas identified as particularly unstable or susceptible to erosion. If more than one petitioner plans to excavate geologically sensitive areas, coordination of their plans shall be necessary to minimize the number and duration of disturbances.

4. The proposed projects could have potentially significant environmental effects on Water Resources because possible upgrades or installation to underground conduits may be in close proximity to underground or surface water sources. While the anticipated construction will generally occur within existing utility rights-of-way, the projects have the potential to impact nearby water sources if heavy excavation is required as the method of access to the conduits.

In order to mitigate any potential effects on water resources, the petitioners shall comply with all local design, construction and safety standards. This will include consultation with all appropriate local, state *and federal* water resource agencies for projects that are in close proximity to water resources, underground or surface. The petitioners shall comply with all applicable local, state *and federal* water resource regulations. Appropriate site specific mitigation plans shall be developed by the petitioners if the projects impact water quality, drainage, direction, flow or quantity. If there is more than one petitioner for a particular area that requires excavation, coordination plans shall be required to minimize the number and duration of disturbances.

5

5. The proposed projects could have potentially significant environmental effects on Air Quality because possible excavation efforts for underground conduits may result in vehicle emissions and airborne dust for the immediate areas of impact. This is especially foreseeable if more than one petitioner should attempt such work in the same locale. While the impact will be temporary, the emissions and dust could exceed air quality standards for the area.

The petitioners shall develop and implement appropriate dust control measures during excavation as recommended by the applicable air quality management district. The petitioners shall comply with all applicable air quality standards as established by the affected air quality management districts. If there is more than one petitioner for a particular area that requires excavation, coordination plans shall be required to minimize the number and duration of disturbances.

6. The proposed projects could have potentially significant environmental impacts on Transportation and Circulation and Public Services because uncoordinated efforts by the petitioners to install fiber optic cable could result in a cumulative impact of traffic congestion, insufficient parking and hazards or barriers for pedestrians. This is foreseeable if the competitors choose to compete in the same locality and desire to install their own cables. If the selected area is particularly dense with heavy vehicular or pedestrian traffic, the impacts could be enormous without sufficient control and coordination. Uncoordinated efforts may also adversely impact the quality and longevity of public street maintenance because numerous excavation activity depreciates the life of the surface pavement. *Impacts from trenching activity may occur in utility rights-of-way that contain other Public Services such as irrigation water lines.*

The petitioners[2] shall coordinate their efforts to install fiber optic cables or additional conduits so that the number of encroachments to the utility rights-of-way are minimized. These coordination efforts shall also include affected transportation and planning agencies to coordinate other projects unrelated to the petitioners' projects. *For example, review of a planning agency's Capital Improvement Plan (CIP) to identify impacted street projects would be an expected part of the coordination effort by the petitioner.* Besides coordinating their efforts, the petitioners shall abide by all local construction, maintenance and safety standards *(and state standards, if applicable)* by acquiring the necessary ministerial permits from the appropriate local agency *or CalTrans (if within a State right-of-way).* Examples of these permits are excavation, encroachment and building permits. Appropriate construction start and end times, and dates if appropriate,

---

2  The petitioners discussed in this Negative Declaration shall coordinate with <u>all</u> CLCs including those listed in the first Negative Declaration adopted by the Commission (D.95-12-057) and all CLCs in future Negative Declarations. CLCs covered in the first Negative Declaration shall likewise be expected coordinate with those CLCs listed in this Negative Declaration or any subsequent one adopted by the Commission.

shall be employed to avoid peak traffic periods and to minimize disruption, especially if the petitioners' work encroaches upon transportation rights-of-way. *Petitioners shall consult with local agencies on appropriate restoration of public service facilities that are damaged by the construction and shall be responsible for such restoration.*

7. The proposed projects could have potentially significant hazard-related effects because uncoordinated construction efforts described above could potentially interfere with emergency response or evacuation plans. There is also potential for an increase in overhead lines and poles which carry hazard-related impacts.

The same mitigation plan as described in the previous section is applicable here as well, and shall be augmented by notice to and consultation with emergency response or evacuation agencies if the proposed project interferes with routes used for emergencies or evacuations. The coordination efforts shall include provisions so that emergency or evacuation plans are not hindered. If the projects result in an increase in overhead communication lines, the petitioner shall obtain the necessary ministerial permits to erect the necessary poles to support the lines. The Commission shall include these facilities as part of its overhead line regular inspections so that the requirements of G.O. 95 are met.

8. The proposed projects could have potentially significant environmental effects on Noise because it is possible some projects may require excavation or trenching. Although the effect is likely to be short-term, existing levels of noise could be exceeded.

If the petitioner requires excavation, trenching or other heavy construction activities which would produce significant noise impacts, the petitioner shall abide by all applicable local noise standards and shall inform surrounding property owners and occupants (particularly school districts, hospitals and the residential neighborhoods) of the day(s) when most construction noise would occur. Notice shall be given at least two weeks in advance of the construction.

9. The proposed projects could have potentially significant environmental effects on aesthetics because it is possible that additional lines on poles in utility rights-of-way could become excessive for a particular area. *Aesthetic impacts may also occur in utility rights-of-way that are landscaped.* Moreover, there is potential for an increase in above grade utility service boxes or cabinets which also carry aesthetic impacts.

Local aesthetic concerns shall be addressed by the petitioners for all facilities that are above-ground, in particular all types of service boxes or cabinets. The local land use or planning agency shall be consulted by the petitioner so that any site-specific aesthetic impacts are assessed and properly mitigated. *For example, this may include restoration of the landscaped utility rights-of-way.*

10. The proposed projects could have potentially significant environmental effects on

cultural resources because situations involving additional trenching may result in *disturbing known* or unanticipated archaeological or historical resources.

*The petitioners shall conduct appropriate data research for known cultural resources in the proposed project area, and avoid such resources in designing and constructing the project.* Should cultural resources be encountered during construction, all earthmoving activity which would adversely impact such resources shall be halted or altered so as to avoid such impacts, until the petitioner retains the service of a qualified archaeologist who will do the appropriate examination and analysis. The archeologist shall consult with appropriate federal, state and local agencies concerned with cultural resources, so that any potential impacts upon cultural resources are assessed and properly avoided or mitigated. The archeologist shall, in coordination with agencies, develop a plan for avoiding or mitigating any potential impacts upon those resources encountered.

In summary, the Mitigation Measures recommended in this environmental determination are:

**A) All Environmental Factors: if** a proposed project extends beyond the utility right-of-way into undisturbed areas or other right-of-way, the petitioner shall file a Petition to Modify its Certificate for Public Convenience and Necessity (CPCN). ("Utility right-of-way" means any utility right-of-way, not limited to only telecommunications utility right-of-way.) An appropriate environmental analysis of the impacts of these site specific activities shall be done.

If the projects remain within the utility right-of-way, the following Mitigation Measures are recommended:

**B) General Cumulative Impacts**: in the event that more than one petitioner seeks modifications or additions to a particular locality, the petitioners shall coordinate their plans with each other, and consult with affected local agencies so that any cumulative effects on the environment are minimized. These coordination efforts shall reduce the number and duration of disturbance to existing utility right-of-way. Regardless of the number of petitioners for a particular locality, the petitioner shall consult with, and abide by the standards established, by all applicable local agencies. Each petitioner shall file a quarterly report, one month prior to the beginning of each quarter, that summarizes the construction projects that are anticipated for the coming quarter. The summary will contain a description of the type of construction and the location for each project so that the local planning agencies can adequately coordinate multiple projects if necessary. The reports will also contain a summary of the petitioner's compliance with all Mitigation Measures for the projects listed. The quarterly reports will be filed with the local planning agencies where the projects are expected to take place and the Commission's Telecommunications Division. The Commission filing will be in the form of an informational advice letter. Subsequent quarterly reports shall also summarize the status

8

of the projects listed in previous quarterly report, until they are completed.

**C) Geological Resources**: the petitioners shall comply with all local design construction and safety standards by obtaining all applicable ministerial permits from the appropriate local agencies including the development and approval of erosion control plans. These shall be developed and implemented for areas identified as particularly unstable or susceptible to erosion. If more than one petitioner plans to excavate sensitive areas, coordination of their plans shall be necessary to minimize the number of disturbances. The petitioner's compliance with this Mitigation Measure shall be included in its quarterly report.

**D) Water Resources**: the petitioners shall consult with all appropriate local, state *and federal* water resource agencies for projects that are in close proximity to water resources, underground or surface. The petitioners shall comply with all applicable local, state *and federal* water resource regulations including the development of site-specific mitigation plans should the projects impact water quality, drainage, direction, flow or quantity. If there is more than one petitioner for a particular area that requires excavation, coordination plans shall be required to minimize the number of disturbances. The petitioner's compliance with this Mitigation Measure shall be included in its quarterly report.

**E) Air Quality**: the petitioners shall develop and implement appropriate dust control measures during excavation as recommended by the applicable air quality management district. The petitioners shall comply with all applicable air quality standards as established by the affected air quality management districts. If there is more than one petitioner for a particular area that requires excavation, coordination plans shall be required to minimize the number of disturbances. The petitioner's compliance with this Mitigation Measure shall be included in its quarterly report.

**F) Transportation and Circulation and Public Services**: the petitioners[3] shall coordinate their efforts to install fiber optic cables or additional conduits so that the number of disturbances to the utility rights-of-way are minimized. These coordination efforts shall include affected transportation and planning agencies to coordinate other projects unrelated to the petitioners' projects. *For example, review of a planning agency's Capital Improvement Plan (CIP) to identify impacted street projects would be an expected part of the coordination effort by the petitioner.* Besides coordinating their efforts, the petitioners shall abide by all local construction, maintenance and safety standards *(and state standards, if applicable)* by acquiring the necessary ministerial permits from the appropriate local agency *and/or CalTrans (if within State right-of-way)*. Examples of these permits are excavation, encroachment and building permits. Appropriate construction start and end times, and dates if appropriate, shall be employed

---

3  See Footnote #2.

to avoid peak traffic periods, especially if the petitioners' work encroaches upon transportation rights-of-way. Notice to the affected area (surrounding property owners and occupants) shall be given at least two weeks in advance of the construction. The notice will provide the time and dates of the proposed construction and discussion of potential impacts on traffic and circulation. *Petitioners shall consult with local agencies on appropriate restoration of public service facilities that are damaged by the construction and shall be responsible for such restoration.* The notice required for Mitigation Measures F and H shall be consolidated. The petitioner's compliance with this Mitigation Measure shall be included in its quarterly report.

**G) Hazards**: the petitioners shall use the Transportation and Circulation mitigation measure and augment it by informing and consulting with emergency response or evacuation agencies if the proposed project interferes with routes used for emergencies or evacuations. The coordination effort shall include provisions so that emergency or evacuation plans are not hindered. If the projects result in an increase in overhead communication lines, the petitioner shall obtain the necessary ministerial permits to erect the necessary poles to support the lines. The Commission shall include these facilities as part of its overhead line regular inspections so that the requirements of G.O. 95 are met. The petitioner's compliance with this Mitigation Measure shall be included in its quarterly report.

**H) Noise**: the petitioner shall abide by all applicable local noise standards and shall inform surrounding property owners and occupants, particularly school districts, hospitals and the residential neighborhoods, of the day(s) when most construction noise would occur if the petitioner plans excavation, trenching or other heavy construction activities which would cause any significant noise. Notice shall be given at least two weeks in advance of the construction. The notice required for Mitigation Measures F and H shall be consolidated. The petitioner's compliance with this Mitigation Measure shall be included in its quarterly report.

**I) Aesthetics**: All applicable local aesthetic standards will be addressed by the petitioners for all facilities that are above-ground, in particular all types of service boxes or cabinets. The local land use agency shall be consulted by the petitioner so that any site-specific aesthetic impacts are assessed and properly mitigated *by the petitioner. For example, this may include restoration of the landscaped utility rights-of-way.* Petitioner's compliance with this Mitigation Measure shall be included in its quarterly report.

**J) Cultural Resources**: *The petitioners shall conduct appropriate data research for known cultural resources in the proposed project area, and avoid such resources in designing and constructing the project.* Should cultural resources be encountered during construction, all earthmoving activity which would adversely impact such resources shall be halted or altered until the petitioner retains the service of a qualified archaeologist who will do the appropriate examination and analysis. The archaeologist will provide

10

proposals for any procedures to mitigate the impact upon those resources encountered. The treatment plan will be designed through coordination with the appropriate federal, state and local agencies. The petitioner's compliance with this Mitigation Measure shall be included in its quarterly report.

***General Statement for all Mitigation Measures:***

*Although local safety and aesthetic input is essential in minimizing the impact of the petitioner's construction, local jurisdictions cannot impose standards or permit requirements which would prevent petitioners from developing their service territories, or otherwise interfere with the statewide interest in competitive telecommunication service. Therefore, the petitioners' required compliance with local permit requirements is subject to this limitation.*

With the implementation of the mitigation measures listed in A) - J) above, the Commission should conclude that the proposed projects will not have one or more potentially significant environmental effects. The Commission should also adopt a Mitigation Monitoring Plan which will ensure that the Mitigation Measures listed above will be followed and implemented. The Mitigation Monitoring Plan is included with this Negative Declaration as Appendix C.

Natalie Walsh, Program Manager
Analysis Branch
Energy Division

4·27·99
Date

11

## INITIAL STUDY CHECKLIST

**Environmental Factors Potentially Affected:**

The environmental factors checked below would be potentially affected by this project, involving at least one impact that is a "Potentially Significant Impact" as indicated by the checklist on the following pages.

☒  Land Use and Planning          ☒  Transportation/Circulation          ☒  Public Services

☐  Population and Housing         ☐  Biological Resources               ☒  Utilities and Service
                                                                          Systems

☒  Geological Problems            ☐  Energy and Mineral Resources

                                                                          ☒  Aesthetics

☒  Water                          ☒  Hazards

                                                                          ☒  Cultural Resources

☒  Air Quality                    ☒  Noise

                                                                          ☐  Recreation

                                  ☒  Mandatory Findings of
                                     Significance

**Note:  For construction outside of the utility rights-of-way, potential environmental impacts are too variable and uncertain to be specifically evaluated in this Initial Study, but are addressed in Environmental Determination 1 and Mitigation Measure (A) in the Negative Declaration.**

**Determination:**

On the basis of this initial evaluation:

I find that the proposed projects COULD NOT have a significant effect
on the environment, and a NEGATIVE DECLARATION will be prepared.                    ☐

I find that although the proposed project could have a significant effect
on the environment, there will not be a significant effect in this case be-
cause the mitigation measures described on an attached sheet have been
added to the projects.  A NEGATIVE DECLARATION will be prepared.                    ☒

I find that the proposed projects MAY have a significant effect on the
environment, and an ENVIRONMENTAL IMPACT REPORT is required.                        ☐

I find that the proposed projects MAY have a significant effect(s) on the
environment, but at least one effect 1) has been adequately analyzed in an
earlier document pursuant to applicable legal standards, and 2) has been
addressed by mitigation measures based on an earlier analysis as described
on attached sheets, if the effect is a "potentially significant impact" or
"potentially significant unless mitigated."  An ENVIRONMENTAL IMPACT
REPORT is required, but it must analyze only the effects that remain to be
addressed.                                                                          ☐

1

I find that although the proposed project could have a significant effect on the environment, there WILL NOT be a significant effect in this case because all potentially significant effects (a) have been analyzed adequately in an earlier EIR pursuant to applicable standards and (b) have been avoided or mitigated pursuant to that earlier EIR, including revisions or mitigation measures that are imposed upon the proposed project.    ☐

_Paul Clanon._    _4-27-99_
**Signature**    For N. Walsh    **Date**

Natalie Walsh    Program Manager
**Printed Name**    Analysis Branch
    Energy Division
    California Public Utilities Commission

| | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|

**I. LAND USE AND PLANNING.  Would the proposal:**

| | | | | | |
|---|---|---|---|---|---|
| a) | Conflict with general plan designation or zoning? | ☐ | ☒ | ☐ | ☐ |
| b) | Conflict with applicable environmental plans or policies adopted by agencies with jurisdiction over the project? | ☐ | ☒ | ☐ | ☐ |
| c) | Be incompatible with existing land use in the vicinity? | ☐ | ☒ | ☐ | ☐ |
| d) | Affect agricultural resources or operations (e.g. impacts to soils or farmlands, or impacts from incompatible land uses)? | ☐ | ☒ | ☐ | ☐ |
| e) | Disrupt or divide the physical arrangement of an established community (including a low-income or minority community)? | ☐ | ☒ | ☐ | ☐ |

The proposed projects are not anticipated to have any significant impacts on general or environmental plans, zoning, existing land usage, or agricultural resources.  The projects are essentially modifications to existing facilities within established utility rights-of-way.   Since these rights-of-way are already designed to be in compliance with zoning and land use plans, disruption of such plans are not foreseeable.  In the event that the petitioners need to construct facilities that extend beyond the rights-of-way, see Mitigation Measure A in the Negative Declaration.

**II. POPULATION AND HOUSING.  Would the proposal:**

| | | | | | |
|---|---|---|---|---|---|
| a) | Cumulatively exceed official regional or local population projections? | ☐ | ☐ | ☐ | ☒ |
| b) | Induce substantial growth in an area either directly or indirectly (e.g. through projects in an undeveloped area or extension of major infrastructure? | ☐ | ☐ | ☐ | ☒ |
| c) | Displace existing housing, especially affordable housing? | ☐ | ☐ | ☐ | ☒ |

The proposed projects will not have impacts upon population or housing.  The purpose of the projects is to

3

introduce competition into the local telephone service market. Since competition will be generally statewide and not centered in one locale, it is not anticipated that the projects will have an effect on population projections or housing availability of any particular area. The areas that will not initially receive the competition are rural, less populated areas; it cannot be seen that the initial lack of competitive services in these areas will result in significant movements of people to areas where competition will be heavy.

| | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|
| **III. GEOLOGIC PROBLEMS.** Would the proposal result in or expose people to potential impacts involving: | | | | |
| a) Fault rupture? | ☐ | ☐ | ☐ | ☒ |
| b) Seismic ground shaking? | ☐ | ☐ | ☐ | ☒ |
| c) Seismic ground failure, including liquefaction? | ☐ | ☐ | ☐ | ☒ |
| d) Seiche, tsunami, or volcanic hazard? | ☐ | ☐ | ☐ | ☒ |
| e) Landslides or mudflows? | ☐ | ☒ | ☐ | ☐ |
| f) Erosion, changes in topography or unstable soil conditions from excavation, grading, or fill? | ☐ | ☒ | ☐ | ☐ |
| g) Subsidence of land? | ☐ | ☐ | ☐ | ☒ |
| h) Expansive soils? | ☐ | ☐ | ☐ | ☒ |
| i) Unique geologic or physical features? | ☐ | ☐ | ☐ | ☒ |

The projects will be constructed within existing utility facilities or established utility rights-of-way and will therefore not expose people to new risks for any of these impacts, except possibly erosion. Should additional cable facilities require the installation of new or upgraded conduits, trenching, excavation, grading and fill could be required. For appropriate mitigation, see Mitigation Measures (B) and (C) for details in the Negative Declaration.

**IV. WATER.** Would the proposal result in:

| | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Changes in absorption rates, drainage patterns, or the rate and amount of surface runoff? | ☐ | ☐ | ☐ | ☒ |
| b) Exposure of people or property to water related hazards such as flooding? | ☐ | ☐ | ☐ | ☒ |

4

| | | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|:---:|:---:|:---:|:---:|
| c) | Discharge into surface waters or other alteration of surface water quality (e.g. temperature, dissolved oxygen or turbidity)? | ☐ | ☒ | ☐ | ☐ |
| d) | Changes in the amount of surface water in any water body? | ☐ | ☐ | ☐ | ☒ |
| e) | Changes in currents, or the course or direction of water movements? | ☐ | ☐ | ☐ | ☒ |
| f) | Change in the quantity of ground waters, either through direct additions or withdrawals, or through interception of an aquifer by cuts or excavations or through substantial loss of groundwater recharge capability? | ☐ | ☒ | ☐ | ☐ |
| g) | Altered direction or rate of flow of groundwater? | ☐ | ☒ | ☐ | ☐ |
| h) | Impacts to groundwater quality? | ☐ | ☒ | ☐ | ☐ |
| i) | Substantial reduction in the amount of groundwater otherwise available for public water supplies? | ☐ | ☐ | ☐ | ☒ |

The projects will involve alterations to existing telecommunication facilities (underground conduits or overhead poles) but could expose additional risks if more than one petitioner decide to compete in the same locality. Efforts to install cables, or if necessary, new conduits, in utility rights-of-way that are in close proximity to an underground or surface water sources could carry significant effects for quality, flow, quantity, direction or drainage if done improperly and without coordination. See Mitigation Measures (B) and (D) in the Negative Declaration for details.

V. AIR QUALITY. Would the proposal:

| | | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|:---:|:---:|:---:|:---:|
| a) | Violate any air quality standard or contribute to an existing or projected air quality violation? | ☐ | ☒ | ☐ | ☐ |
| b) | Expose sensitive receptors to pollutants? | ☐ | ☒ | ☐ | ☐ |

|  |  | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|---|
| c) | Alter air movement, moisture, or temperature, or cause any change in climate? | ☐ | ☐ | ☐ | ☒ |
| d) | Create objectionable odors? | ☐ | ☐ | ☐ | ☒ |

If the projects do not require excavation or trenching of underground conduits, they will not have an effect upon air quality, movement, temperature or climate.  However, should the projects require such work and, if more than one petitioner decide to work in the same locale, there is potential for an increase in dust in the immediate area. See Mitigation Measures (B) and (E) in the Negative Declaration for details.

## VI. TRANSPORTATION/CIRCULATION.
Would the proposal result in:

|  |  | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|---|
| a) | Increased vehicle trips or traffic congestion? | ☐ | ☒ | ☐ | ☐ |
| b) | Hazards to safety from design features (e.g. sharp curves or dangerous intersections) or incompatible uses (e.g. farm equipment)? | ☐ | ☒ | ☐ | ☐ |
| c) | Inadequate emergency access or access to nearby uses? | ☐ | ☒ | ☐ | ☐ |
| d) | Insufficient parking capacity on-site or off-site? | ☐ | ☒ | ☐ | ☐ |
| e) | Hazards or barriers for pedestrians or bicyclists? | ☐ | ☒ | ☐ | ☐ |
| f) | Conflicts with adopted policies supporting alternative transportation (e.g. bus turnouts, bicycle racks)? | ☐ | ☐ | ☐ | ☒ |
| g) | Rail, waterborne or air traffic impacts? | ☐ | ☒ | ☐ | ☐ |

The petitioners plan to modify existing utility conduits or poles within existing utility rights-of-way initially in urban, commercial zones and residential areas.  Modification of these facilities by a single party does not present significant impacts upon traffic or circulation since the installation process is not expected to be lengthy. However, if more than one of the petitioners decide to compete in the same locality, their efforts to install their own cables will have a significant cumulative effect on circulation, especially in dense, urban commercial areas. As a result, increases in traffic congestion, insufficient parking, and hazards or barriers for pedestrian are possible.  See Mitigation Measures (B) and (F) in the Negative Declaration for details.

|  | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|

## VII. BIOLOGICAL RESOURCES.
Would the proposal result in impacts to:

| | | | | | |
|---|---|---|---|---|---|
| a) | Endangered, threatened, or rare species or their habitats (including but not limited to plants, fish, insects, animals, and birds)? | ☐ | ☐ | ☐ | ☒ |
| b) | Locally designated species (e.g. heritage trees)? | ☐ | ☐ | ☐ | ☒ |
| c) | Locally designated natural communities (e.g. oak forest, coastal habitat, etc.)? | ☐ | ☐ | ☐ | ☒ |
| d) | Wetland habitat (e.g. marsh, riparian and vernal pool)? | ☐ | ☐ | ☐ | ☒ |
| e) | Wildlife dispersal or migration corridors? | ☐ | ☐ | ☐ | ☒ |

The projects will not affect any biological resources since all anticipated work will occur within existing utility facilities or established utility rights-of -way.   Established utility rights-of-way are assumed to be outside of locally designated natural communities, habitats or migration corridors.

## VIII. ENERGY AND MINERAL RESOURCES.
Would the proposal result in:

| | | | | | |
|---|---|---|---|---|---|
| a) | Conflict with adopted energy conservation plans? | ☐ | ☐ | ☐ | ☒ |
| b) | Use non-renewable resources in a wasteful and inefficient manner? | ☐ | ☐ | ☐ | ☒ |
| c) | Result in the loss of availability of a known mineral resource that would be of future value to the region and the residents of the State? | ☐ | ☐ | ☐ | ☒ |

The projects will no impact upon mineral resources or the use of energy.  The projects provide competitive telecommunication services that have no direct relationship to efficient energy use or mineral resources.   The installation of additional fiber optic cables are within  existing facilities or rights-of-way that are assumed to have adequate mitigation designs to avoid impacts on any mineral resources within proximity.

| | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|

**IX. HAZARDS.** Would the proposal involve:

| | | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|---|
| a) | A risk of accidental explosion or release of hazardous substances (including, but not limited to: oil, pesticides, chemicals or radiation)? | ☐ | ☐ | ☐ | ☒ |
| b) | Possible interference with an emergency response plan or emergency evacuation plan? | ☐ | ☒ | ☐ | ☐ |
| c) | The creation of any health hazard or potential health hazard? | ☐ | ☐ | ☐ | ☒ |
| d) | Exposure of people to existing sources of potential health hazards? | ☐ | ☐ | ☐ | ☒ |
| e) | Increased fire hazard in areas with flammable brush, grass, or trees? | ☐ | ☐ | ☐ | ☒ |

The installation of fiber optic cables can be a quick, clean and simple procedure with little use of heavy machinery. However there may be situations where excavation and trenching of underground conduits is necessary if the conduits are not easily accessible. Should this occur, uncoordinated efforts by the petitioners in one concentrated area could potentially affect emergency response or evacuation plans for that locale. See Mitigation Measures (B) and (G) in the Negative Declaration for details. Once the project is completed, the additional cables do not represent any additional hazards to people nor do they increase the possibility of fires.

**X. NOISE.** Would the proposal result in:

| | | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|---|
| a) | Increases in existing noise levels? | ☐ | ☒ | ☐ | ☐ |
| b) | Exposure of people to severe noise levels? | ☐ | ☒ | ☐ | ☐ |

The anticipated projects can be a quick and simple procedure, but in some cases could require heavy machinery or construction activity such as excavation, trenching, grading and refill. There is also the possibility that uncoordinated efforts by the petitioners in one locale could increase existing noise levels, if their activities involve the construction described. See Mitigation Measures (B) and (H) in the Negative Declaration for details.

8

| | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|

### XI. PUBLIC SERVICES. Would the proposal have an effect upon, or result in a need for new or altered government services in any of the following areas:

| | | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|---|
| a) | Fire protection? | ☐ | ☐ | ☐ | ☒ |
| b) | Police protection? | ☐ | ☐ | ☐ | ☒ |
| c) | Schools? | ☐ | ☐ | ☐ | ☒ |
| d) | Maintenance of public facilities, including roads? | ☐ | ☒ | ☐ | ☐ |
| e) | Other government services? | ☐ | ☐ | ☐ | ☒ |

The proposed projects will increase competition in the local telephone service. The construction associated with the projects have potential impacts on the maintenance of public streets and roads. Numerous disturbances to the street surfaces depreciates the quality and longevity of the pavement. Trenching projects may also impact other existing public service facilities (e.g. irrigation lines) in the utility rights-of-way. Mitigation Measure F addresses this impact.

### XII. UTILITIES AND SERVICE SYSTEMS. Would the proposal result in a need for new systems or supplies, or substantial alterations to the following utilities:

| | | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|---|
| a) | Power or natural gas? | ☐ | ☐ | ☐ | ☒ |
| b) | Communication systems? | ☐ | ☒ | ☐ | ☐ |
| c) | Local or regional water treatment or distribution facilities? | ☐ | ☐ | ☐ | ☒ |
| d) | Sewer or septic tanks? | ☐ | ☐ | ☐ | ☒ |
| e) | Storm water drainage? | ☐ | ☐ | ☐ | ☒ |
| f) | Solid waste disposal? | ☐ | ☐ | ☐ | ☒ |
| g) | Local or regional water supplies? | ☐ | ☐ | ☐ | ☒ |

The proposed projects could substantially alter communication systems in the event that existing facilities are unable to accommodate all of the participants in the market. If this should occur, additional conduits or poles for telecommunication equipment will need to be inserted in existing utility rights-of-way or the petitioners may seek entry to other rights-of-way. If the petitioners are forced to construct outside of the existing utility rights-of-way,

Mitigation Measure A is applicable. For work within the rights-of-way, see Mitigation Measure B in the Negative Declaration.

|  | | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|:---:|:---:|:---:|:---:|
| **XIII. AESTHETICS.** Would the proposal: | | | | | |
| a) | Affect a scenic vista or scenic highway? | ☐ | ☒ | ☐ | ☐ |
| b) | Have a demonstrated negative aesthetic effect? | ☐ | ☒ | ☐ | ☐ |
| c) | Create light or glare? | ☐ | ☐ | ☐ | ☒ |

The proposed projects will occur within utility rights of way that will be either be undergrounded or on existing poles. Undergrounded facilities will have no demonstrated negative aesthetic effects. *However, landscaped utility rights-of-way may be impacted by trenching activities.* Additional lines on the poles may be a concern, but the proposed cables are not easily discernible and will unlikely have a negative impact. The only scenario where an aesthetic effect can occur is if the number of competitors for a particular area become so heavy that the cables on the poles become excessive. There is potential for an increase in service boxes if the boxes cannot be installed within buildings or underground. Should this occur, the petitioners should follow Mitigation Measures (B) and (I) as described in the Negative Declaration.

|  | | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|:---:|:---:|:---:|:---:|
| **XIV. CULTURAL RESOURCES.** Would the proposal: | | | | | |
| a) | Disturb paleontological resources? | ☐ | ☒ | ☐ | ☐ |
| b) | Disturb archaeological resources? | ☐ | ☒ | ☐ | ☐ |
| c) | Affect historical resources? | ☐ | ☒ | ☐ | ☐ |
| d) | Have potential to cause a physical change which would affect unique ethnic cultural values? | ☐ | ☒ | ☐ | ☐ |
| e) | Restrict existing religious or sacred uses within the potential impact area? | ☐ | ☒ | ☐ | ☐ |

The projects will involve existing utility facilities or established rights-of-way that are assumed to be clear from any paleontological, historical or archaeological resources. However, some projects may require excavation or trenching of utility rights-of-way, or outside the rights-of-way. If *known or* unanticipated cultural resources are encountered during such work, then the Mitigation Measures (B) and (J) should be followed. See Negative Declaration for details.

|  | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|
| **XV. RECREATION. Would the proposal:** | | | | |
| a) Increase the demand for neighborhood or regional parks or other recreational facilities? | ☐ | ☐ | ☐ | ☒ |
| b) Affect existing recreational opportunities? | ☐ | ☐ | ☐ | ☒ |

The projects will have no impact on recreational facilities or opportunities since these resources have no direction relationship to increased competition in local telephone services.

**XVI. MANDATORY FINDINGS OF SIGNIFICANCE.**

| | Potentially Significant Impact | Potentially Significant Unless Mitigation Incorporated | Less Than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Does the project have the potential to degrade the quality of the environment, substantially reduce the habitat of a fish or wildlife species, cause a fish or wildlife population to drop below self-sustaining levels, threaten to eliminate a plant or animal community, reduce the number or restrict the range of a rare or endangered plant or animal, or eliminate important examples of the major periods of California history or prehistory? | ☐ | ☐ | ☐ | ☒ |
| b) Does the project have the potential to achieve short-term, to the disadvantage of long-term, environmental goals? | ☐ | ☐ | ☐ | ☒ |
| c) Does the project have impacts that are individually limited, but cumulatively considerable? ("Cumulatively considerable" means that the incremental effects of a project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probably future projects.) | ☐ | ☒ | ☐ | ☐ |
| d) Does the project have environmental effects which will cause substantial adverse effects on human beings, either directly or indirectly? | ☐ | ☐ | ☐ | ☒ |

# TELEPHONE EXCHANGE AREAS
# CALIFORNIA PUBLIC UTILITIES COMMISSION

LEGEND

- PACIFIC BELL (PB)
- GTE CALIFORNIA (GT)
- CONTEL OF CALIFORNIA (CT)
- OTHER TELEPHONE COMPANIES
- UNIFIED TERRITORY
- NUMBER PLAN AREA BOUNDARIES (NPA) "AREA CODES"
- LATA BOUNDARIES
- PALM SPRINGS MARKET AREA
- COUNTY LINES
- COUNTY NAMES
- MAJOR V · H COORDINATE INTERSECTIONS

REV 1/91

BASE MAP COURTESY OF PACIFIC BELL

OTHER TELEPHONE COMPANIES

**APPENDIX B**

**PROJECT SPONSORS AND ADDRESSES**

1.  Eagle Communications of California, LLC          60 East 56th Street
    I.95-04-044  (Pet 132)                          New York, NY  10022

2.  US Data Highway Corp.                            1113 Hopkins Way
    I.95-04-044  (Pet. 133)                         Pleasanton, CA  94566

3.  Seren Innovations, Inc.                          15 South 5th Street, Suite 500
    I.95-04-044  (Pet. 134)                         Minneapolis, MN  55402

4.  HTC Communications, LLC                          2131 N. Lamer Street
    I.95-04-044  (Pet. 135)                         Burbank, CA  91504

5.  Network Plus, Inc.                               234 Copeland Street
    I.95-04-044  (Pet. 136)                         Quincy, MA  02169

6.  Campuslink Communications Systems, Inc.          1530 Eisenhower Place
    I.95-04-044  (Pet. 137)                         Ann Arbor, MI  48108

7.  XL Networks, Inc.                                909 Via Mirola
    I.95-04-044  (Pet. 138)                         Palos Verdes Estates, CA  90274

8.  Triad Communications Corporation                 2420 Sand Hill Road
    I.95-04-044  (Pet. 139)                         Menlo, Park, CA  94025

9.  NTC Network, LLC                                 700 Wilshire Boulevard, 7th Floor
    I.95-04-044  (Pet. 140)                         Los Angeles, CA  90017

## Appendix C

## Mitigation Monitoring Plan

### Competitive Local Carriers (CLCs)
### Projects for Local Exchange Telecommunication Service throughout California

**Introduction:**

The purpose of this section is to describe the mitigation monitoring process for the CLCs' proposed projects and to describe the roles and responsibilities of government agencies in implementing and enforcing the selected mitigation measures.

**California Public Utilities Commission (Commission):**

The Public Utilities Code confers authority upon the Commission to regulate the terms of service and safety, practices and equipment of utilities subject to its jurisdiction. It is the standard practice of the Commission to require that mitigation measures stipulated as conditions of approval be implemented properly, monitored, and reported on. Section 21081.6 of the Public Utilities Code requires a public agency to adopt a reporting and monitoring program when it approves a project that is subject to the adoption of a mitigated negative declaration.

The purpose of a reporting and monitoring program is to ensure that measures adopted to mitigate or avoid significant environmental impacts are implemented. The Commission views the reporting and monitoring program as a working guide to facilitate not only the implementation of mitigation measures by the project proponents, but also the monitoring, compliance and reporting activities of the Commission and any monitors it may designate.

The Commission will address its responsibility under Public Resources Code Section 21081.6 when it takes action on the CLCs' petitions to provide local exchange telephone service. If the Commission adopts the Negative Declaration and approves the petitions, it will also adopt this Mitigation Monitoring Plan as an attachment to the Negative Declaration.

**Project Description:**

The Commission has authorized various companies to provide local exchange telephone service in competition with Pacific Bell, GTE California, Roseville Telephone Company and Citizens Telephone Company of California. The current petitioners notified the Commission of their intent to compete in the territories throughout California, all of which are facilities-based services meaning that they propose to use their own facilities to provide service.

Step 1: Disputes and complaints (including those of the public) shall be directed first to the Commission's designated Project Manager for resolution. The Project Manager will attempt to resolve the dispute.

Step 2: Should this informal process fail, the Commission Project Manager may initiate enforcement or compliance action to address deviation from the proposed project or adopted Mitigation Monitoring Program.

Step. 3: If a dispute or complaint regarding the implementation or evaluation of the Mitigation Monitoring Program or the Mitigation Measures cannot be resolved informally or through enforcement or compliance action by the Commission, any affected participant in the dispute or complaint may file a written "notice of dispute" with the Commission's Executive Director. This notice shall be filed in order to resolve the dispute in a timely manner, with copies concurrently served on other affected participants. Within 10 days of receipt, the Executive Director or designee(s) shall meet or confer with the filer and other affected participants for purposes of resolving the dispute. The Executive Director shall issue an Executive Resolution describing his decision, and serve it on the filer and the other participants.

Parties may also seek review by the Commission through existing procedures specified in the Commission's Rules of Practice and Procedure, although a good faith effort should first be made to use the foregoing procedure.


**Mitigation Monitoring Program:**

1. As discussed in Mitigation Measure B, the petitioners shall file a quarterly report which summarizes those projects which they intend to construct for the coming quarter. The report will contain a description of the project and its location, and a summary of the petitioner's compliance with the Mitigation Measures described in the Negative Declaration. The purpose of the report is to inform the local agencies of future projects so that coordination of projects among petitioners in the same locality can be done. The quarterly report shall be filed with the appropriate planning agency of the locality where the project(s) will occur. The report shall also be filed as an informational advice letter with the Commission's Telecommunications Division so that petitioner compliance with the Mitigation Measures are monitored..

In order to ensure that the Mitigation Measures are fulfilled, the Commission will make periodic reviews of the projects listed in quarterly reports. The projects will be generally chosen at random, although the Commission will review any project at its discretion. The reviews will follow-up with the local jurisdictions so that all applicable Mitigation Measures are addressed.

If any project is expected to go beyond the existing utility rights-of-way, that project will require a separate petition to modify the CPCN. The petitioner shall file the petition with the Commission and shall also inform the affected local agencies in writing. The local agencies are also responsible for informing the Commission of any project listed in the quarterly reports which may potentially go out of the existing utility right-of-way. As discussed in Mitigation Measure A, a complete environmental review of the project will be triggered under CEQA, with the Commission as the lead agency.

2. In the event that the petitioner and the local agency do not agree if a project results in work outside of the utility rights-of-way, the Commission will review the project and make the final determination. See **Dispute Resolution Process** discussed above.

3. For projects that are in the utility rights-of-way, the petitioners shall abide by all applicable local standards as discussed in the Mitigation Measures. If a petitioner fails to comply with local regulatory standards by either neglecting to obtain the necessary permits, or by neglecting to follow the conditions of the permits, the local agency shall notify the Commission and **Dispute Resolution Process** begins..

4. The Commission is the final arbiter for all unresolvable disputes between the local agencies and the petitioners. If the Commission finds that the petitioner has not complied with the Mitigation Measures in the Negative Declaration, it may halt and terminate the project.

Since many of the facilities-based petitioners are initially targeting local telephone service for areas where their telecommunications infrastructure is already established, very little construction is envisioned. However, there will be occasion where the petitioners will need to install fiber optic cable within existing utility underground conduits or attach cables to overhead lines. There is the possibility that existing utility conduits or poles will be unable to accommodate all the planned facilities, thereby forcing some petitioners to build or extend additional conduits into other rights-of-way, or into undisturbed areas. For more details on the project description please see **Project Description** in the Negative Declaration.

**Roles and Responsibilities:**

As the lead agency under the California Environmental Quality Act (CEQA), the Commission is required to monitor this project to ensure that the required mitigation measures are implemented. The Commission will be responsible for ensuring full compliance with the provisions of this monitoring program and has primary responsibility for implementation of the monitoring program. The purpose of this monitoring program is to document that the mitigation measures required by the Commission are implemented and that mitigated environmental impacts are reduced to insignificance or avoided outright.

Because of the geographic extent of the proposed projects, the Commission may delegate duties and responsibilities for monitoring to other environmental monitors or consultants as deemed necessary. For specific enforcement responsibilities of each mitigation measure, please refer to the Mitigation Monitoring Table attached to this plan.

The Commission has the ultimate authority to halt any construction, operation, or maintenance activity associated with the CLC's local telephone service projects if the activity is determined to be a deviation from the approved project or adopted mitigation measures. For details refer to the mitigation monitoring plan discussed below.

**Mitigation Monitoring Table:**

The table attached to this plan presents a compilation of the Mitigation Measures in the Negative Declaration. The purpose of the table is to provide the monitoring agencies with a single comprehensive list of mitigation measures, effectiveness criteria, the enforcing agencies, and timing.

**Dispute Resolution Process:**

The Mitigation Monitoring Plan is expected to reduce or eliminate many potential disputes. However, in the event that a dispute occurs, the following procedure will be observed:

| Potential Impact | Mitigation Measure | Monitoring/Reporting Action | Effectiveness Criteria | Responsible Party | Timing |
|---|---|---|---|---|---|
| **ALL FACTORS** | | | | | |
| Extension or work beyond or outside of the existing utility right-of-way into undisturbed areas. | A. Petitioner must file a Petition to modify its CPCN. An appropriate environmental study of the project is done. | Quarterly reports. | Any work outside of existing utility right-of-way is assessed through an environ-mental study. | CPUC | Before construction |
| **CUMULATIVE EFFECTS** | | | | | |
| Cumulative im-pacts due to multiple disturb-ances to a par-ticular area. | B. Coordination efforts among the petitioners and the affect-ed local agencies so that construction projects in the same location can be com-bined or simultaneous. | Quarterly reports. | The number and duration of disturbances to a particular area are minimized. | Local agencies. | Before construction |
| **GEOLOGICAL RESOURCES** | | | | | |
| Potential erosion due to excavation, grading and fill. | C. Petitioners shall comply with all local design, construc-tion and safety standards through permit process. Erosion control plans for areas identified as susceptible to erosion. | Quarterly reports. | Erosion at the project areas is contained. | Local agencies. | Before and during contruction. |
| **WATER RESOURCES** | | | | | |
| Potential impact on water resouces, underground or surface due to exca-vation or grading work. | D. Petitioners shall consult with all appropriate water resource agencies for projects in close proximity to water resouces Appropriate mitigation plans shall be developed and compliance to all local and state water regu-lations is required. | Quarterly reports. | Impacts to water qua-lity, drainage, flow, di-rection and quantity are averted. | Federal agencies Local agencies. Applicable state water resource agencies. | Before and during construction.. |

---

* The CPUC is ultimately responsible for compliance with the mitigation measures listed in this document, but shall defer the responsibility to federal, state and local agencies, unless otherwise designated.

(END OF APPENDIX D)

| | | | | | |
|---|---|---|---|---|---|
| **HAZARDS** | | | | | |
| Potential increase in overhead poles and communication lines. | G. Petitioner shall obtain all necessary building permits for the poles.\n\nCPUC will inspect the overhead lines. | Quarterly reports. | Poles are built in compliance with local safety standards. Lines are inspected and maintained as safe. | CPUC\nLocal agencies. | Before and during construction. |
| **NOISE** | | | | | |
| Noise standards for the area are exceeded due to construction. | H. All applicable noise standards shall be complied with by the petitioners.\n\nPetitioners shall notice the surrounding area of constructions dates and times. | Quarterly reports. | Noise from construction is kept to levels that do not exceed local standards. | Local agencies | Before and during construction. |
| **AESTHETICS** | | | | | |
| Service boxes or cabinets may be a visual blight. Landscaping in utility right-of-way may be impacted by trenching. | I. All applicable aesthetic standards will be met by petitioners for above-ground facilities, especially service cabinets. Consult with local agencies on proper restoration of landscaping. | Quarterly reports. | Cabinets are placed within existing buildings, underground, or in areas that are landscaped so that aesthetic impacts are minimized. Landscaping restored to original form. | Local agencies. | Before and during construction. |
| **CULTURAL RESOURCES** | | | | | |
| Cultural resources are encountered during construction; resources are damaged or moved. | J. All earthmoving that would impact the resources shall cease or be altered until the petitioner retains the service of an archaeologist who will propose mitigation. Thorough research done prior to construction to avoid known resources. | Quarterly reports. | Cultural resources that are encountered are not destroyed or adversely impacted. | Local, state and/or federal agencies. | Before and during construction. |

3

PROOF OF SERVICE BY MAIL

I, _____Lillian Li_____, declare:

I am over the age of 18 years, not a party to this proceeding, and am employed by the California Public Utilities Commission at 505 Van Ness Avenue, San Francisco, California.

On _____6/24/99_____, I deposited in the mail at San Francisco, California, a copy of:

_____99-06-083_____
(DECISION NUMBER OR TYPE OF HEARING)

_____6/24/99_____
(DATE OF HEARING)

_____R 95-04-043/I 95-04-044_____
(APPLICATION/CASE/OII/OIR NUMBER)

in a sealed envelope, with postage prepaid, addressed to the last know address of each of the addressees in the attached list.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on _____6/24/99_____, at San Francisco, California.

_____Lillian Li_____
*Signature
9/92

CA-21
6/24/99

R 95-04-043
I 95-04-044

DECISION: *99-06-083*

MAIL DATE: *6/24/99*

Copy of **" OPINION "** and order mailed to the following.

**SEE ATTACHED LIST FOR APPEARANCES, STATE SERVICE**

Count *245*

6/18/99
lil

*doc #15576 (rev. 3/4/98)*

```
*********** SERVICE LIST *************
```

Last updated on 18-JUN-1999 by: LIL
R9504043   LIST
I9504044

```
****************** APPEARANCES ******************
```

Matthew C. Ames
WILLIAMS MALONE/WILLIAMS L. LOWERY
Attorney At Law
1155 CONNECTICUT AVE., NW, STE. 1000
WASHINGTON DC 20036
(202) 785-0600
mames@millervaneaton.com
For: BO&MAI/IREM/NAA/NAREIT/NMHC

Randolph W. Deutsch
Attorney At Law
AT&T COMMUNICATIONS OF CALIFORNIA, INC.
795 FOLSOM STREET, ROOM 690
SAN FRANCISCO CA 94107
(415) 442-5560
deutsch@lga.att.com

Jerry Varcak
Vice President
BANK OF AMERICA
PO BOX 37000, DEPT 13892
SAN FRANCISCO CA 94137
(925) 675-1042
gerald.varcak@bankamerica.com

Jeffrey F. Beck
BECK & ACKERMAN
4 EMBARCADERO CENTER, SUITE 760
SAN FRANCISCO CA 94111
(415) 263-7300
jillbit@aol.com

Stephen P. Bowen
Attorney At Law
BLUMENFELD & COHEN
4 EMBARCADERO CENTER, SUITE 1170
SAN FRANCISCO CA 94111
(415) 394-7500
steve@technologylaw.com
For: SpectraNet International

Walter C. Finch
Executive Vice President
BOMA CALIFORNIA
1000 BROADWAY, SUITE 355
OAKLAND CA 94607-4090

William Brown
SUITE 14E06
1100 PEACHTREE ST, NE
ATLANTA GA 30309-4599
For: bakersfield cellular

Debra L. Carlton
Vice President
CALIFORNIA APARTMENT ASSOCIATION
980 NINTH STREET, STE 2150
SACRAMENTO CA 95814-2741
(916) 447-7881

Darlene Clark
CALIFORNIA CABLE TELEVISION ASSN.
PO BOX 11080
OAKLAND CA 94611
(510) 428-2225
CACableTV@aol.com

Jerome Candelaria
Attorney At Law
CALIFORNIA CABLE TV ASSOCIATION
4341 PIEDMONT AVENUE, 2ND FLOOR
OAKLAND CA 94611-4715
For: CCTA, AT&T,ICG,TCG San Francisco, TCG Los
Angeles, TCG San Diego

Carmela Castellano
1535 MISSION STREET
SAN FRANCISCO CA 94103

Joshua M. King
Senior Counsel
CELLULAR ONE/DIGITAL PCS
651 GATEWAY BLVD., SUITE 1500
SOUTH SAN FRANCISCO CA 94080
(650) 827-5656

Jon Chambers
1850 M STREET, N.W. 11TH FLR.
WASHINGTON DC 20036
For: Sprint Telecommunications Venure
```

*********** SERVICE LIST ************

Charles E. Born
Director, Regulatory Affairs
CITIZENS COMMUNICATIONS
7901 FREEPORT BLVD., SUITE 200
SACRAMENTO CA 95832
(916) 665-5355
cborn@czn.com

Barbara L. Snider
Attorney At Law
CITIZENS COMMUNICATIONS COMPANY
7901 FREEPORT BLVD., SUITE 100
SACRAMENTO CA 95832
(916) 665-5335
bsnider@czn.com

Louise Renne
CITY AND COUNTY OF SAN FRANCISCO
1390 MARKET ST., SUITE 250
SAN FRANCISCO CA 94102
For: City of LA/Sacramento/San Carlos/San Jose/
Santa Monica/San Mateo Cnty Tel Auth/City & Cnty
San

Robert D. Herrick
City Attorney
CITY OF MORENO VALLEY
14177 FREDERICK STREET
MORENO VALLEY CA 92552-0805
(909) 413-3036
For: CITY OF MORENO VALLEY

Nick Rahe
CITY OF SANTA ANA
PO BOX 1988
SANTA ANA CA 92702

Traci Bone
JULIA M.C. FRIEDLANDER
Deputy City Attorney
CITY/COUNTY OF SAN FRANCISCO
1390 MARKET ST., 5TH FLOOR
SAN FRANCISCO CA 94102-5408
(415) 554-4257
For: The City of LA/Sacramento/San Carlos/San
Jose/Santa Monica;San Mateo Co Telcom Auth;S.F.
City &

Terry Monroe
Vice President, State Affairs
COMPETITIVE TELECOMMUNICATIONS ASSN
1900 M STREET, N.W., SUITE 800
WASHINGTON DC 20036
(202) 296-6650
tmonroe@comptel.org

E. Garth Black
Attorney At Law
COOPER, WHITE & COOPER
201 CALIFORNIA ST., 17TH FLOOR
SAN FRANCISCO CA 94111
(415) 433-1900
spb1@cwclaw.com

Mark P. Schreiber
Attorney At Law
COOPER, WHITE & COOPER, LLP
201 CALIFORNIA STREET, 17TH FLOOR
SAN FRANCISCO CA 94111
(415) 433-1900
spb1@cwclaw.com
For: Roseville Telephone Company/Smaller
Independent LECs

Dhruv Khanna
Vice President, General Counsel
COVAD COMMUNICATIONS COMPANY
2330 CENTRAL EXPRESSWAY
SANTA CLARA CA 95050
(408) 490-4560
dkhanna@covad.com

Carrington Phillip
COX CALIFORNIA TELCOM INC.
1400 LAKE HEARN DRIVE NE
ATLANTA GA 30319

Richard Smith
Director, State Regulatory Affairs
COX CALIFORNIA TELCOM, LLC
2200 POWELL STREET, SUITE 795
EMERYVILLE CA 94608-2618
(510) 923-6220
richard.smith@cox.com

Karen L. Peterson
Attorney At Law
CROSBY HEAFEY ROACH & MAY
1999 HARRISON STREET, 26TH FLOOR
OAKLAND CA 94612
(510) 466-6855
klpeterson@chrm.com

Daniel M. Waggoner
DAVIS WRIGHT TERMAINE
2600 CENTURY SQUARE
1501 FOURTH AVENUE
SEATTLE WA 98101-1688

*********** SERVICE LIST *************

David J. Marchant
Attorney At Law
DAVIS WRIGHT TREMAINE LLP
ONE EMBARCADERO CENTER, STE 600
SAN FRANCISCO CA 94111-3834
(415) 276-6568
davidmarchant@dwt.com
For: Teleport Commun.Grp,Cable Plus,


Mark P. Trinchero
Attorney At Law
DAVIS WRIGHT TREMAINE LLP
1300 SW 5TH AVENUE, SUITE 2300
PORTLAND OR 97201
For: ELECTRIC LIGHTWAVE


Jones Day
555 W FIFTH ST SUITE 4600
LOS ANGELES CA 90013

Shelly Bergum
Executive Director
DEAF & DISABLED TELECOM PROGRAM
1939 HARRISON STREET, SUITE 520
OAKLAND CA 94612-3532

Virginia J. Taylor
Attorney At Law
DEPARTMENT OF CONSUMER AFFAIRS
400 R STREET, SUITE 3090
SACRAMENTO CA 95814-6200
(916) 445-5126

Laura H. Phillips
DOW LOHNES & ALBERTSON
1200 NEW HAMPSHIRE AVENUE, N.W.
WASHINGTON DC 20036-6802

Penny H. Bewick
Government & Industry Affairs
ELECTRIC LIGHTWAVE, INC.
4400 NE 77TH AVENUE, PO BOX 4678
VANCOUVER WA 98662-0678
(360) 896-3211

Hal Kluis
President
EVANS TELEPHONE COMPANY
4918 TAYLOR COURT
TURLOCK CA 95382-9599

Bill Tynes
FEDERAL COMMUNICATIONS CORPORATION
131 ALBRIGHT WAY SUITE C
LOS GATOS CA 95030

Jerrey P. Gray
Attorney At Law
GOODIN MACBRIDE SQUERI RITCHIE & DAY LLP
505 SANSOME STREET, STE 900
SAN FRANCISCO CA 94111
(415) 392-7900
jsqueri@gmssr.com
For: Mountain Celluar


John L. Clark
Attorney At Law
GOODIN MACBRIDE SQUERI RITCHIE & DAY LLP
505 SANSOME STREET, 9TH FLOOR
SAN FRANCISCO CA 94111
(415) 765-8443
jclark@gmssr.com
For: HTC COMMUNICATIONS, LLC


Michael B. Day
Attorney At Law
GOODIN MACBRIDE SQUERI RITCHIE & DAY LLP
505 SANSOME STREET, SUITE 900
SAN FRANCISCO CA 94111-3133
(415) 392-7900
mday@gmssr.com

Peter W. Hanschen
Attorney At Law
GRAHAM AND JAMES LLP
ONE MARITIME PLAZA, SUITE 300
SAN FRANCISCO CA 94111
(415) 954-0258
phanschen@gj.com

Barry Pineles
Regulatory Counsel
GST TELECOM, INC.
4001 MAIN STREET
VANCOUVER WA 98663
(360) 906-7104
bpineles@gstworld.net

Susan Rossi
GTE OF CALIFORNIA INCORPORATED
LEGAL DEPARTMENT
ONE GTE PLACE, CA500LB
THOUSAND OAKS CA 91362-3811
(805) 372-6358
susan.rossi@telops.gte.com

*********** SERVICE LIST *************

Schelly Jensen
Manager-Government Relations
GTE WIRELESS
12677 ALCOSTA BOULEVARD
SAN RAMON CA 94583-0811
(510) 904-3908

Bruce M. Holdridge
Director, Government Affairs
ICG TELECOM GROUP, INC.
180 GRAND AVENUE, SUITE 1000
OAKLAND CA 94612
(510) 251-7033

K.S. Noller
Assistant General Manger
IMPERIAL IRRIGATION DISTRICT
PO BOX 937
IMPERIAL CA 92251

Earl Nicholas Selby
Attorney At Law
LAW OFFICES OF EARL NICHOLAS SELBY
418 FLORENCE STREET
PALO ALTO CA 94301-1705
(650) 323-0990
enselby@wenet.net

Kim Logue
Regulatory Analyst
LCI INTERNATIONAL TELECOM CORP.
4250 N. FAIRFAX DRIVE, 12W002
ARLINGTON VA 22203
(703) 363-4321
kim.logue@qwest.net

Terry J. Houlihan
Attorney At Law
MCCUTCHEN DOYLE BROWN & ENERSEN LLP
3 EMBARCADERO CENTER, 18TH FLOOR
SAN FRANCISCO CA 94111
(415) 393-2022
thoulihan@mdbe.com

William C. Harrelson
ANTHONY DITIRRO
Attorney At Law
MCI WORLDCOM
201 SPEAR STREET, 9TH FLOOR
SAN FRANCISCO CA 94105
(415) 228-1090
william.harrelson@wcom.com

Woody Trayler
MCIMETRO
2250 LAKESIDE BLVD
RICHARDSON TX 75082

Mary E. Wand
Attorney At Law
MORRISON & FOERSTER LLP
425 MARKET STREET
SAN FRANCISCO CA 94105
(415) 268-7201
mwand@mofo.com

Hojoon Hwang
Attorney At Law
MUNGER TOLLES & OLSON LLP
355 S. GRAND AVE., 35TH FLOOR
LOS ANGELES CA 90071-1560
(213) 683-9150
hwanghx@mto.com

Burton Gross
MUNGER, TOLLES & OLSON, LLP
33 NEW MONTGOMERY STREET 19TH FLOOR
SAN FRANCISCO CA 94105
(415) 512-4024
grossba@mto.com

Terry Murray
MURRAY & ASSOCIATES
227 PALM DRIVER
PIEDMONT CA 94610

Helen M. Mickiewicz
Legal Division
RM. 5123
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-1319
hmm@cpuc.ca.gov

Joseph R. Cocke
NORTH AMERICAN NUMBERING PLAN ADM
SUITE 349
2060-D AVENUE ARBOLES
THOUSAND OAKS CA 91362

Martin A. Mattes
Attorney At Law
NOSSAMAN GUTHNER KNOX & ELLIOTT, LLP
50 CALIFORNIA STREET, 34TH FLOOR
SAN FRANCISCO CA 94111-4799
(415) 398-3600
mmattes@nossaman.com

Robert J. Gloistein
Attorney At Law
ORRICK HERRINGTON & SUTCLIFFE, LLP
400 SANSOME STREET
SAN FRANCISCO CA 94111-3143
(415) 773-5900
rgloistein@orrick.com

*********** SERVICE LIST *************

David Discher
ROBERT J. MAZIQUE
Attorney At Law
PACIFIC BELL
140 NEW MONTGOMERY ST, ROOM 1517
SAN FRANCISCO CA 94105
(415) 542-7747
david.discher@pactel.com
For: Pacific Bell


Ed Kolto Wininger
Attorney At Law
PACIFIC BELL
140 NEW MONTGOMERY ST., ROOM 1619
SAN FRANCISCO CA 94105
(415) 545-9422
ed.kolto.wininger@pactel.com

Nicola Erbe
Attorney At Law
PACIFIC BELL
140 NEW MONTGOMERY ST., ROOM 1514
SAN FRANCISCO CA 94105
(415) 542-7691
nicola.erbe@pactel.com

Louis E. Vincent
Attorney At Law
PACIFIC GAS AND ELECTRIC COMPANY
PO BOX 7442
SAN FRANCISCO CA 94120
(415) 973-2981
For: Pacific Gas and Electric Company


Michelle L. Wilson
Attorney At Law
PACIFIC GAS AND ELECTRIC COMPANY
PO BOX 7442, LAW DEPT.
SAN FRANCISCO CA 94120
(415) 973-7467
For: PACIFIC GAS AND ELECTRIC COMPANY


Isabelle Salgado
PACIFIC TELESIS LEGAL GROUP
2600 CAMINO RAMON, ROOM 2W802
SAN RAMON CA 94583

Peter A. Casciato
Attorney At Law
PETER A. CASCIATO, A PROF. CORP.
8 CALIFORNIA STREET, SUITE 701
SAN FRANCISCO CA 94111-4825
(415) 291-8661
casciato@dnai.com
For: ASSOCIATION OF DIRECTORY PUBLISHERS


Randall B. Lowe
PIPER & MARBURY, L.L.P.
1200 NINETEENTH STREET, NW
WASHINGTOM DC 20036

Cheryl Hills
Attorney At Law
PRIMA LEGAL SERVICES
2317 BROADWAY, SUITE 350
REDWOOD CITY CA 94063
(650) 261-0500
chills@primelegal.com
For: Cox California Telcom


Maria E. Andrade
PUBLIC ADVOCATES, INC.
1535 MISSION STREET
SAN FRANCISCO CA 94103-2500
(415) 431-7430
MariaEAndrade@hotmail.com

Daniel Weaver
SAN FRANCISCO BEAUTIFUL
41 SUTTER STREET, SUITE 709
SAN FRANCISCO CA 94104

Natalie D. Wales
Attorney At Law
SPRINT COMMUNICATIONS COMPANY L.P.
1850 GATEWAY DRIVE, 7TH FLOOR
SAN MATEO CA 94404-2467
(650) 513-2732
natalie.d.wales@mail.sprint.com

Andrew Lipman
SWIDLER BERLIN SHEREFF FRIEDMAN, LLP
3000 K ST NW STE 300
WASHINGTON DC 20007

Peter J. Stapp
Vice President Of Regulatory Policy
TCI TELEPHONY SERVICES, INC.
5619 DTC PARKWAY
ENGLEWOOD CO 80111-3000

*********** SERVICE LIST ************

Andrew O. Isar
Director, Industry Relations
TELECOMMUNICATIONS RESELLERS ASSN.
4312 92ND AVENUE, N.W.
GIG HARBOR WA 98335
(253) 265-3910
aisar@harbor-group.com

Deborah Waldbaum
KAREN NOTSUND
Attorney At Law
TELEPORT COMMUNICATIONS GROUP INC
1350 TREAT BOULEVARD, STE 500
WALNUT CREEK CA 94596

Michael A. Morris
Regional Vice President
TELEPORT COMMUNICATIONS GROUP INC.
REGULATORY AND EXTERNAL AFFAIRS
1350 TREAT BLVD.
WALNUT CREEK CA 94596
(10) 949-0600
rris@tcg.com

Thomas Long
THE UTILITY REFORM NETWORK
711 VAN NESS AVE., STE 350
SAN FRANCISCO CA 94102
(415) 929-8879
long@turn.org

Cecil O. Simpson, Jr.
US ARMY LEGAL SERVICES AGENCY
901 NORTH STUART STREET, SUITE 713
ARLINGTON VA 22203-1837
(703) 696-1643
simpsco@hqda.army.mil

Susan Davis Morley
WIGGINS & VILLACORTA, P.A.
2145 DELTA BOULEVARD, STE 200
TALLAHASSEE FL 32302
(850) 385-6007
wiggvill@nettally.com

Michael J. Thompson
Attorney At Law
WRIGHT & TALISMAN, PC
1200 G STREET, N.W., STE 600
WASHINGTON DC 20005
(202) 393-1200
thompson@wrightlaw.com

David A. Simpson
Attorney At Law
YOUNG VOGL HARLICK WILSON & SIMPSON LLP
425 CALIFORNIA ST., STE 2500
SAN FRANCISCO CA 94104
(415) 291-1970
das@bizlaw.net
For: Western Fiber telecom, LLC

David M. Wilson
Attorney At Law
YOUNG VOGL HARLICK WILSON & SIMPSON LLP
425 CALIFORNIA STREET, STE 500
SAN FRANCISCO CA 94104-2107
(415) 291-1970

*************** STATE SERVICE ****************

Joseph A. Abhulimen
Telecommunications Division
AREA 3-E
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-1458
jaa@cpuc.ca.gov

Natalie Billingsley
Office of Ratepayer Advocates
RM. 4101
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-1368
nxb@cpuc.ca.gov

Mary Jo Borak
Telecommunications Division
AREA 3-D
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-1879
bor@cpuc.ca.gov

Danny Shields
Manager
CALTRANS RIGHTS-OF-WAY PROGRAMS
1120 N STREET, MS 37
SACRAMENTO CA 95814-5690

Tracey F. Pirie
Administrarive Analyst
CITY OF SANTA BARBARA
PO BOX 1990
SANTA BARBARA CA 93102-1990

*********** SERVICE LIST *************

Jerry Jazmadarian
Telcommunications Manager
COUNTY OF PLACER
2809 SECOND STREET
AUBURN CA 95603
(530) 889-7735

Brian M. Chang
Office of Ratepayer Advocates
RM. 4205
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-1333
bmc@cpuc.ca.gov

Robert T. Feraru
Public Advisor Office
RM. 5303
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-2074
rtf@cpuc.ca.gov

Janice L. Grau
Legal Division
RM. 5023
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-1960
jlg@cpuc.ca.gov

Risa Hernandez
Telecommunications Division
AREA 3-D
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-5331
rhh@cpuc.ca.gov

Karen Jones
Telecommunications Division
AREA 3-D
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-1955
kaj@cpuc.ca.gov

Ira Kalinsky
Legal Division
RM. 5027
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-2130
kal@cpuc.ca.gov

Victoria S Kolakowski
ORA/CIB
Office of Ratepayer Advocates
RM. 4102
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-2245
vsk@cpuc.ca.gov
For: ROOM 4102,  3-2245

Jonathan Lakritz
Telecommunications Division
AREA 3-E
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-2117
jol@cpuc.ca.gov

Thomas Lew
Office of Ratepayer Advocates
RM. 4205
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-1784
tho@cpuc.ca.gov

Bill Neill
Private Citizen, Professional Engineer
PO BOX 33666
SAN DIEGO CA 92163-3666
(619) 231-1313
PROEV@MILL.NET

Barbara Ortega
Executive Division
RM. 5109
320 WEST 4TH STREET SUITE 500
LOS ANGELES CA 90013
(213) 576-7070
bho@cpuc.ca.gov

Dale Piiru
Office of Ratepayer Advocates
RM. 4101
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-1726
dgp@cpuc.ca.gov

Thomas R. Pulsifer
Administrative Law Judge Division
RM. 5005
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-2386
trp@cpuc.ca.gov

************ SERVICE LIST *************

Jacqueline A. Reed
Administrative Law Judge Division
RM. 5117
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-2935
jar@cpuc.ca.gov


Utilities And Communications Committee
SENATE ENERGY
STATE CAPITOL ROOM 408
SACRAMENTO CA 95814


Eleanor Yung Szeto
Telecommunications Division
AREA 3-D
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-2253
eys@cpuc.ca.gov


Leah A. Senitte
9-1-1 Program Mgr.
TELECOMMUNICATIONS DIVISION
601 SEQUOIA PACIFIC BLVD
SACRAMENTO CA 95814-0282


Allan G. Tolman
Departmentof General Services
TELEPHONE & NETWORK SVCS.
601 SEQUOIA PACIFIC BLVD.
SACRAMENTO CA 95814


Jensen Uchida
Telecommunications Division
AREA 3-D
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-5953
jmu@cpuc.ca.gov


Lionel B. Wilson
Legal Division
RM. 5136
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-1642
lbw@cpuc.ca.gov


************ INFORMATION ONLY ***************

Clifford G. Rudolph
President And Chief Exec. Officer
ADVANCED TELCOM GROUP, INC.
885 N. SAN ANTONIO ROAD, SUITE R
LOS ALTOS CA 94022
(650) 559-8900


Richard C. Nelson
Director - Regulatory
AIRTOUCH COMMUNICATIONS, INC.
ONE CALIFORNIA STREET, 28TH FLOOR
SAN FRANCISCO CA 94111-5401
(415) 658-2059


Mark J. Angell
ANGELL & ASSOCIATES
1075 ROSEWOOD DRIVE
GRAPEVINE TX 76051
(817) 329-7424
For: Digital Telecommunications Services, LLC


Glenn Stover
Attorney At Law
AT&T COMMUNICATIONS
795 FOLSOM STREET, ROOM 670
SAN FRANCISCO CA 94107
(415) 442-5550
gstover@att.com


William A. Ettinger
Attorney At Law
AT&T COMMUNICATIONS OF CALIFORNIA, INC.
795 FOLSOM STREET, ROOM 625
SAN FRANCISCO CA 94107
(415) 442-2783
ettinger@att.com
For: AT&T Communications of California, Inc.


Kurt Maass
AT&T WIRELESS SERVICES, INC.
5400 CARILLON POINT
KIRKLAND WA 98033


Mary Kruchten
BANK OF AMERICA
PO BOX 37000 DEPT 13411
SAN FRANCISCO CA 94137


M. Manuel Fishman
Attorney At Law
BARTKO ZANKEL TARRANT MILLER
900 FRONT STREET, STE 300
SAN FRANCISCO CA 94111
(415) 956-1900
mfishman@bztm.com

************ SERVICE LIST *************

Charles L. Best
Attorney At Law
1220 S.W. MORRISON ST., SUITE 805
PORTLAND OR 97205

Stephen P. Bowen
Attorney At Law
BLUMENFELD & COHEN
4 EMBARCADERO CENTER, SUITE 1170
SAN FRANCISCO CA 94111
(415) 394-7500
steve@technologylaw.com

James E. Pickrell
BRAND X INTERNET
927 6TH STREET
SANTA MONICA CA 90403
(310) 395-5500

Milton J. Morris, Esq.
Attorney
BROOKS FIBER COMMUNICATIONS OF SAC.
10316 PLACER LANE
SACRAMENTO CA 95827
(916) 431-5105
For: Brooks Fiber Communications of Sacramento,
Inc.


Rachel J. Rothstein
Senior Regulatory Counsel
CABLE & WIRELESS, INC.
8219 LEESBURG PIKE
VIENNA VA 22182
(703) 734-4439

Jeff Kositsky
CAL/NEVA COMMUNITY ACTION
225 30TH ST STE 200
SACRAMENTO CA 95814

Traci Nutter
CALIFORNIA PAYPHONE ASSOCIATION
1866 CLAYTON ROAD, SUITE 213
CONCORD CA 94520

Jeffrey Elkins   Ceo
CALTECH INTERNATIONAL TELECOM
197 JOAQUIN CIRCLE
DACVILLE CA 94526

Douglas F. Carlson
POST OFFICE BOX 12574
BERKELEY CA 94712-3574
(510) 597-9995
dfc@uclink4.berkeley.edu

Heidi Sieck Williamson
Dept Of Telecommunications & Information
CITY & COUNTY OF SAN FRANCISCO
875 STEVENSON STREET, 5TH FLOOR
SAN FRANCISCO CA 94103
(415) 554-0811
heidi_sieck-williamson@ci.sf.ca.us

Bremda Riddick
Director
CLEC IMPLEMENTATION
1250 BAYHILL DRIVE, STE 200
SANBRUNO CA 94066
(650) 794-2689
brenda.riddick@ren.net

Michele Tennant
COLE RAYWID BRAVERMAN
1919 PENNSYLVANIA AVE., NW., SUITE 200
WASHINGTON DC 20006-3458

Nancy Biagini
Cwa Staff Representative
COMMUNICATIONS WORKERS OF AMERICA
411 AIRPORT BOULEVARD
BURLINGAME CA 94010
(650) 348-7303

Ken Mceldowney
Executive Director
CONSUMER ACTION
717 MARKET STREET, SUITE 310
SAN FRANCISCO CA 94103

Thomas J. Burke
CONTEL SERVICE CORPORATION
#CA500 GCF
ONE GTE PLACE
THOUSAND OAKS CA 91362-3811

Bernard H. Chao
Esquire
COVAD COMMUNICATIONS COMPANY
2330 CENTRAL EXPRESSWAY
SANTA CLARA CA 95050
(408) 490-4367
bchao@covad.com

Alexander V. Netchvolodoff
Vice President Of Public Policy
COX ENTERPRISES, INC.
1225 19TH STREET NW, STE 450
WASHINGTON DC 20036-2458

*********** SERVICE LIST ************

Cherrie Conner
Telecommunications Division
AREA 3-D
505 VAN NESS AVE
SAN FRANCISCO CA 94102
(415) 703-2767
chr@cpuc.ca.gov

Joseph Faber
Attorney
DAVIS WRIGHT TREMAINE LLP
ONE EMBARCADERO CENTER
SUITE 600
SAN FRANCISCO CA 94111-3834
(415) 276-6500
For: New Telco, d/b/a Sprint Telecommunications
Venture

Juanita Harris
DEPARTMENT OF JUSTICE/TELECOM TASK FORCE
ANTITRUST DIVISION NO.8104
1401 H STREET NW, STE 8000
WASHINGTON DC 20530
(202) 514-5642
For: DEPARTMENT OF JUSTICE

David Carter
DIALINK CORPORATION
164 E. DANA STREET
MOUNTAIN VIEW CA 94041-1508
(650) 691-9330

T.M. Eagan
Calif. Environmental & Resource Assc.
EAGAN & WARD
1024 10TH STREET, STE. 300
SACRAMENTO CA 95814-3514

Kevin P. Timpane
FIRST WORLD COMMUNICATIONS, INC.
878 ELIZABETH STREET
SAN FRANCISCO CA 94114

Esther H. Rosenthal
Regulatory Counsel
FIRSTWORLD COMMUNICATIONS
9333 GENESEE AVENUE, SUITE 200
SAN DIEGO CA 92121
(615) 552-8010

Gwen Moore
GEM COMMUNICATIONS
4201 WILSHIRE BLVD., STE 300
LOS ANGELES CA 90010

Regina Deangelis
Attorney At Law
GOODIN MACBRIDE SQUERI RITCHIE & DAY LLP
505 SANSOME STREET, SUITE 900
SAN FRANCISCO CA 94111
(415) 392-7900
For: Preferred Long Distance, Inc.

Regina M. Deangelis
Attorney At Law
GOODIN MACBRIDE SQUERI RITCHIE & DAY LLP
505 SANSOME STREET, STE 900
SAN FRANCISCO CA 94111
(415) 392-7900

Michael Gersick
GRATTAN GERSICK KARP MILLER
980 9TH STREET, 16TH FLOOR
SACRAMENTO CA 95814-2719

Gary Yaquinto
Vice President, Government Affairs
GST TELECOM INC.
1201 S. ALMA SCHOOL ROAD, STE 2000
MESA AZ 85210

Ken Snow
Director-Government Affairs
GST TELECOM, INC.
1340 TREAT BLVD., SUITE 100
WALNUT CREEK CA 94596

Margo Friedrich
Regulatory Affairs
GTE CALIFORNIA INCORPORATED
711 VAN NESS AVE., STE 300
SAN FRANCISCO CA 94102
margo.friedrich@telops.gte.com

Helen Hall
GTE CARD SERVICES INCOPORATED
5221 N. O'CONNOR BLVD., 13TH FLOOR
IRVING TX 75039

Gordon Allen
GTE CARD SERVICES INCORPORATED
1200 WALNUT HILL LANE, STE 2600
IRVING TX 75038

*********** SERVICE LIST *************

Brenda J. Boykin
LOUIS GURMAN
GURMAN , BLASK & FREEDMAN, CHARTERED
1400 SIXTEENTH STREET, N.W., SUITE 500
WASHINGTON DC 20036
(202) 328-8200
For: Commco Tec Corporation

Leslie S. Spahnn
HEIM NOACK KELLY & SPAHNN
1121 L STREET, SUITE 100
SAXRAMENTO CA 95814

Linda L. Oliver
HOGAN & HARTSON
555 THIRTEENTH STREET, N.W.
WASHINGTON DC 20004-1109
(202) 637-5600
lol@dcl.hhlaw.com

Allan C. Hubbard, Esq.
Regulatory Counsel
POST OFFICE BOX 10804
300 WEST SERVICE ROAD
CHANTILLY VA 20153
(703) 478-5772
For: Access Network Services, Inc.

Jack Burk
President
INTEGRATED TELESERVICES, INC.
7108 N. FRESNO STREET, SUITE 300
FRESNO CA 93720

Richard C. Hall
INTEL CORPORATION
1900 PRAIRIE CITY RD, M/S FM4-125
FOLSOM CA 95630-9598

Lance Sentman
International Research Analyst
INTERNATIONAL TELCOM, LTD.
417 SECOND AVENUE WEST
SEATTLE WA 98119
(206) 479-2899
For: INTERNATIONAL TELCOM, LTD.

Edward W. O'Neill
Attorney At Law
JEFFER MANGELS BUTLER & MARMARO LLP
ONE SANSOME STREET, 12TH FLOOR
SAN FRANCISCO CA 94104
(415) 392-8080
ewo@jmbm.com

Jonathan E. Canis
Attorney
KELLEY DRYE & WARREN
1200 19TH STREET, N.W., SUITE 500
WASHINGTON DC 20036
(202) 955-9600
For: Intermedia Communications, Inc.

Ross A. Buntrock
BRAD E. MUTSCHELKNAUS
KELLEY DRYE & WARREN LLP
1200 19TH STREET, FIFTH FLOOR
WASHINGTON DC 20036
(202) 955-9600
For: ACSI Local Switched Services, Inc. dba
e.spire

David Klein
KLEIN ZELMAN ROTHERMEL & DICHTER, LLP
485 MADISON AVENUE
NEW YORK NY 10022
(212) 935-6020
For: Eagle Communications of California , LLC

Scott M. Johnson
Attorney At Law
LAW OFFICE OF SCOTT M. JOHNSON
21312 FOREST MEADOW
EL TORO CA 92630-5813
(949) 855-6358
For: Brand X Internet

David A. Jones
LEAGUE OF CALIFORNIA CITIES
1400 K STREET
SACRAMENTO CA 95814

Thomas Mcdonald
Attorney
LEBOEUF LAMB GREENE & MACRAE
ONE EMBARCADERO CENTER
SAN FRANCISCO CA 94111
(415) 951-1100
For: MCI Metro Access Transmission Services, I

Jacqueline R. Kinney
Attorney At Law
LEGAL AND LEGISLATIVE SERVICES
2788 LAND PARK DRIVE
SACRAMENTO CA 95818

*********** SERVICE LIST ************

Terrence J. Ferguson
Senior Vice President & General Counsel
LEVEL 3 COMMUNICATIONS, LLC
3555 FARNAM STREET
OMAHA NE 68131
(402) 536-3624


General Counsel
LOS ANGELES CELLULAR TELEPHONE CO.
17785 CENTER COURT DRIVE
NORTH CERRITOS CA 90703-8575

Mark Brown
Senior Attorney
MCI TELECOMMUNICATIONS CORP.
201 SPEAR STREET, 9TH FLOOR
SAN FRANCISCO CA 94105
(415) 978-1292
For: MCI Metro Access Transmission Services, Inc.


Denise V. Thomas
MCI WORLDCOM
2678 BISHOP DRIVE, STE 200
SAN RAMON CA 94583

Nikayla Nail
Attorney At Law
MCI WORLDCOM
201 SPEAR STREET, 9TH FLOOR
SAN FRANCISCO CA 94105
(415) 228-1150
n.nail@mci.com

Mark E Brown
JOHN A. GUTTIEREZ
MEDIAONE TELECOMMUNICATIONS OF CALIF,INC
1999 HARRISON STREET, STE 660
OAKLAND CA 94612-3517

Lonn L. Beedy
METRO ONE COMMUNICATIONS
8405 S W NIMBUS AVENUE
BEAVERTON OR 97008

Francis F. Chin
General Counsel
METROPOLITAN TRANSPORTATION COMMISSION
JOSEPH P. BORT METRO CENTER
101 EIGHTH STREET
OAKLAND CA 94607-4700
(510) 464-7710

Kent Heyman, Esq.
Vice President & General Counsel
MGC COMMUNICATIONS, INC.
3165 PALMS CENTRE DRIVE
LAS VEGAS NV 89103
(702) 310-1000


Marilyn H. Ash
Associate Legal Counsel
MGC COMMUNICATIONS, INC.
3301 N. BUFFALO DRIVE
LAS VEGAS NV 89129
(702) 310-8461
mash@mgccom.com

Rocky N. Unruh
Judith A. Holiber
MORGENSTEIN & JUBELIRER LLP
ONE MARKET PLAZA
SPEAR STREET TOWER, 32ND FLOOR
SAN FRANCISCO CA 94105
(415) 896-0666

Lorrie Bernstein
MOSS ADAMS
1899 WEST MARCH LANE, SUITE F
STOCKTON CA 95207-6422
(209) 957-5851

Gregory M. Duncan, Ph.D.
Vice President
NATIONAL ECONOMIC RESEARCH ASSOC. INC.
777 SOUTH FIGUEROA STREET, STE. 4200
LOS ANGELES CA 90017

Jane Emerson
Manager Of Research
NEW PARADIGM RESOURCES GROUP, INC
12 S. MICHIGAN AVE., 5TH FLOOR
CHICAGO IL 60603

Karen M. Potkul
Attorney At Law
NEXTLINK CALIFORNIA, INC.
1924 E. DEERE AVENUE, STE 110
SANTA ANA CA 92705
(949) 417-7766
kpotkul@nextlink.net

Steven Gorosh, Esq.
Vice President & General Counsel
NORTHPOINT COMMUNICATIONS
222 SUTTER STREET, 7TH FLOOR
SAN FRANCISCO CA 94108
For: NORTHPOINT COMMUNICATIONS

*********** SERVICE LIST *************

Jose E. Guzman, Jr.
Attorney At Law
NOSSAMAN GUTHNER KNOX & ELLIOTT LLP
50 CALIFORNIA STREET, 34TH FLOOR
SAN FRANCISCO CA 94111-4799
(415) 398-3600
jeg@ngke.com
For: METROPOLITAN TRANSPORTATION COMMISSION


Audrey P. Rasmussen
O'CONNOR & HANNAN, L.L.P.
SUITE 800
1919 PENNSYLVANIA AVENUE, N.W.
WASHINGTON DC 20006-1400
(202) 887-1400


Kate Riley
OFFICE OF ASSEMPLYMAN WALLY KNOX
STATE CAPITOL
ROOM 6025
SACRAMENTO CA 95814
(916) 316-2042
kate.riley@asm.ca.gov


Fred W. Daniel
PRION TELECOM.
P. BOX 9227
NEWPORT BEACH CA 92658-9227


Carl K. Oshiro
Counselor At Law
100 FIRST STREET, SUITE 2540
SAN FRANCISCO CA 94105
(415) 927-0158
oshirock@pacbell.net


James B. Young
COLLEN M. O'GRADY
PACIFIC BELL
140 NEW MONTGOMERY ST. RM 1619
SAN FRANCISCO CA 94105
(415) 545-0422


Robert Mazique
Attorney
PACIFIC BELL
140 NEW MONTGOMERY STREET
15TH FLOOR
SAN FRANCISCO CA 94105
(415) 542-7712
For: Pacific Bell

D.M. Carroll
PAGING SYSTEMS, INC
PO BOX 4249
BURLINGAME CA 94011-4249


Peter A. Casciato
Attorney At Law
PETER A. CASCIATO, A PROF. CORP.
8 CALIFORNIA STREET, SUITE 701
SAN FRANCISCO CA 94111-4825
(415) 291-8661
casciato@dnai.com


Peter A. Casciato
Attorney At Law
PETER A. CASCIATO, A PROF. CORP.
8 CALIFORNIA STREET, SUITE 701
SAN FRANCISCO CA 94111-4825
(415) 291-8661
casciato@dnai.com
For: Time Warner Telecom of California, L.P.


Bonnie Y. Cheng
Director Of Operations
PHOENIX INTEGRATION CORPORATION
7773 EAST GARVEY AVENUE., SUITE 832
ROSEMEAD CA 91770
(909) 868-0808


Jeff Hendrix
PROTEL, INC.
4150 KIDRON ROAD
LAKELAND FL 33811


Deborah Kong
SAN JOSE MERCURY NEWS
750 RIDDER PARK DRIVE
SAN JOSE CA 95190
(408) 920-5922


Stephen Buel
SAN JOSE MERCURY NEWS
750 RIDDER PARK DRIVE
SAN JOSE CA 95126


Keith W. Melville
Attorney At Law
SEMPRA ENERGY
101 ASH STREET
SAN DIEGO CA 92101-3017
(619) 699-5039
kmelville@sempra.com

*********** SERVICE LIST ************

David M. Norris
Attorney At Law
SIERRA PACIFIC POWER COMPANY
6100 NEIL ROAD, PO BOX 10100
RENO NV 89520-0024
(775) 834-4208
dnorris@sppc.com

Linda Burton
SIERRA TELEPHONE
PO BOX 219
OAKHURST CA 93644-0219

Carol B. Henningson
Attorney At Law
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVE.,
ROSEMEAD CA 91770
(626) 302-1911

Jeffrey M. Pfaff
Attorney At Law
SPRINT PCS - LEGAL/REGULATORY
4900 MAIN STREET, 11TH FLOOR
KANSAS CITY MO 64112
(816) 559-1912

Thomas K. Braun
STEPTOE & JOHNSON, LLP
2244 WALNUT GROVE AVENUE
ROSEMEAD CA 91770
(818) 302-4413
brauntk@sce.com

Charles H.N. Kallenbach
Attorney
SWIDLER & BERLIN, CHARTERED
3000 K STREET, NW., SUITE 300
WASHINGTON DC 20007
(202) 424-7715
For: L.D. Services, Inc.

James Falvey
Attorney
SWIDLER & BERLIN, CHARTERED
3000 K STREET, NW., SUITE 300
WASHINGTON DC 20007
(202) 424-7706
For: GST Lightwave (CA), Inc.

Richard M. Rindler
Attorney
SWIDLER & BERLIN, CHARTERED
3000 K STREET, NW., SUITE 300
WASHINGTON DC 20007
(202) 424-7500
For: WorldCom Technologies, Inc.

Lawrence A. Walke
Attorney At Law
SWIDLER BERLIN SHEREFF FRIEDMAN LLC
3000 K STREET, NW, SUITE 300
WASHINGTON DC 20007
(202) 424-7500
For: DSLnet COMMUNICATIONS, INC.

Phyllis Whitten
SWIDLER BERLIN SHEREFF FRIEDMAN, LLC
3000 K STREET, N.W., SUITE 300
WASHINGTON DC 20007-5116
(202) 424-7500

Andrew D. Lipman
KATHLEEN L. GREENMAN
SWIDLER BERLIN SHEREFF FRIEDMAN, LLP
3000 K ST., N.W., SUITE 300
WASHINGTON DC 20007
(202) 945-6922

Carol Critchlow-Bentley
SWIDLER BERLIN SHEREFF FRIEDMAN, LLP
3000 K STREET, N.W., STE. 300
WASHINGTON DC 20007
(202) 424-7793

Louise Beale
Consultant
TECHNOLOGIES MANAGEMENT, INC.
PO DRAWER 200
WINTER PARK FL 32790-0200
(407) 740-8575

Julie Richey
Marketing Director
TEL COM PLUS
5251 110TH AVE. NORTH, STE 118
CLEARWATER FL 33760
(813) 572-7832

Mark O'Krent
TELEPHONE CONNECTION OF LOS ANGELES
9911 WEST PICO BLVD., STE. 680
LOS ANGELES CA 90035-2710

*********** SERVICE LIST *************

Mike Freedman
Regional Business Manager
TELIGENT, INC.
111 BROADWAY, SUITE 1300
OAKLAND CA 94607-5500

Terri Natoli
CAROLYN SHUP, ESQ.
Esquire
TELIGENT, INC.
8065 LEESBURG PIKE, STE 400
VIENNA VA 22180

Edwin D. Jones
TESCO
355 STARLING ROAD
MILL VALLEY CA 94941
(415) 383-1825

Patricia J Osorio
THE GREENLINING INSTITUTE
785 MARKET ST 3RD FLOOR
SAN FRANCISCO CA 94103-2003

Kenneth F. Melley, Jr.
Vice President Of Regulatory Affairs
U.S. LONG DISTANCE, INC.
9311 SAN PEDRO, SUITE 300
SAN ANTONIO TX 78216
(210) 525-9009

Steve Page
US DATA HIGHWAY CORP.
1113 HOPKINS WAY
PLEASANTON CA 94566
(925) 454-8624

Michael Shames
Attorney At Law
UTILITY CONSUMERS' ACTION NETWORK
1717 KETTNER BLVD., SUITE 101
SAN DIEGO CA 92101-2532
(619) 696-6966
mshames@ucan.org

Glen Carolo
VALLEY COMMUNICATIONS INCORPORATED
47221 FREMONT BOULEVARD
FREMONT CA 94538
(510) 659-9955 X314
gcarolo@valleycom.com

Bruce J. Weston
Attorney At Law
169 WEST HUBBARD AVENUE
COLUMBUS OH 43215-1439

Kathleen Villacorta
Attorney
WIGGINS & VILLACORTA, P.A.
POST OFFICE BOX 1657
501 EAST TENNESSEE STREET, SUITE B
TALLAHASSEE FL 32302
(904) 222-1534
For: Business Discount Plan, Inc. d/b/a L.D.
Discount Plan

David Wilner
PO BOX 2340
NAVATO CA 94948-2340

Maia Ettinger
Legal Director
WORKING ASSETS FUNDING SERVICE, INC.
101 MARKET STREET, NO. 700
SAN FRANCISCO CA 94105
(415) 369-2084

Walter Mcgee
WORKING ASSETS FUNDING SERVICE
701 MONTGOMERY ST., SUITE 400
SAN FRANCISCO CA 94111

Rachelle B. Chong
WENDY CHOW/COUDERT BORTHERS
XL NETWORKS, INC.
4 EMBARCADERO CENTER, SUITE 3300
SAN FRANCISCO CA 94111
(415) 986-1300
For: XL NETWORKS, INC.

Rachelle B. Chong
XL NETWORKS, INC.
4 EMBARCADERO CENTER, SUITE 3300
SAN FRANCISCO CA 94111
(415) 986-1300

David A. Simpson
Attorney At Law
YOUNG VOGL HARLICK WILSON & SIMPSON LLP
425 CALIFORNIA ST., STE 2500
SAN FRANCISCO CA 94104
(415) 291-1970
das@bizlaw.net
For: Bakersfield Cellular Telephone Company

(I)

NETWORK PLUS, INC.
234 COPELAND STREET
QUINCT CA 02169


(I)

EAGLE COMMUNICATIONS OF CALIFORNIA, LLC
60 EAST 56TH STREET
NEW YORK NY 10022


(I)

CAMPUSLINK COMMUNICATIONS SYSTEMS, INC.
1530 EISENHOWER PLACE
ANN ARBOR MI 48108


(I)

SEREN INNOVATIONS, INC.
15 SOUTH 5TH STREET, SUITE 500
MINNEAPOLIS MN 55402


(I)

NTC NETWORK, LLC
700 WILSHIRE BLVD, 7TH FLOOR
LOS ANGELES CA 90017


(I)

XL NETWORKS, INC.
909 VIA MIROLA
PALOS VERDES ESTATES CA 90274


(I)

HTC COMMUNICATIONS, LLC
2131 N LAMER STREET
BURBANK CA 91504


(I)

TRIAD COMMUNICATIONS CORPORATION
2420 SAND HILL ROAD
MENLO PARK CA 94025


(I)

US DATA HIGHWAY CORP.
1113 HOPKINS WAY
PLEASANTON CA 94566

## THIRD AMENDMENT TO MASTER LICENSE AGREEMENT FOR ELECTRIC DISTRIBUTION POLE ATTACHMENTS BETWEEN PACIFIC GAS AND ELECTRIC COMPANY AND NEXTG NETWORKS

This Third Amendment is made and entered into on this $7^{th}$ day of December, 2012 between Pacific Gas and Electric Company ("PG&E"), a California corporation and NextG Networks of California, Inc., a Delaware corporation with offices at 890 Tasman Drive, Milpitas, California ("LICENSEE") (together, PG&E and LICENSEE shall be referred to as the "Parties").

### RECITALS:

WHEREAS, the Parties have executed a Master License Agreement for Electric Distribution Pole Attachments ("Agreement") dated March 30, 2011; as amended by that certain First Amendment to the Master License Agreement dated June 24, 2011; as amended by that certain Second Amendment to the Master License Agreement dated August 24, 2011;

WHEREAS, the Parties desire to amend the Agreement by this Amendment (as defined in the Agreement);

PACIFIC GAS AND ELECTRIC COMPANY

By: Deanna Toy

Name:  Deanna Toy

Title:  Director, Business Development

Contract ID # 65738

NextG Networks
3rd Amendment to MLA
11-8-2012
Page 1 of 2

NEXTG NETWORKS OF CALIFORNIA, INC.

By: _____

Robert L. Delsman
VP DAS Network Real Estate

Name: _____

Title: _____

Approved as to Form
and Legal Sufficiency:

_____
Signature/Initials

Date: __11__ / __9__ /20 _12_

Note - Site plans may accurately list Pacific Gas and Electric (PG&E) as the pole owner but the site-specific permission to attach may come from AT&T due to the communications space on the PG&E owned pole being controlled by AT&T. In these instances, PG&E will not provide approval in addition to AT&T approval and AT&T approval constitutes pole owner approval to attach.

Refer to Attachment 13 of this application, in their normal course of business, the pole owners (PG&E or AT&T) do not provide a statement of structural soundness in their attachment application approval documents.

**EXHIBIT A**
**APPLICATION FOR POLE & CONDUIT ATTACHMENT**
**TELCO CONTACT PERMIT**

 *Pacific Gas and Electric Company*™

WM Notification No. _____125955135_____

| PART 1 | REQUEST FOR ACCESS BY APPLICANT (To PG&E) |
|---|---|

Date 05/11/2023

**PG&E – Joint Utilities Department**

**850 Stillwater Rd**

**West Sacramento, CA 95605**

Overhead License Agreement 2022-01-28 Prior

Agreement Number _____

Application Number CA_SF_SANMATEO_245M2

Applicant Job Number _____

Permittee Company  Crown Castle Fiber LLC (f/k/a Crown Castle NG Networks LLC)

*In accordance with the executed agreement between the Permittee and PG&E, we hereby request access to poles and/ or conduits/ducts, located at or along* 124 Warren Rd _____ *, in the City of* _____ San Mateo, CA 94401 _____ *, as described in the attached drawings.*

Requestor Company Crown Castle Fiber LLC (f/k/a Crown Castle NG Networks LLC) Phone (949)383-1906

Address 2000 Corporate Drive, Canonsburg, PA 15317

Requestor Authorization Signature _Carlos Moreno_

Requestor Authorization Name Carlos Moreno _____ Title: Utility Relations Specialist

***ATTACHMENTS APPLIED FOR UNDER THIS APPLICATION***

No. of Poles Contacted[7] (new) **1 pole license migrating from existing SLA to new OLA** No. of Anchors (new) __

No. of Risers Installed (new) _____ No. of Poles Cable Rebuild[7] (exist[6]) _____

No. of Poles Overlashed[7] (exist[6]) _____ Cable size over 2" (diameter in inch) _____

Total vertical feet of Pole used for Telco equipment (Power Supply) 3

| PART 2 | FINAL AUTHORIZATION BY PG&E (To Permittee) |
|---|---|

***You are hereby authorized for installation.***

PG&E Authorization Signature _Rene Picazo_ Date 5/2/24

PG&E Authorization Name  Rene Picazo _____ Title  Senior New Business Rep

PG&E Job No(s) 35454381 _____ Contact Permit No. _____

| PART 3 | NOTICE OF COMPLETION BY APPLICANT |
|---|---|
| | (To PG&E Area Telco Project Manager with 10 days after completion) |

*We hereby notify you that the work authorized above has been completed and is ready for your inspection.*

Permittee Authorization Signature _Marc Buan_ Date 5/2/2024

Permittee Authorization Name  Marc Buan _____ Title Utility Relations Specialist

Notes: _____
_____
_____

1. PART (1) & (3) to be completed by applicant, part (2) to be completed by PG&E.
2. PG&E's authorization must be secured before the Permittee's facilities are attached.
3. This application shall be submitted to PG&E for all new attachments and rebuilds, overlash or modification of all existing facilities.
4. At PG&E request, Permittee shall be able to provide the authorized Telco Contact Permit (this form) for all attachment.
5. The Permittee shall exercise the access rights to the pole(s) and/or conduit(s) within 90 days of the authorization in Part 2.
6. Applicant to provide Contact Permit Number for existing facilities (see Note 4).
7. A maximum of 25 poles can be applied for on a singular Exhibit A Application.

Environmental Information Form

# CITY OF SAN MATEO
# ENVIRONMENTAL INFORMATION FORM INSTRUCTIONS

The information provided by the applicant on this form will enable City staff to understand the proposed project and to prepare any necessary environmental documents. **Careful completion of this form will enable staff to more efficiently and quickly process your application.**

Answers to the 34 numbered questions should be entered in the space provided. At the end of each question, circle YES or NO. If you circle YES, please complete all subsections of that question. If you circle NO proceed to the next numbered question. All questions must be answered to complete your application. Extra sheets may be attached if longer responses are necessary.

Please contact Planning Staff at (650) 522-7212 if you have any questions in completing this form.

**EXISTING SITE & DEVELOPMENT**

1. Site area (sq. ft. or acres): ___Back of curb - 2x2 sq ft_____

2. Zoning: ___R1A_____

3. Is there existing development on site?                                YES  [NO]

   a. Existing building floor area (gross sq. ft.): _____

   b. Existing building coverage: _____

   c. Number of existing off-street parking spaces: _____

   d. Number of existing bicycle parking spaces: _____

   e. Number of existing structures on the site: _____

   f. Existing use (# of units of residential, or type of use and sq. ft. of use if commercial):

   _____

   _____

4. Are structures or portions thereof, to be removed?                 YES  [NO]

   a.    Square footage to be removed: _____

5. Is the property encumbered by any easements?                       YES  [NO]

-1-

a. Please attach title report and map showing all easements.

6. Describe, in general, the existing uses to the:

North of the site:   Residential

South of the site:   Residential

East of the site:    Residential

West of the site:    Residential

## PROJECT DESCRIPTION

7. Is the project a residential development?              YES [NO]

a. Unit description:

| Type of Unit | Number of Units | Unit Size (range in sq. ft.) | Household Size |
|---|---|---|---|
| Studio | | | |
| 1 Bedroom | | | |
| 2 Bedroom | | | |
| 3 Bedroom | | | |
| TOTAL: | | | |

b. Total floor area (gross sq. ft.): _____

c. Total lot coverage (sq. ft.) if site is zoned R4-D, R5-D or R6-D: _____

d. Number of off-street parking spaces provided:

| | Covered | Open | TOTAL |
|---|---|---|---|
| Standard | | | |
| Compact | | | |
| Handicap | | | |
| Total | | | |

e. Number of bicycle parking facilities (9' x 18' areas) provided: _____

f. Is the proposed project RENTAL or OWNERSHIP? (circle one)

g. Approximate range of sales prices or rental rates: _____

h. Number of stories: _____

i. Building height in feet: _____

j. Building setbacks: Front _____ Left Side _____ Right Side _____ Rear _____

- 2 -

8. Is the project a **COMMERCIAL** INDUSTRIAL, or INSTITUTIONAL development? (circle one)

a. Type of use: Crown Castle small wireless facility on an existing Utility Pole in PROW

b. Gross floor area: N/A

c. Total lot coverage (sq. ft.): N/A

d. Estimated max. no. of employees per shift: N/A

e. Total no. of employees: N/A

f. Days/hours of operation: N/A

g. Number of off-street parking spaces provided:

| | Covered | Open | TOTAL |
|---|---|---|---|
| Standard | | | |
| Compact | | | |
| Handicap | | | |
| Total | | | |

h. Type of loading facilities provided: N/A

i. Number of bicycle facilities provided: N/A

j. Number of stories: N/A

k. Building height (in feet): N/A

l. Building setbacks: Front _____ Left Side _____ Right Side _____ Rear _____

9. Is the proposed development a phased project?                    YES  **NO**

a. Describe each phase and schedule for development: _____

_____

_____

_____

b. Describe any associated projects: _____

_____

_____

10. If the project involves a variance, conditional use or rezoning application, state this and indicate clearly why the application is required. <u>Wireless Communication Facilities Permit</u> <u>required for all wireless facilities installed in San Mateo.</u>

_____

11. Describe any change in scenic views or vistas from existing residential areas or public lands and roads. <u>No changes in any scenic views.</u>

_____

_____

12. Describe any change in the patterns, scale or character of the general area of the property. No changes in patterns, scales, or character.

_____

## GEOLOGY/LAND FORM

13. Will the project involve construction on slopes of 20% or greater?    YES [NO]

 a. Maximum gradient of the property: _____% (vertical rise ÷ horizontal run)

 b. Average gradient of the property: _____% (corner to diagonal corner of site)

14. Will the project involve construction of retaining walls?    YES [NO]

 a. Maximum height (ft.): _____

 b. Total length (ft.): _____

15. Does the project involve excavation for underground parking?    YES [NO]

 a. Depth of construction (ft.): _____

 b. Maximum slope of garage ramp (%): _____

16. Will the proposed project involve grading?    YES [NO]

 a. Total cut (cubic yds.) _____

 b. Total fill (cubic yds.) _____

 c. Maximum depth of cut (ft.) _____

 d. Maximum depth of fill (ft.) _____

 e. Maximum slope of cut and fill slopes (vertical / horizontal): _____

- 4 -

f.  Land area to be disturbed (sq. ft.): _____

g.  Proposed erosion control measures: _____

h.  Proposed measures to prevent failure of slopes: _____

17. Does the site contain a known landslide area, soil creep, expansive soils or other evidence of geologic failure?                                           YES [ NO ]

a.  Describe nature and location(s): _____

_____

_____

18. Does the site contain an unusual geologic landform, such as a ridge line or rock outcrop?
                                                                        YES [ NO ]

a.  Describe feature: _____

b.  Describe any proposed modification: _____

**WATER/HYDROLOGY**

19. Does the site contain or abut a natural drainage channel or streambed?   YES [ NO ]

a.  Describe location(s): _____

_____

20. Describe any proposed alterations to such channel(s) or stream bed(s): _____

_____

_____

21. Does the site abut the Bay, Marina Lagoon, or a slough?               YES [ NO ]

a.  Describe any proposed alterations to such water feature or shoreline. _____

_____

_____

22. Describe the expected amount of water use (except for residential development of fewer than 4 units):

Domestic: ___N/A___ gal/day          Peak Use: ___N/A___ gal/day

Commercial: ___N/A___ gal/day        Peak Use: ___N/A___ gal/day

- 5 -

Expected fire flow demand: _____N/A_____ gal/min

Daily sewer discharge (over 30 fixtures only): _____N/A_____ gal/day

## VEGETATION

23. Will the project remove any trees that are 6" or greater in diameter at a point 4' above grade, or a substantial amount of natural plant cover?    YES [NO]

   a. List the number, types and sizes of all trees existing on the site, and all of these to be removed. (Attach another sheet if more space is needed.) _____

   _____

   b. Describe the existing natural brush and groundcover features of the site and any proposed reduction. _____

   _____

## EXTERNAL IMPACTS

24. Will the proposed project generate dust, smoke, fumes or odors, excluding ~~dust~~ during construction?    YES [NO]

   a. Describe emission(s), extent and duration: _____

   _____

25. Will the project involve the use, storage or disposal of potentially toxic or hazardous materials, including solvents, acids, pesticides, herbicides, or radioactive substances?    YES [NO]

   a. Detail type(s), quantities, storage and disposal procedures: _____

   _____

26. Is the project expected to generate noise in sufficient levels to be heard beyond the boundaries of the site?    YES [NO]

   a. Describe noise generating activities: _____

   b. Daily time duration: _____

## UTILITIES/PUBLIC WORKS

27. Will the proposed project require extension or alteration of existing electrical transmission and distribution facilities?    YES [NO]

   a. Give details of extension: _____

b. Describe location of new electric transformer, if required: _____
_____
_____

28. Are any off-site improvements proposed (such as sewer or storm drain extensions)?
YES [NO]

a. Please describe nature and location: _____
_____
_____
_____
_____

29. Will the proposed project incorporate any measures to conserve electricity, or water?
YES [NO]

a. Please describe: _____
_____
_____

30. Are new curb cuts proposed or existing curb cuts eliminated?     YES [NO]
a. Describe number and location(s): _____
_____
_____

31. Are new streets, or driveways in excess of 300 feet in length, to be developed within the proposed project?     YES [NO]

a. Indicate whether private or public: _____
b. List lengths and widths: _____
c. Maximum grade (%): _____

32. Will proposed structures be protected by fire sprinklers?     YES [NO]

## DISPLACEMENT

33. Will existing businesses or residents be displaced by the proposed development?
YES [NO]

a. Describe type(s) of business(es) or numbers of residents to be displaced: _____
_____

b. Describe any relocation assistance proposed: _____

_____

_____

## LIGHTING/SIGNAGE

34. Does the proposed project include the addition of new exterior lighting?    YES    [NO]

Describe location(s), type(s) and wattage of light fixtures proposed: _____

_____

35. Are signs proposed as part of the proposed project?    [YES]    NO

a. Please provide the following information for all proposed signs:

| Type of Sign (pole, wall, projecting, etc.) | Area (sq. ft.) | Length (ft.) | Height (ft.) | Max. Height (for pole signs) |
|---|---|---|---|---|
| Pole | .44' | 8" | 8" | 20' |
| Pole | .17 | 4" | 6" | 10' |
| | | | | |

b. Will sign(s) flash or include movement?    YES    [NO]

Please describe: _____

_____

_____

_____

## CERTIFICATION

I certify that the above answers are true and correct to the best of my knowledge, and I understand that subsequent action to rescind any permit based upon this questionnaire may be possible if evidence is uncovered to the contrary.

Signature: _Jason Camarena_____

Name: _____Jason Camarena_____

## PERSON COMPLETING THIS APPLICATION

Name: ____Jason Camarena_____    Date: ____10/22/2024____

Address: ___1 Park Pl, Suite 300_____

City: ____Dublin_____    State: ___CA___    Zip: ___94568___

Daytime Phone Number: ____(925) 201-5806_____

- 8 -

RF Compliance Report



# RF EMISSIONS COMPLIANCE REPORT

**Prepared for:**

Crown Castle
1 Park Place
Dublin, CA 94568

**Site:**

CA_SF_SANMATEO_245M2
124 Warren Rd
San Mateo, CA 94401
37.572725, -122.343308

**February 5, 2024**

**This RF Report is based upon the construction plans KHCLE-37293
which show compliance with GO95, Rule 94 requirements.**

## This site will be in compliance with

## FCC Regulations and MPE Limits:

### Crown Castle Is 1.191% of General Population (GP) Limit

### (0.238% of Occupational (Occ) Limit)

<u>Certification</u>
I have reviewed this RF Emissions
assessment report and believe it to be both
true and accurate to the best of my
knowledge.

REGISTERED PROFESSIONAL ENGINEER
DAVID CHARLES COTTON JR.
NO. 18838
2024-Feb-05
ELECTRICAL
STATE OF CALIFORNIA

David Charles Cotton, Jr.
Registered Professional Engineer (Electrical)
State of California, 18838

**Analysis completed using Waterford's NIERTool© software**

**Only clients and client representatives are authorized to provide input data through the Waterford web
portal. In securing that authorization, clients and client representatives warrant the accuracy of all input
data. Waterford Consultants, LLC attests to the accuracy of the engineering calculations. Waterford also
attests that the results of those engineering calculations are correctly summarized in this report.**

©Copyright 2005-2023 Waterford Consultants, LLC.
All rights reserved

7430 New Technology Way, Suite 150      Frederick, Maryland 21703      (703) 596-1022 Phone      www.waterfordconsultants.com
Control # 100112

**RF EMISSIONS COMPLIANCE STATEMENT**

**Site:**
**CA_SF_SANMATEO_245M2**
**124 Warren Rd**
**San Mateo, CA 94401**

**Compliance Statement**

Subject site COMPLIES with Radiofrequency Radiation Exposure Limits of 47 C.F.R. §§ 1.1307(b)(3) and 1.1310.

**Ground Level Site Summary**

Predicted cumulative RF power density at ground level as a percentage of the FCC General Population limits. This result is the sum of the maximum ground level MPE for each RF emitter by band of operation. Sites below 100% are in full compliance.

| Source | Predicted Power Density, % of Limit (GP) |
|---|---|
| Verizon 28000 MHz | 1.191 % |
| **Sum of Listed Sources** | **1.191%** |

**Antenna Level Site Summary**

Predicted cumulative RF power density at elevated levels near the antenna(s) has been evaluated with respect to the FCC General Population limits. The mitigation measures recommended herein are necessary to achieve and maintain compliance at the site based on the following assessment:

**Antenna Level Assessment**

Signage directives for this report are specified in the Elevation Detail Plot which depicts predicted RF power density near the antenna as a percentage of the FCC General Population limits. Areas exceeding 100% of the General Population limits are depicted as blue. Any work required within areas exceeding 100% of the limits should be coordinated with wireless operators or performed by personnel trained in RF safety and equipped with personal protection equipment. Workers in areas depicted as green or clear will not be exposed to hazardous levels of RF energy and no action is required to maintain a safe working environment.

As shown in the Elevation Detail Plot, the following keep-back distances to the FCC limits have been determined:

| Reference Level | Maximum Level: General Population (%) | Maximum Level: Occupational (%) |
|---|---|---|
| Ground Level | 1.191 | 0.238 |
| Antenna Level | 359.926 | 71.985 |

Distance to FCC 100% MPE Limits at Antenna Level
- Vertical Stand Off Distance (General Population) 3 feet
- Vertical Stand Off Distance (Occupational) N/A
- Horizontal Stand Off Distance (General Population) 5 feet
- Horizontal Stand Off Distance (Occupational) N/A

Distance to FCC 100% MPE Limits at Ground Level
- Horizontal Stand Off Distance (General Population) N/A
- Horizontal Stand Off Distance (Occupational) N/A

.

**RF Alerting Signage**

The "Notice" sign must be posted near the bottom of the pole or on the shroud any time there is a zone near the antenna that exceeds the General Population limit. This sign should be mounted where it is easily visible to workers on the ground as they approach the pole. Suggested locations include on the pole about 8-10' from the ground or on the front of the equipment shroud if it is mounted on the pole.



The "Caution" sign must be posted on the antenna any time there is an area that exceeds the FCC General Public exposure limit. The keep-back distance for the General Population limit must be filled in on the sign as depicted below. This sign must be mounted on or just below the radiating antenna so that it is maximally visible to workers approaching the antenna in a lift or bucket truck. If there is more than one radiating antenna and they are less than 5' apart then the sign should be mounted on or near the lower antenna. If there are multiple radiating antennas and they are >5' apart then separate signs should be mounted on or near each antenna.



.

**Technical Framework: Basis for Compliance Statement**

The compliance framework is derived from the Federal Communications Commission (FCC) Rules and Regulations for preventing human exposure in excess of the applicable Maximum Permissible Exposure ("MPE") limits listed in Table 1 of 47 C.F.R. § 1.1310. Calculations using input data provided to Waterford by client or client's representative numerically confirm the subject site can operate at a 100% duty cycle without exceeding the FCC MPE limits in areas of uncontrolled access.

At this site, the radio frequency (RF) power density resulting from each transmitter at any location may be expressed as a percentage of the frequency-specific limits and added to determine if 100% of the exposure limit has been exceeded. The FCC Rules define two tiers of permissible exposure differentiated by the situation in which the exposure takes place and/or the status of the individuals who are subject to exposure. General Population / Uncontrolled exposure limits apply to those situations in which persons may not be aware of the presence of electromagnetic energy, where exposure is not employment related, or where persons cannot exercise control over their exposure. Occupational / Controlled exposure limits apply to situations in which persons are exposed as a consequence of their employment, have been made fully aware of the potential for exposure, and can exercise control over their exposure. Based on the criteria for these classifications, continuous exposure to RF power density levels below the FCC General Population limits is not hazardous. The FCC General Population limits are 5 times more restrictive than the Occupational limits.

| Frequency (MHz) | Limits for General Population/ Uncontrolled Exposure | | Limits for Occupational/ Controlled Exposure | |
|---|---|---|---|---|
| | Power Density (mW/cm$^2$) | Averaging Time (minutes) | Power Density (mW/cm$^2$) | Averaging Time (minutes) |
| 30-300 | 0.2 | 30 | 1 | 6 |
| 300-1500 | f/1500 | 30 | f/300 | 6 |
| 1500-100,000 | 1.0 | 30 | 5.0 | 6 |

In situations where the predicted MPE exceeds the General Population threshold in an accessible area because of emissions from multiple transmitters, FCC licensees that contribute greater than 5% of the aggregate MPE share responsibility for mitigation.

For any location where radiofrequency (RF) power densities exceed 100% MPE of the General Population limits, access controls with appropriate RF alerting signage must be available to be visible upon approach from any direction to provide notification of potential conditions within these areas. Subject to other site security requirements, occupational personnel should be trained in RF safety and equipped with personal protective equipment (e.g. RF personal monitor) designed for safe work in the vicinity of RF emitters. Waterford Consultants, LLC recommends that any work activity in these designated areas or in front of any transmitting antennas be coordinated with the wireless operators.

**Predictive Modeling**

Based on the computational guidelines set forth in FCC Office of Engineering and Technology, Bulletin 65 ("OET65"), Waterford Consultants, LLC has developed software to predict the overall MPE possible at any particular location given the spatial orientation and operating parameters of multiple RF sources. These theoretical results represent worst-case predictions as emitters are assumed to be operating at 100% duty cycle.

The tabular analysis in this report calculates the spatial peak power density produced at ground level from each RF emitter. The far field power density in milliWatts per square centimeter is expressed as Sff = 33.4 x ERP / R2 where ERP is the Effective Radiated Power along a specific azimuth in Watts and R is the distance from the antenna radiation center in meters. The antenna manufacturer's horizontal and vertical radiation patterns have been considered in determining the ERP in any direction. This computation is based on the maximum ERP and includes a 1.6-fold increase in field strength due to ground reflection. The result provides a conservative estimate of spatially averaged power density at ground level and may be higher than predicted MPE in the graphical plots described below.

As the limits are frequency dependent, the contribution of any RF source at a specific location may be expressed as a percentage of the FCC General Population MPE limits at the associated operating frequency. The percentage contributions from all RF sources are added to determine the overall exposure level. If this result is less than 100%, the predicted cumulative exposure level is below the General Population limits set forth in the FCC Rules. The cumulative MPE depicted on the summary page is the summation of maximum MPE values for each emitter regardless of antenna orientation.

A graphical plot of calculated spatially averaged RF power density, based on the Cylindrical Model as described in OET65, predicts spatially averaged MPE conditions at areas in near proximity to the antenna. In the vertical display, predicted MPE is depicted at the center of the 6 ft vertical zone that a person could occupy.

## Qualifications of Waterford

With more than 100 team-years of experience, Waterford Consultants, LLC [Waterford] provides technical consulting services to clients in the radio communications and antenna locating industry. Waterford retains professional engineers who are placed in responsible charge of the processes for analysis.

Waterford is familiar with 47 C.F.R. § § 1.1307(b)(3) and 1.1310 along with the general Rules, Regulations and policies of the FCC. Waterford work processes incorporate all specifications of FCC Office of Engineering and Technology, Bulletin 65 ("OET65"), from the website: www.fcc.gov/oet/rfsafety and follow criteria detailed in 47 CFR § 1.1310 "Radiofrequency radiation exposure Limits".

Within the technical and regulatory framework detailed above, Waterford developed tools according to recognized and generally accepted good engineering practices. Permissible exposure limits are band specific, and the Waterford computerized modeling tools correctly calculate permissible exposure based on the band(s) specified in the input data. Only clients and client representatives are authorized to provide input data through the Waterford web portal. In securing that authorization, clients and client representatives attest to the accuracy of all input data.

Waterford Consultants, LLC attests to the accuracy of the engineering calculations computed by those modeling tools. Furthermore, Waterford attests that the results of those engineering calculations are correctly summarized in this report.

## Certification

My stamp and signature on the cover indicates that I am fully aware of and familiar with the Rules and Regulations of both the Federal Communications Commissions (FCC) and the Occupational Safety and Health Administration (OSHA) with regard to Human Exposure to Radio Frequency Radiation, specifically in accordance with FCC's OET Bulletin 65. I have reviewed this Radio Frequency Exposure Assessment report and believe it to be both true and accurate to the best of my knowledge.

**Antenna Inventory**

| # | Operator | Make | Model | Freq (MHz) | Az (deg) | Tilt (deg) | HorBW (deg) | Ant (ft) | TPO (w) | Paths | Loss (db) | Ant Gain | Radiated Power (W) | RC AGL (ft) |
|---|----------|----------|--------------------------------|-------|-----|---|---|-------|----------|---|---|----------|---------------|--------|
| 1 | Verizon | ERICSSON | SON_SM6705 CM1 02.07.22 28GHz VZW | 28000 | 40 | 0 | 4 | 1.312 | 0.294401 | 4 | 0 | 26.14dBd | 794.330 EIRP | 19.917 |
| 2 | Verizon | ERICSSON | SON_SM6705 CM1 02.07.22 28GHz VZW | 28000 | 160 | 0 | 4 | 1.312 | 0.294401 | 4 | 0 | 26.14dBd | 794.330 EIRP | 19.917 |
| 3 | Verizon | ERICSSON | SON_SM6705 CM1 02.07.22 28GHz VZW | 28000 | 280 | 0 | 4 | 1.312 | 0.294401 | 4 | 0 | 26.14dBd | 794.330 EIRP | 19.917 |

No other nearby permits or sites found within 100 ft radius.





## ELEVATION DETAIL

Predicted MPE depicted at the center of the 6 ft vertical zone that a person could occupy



## TOP DOWN  DETAIL



## TOP DOWN  DETAIL



**GROUND LEVEL MPE BY RF EMITTER**

The maximum ground level MPE along the azimuth of orientation for each RF emitter by band of operation is listed below. The computational approach is described in the Predictive Modeling section. The maximum MPE by operator and band is contributive to the cumulative ground level MPE summary table presented above.

**Verizon**
**CA_SF_SANMATEO_245M2**
**ERICSSON - SON_SM6705 CM1 02.07.22 28GHz VZW 40° Sector**

**Maximum Exposure Limit - 28000 MHz**

| Limit (GP): | 1000.000 µW/cm^2 |
|---|---|

| **EiRP** | | **Height** | | **Downtilt** | |
|---|---|---|---|---|---|
| (Watts) | 794.330 | (feet) | 19.917 | (Degrees) | 0 |



Ground Level MPE as Percent of FCC General Population Limits

| Maximum power density at ground level: | 11.909 µW/cm^2 |
|---|---|
| Highest percentage of Maximum Exposure Limit: | 1.191 % |

**Verizon**
## CA_SF_SANMATEO_245M2
## ERICSSON - SON_SM6705 CM1 02.07.22 28GHz VZW 160° Sector

**Maximum Exposure Limit - 28000 MHz**

Limit (GP):                    1000.000  µW/cm^2

| **EiRP** | | **Height** | | **Downtilt** | |
|---|---|---|---|---|---|
| (Watts) | 794.330 | (feet) | 19.917 | (Degrees) | 0 |



Ground Level MPE as Percent of FCC General Population Limits

| | |
|---|---|
| Maximum power density at ground level: | 11.909  µW/cm^2 |
| Highest percentage of Maximum Exposure Limit: | 1.191  % |

**Verizon**
## CA_SF_SANMATEO_245M2
## ERICSSON - SON_SM6705 CM1 02.07.22 28GHz VZW 280° Sector

**Maximum Exposure Limit - 28000 MHz**

Limit (GP):                          1000.000  µW/cm^2

| EiRP | | Height | | Downtilt | |
|---|---|---|---|---|---|
| (Watts) | 794.330 | (feet) | 19.917 | (Degrees) | 0 |



Ground Level MPE as Percent of FCC General Population Limits

| | |
|---|---|
| Maximum power density at ground level: | 11.909  µW/cm^2 |
| Highest percentage of Maximum Exposure Limit: | 1.191  % |

**Checklist for Local Government To Determine Whether a Facility is Categorically Excluded**

(Taken from the FCC's *"A Local Government Official's Guide to Transmitting Antenna RF Emission Safety: Rules, Procedures, and Practical Guidance"*, Appendix A)

Purpose: The FCC has determined that many wireless facilities are unlikely to cause human exposures in excess of RF exposure guidelines. Operators of those facilities are exempt from routinely having to determine their compliance. These facilities are termed "categorically excluded." Section 1.1307(b)(1) of the Commission's rules defines those categorically excluded facilities. This checklist will assist state and local government agencies in identifying those wireless facilities that are categorically excluded, and thus are highly unlikely to cause exposure in excess of the FCC's guidelines. Provision of the information identified on this checklist may also assist FCC staff in evaluating any inquiry regarding a facility's compliance with the RF exposure guidelines.

**BACKGROUND INFORMATION**

1. Facility Operator's Legal Name:  Verizon Wireless
2. Facility Operator's Mailing Address:  2785 Mitchell Drive Bldg. 9, Walnut Creek, CA  94598
3. Facility Operator's Contact Name/Title:  Melvin Baccay / Principal RF Engineer
4. Facility Operator's Office Telephone:  (925) 279-6678
5. Facility Operator's Fax:  (925) 279-6399
6. Facility Name:  CA_SF_SANMATEO_245M2
7. Facility Address:  124 Warren Rd
8. Facility City/Community:  San Mateo
9. Facility State and Zip Code:  CA  94401
10. Latitude:  37.572725
11. Longitude:  -122.343308

All information set forth is true, accurate and complete.

Signed: Melvin Baccay                    Date:  3/19/2024
Title:  Principal RF Engineer

Continue

**FCC/LSGAC**                                                    **Local Official's Guide to RF**

## Checklist (page 2)

**EVALUATION OF CATEGORICAL EXCLUSION**

12. Licensed Radio Service (see attached Table 1): _Wireless Communications Service_
13. Structure Type (free-standing or building/roof-mounted): _Free Standing_
14. Antenna Type [omnidirectional or directional (includes sectored)]: _Directional (40°, 160°, 280°)_
15. Height above ground of the lowest point of the antenna (in meters): _18'-7" (5.6642 m)_
16. ☐ Check if <u>all</u> of the following are true:
    (a) This facility will be operated in the Multipoint Distribution Service, Paging and Radiotelephone Service, Cellular Radiotelephone Service, Narrowband or Broadband Personal Communications Service, Private Land Mobile Radio Services Paging Operations, Private Land Mobile Radio Service Specialized Mobile Radio, Local Multipoint Distribution Service, or service regulated under Part 74, Subpart I (see question 12).
    (b) This facility will <u>not</u> be mounted on a building (see question 13).
    (c) The lowest point of the antenna will be at least 10 meters above the ground (see question 15).

If box 16 is checked, this facility is categorically excluded and is unlikely to cause exposure in excess of the FCC's guidelines. The remainder of the checklist need not be completed. If box 16 is not checked, continue to question 17.

17. Enter the power threshold for categorical exclusion for this service from the attached Table 1 in watts ERP or EIRP* (note: EIRP = (1.64) X ERP): _1000 W ERP (1640 W EIRP)_
18. Enter the total number of channels if this will be an omnidirectional antenna, or the maximum number of channels in any sector if this will be a sectored antenna: _1_
19. Enter the ERP or EIRP per channel (using the same units as in question 17): _484.35 W ERP (794.33 W EIRP)_
20. Multiply answer 18 by answer 19: _484.35 W ERP (794.33 W EIRP) per sector._
21. Is the answer to question 20 less than or equal to the value from question 17 (yes or no)? _YES_

If the answer to question 21 is YES, this facility is categorically excluded. It is unlikely to cause exposure in excess of the FCC's guidelines.

If the answer to question 21 is NO, this facility is not categorically excluded. Further investigation may be appropriate to verify whether the facility may cause exposure in excess of the FCC's guidelines.

---

*"ERP" means "effective radiated power" and "EIRP" means "effective isotropic radiated power

FCC/LSGAC                                                    **Local Official's Guide to RF**

<u>TABLE 1</u>: TRANSMITTERS, FACILITIES AND OPERATIONS SUBJECT TO ROUTINE
ENVIRONMENTAL EVALUATION

| SERVICE (TITLE 47 CFR RULE PART) | EVALUATION REQUIRED IF: |
|---|---|
| Experimental Radio Services (part 5) | power > 100 W ERP (164 W EIRP) |
| Multipoint Distribution Service (subpart K of part 21) | <u>non-building-mounted antennas</u>: height above ground level to lowest point of antenna < 10 m <u>and</u> power > 1640 W EIRP<br><u>building-mounted antennas</u>:<br>power > 1640 W EIRP |
| Paging and Radiotelephone Service (subpart E of part 22) | <u>non-building-mounted antennas</u>: height above ground level to lowest point of antenna < 10 m <u>and</u> power > 1000 W ERP (1640 W EIRP)<br><u>building-mounted antennas</u>:<br>power > 1000 W ERP (1640 W EIRP) |
| Cellular Radiotelephone Service (subpart H of part 22) | <u>non-building-mounted antennas</u>: height above ground level to lowest point of antenna < 10 m <u>and</u> total power of all channels > 1000 W ERP (1640 W EIRP)<br><u>building-mounted antennas</u>:<br>total power of all channels > 1000 W ERP (1640 W EIRP) |

TABLE 1 (cont.)

| SERVICE (TITLE 47 CFR RULE PART) | EVALUATION REQUIRED IF: |
|---|---|
| Personal Communications Services (part 24) | (1) Narrowband PCS (subpart D): <u>non-building-mounted antennas</u>: height above ground level to lowest point of antenna < 10 m <u>and</u> total power of all channels > 1000 W ERP (1640 W EIRP) <u>building-mounted antennas</u>: total power of all channels > 1000 W ERP (1640 W EIRP)<br><br>(2) Broadband PCS (subpart E): <u>non-building-mounted antennas</u>: height above ground level to lowest point of antenna < 10 m <u>and</u> total power of all channels > 2000 W ERP (3280 W EIRP) <u>building-mounted antennas</u>: total power of all channels > 2000 W ERP (3280 W EIRP) |
| Satellite Communications (part 25) | all included |
| General Wireless Communications Service (part 26) | total power of all channels > 1640 W EIRP |
| Wireless Communications Service (part 27) | total power of all channels > 1640 W EIRP |
| Radio Broadcast Services (part 73) | all included |

TABLE 1 (cont.)

| SERVICE (TITLE 47 CFR RULE PART) | EVALUATION REQUIRED IF: |
|---|---|
| Experimental, auxiliary, and special broadcast and other program distributional services (part 74) | subparts A, G, L: power > 100 W ERP<br><br>subpart I:<br>non-building-mounted antennas: height above ground level to lowest point of antenna < 10 m and power > 1640 W EIRP<br>building-mounted antennas: power > 1640 W EIRP |
| Stations in the Maritime Services (part 80) | ship earth stations only |
| Private Land Mobile Radio Services Paging Operations (part 90) | non-building-mounted antennas: height above ground level to lowest point of antenna < 10 m and power > 1000 W ERP (1640 W EIRP)<br>building-mounted antennas: power > 1000 W ERP (1640 W EIRP) |
| Private Land Mobile Radio Services Specialized Mobile Radio (part 90) | non-building-mounted antennas: height above ground level to lowest point of antenna < 10 m and total power of all channels > 1000 W ERP (1640 W EIRP)<br>building-mounted antennas:<br>total power of all channels > 1000 W ERP (1640 W EIRP) |

TABLE 1 (cont.)

| SERVICE (TITLE 47 CFR RULE PART) | EVALUATION REQUIRED IF: |
|---|---|
| Amateur Radio Service<br>(part 97) | transmitter output power > levels specified in § 97.13(c)(1) of this chapter |
| Local Multipoint Distribution Service<br>(subpart L of part 101) | <u>non-building-mounted antennas</u>: height above ground level to lowest point of antenna < 10 m <u>and</u> power > 1640 W EIRP<br><u>building-mounted antennas</u>: power > 1640 W EIRP<br><br>LMDS licensees are required to attach a label to subscriber transceiver antennas that: (1) provides adequate notice regarding potential radiofrequency safety hazards, *e.g.,* information regarding the safe minimum separation distance required between users and transceiver antennas; and (2) references the applicable FCC-adopted limits for radiofrequency exposure specified in § 1.1310 of this chapter. |

Noise Compliance Report

**CROWN CASTLE**

CA_SF_SANMATEO_245M2
March 22, 2024
Version No. 1

## Noise Compliance Report Memo

### CA_SF_SANMATEO_245M2

To whom it may concern:

The construction plans KHCLE-37293 show that the nearest radio/antenna is beyond the required 5.05 feet distance from the nearest property line per 3rd party Noise Study report. The title, author and date of the report is shown below:

- Title: Noise Emission Analysis, Ericsson Streetmacro 6705 3-Radio Configuration, City of San Mateo, CA
- Author: MD Acoustics, LLC (MD)
- Date: February 27, 2024

**Figure 1: Noise Contour**



**Table 2: Telecom Node Cluster Output Sound Level (dBA)**

| Distance | Noise level (dBA) |
|----------|-------------------|
| 5.05 feet | 50 |
| 10 feet | 44 |
| 20 feet | 38 |
| 30 feet | 35 |
| 40 feet | 32 |
| 50 feet | 30 |
| 60 feet | 29 |
| 70 feet | 27 |

The project will be compliant with the noise limit of 50 dBA at any distance greater than 5.05 feet from the cluster.



CA Office
1197 Los Angeles Ave, Ste C-256
Simi Valley, CA 93065
p. (805) 426-4477

www.mdacoustics.com



CA Office
9841 Irvine Center Drive, Ste 200
Irvine, CA 92618
www.tjwengineering.com

February 27, 2024

Crown Castle Fiber, LLC
1 Park Place
Dublin, CA 94568

C/O Aspectus, Inc.

**Subject:** **Noise Emission Analysis, Ericsson Streetmacro 6705 3-Radio Configuration, City of San Mateo, CA**

MD Acoustics, LLC (MD) has completed a Noise Analysis report for City of San Mateo. A glossary of acoustical terms is provided in Appendix A. This node cluster proposes an assembly of the following:

Three (3) Ericsson Streetmacro 6705

## 1.0    Acoustics Requirements

Table 7.30.040 from the San Mateo's Code of Ordinances (see Appendix B) states noises level may not exceed 50 dBA for the residential properties adjacent to the project site.

Therefore, this study evaluates the telecommunication equipment's worst-case noise levels and compares the results to the City's strictest residential allowable noise level of 50 dBA.

## 2.0    Study Method and Procedure

The future telecommunication equipment noise level was modeled using SoundPLAN 3D (SP) acoustic modeling software. SP is capable of evaluating stationary noise sources (e.g. point sources such as fans from radio equipment) at various receptor locations. SP's software utilizes algorithms (based on inverse square law and reference equipment noise level data) to calculate the noise projections. The software allows the user to input specific noise sources, spectral content, and noise sensitive receptors. Appendix C provides the SoundPlan model's inputs and outputs. Appendix D provides the manufacturers' specification sheet. The model assumes the implementation of the following (see Table 1):

**Table 1: Manufacturer Specification Reference Noise Levels (dBA)**

| Quantity | Model Number | Reference Noise[1] |
|---|---|---|
| 3 | Ericsson Streetmacro 6705 | Sound Power Level of 60 dBA |
| | 1. See Appendix D | |

*Ericsson Streetmacro 6705 3-Radio Configuration*
*Noise Emission Analysis*
*San Mateo, CA*

## 3.0    Findings

The future operational noise levels at and/or adjacent to the project site are mapped onto an illustrative section drawing of a generic telecom pole. The red dot is the summation of all noise sources outlined in this project at 16 feet 4 inches in the air. It should be noted that the noise impact to the ground will be reduced the higher the equipment is mounted on the pole and any azimuth deviation between the three (3) Ericsson Streetmacro 6705 units does not have any acoustical impact on the noise study result. Figure 1 illustrates the noise propagation from the equipment in 5-ft increments. Table 2 outlines the noise level in 10-foot increments.

**Figure 1: Noise Contour**



**Table 2: Telecom Node Cluster Output Sound Level (dBA)**

| Distance | Noise level (dBA) |
|---|---|
| 5.05 feet | 50 |
| 10 feet | 44 |
| 20 feet | 38 |
| 30 feet | 35 |
| 40 feet | 32 |
| 50 feet | 30 |
| 60 feet | 29 |
| 70 feet | 27 |

The project will be compliant with the noise limit of 50 dBA at any distance greater than 5.05 feet from the cluster.

**4.0    Conclusion**

MD is pleased to provide this noise review for this project. The project will comply with the City's applicable noise limit of 50 dBA at distances greater than 5.05 feet based on the proposed design. It should be noted that the noise impact to the ground will be reduced the higher the equipment is mounted on the pole and any azimuth deviation between the three (3) Ericsson Streetmacro 6705 units does not have any acoustical impact on the noise study result. Our resume and acoustical background in the field of acoustics is provided in Appendix E. If you have any questions regarding this letter, please call our office at (805) 426-4477.

Sincerely,
MD Acoustics, LLC

Mike Dickerson, INCE                        Thomas J. Wheat, PE, TE
Principal                                   Principal



*Ericsson Streetmacro 6705 3-Radio Configuration*
*Noise Emission Analysis*
*San Mateo, CA*

**Appendix A**
Glossary of Acoustical Terms

## Glossary of Terms

**_A-Weighted Sound Level:_** The sound pressure level in decibels as measured on a sound level meter using the A-weighted filter network.  The A-weighting filter de-emphasizes the very low and very high frequency components of the sound in a manner similar to the response of the human ear.  A numerical method of rating human judgment of loudness.

**_Ambient or Background Noise Level:_** The composite of noise from all sources, near and far.  In this context, the ambient noise level constitutes the normal or existing level of environmental noise at a given location.

**_Decibel (dB):_** A unit for measuring the amplitude of a sound, equal to 20 times the logarithm to the base 10 of the ratio of the pressure of the sound measured to the reference pressure, which is 20 micro-pascals.

**_dB(A):_** A-weighted sound level (see definition above).

**_Equivalent Sound Level (LEQ):_** The sound level corresponding to a steady noise level over a given sample period with the same amount of acoustic energy as the actual time varying noise level.  The energy average noise level during the sample period.

**_Day-Night Level (LDN or DNL):_** LDN is the average noise level over a 24-hour period. The noise between the hours of 10PM to 7AM is artificially increased by 10 dB. This noise is weighted to take into account the decrease in community background noise of 10 dB during this period.

**_Noise:_** Any unwanted sound or sound which is undesirable because it interferes with speech and hearing, or is intense enough to damage hearing, or is otherwise annoying.  The State Noise Control Act defines noise as "...excessive undesirable sound...".

**_Sound Level (Noise Level):_** The weighted sound pressure level obtained by use of a sound level meter having a standard frequency-filter for attenuating part of the sound spectrum.

**_Sound Level Meter:_** An instrument, including a microphone, an amplifier, an output meter, and frequency weighting networks for the measurement and determination of noise and sound levels.

**Appendix B**
San Mateo, CA
Table 7.30.040

City of San Mateo Law Library / City of San Mateo Municipal Code. / Title 7 HEALTH, SANITATION, AND PUBLIC NUISANCES / Chapter 7.30 NOISE REGULATIONS / 7.30.040 MAXIMUM PERMISSIBLE SOUND LEVELS.

# 7.30.040 MAXIMUM PERMISSIBLE SOUND LEVELS.

(a) It is unlawful for any person to operate or cause to be operated any source of sound at any location within the City or allow the creation of any noise on property owned, leased, occupied or otherwise controlled by such person, which causes the noise level when measured on any other property to exceed:

(1) The noise level standard for that property as specified in Table 7.30.040 for a cumulative period of more than 30 minutes in any hour;

(2) The noise level standard plus five dB for a cumulative period of more than 15 minutes in any hour;

(3) The noise level standard plus 10 dB for a cumulative period of more than five minutes in any hour;

(4) The noise level standard plus 15 dB for a cumulative period of more than one minute in any hour; or

(5) The noise level standard or the maximum measured ambient level, plus 20 dB for any period of time.

(b) If the measured ambient level for any area is higher than the standard set in Table 7.30.040, then the ambient shall be the base noise level standard for purposes of subsection (a)(1) of this section. In such cases, the noise levels for purposes of subsections (a)(2) through (a)(5) of this section shall be increased in five dB increments above the ambient.

# Table 7.30.040 NOISE LEVEL STANDARDS*

| Noise Zone | Time Period | Noise Level (dB) |
|---|---|---|
| Noise Zone 1 | 10 p.m.—7 a.m. | 50 |
| | 7 a.m.—10 p.m. | 60 |
| Noise Zone 2 | 10 p.m.—7 a.m. | 55 |
| | 7 a.m.—10 p.m. | 60 |
| Noise Zone 3 | 10 p.m.—7 a.m. | 60 |
| | 7 a.m.—10 p.m. | 65 |
| Noise Zone 4 | Anytime | 70 |

* Source: Adapted from "The Model Community Noise Control Ordinance," Office of Noise Control, California Department of Health.

(Ord. No. 2004-16 § 1.)

**Cross References**

[Section 7.30.050](Section 7.30.050)

[Section 7.30.110](Section 7.30.110)

*Ericsson Streetmacro 6705 3-Radio Configuration*
*Noise Emission Analysis*
*San Mateo, CA*

**Appendix C**
SoundPlan Inputs/Output

**San Mateo Generic 2**
**Contribution spectra - Situation 1 - Per Plan - Outdoor SP**

| Source | Time slice | Sum dB(A) | 500Hz dB(A) | |
|---|---|---|---|---|
| Receiver 50 dBA @ 5.05'  Fl G   dB(A)  LEQ 50.0 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 45.2 | 45.2 | |
| Ericsson Streetmacro 6705 | LEQ | 45.2 | 45.2 | |
| Ericsson Streetmacro 6705 | LEQ | 45.3 | 45.3 | |
| Receiver 5'  Fl G   dB(A)  LEQ 50.1 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 45.3 | 45.3 | |
| Ericsson Streetmacro 6705 | LEQ | 45.3 | 45.4 | |
| Ericsson Streetmacro 6705 | LEQ | 45.4 | 45.4 | |
| Receiver 10'  Fl G   dB(A)  LEQ 44.1 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 39.3 | 39.3 | |
| Ericsson Streetmacro 6705 | LEQ | 39.3 | 39.3 | |
| Ericsson Streetmacro 6705 | LEQ | 39.3 | 39.3 | |
| Receiver 15'  Fl G   dB(A)  LEQ 40.5 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 35.8 | 35.8 | |
| Ericsson Streetmacro 6705 | LEQ | 35.8 | 35.8 | |
| Ericsson Streetmacro 6705 | LEQ | 35.8 | 35.8 | |
| Receiver 20'  Fl G   dB(A)  LEQ 38.0 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 33.3 | 33.3 | |
| Ericsson Streetmacro 6705 | LEQ | 33.3 | 33.3 | |
| Ericsson Streetmacro 6705 | LEQ | 33.3 | 33.3 | |
| Receiver 25'  Fl G   dB(A)  LEQ 36.1 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 31.3 | 31.3 | |
| Ericsson Streetmacro 6705 | LEQ | 31.3 | 31.3 | |
| Ericsson Streetmacro 6705 | LEQ | 31.3 | 31.3 | |
| Receiver 30'  Fl G   dB(A)  LEQ 34.5 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 29.8 | 29.8 | |
| Ericsson Streetmacro 6705 | LEQ | 29.8 | 29.8 | |
| Ericsson Streetmacro 6705 | LEQ | 29.8 | 29.8 | |
| Receiver 35'  Fl G   dB(A)  LEQ 33.2 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 28.4 | 28.4 | |
| Ericsson Streetmacro 6705 | LEQ | 28.4 | 28.4 | |
| Ericsson Streetmacro 6705 | LEQ | 28.4 | 28.4 | |
| Receiver 40'  Fl G   dB(A)  LEQ 32.1 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 27.3 | 27.3 | |
| Ericsson Streetmacro 6705 | LEQ | 27.3 | 27.3 | |
| Ericsson Streetmacro 6705 | LEQ | 27.3 | 27.3 | |
| Receiver 45'  Fl G   dB(A)  LEQ 31.1 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 26.3 | 26.3 | |
| Ericsson Streetmacro 6705 | LEQ | 26.3 | 26.3 | |
| Ericsson Streetmacro 6705 | LEQ | 26.3 | 26.3 | |
| Receiver 50'  Fl G   dB(A)  LEQ 30.2 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 25.4 | 25.4 | |
| Ericsson Streetmacro 6705 | LEQ | 25.4 | 25.4 | |
| Ericsson Streetmacro 6705 | LEQ | 25.4 | 25.4 | |
| Receiver 55'  Fl G   dB(A)  LEQ 29.4 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 24.6 | 24.6 | |
| Ericsson Streetmacro 6705 | LEQ | 24.6 | 24.6 | |
| Ericsson Streetmacro 6705 | LEQ | 24.6 | 24.6 | |
| Receiver 60  Fl G   dB(A)  LEQ 28.6 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 23.9 | 23.9 | |

MD Acoustics  1197 E Los Angeles Ave,Unit C 256  Simi Valley, CA 93065  USA

1

# San Mateo Generic 2
## Contribution spectra - Situation 1 - Per Plan - Outdoor SP

| Source | Time slice | Sum dB(A) | 500Hz dB(A) | |
|---|---|---|---|---|
| Ericsson Streetmacro 6705 | LEQ | 23.9 | 23.9 | |
| Ericsson Streetmacro 6705 | LEQ | 23.9 | 23.9 | |
| Receiver 65'  FI G   dB(A)   LEQ 27.9 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 23.2 | 23.2 | |
| Ericsson Streetmacro 6705 | LEQ | 23.2 | 23.2 | |
| Ericsson Streetmacro 6705 | LEQ | 23.2 | 23.2 | |
| Receiver 70'  FI G   dB(A)   LEQ 27.3 dB(A) | | | | |
| Ericsson Streetmacro 6705 | LEQ | 22.6 | 22.6 | |
| Ericsson Streetmacro 6705 | LEQ | 22.6 | 22.6 | |
| Ericsson Streetmacro 6705 | LEQ | 22.6 | 22.6 | |

MD Acoustics  1197 E Los Angeles Ave,Unit C 256  Simi Valley, CA 93065  USA

2

| San Mateo Generic 2 Contribution level - Situation 1 - Per Plan - Outdoor SP | | | | | 9 |
|---|---|---|---|---|---|

| Source | Source type | LEQ dB(A) | A dB | |
|---|---|---|---|---|
| Receiver 50 dBA @ 5.05'   Fl G   dB(A)   LEQ 50.0 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 45.3 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 45.2 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 45.2 | 0.0 | |
| Receiver 5'  Fl G   dB(A)   LEQ 50.1 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 45.4 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 45.4 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 45.3 | 0.0 | |
| Receiver 10'  Fl G   dB(A)   LEQ 44.1 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 39.3 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 39.3 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 39.3 | 0.0 | |
| Receiver 15'  Fl G   dB(A)   LEQ 40.5 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 35.8 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 35.8 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 35.8 | 0.0 | |
| Receiver 20'  Fl G   dB(A)   LEQ 38.0 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 33.3 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 33.3 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 33.3 | 0.0 | |
| Receiver 25'  Fl G   dB(A)   LEQ 36.1 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 31.3 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 31.3 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 31.3 | 0.0 | |
| Receiver 30'  Fl G   dB(A)   LEQ 34.5 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 29.8 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 29.8 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 29.8 | 0.0 | |
| Receiver 35'  Fl G   dB(A)   LEQ 33.2 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 28.4 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 28.4 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 28.4 | 0.0 | |
| Receiver 40'  Fl G   dB(A)   LEQ 32.1 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 27.3 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 27.3 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 27.3 | 0.0 | |
| Receiver 45'  Fl G   dB(A)   LEQ 31.1 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 26.3 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 26.3 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 26.3 | 0.0 | |
| Receiver 50'  Fl G   dB(A)   LEQ 30.2 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 25.4 | 0.0 | |

MD Acoustics  1197 E Los Angeles Ave,Unit C 256  Simi Valley, CA 93065  USA

1

| San Mateo Generic 2 Contribution level - Situation 1 - Per Plan - Outdoor SP | | | | 9 |

| Source | Source type | LEQ dB(A) | A dB | |
|---|---|---|---|---|
| Ericsson Streetmacro 6705 | Point | 25.4 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 25.4 | 0.0 | |
| Receiver 55'  FI G   dB(A)    LEQ 29.4 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 24.6 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 24.6 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 24.6 | 0.0 | |
| Receiver 60  FI G   dB(A)    LEQ 28.6 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 23.9 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 23.9 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 23.9 | 0.0 | |
| Receiver 65'  FI G   dB(A)    LEQ 27.9 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 23.2 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 23.2 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 23.2 | 0.0 | |
| Receiver 70'  FI G   dB(A)    LEQ 27.3 dB(A) | | | | |
| Ericsson Streetmacro 6705 | Point | 22.6 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 22.6 | 0.0 | |
| Ericsson Streetmacro 6705 | Point | 22.6 | 0.0 | |

**Appendix D**
Manufacturer's Cutsheet



# Streetmacro Description

## Streetmacro 6705

Description



300/1551-LZA 701 0001/1 Uen B

Streetmacro Description

### 2.3.1 Operating Environment

The following is a list of values for the Streetmacro unit in normal operating environment:

| | |
|---|---|
| Temperature range | −40°C through +55°C |
| Relative humidity | 5−100% |
| Absolute humidity | 0.26 g/m$^3$ through 40 g/m$^3$ |
| Maximum temperature change | 1°C/min |

### 2.3.2 Acoustic Noise

The unit may emit low levels of acoustic noise during operation.

The acoustic noise depends on the ambient temperature.

Table 6    Sound Power Level

| Temperature (°C) | Sound Power Level (Bel) |
|---|---|
| +55 | < 6.0 |

### 2.3.3 Vibration

This section describes the unit tolerance to vibrations.

The unit operates reliably during seismic activity as specified by test method IEC 60 068-2-57 Ff.

| | |
|---|---|
| Maximum level of RRS | 50 m/s$^2$ within 2−5 Hz for DR=2% |
| Frequency range | 0.3−50 Hz |
| Time history signal | VERTEQ II |

The unit operates reliably during random vibration as specified by test method IEC 60 068-2-64 Fh method 1.

| | |
|---|---|
| Random vibration frequency | 2 Hz-200 Hz |
| Random vibration, X, Y axis | 0.3 m$^2$/s$^3$ |
| Random vibration, z axis | 0.2 m$^2$/s$^3$ |

The unit operates reliably during shock as specified by test method IEC 60 068-2-27 Ea.

*Ericsson Streetmacro 6705 3-Radio Configuration*
*Noise Emission Analysis*
*San Mateo, CA*

**Appendix E**
Resume





# Mike Dickerson Jr., INCE

## Principal

Mike Dickerson has a passion for the science of sound and vibration and has worked professionally in acoustical engineering since 2002. He received his Bachelor of Science degree in Physics, emphasizing in acoustics from Brigham Young University in Utah. He is currently a member of the Institute of Noise Control Engineers (INCE). Motivated by professional growth and opportunity, Mr. Dickerson formed his own acoustical engineering firm, MD Acoustics in 2012.

Mr. Dickerson's versatile experience includes leading and assisting in the design and review of many facets of acoustical engineering and air quality projects, including but not limited to: air/noise assessments, ceiling/floor assembly design, architectural design, acoustical product design, vibration analysis and noise mitigation  strategies.

Prior to starting his own consulting firm, Mr. Dickerson worked for Sony Entertainment, Parsons, and RK Engineering. He has successfully completed over 4,200 acoustical/air quality assessment reports for various engineering companies, municipalities and other agencies (both public and private). His strategic project planning and cost effective management solutions enabled him to excel in the field of Acoustics and project management.

In 2011, Mr. Dickerson was asked to present a paper at the Acoustical Society of America Seattle, Washington Conference on his research and work on noise and vibration in Cockpit Door Modules. MD continues to work closely with many engineering disciplines and provides quality results.

### Education

Brigham Young University
B.S., Physics (Acoustics), 2005

### Affiliations & Awards

Institute of Noise
Control Engineers (INCE)

Acoustical Society
of America (ASA)

BYU Acoustic Research Group

Association of Environmental
Planners (AEP)

©MD Acoustics, LLC | All Rights Reserved

Mike Dickerson Jr., INCE



## Representative Project Experience – continued

### Interior Noise Isolation Analysis

- Monterrey Park Residential and Hotel Mixed Use Development, Monterrey Park, CA
- 57 Wheeler Mixed Use Development, Arcadia, CA
- Melrose Triangle Mixed Use Development, West Hollywood, CA
- Britanna at Oyster Point, South San Francisco, CA
- Marina City Club, Marina Del Rey, CA
- Wells Fargo Corporate Office, Chandler, AZ
- Peoria Sports Complex – Seattle Mariners Lobby, Peoria, AZ
- Intel Corporation CH5-216/217, Chandler, AZ
- Revolt Studio, Hollywood, CA
- Mammoth Rock and Bowl, Mammoth Lakes, CA
- Rubios Restaurant, San Diego, CA
- Americana at Brand, Glendale, CA
- 6300 Hollywood Blvd Retail Space, Hollywood, CA
- Calvary Church Renovations, Santa Ana, CA

### Noise Impact Study

- Central Metal Incorporated Reclamation Plant Expansion, Los Angeles, CA
- Sonora Commons – North Gateway Transfer Station, Phoenix, AZ
- Great Wolf Lodge Development, Garden Grove, CA
- SuperStar Car Wash All Locations - Corporate Account
- City of San Marcos Noise Element Update, San Marcos, CA

### Oil and Gas Noise and Vibration Assessment

- La Goleta Storage Field Enhancement, Santa Barbara County, CA
- Whittier Workman Mill Road Oil Rig Drilling Operation, Los Angeles County, CA
- La Goleta Storage Compressor Vibration, Santa Barbara County, CA
- Mills Station Excavation Noise and Vibration, Ventura, CA

### Highway/Airport/Rail Noise and Vibration

- Caltrans Yucaipa Bridge Box Culvert Improvement, Yucaipa, CA

- Caltrans SR-110 Freeway Expansion, Los Angeles, CA
- Jackson Hole Airport Noise Contours and Flight Path Evaluation, Jackson Hole, WY
- Light Rail Transit Exposition Blvd to Culver Dr, Los Angeles, CA

### Telecommunications

- T-Mobile Telecommunication Tower, Calabasas, CA
- T-Mobile Telecommunication Tower, Malibu, CA
- Verizon Wireless Telecommunication Tower, Santa Clarita, CA

### Construction Noise and Vibration

- La Goleta Storage Field Enhancement (1-yr construction monitoring), Santa Barbara County, CA
- Westin Bonaventura Hotel, Los Angeles, CA
- Railroad Canyon Road Expansion, Riverside, CA

### Industrial Noise and Vibration Assessment

- Intel Corporation – Noise Evaluations
- Hexcel Corporation Dust Collector Noise & Vibration, Casa Grande, AZ
- ABB Inverter Operation Noise and Vibration, Tempe, AZ
- Pacific Scientific Shaker Room, Chandler, AZ

### Industrial Noise and Vibration Assessment

- Intel Corporation – Noise Evaluations
- Hexcel Corporation Dust Collector Noise & Vibration, Casa Grande, AZ
- ABB Inverter Operation Noise and Vibration, Tempe, AZ
- Pacific Scientific Shaker Room, Chandler, AZ

### Air Quality & Greenhouse Gas Assessment

- KPC Mixed Use Development, San Jacinto, CA
- TTM 36627 Residential Development, Hemet, CA
- Smart and Final, Highland, CA
- Bellflower Multi-family Development, Bellflower, CA
- Golden Gate National Park Recreation Area, San Mateo, CA

Mike Dickerson Jr., INCE



## Representative Project Experience – continued

### Air Quality & Greenhouse Gas Assessment - continued

- RAW removal of Contaminated Soils AQ/GHG, Glendora, CA
- Nance Street Warehouse Development, AQ/GHG/ HRA, Perris, CA
- Hyssop Drive Warehouse AQ/GHG/HRA, Rancho Cucamonga, CA
- Mojave Water Agency Pipeline AQ/GHG, Victorville, CA
- Shinohara Warehouse AQ/GHG/HRA, Chula Vista, CA

### Semiconductor Noise/Vibration Evaluations

- NXP Semiconductor – Building M – Vibration Isolation Design/Modifications
- NXP Semiconductor – PCW Pump Isolation Vibration Isolation Design
- NXP Semiconductor – HVAC Duct Silencer and Acoustical Design
- NXP Semiconductor – Demising Wall Evaluation and Redesign
- CyrusOne Data Center – Chiller Noise Evaluation and Noise Abatement

### Mechanical Equipment (HVAC) Noise and Vibration Assessment

- Kaiser Hospital AHU Louver Replacement – Acoustics Review/Design, San Francisco, CA
- Northern Arizona University – Communication Building Redesign of Mechanical Systems – Noise and Vibration Abatement Assessment and Design Recommendations, Flagstaff, AZ
- UCLA Call Center HVAC Equipment Noise and Vibration Design Review and Recommendations, Agora Hills, CA

### Film and Entertainment Noise and Vibration Assessment

- Revolt Studio, Hollywood, CA
- University of Arizona, HSIB, Acoustics Evaluation and Design, Tucson, AZ
- The Van Buren, Phoenix, AZ
- Down to Shop Studios, Los Angeles, CA

### Court Cases

- Miller/Botkin v. Roper Construction, Lincoln County, NM (D-1226-CV-2021-00261)
- Mirabella v. Shady Park, Tempe, AZ (Case No: CV2021-016159)
- Sanctuary at Desert Ridge, Scottsdale, AZ
- Westfield Mall, Topanga Canyon Blvd., Woodland Hills, CA
- Water Hauling Operations, Phoenix, AZ
- Mobile Radio Patent infringement, Calfee Attorneys
- Foghorn Noise Acoustic Evaluation and Noise Review, Oxnard, CA

### Ordinances

- Flagstaff Police Department and City of Flagstaff Noise Ordinance, 2022
- Flagstaff Parks Noise Ordinance, Flagstaff, AZ, 2018
- Queen Creek Noise and Vibration for Well Drilling, Queen Creek, AZ
- Fountain Hills Noise Ordinance, Fountain Hills, AZ
- Paradise Valley Special Event Noise, Paradise Valley, AZ

### Product Development/Testing

- Wrap Technologies, BolaWrap, Silencer Supperssor, 2019/2020
- International Drying Corporation - Stealth Dryer Systems
- International Dyring Corporation - Impeller Design
- International Dyring Corporation - Silencer Design
- International Dyring Corporation - Mechanical Engineering/Flat Piece Design/Machining
- Sound Cave Labratory, Anechoic Chamber

*Go Back to Meet the Team ↑*

©MD Acoustics, LLC | All Rights Reserved

Project Purpose and Technical Objectives

# Crown Castle Fiber LLC

## *Project Narrative*

*Application ID No. CA_SF_SANMATEO_245M2*

I.    <u>INTRODUCTION</u>

This Project Narrative is submitted to the City of San Mateo in support of its applications for the installation of wireless telecommunications facilities pursuant to City of San Mateo Municipal Code Chapter 10 Article 18, Wireless telecommunications facilities within the public right-of-Way.

    a.  Crown Castle

Crown Castle Fiber LLC ("Crown Castle") provides wireless carriers with the infrastructure they need to keep people connected and business running.  With approximately 40,000 towers and 18,000 small cell nodes supported by approximately 60,000 miles of fiber, Crown Castle is the nation's largest provider of shared wireless infrastructure, with a significant presence in the top 100 US markets.

Crown Castle's small cell network (SCN) represents the state-of-the-art in wireless telecommunications network technology.  It is a low-profile telecommunications system capable of delivering wireless services to customers of multiple carriers such as Verizon, AT&T, Sprint, Metro PCS and T-Mobile.  The elements of Crown Castle's SCN are small-scale, as individual SCN facilities can be attached to standard sign poles that take up little space in the public rights-of-way ("ROW") or, where feasible, onto existing elements in the ROW such as streetlights, traffic signals, and wooden utility poles.  Crown Castle SCN therefore allows one aesthetically unobtrusive system to take the place of multiple antennas or macro-sites constructed by individual carriers -- a single, streamlined solution that diminishes the prospect of multiple carrier-constructed antenna facilities servicing a given area.  Put another way, Crown Castle SCN permits many carriers to provide their services over one system with only a single series of vertical elements.

    b.  The Proposed Project

        i.  *The Network.*

Crown Castle proposes developing its SCN network with approximately one-hundred and ninety-seven new (197) antenna nodes in the ROW (the "Project") in the City of San Mateo ("Network"). All proposed nodes qualify as Small Wireless Facilities as defined in 47 C.F.R § 1.6002(l). Specifically, this application proposes one antenna node submitted to the City of San Mateo for a Wireless Permit by the Department Public Works. Completion of the Project will provide needed wireless broadband and communications services and the addition of critical network capacity to throughout portions of the City of San Mateo ("Service Area(s)").  Where feasible, each of the 197

nodes comprising the SCN will utilize existing vertical elements in the ROW, including utility poles and city-owned Streetlights.

Each SCN node receives an optical signal from a central hub and distributes the signal to the antenna nodes via fiber optic cable. The optical signal is then propagated from the SCN nodes in the form of radio frequency transmissions. Distribution of signal from the hub to the low-power, low-profile antenna nodes, allows carriers to offload service capacity and provide wireless communications and data services to areas otherwise difficult to reach with conventional wireless telecommunications facilities.

By using existing streetlight, traffic signal poles, and utility pole attachments whenever possible, the Project seeks to reduce the addition of new vertical elements, thereby minimizing intrusions into the right-of-way ("ROW").

### ii. *Network Facility Features.*

A majority of the proposed sites consist of the node units mounted directly to a streetlight pole with the attachment of antennas and radios in a shroud on the side of the pole. Fiber optic connections and power connections will be brought underground to these facilities. The total height of the pole mounted facilities, measured from grade level, is typically up to 40'. In addition, the nodes located on streetlights require an underground pull box containing fiber optic cable connection. The fiber converters convert digitalized spectrum received from the hub into RF signals emitted from the node to the Service Area.

## II.    APPLICABLE LEGAL STANDARDS.

Crown Castle presents this analysis pursuant to the City of San Mateo Municipal Code. Specifically, this narrative demonstrates the demands and rationale that led to the selection of a particular location and design for the telecommunication facilities proposed herein.

### a.    Applicable State Law.

#### i. *Public Utilities Code Sections 7901 and 7901.1*

Crown Castle is a "competitive local exchange carrier" ("CLEC"). CLECs are public utilities and therefore have a special status under state law. By virtue of the California Public Utilities Commission's ("CPUC") issuance of a certificate of public convenience and necessity ("CPCN"), CLECs have authority under state law to "erect poles, posts, piers, or abutments" in the ROW subject only to local municipal control over the "time, place and manner" of access to the ROW.[1]

The CPUC has issued a CPCN (attached as Exhibit D) authorizing Crown Castle to construct the Network pursuant to its regulatory status under state law. Crown Castle's special regulatory status as a CLEC gives rise to a vested right to use the ROW in the City to "construct … telephone lines

---

[1] Pub. Util. Code, §§ 1001, 7901; 7901.1; see *Williams Communication v. City of Riverside*, 114 Cal. App. 4th 642, 648 (2003) [upon obtaining a CPCN, a telephone corporation has "the right to use the public highways to install [its] facilities."].

along and upon any public road or highway, along or across any of the waters or lands within this State" and to "erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway[.]"[2] The nature of the vested right was described by one court as follows:

> … "[I]t has been uniformly held that [section 7901] is a continuing offer extended to telephone and telegraph companies to use the highways, which offer when accepted by the construction and maintenance of lines constitutes a binding contract based on adequate consideration, and that the vested right established thereby cannot be impaired by subsequent acts of the Legislature. [Citations.]" …

Thus, telephone companies have the right to use the public highways to install their facilities.[3]

While Public Utility Code section 7901.1 grants local municipalities the limited "right to exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed [,]" such controls cannot have the effect of foreclosing use by Crown Castle of the ROW or otherwise prevent Crown Castle from exercising its right under state law to "erect poles" in the ROW. That is because "the construction and maintenance of telephone lines in the streets and other public places within the City is today a matter of state concern and not a municipal affair." (Williams Communication v. City of Riverside, supra, 114 Cal.App.4th at p. 653.)

On the basis of Crown Castle's status as a CLEC, and its attendant rights to the ROW, the Network is designed as a ROW system. With respect to the siting and configuration of the Network, the rights afforded under PUC sections 7901 and 7901.1 apply. Crown Castle reserves its rights under section 7901 and 7901.1, including, but not limited to, its right to challenge any approval process, that impedes or infringes on Crown Castle's rights as a CLEC.

>      *ii.   Government Code Section 50030.*

Government Code section 50030 also applies to telephone corporations seeking to install their facilities in the public rights-of-way. That section provides that a city cannot require payment for entry into its ROW beyond what is necessary to address the "reasonable costs of providing the service for which the fee is charged."[4] Section 50030 constitutes a legislative determination that any fee or exaction that exceeds the cost of addressing actual impacts arising from the construction of a telephone network is unlawful because it fails to satisfy the nexus and rough proportionality requirements under the dual Supreme Court cases of *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994).

>      *iii.   Government Code Section 65964.1.*

---

[2] Pub. Util. Code, § 7901.
[3] *Williams Communications v. City of Riverside*, supra, 114 Cal.App.4th at p. 648 quoting *County of L.A. v. Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 384 [196 P.2d 773].
[4] *Williams Communications v. City of Riverside*, supra, 114 Cal.App.4th at p. 648.

Government Code section 65964.1 became effective on January 1, 2022. Pursuant to this provision, an application for a new wireless facility is deemed approved if: (a) the city --including a charter city -- or county fails to approve or disapprove the application within the time periods established in the Federal Communications Commission's ("FCC") 2018 Declaratory Rulings (33 FCC Rcd 9088 (14) (60 days for collocation of small wireless facilities and 90 days for stand-alone small wireless facilities; 150 days for non-small wireless facilities), and (b) all public notices regarding the application have been provided. (Gov. Code, § 65964.1, subd. (a).) The new statute also contains an express finding that wireless telecommunications facilities are a matter of statewide concern, not a "municipal affair" as that term is used in section 5 of Article XI of the California Constitution. (Id., § 65964.1, subd. (e).)

        b.   Applicable Federal Law.

           *i.   The Federal Telecommunications Act.*

The Telecommunications Act of 1996 ("Telecom Act") governs the deployment of telecommunications infrastructure and was "intended to remove all barriers to entry in the provision of telecommunications services."[5] Sections 253 and 332 of the Telecom Act speak directly to Congress's determination that certain state and local regulations are unlawful.[6] Section 253 represents a "broad preemption of laws that inhibit competition."[7] Section 253(a) provides, in relevant part:

> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service. 47 U.S.C. § 253(a).

Similarly, section 332(c)(7) states:

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—(I) shall not unreasonably discriminate among providers of functionally equivalent services; and (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services. 47 U.S.C. § 332(c)(7)(B)(i).

---

[5] *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, Declaratory Ruling and Third Report and Order, WT Docket Nos. 17-79, 17- 84, FCC 18-133, ¶ 14 (rel. Sept. 27, 2018) ("*Removing Barriers*") (citing congressional conference report on the Telecom Act).

[6] *Id*. at ¶15; Section 253(a) addresses "any interstate or intrastate telecommunications service," while section 332(c)(7)(B)(i)(II) addresses "personal wireless services"—a type of telecommunications service (wireless). *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, Declaratory Ruling and Third Report and Order, WT Docket Nos. 17-79, 17-84, FCC 18-133, ¶ 34 (rel. Sept. 27, 2018) (citing 47 U.S.C. §§ 253(a), 332(c)(7)(B)(i)(II) ("*Removing Barriers*").

[7] *Removing Barriers*, at ¶15 (citing *Puerto Rico Tel. Co. v. Telecomm. Reg. Bd. of Puerto Rico*, 189 F.3d 1, 11 n.7 (1st Cir.1999)).

Section 332 further provides as follows:

> A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request. 47 U.S.C. § 332(c)(7)(B)(ii).

> Any decision by a state or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in the written record. 47 U.S.C. § 332(c)(7)(B)(iii).

As noted above, the Telecom Act prohibits localities from taking actions (or not acting) that either prohibit or have "the effect of prohibiting the provision of" telecommunications services and personal wireless service. In 2018, the Federal Communications Commission ("FCC") declared that the proper standard for determining whether a state or local requirement has the effect of prohibiting service and violates sections 253 and 332 is the "materially inhibit" standard articulated in the FCC's 1997 *California Payphone* decision.[8] Under that decision, a state or local law has the improper effect of prohibiting the provision of telecommunications services if it "materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service.[9] "This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities."[10] In other words, "a state or local legal requirement could materially inhibit service in numerous ways[,]" including "materially inhibiting the introduction of new services or the improvement of existing services."[11]

In addition to the above, other FCC enactments and policies also guide local governmental actions, including the following:

> (1)     The "Shot Clock" Rule:  On November 18, 2009, the Federal Communications Commission ("FCC") adopted the "Shot Clock" Rule, placing strict time limits on local governments to act on applications for the siting of wireless telecommunications facilities.  The "Shot Clock" Rule was intended to "promote[] deployment of broadband and other wireless services" by "reducing delays in construction and improvement of wireless networks."

> (2)     The Updated "Shot Clock" Rule: In 2018, the FCC revisited the 2009 "Shot Clock" Rule. Among other findings and

---

[8] *Removing Barriers*, at ¶¶ 10, 31.
[9] *Id.*, at ¶ 37.
[10] *Id.*
[11] *Id.*

rulings, the FCC shortened the "Shot Clock" timeframe during which local governments must act on applications for the siting of small wireless telecommunications facilities, restricted the fee rates jurisdictions may lawfully charge for small wireless telecommunications facilities, and established a new remedy for violations of the "Shot Clock" Rule. Further, the FCC clarified that jurisdictions act solely within their regulatory capacity when dictating the terms of access to their public rights-of-way and instituted procedures for processing applications. The following year, in its decision in *City of Portland v. United States*, No. 18-72689, (9th Cir. 2020), the Ninth Circuit Court confirmed all the preceding FCC findings.

III.    <u>JUSTIFICATION</u>

As discussed more fully below, the Service Area described prior currently experiences a degradation in service due to capacity limitations in wireless telecommunications coverage. To bolster this degradation in service and/or capacity, Crown Castle proposes small wireless facility nodes to support the degradation in this area. As a CLEC entitled to ROW access, Crown Castle construct its systems in the ROW. On that basis and during the network planning phase, Crown Castle examines locations potentially available for siting within the ROW. The analysis below demonstrates the reasons behind Crown Castle's proposal for small wireless facilities and their placement in the locations specified in the applications.

a.    Height of the Proposed Facilities.

The antenna heights and locations of the Small Cell Site nodes were chosen to provide the minimum signal level needed to meet critical coverage and/or capacity needs in the Service Area. Despite the technical limitations of a low-profile system, Crown Castle seeks to maximize the coverage of each node location, since maximization of the node performance equates to a lower overall number of facilities for the Network. Accordingly, each location was chosen to provide an effective relay of signal from the adjacent node and nearby base station, so that ubiquitous coverage and capacity of the minimum signal level is provided throughout the Service Area with the minimum number of nodes.

b.    Location of Proposed Facilities.

The selected node locations maximize the RF coverage of the node and minimize interference/overlap with the other nodes of the system, resulting in a lower overall number of facilities for the Network and a less obstructive system. Each node provides an effective relay of signal from the adjacent node, so that ubiquitous coverage is provided throughout the Service Area. Because each node is locationally dependent on the other nodes of the Network, moving a node

too far from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network, rendering relocation technically infeasible. In selecting node locations, Crown Castle also sought out use of existing utility, streetlight, and street sign pole sites that could serve as a potential host site for an alternative location.

   c.  Small Wireless Facility Sites

Apart from the siting considerations described above, Small Wireless Facilities are inherently unobtrusive by design. Small Wireless Facilities were developed as a smaller-scale solution to, and in support of, the larger macro-site or cell tower. It therefore represents a significant technological advance in the development of smaller profile wireless transmission devices. As devices shrink in size, they also, necessarily, shrink in power. Accordingly, more facilities are needed, and such facilities must be located closer to the user. The proposed nodes are designed to be smaller scale and lower power to allow them to integrate more easily into their surroundings.

The proposed facilities combine a smaller scale product with state-of-the-art technology that allows for multiple carriers to provide service from the node. The nodes are designed to blend into the existing elements of the ROW. They feature narrow-profile poles and minimal equipment. Each facility also will be designed to blend with existing features in the road. Crown Castle's network of supports coverage by offloading capacity from the existing surrounding (macro) sites while also reducing impact to the ROW in the following manner:

   (1)  Crown Castle Small Cell Site node utilizes the latest in wireless infrastructure technology, incorporating smaller, low-power facilities instead of using larger, more obtrusive cell towers;

   (2)  Crown Castle Small Cell Site node utilizes the ROW, thereby avoiding intrusions into private property or undeveloped sensitive resource areas;

   (3)  Crown Castle Small Cell Site allows for collocation by multiple carriers, thereby avoiding proliferation of nodes;

   (4)  Crown Castle Small Cell site strikes a balance between antenna height, capacity and coverage in order to minimize visual impacts;

   (5)  Crown Castle Small Cell Site carefully spaces the nodes to effectively relay signal with a minimum number of node locations; and

   (6)  Crown Castle Small Cell Site seeks to utilize existing vertical elements in the ROW, such as utility poles and street light poles, thereby minimizing the net number of vertical intrusions in the ROW.

   d.  Health and Safety/FCC Compliance.

The FCC has preempted the field of compliance with RF emission standards.  Moreover, section 47 U.S.C. 332(c)(7)(B)(iv) preempts local and state governments from regulating the siting of wireless telecommunications facilities on the basis of the perceived health effects of RF emissions. Nevertheless, the Network, and all equipment associated with the Network, complies with all applicable FCC RF emission standards.  A demonstration of the Network's compliance with applicable FCC RF emission standards is enclosed with the application and marked as "Attachment 07 - RF Compliance Report".

      e.     Selection Criteria for Each Node Site.

Given the low profile of the nodes, and the resultant limitations of such a low-profile system, Crown Castle seeks to maximize capacity off load coverage of each node location because maximization of the node coverage equates to a lower overall number of facilities for the network and a less incursive system.  Each node is locationally dependent on the other nodes of the Network.  Accordingly, each location was specifically chosen to provide an effective relay of signal from the adjacent node, so that ubiquitous coverage is provided throughout the Service Area with the least number of nodes.  To move a node too far from its proposed location will therefore result in an inability to effectively offload service capacity in order to meet the node's technical objectives as the node is unable to properly propagate its signal to the other nodes within the larger Network. The further a node is moved from its proposed location, the more the signal from that node will weaken. The technical limitations of small wireless facilities may result in limited viable options for their placement, as relocating a node by more than 50 feet from the proposed location materially impairs its technical capability.

While Crown Castle is able to install new poles to achieve its RF capacity offload and coverage objectives, technical objectives are not Crown Castle's sole consideration when selecting a node location. Crown Castle also considers aesthetic impacts, making the strategic decision to minimize the installation of new poles, where feasible, by installing nodes on existing vertical elements, including streetlights and wooden utility poles.  By approaching a network design in this matter, Crown Castle limits proliferation of verticalities in the public ROW.  Crown Castle considers the following factors during the site selection process:

      (1)     Technical feasibility;

      (2)     Ability to utilize existing vertical elements;

      (3)     Ability to offload and support capacity demands, meet RF objectives; and

      (4)     Minimization of visibility/aesthetic impacts.

      f.     Selection Criteria for Node Site Location.

Each node of the Network is necessary to support a degradation of service due to overload on the system.  The need to maintain minimum quality of service to a level that allows adequate in-building coverage and to address growing capacity demands is underscored by the greater numbers

of customers dropping their landlines and relying solely on wireless telecommunications for their phone service.  Additionally:

(1)    In a recent international study, the United States dropped to fifteenth in the world in broadband penetration, well behind South Korea, Japan, the Netherlands and France.[12]

(2)    40 percent of all American homes are now wireless only.[13]

(3)    More and more civic leaders and emergency response personnel cite lack of a robust wireless network as a growing public safety risk.  The number of 911 calls placed by people using wireless phones has significantly increased in recent years.  It is estimated that about 70 percent of 911 calls are placed from wireless phones, and that percentage is growing.[14]

(4)    Data demand from new smartphones and tablets is leading to a critical deficit in spectrum, requiring more wireless antennas and infrastructure.  According to a 2011 report, wireless data traffic was 110 percent higher than in the last half of 2010.  Similarly, AT&T reports that its wireless data volumes have increased 30-fold since the introduction of the iPhone.[15]

(5)    Wireless data traffic grew by a factor of 20 between 2010 and 2015.[16]

As more Americans depend on wireless communications technologies and smartphone, reliable network capacity and maintaining high level in-building service coverage is and will continue to be critical.  The San Mateo Service Area is currently experiencing insufficient coverage and/or capacity.  Users in the Service Area therefore would experience an intolerably high percentage of blocked and dropped calls and/or slow data speeds for outside use, with a commensurate decline in signal strength as one moves toward the inside of existing buildings and homes.  Crown Castle Small Cell Site nodes seek to provide sufficient signal strength to ensure not only adequate signal for mobile and outdoor users, but further support for reliable in-building coverage for all those customers who may seek to abandon their home landlines and sufficient capacity to address new data demands from smartphones and tablets.  Wireless customers must be able to count on a level of service commensurate with that provided by landlines.

g. Additional Information Provided Regarding Drive Tests-NOIs

---

[12] Organization for Economic Co-operation and Development (OECD) Directorate for Science, Technology, and Industry, "Broadband Statistics," (June 2010): www.oecd.org/sti/ict/broadband.

[13] Federal Communications Commission (April 2013).

[14] Federal Communications Commission (2013) http://www.fcc.gov/guides/wireless-911-services.
Executive Office of the President Council of Economic Advisors (White House, Feb. 2012) at 2-6.

[15] *Id.*

[16] *Id.*

Drive test data, which is requested to show the area of coverage for the proposed site, is not relevant for a small wireless facility that is needed to address capacity constraints and network densification needs as opposed to traditional coverage gaps. Crown Castle did not conduct in-field drive tests and is unable to provide any drive test results reflecting any gaps in coverage or coverage are, as addressing a coverage gap is not a technical objective of the project at hand. We are instead improving existing service and introducing the 5G spectrum, a new service, to the San Mateo area. Small Cells are needed to densify the overall network and Crown Castle is targeting the Public Right of Way where 5G is not yet available. Please be advised that pursuant to the FCC, a provider enhancing, densifying, expanding, or introducing new services need not show a significant gap in order to show necessity for its facilities—it may instead use other, more relevant means of showing its introduction of new or improvement of existing services.[17] The instant narrative and other application materials show Crown Castle is introducing new and improving existing services in the San Mateo area.

## IV. COMPLIANCE WITH CITY OF SAN MATEO SMALL CELL DESIGN STANDARDS, APPLICATION REQUIREMENTS, CONDITIONS OF APPROVAL FOR WIRELESS FACILITIES IN THE PUBLIC RIGHT-OF-WAY

1. Project Purpose

In support of the Project purpose as detailed above, the proposed site objective is to add new personal wireless service capacity to an area in which the licensee currently provides personal wireless service coverage.

2. Technical Objectives

Refer to the plan set, KHCLE-37293, submitted in the application for site CA_SF_SANMATEO_245M2 for the proposed centerline height and equipment configuration of the proposed site. The centerline height and equipment configuration as shown in the above referenced plan set is required to achieve the objective stated above for the following reasons:

- To maintain compliance with all applicable codes and standards as listed in the "Codes" section of the above referenced plan set.
- To maintain compliance with FCC-licensed spectrum as submitted in the application for the site as referenced above.
- To provide signal propagation with consideration of surrounding topography, foliage, and structures.

Refer to section VI, Geographic Map of Coverage Improvement with New Service, of this document for the street-level map that shows the general geographic area of the service area to be improved through the proposed facility. The following uses are located within the service area of the site:

- Residential

As described above, users in the service area experience an intolerably high percentage of blocked and dropped calls and/or slow data speeds for outside use, with a commensurate decline in signal strength as one moves toward the inside of existing buildings and homes. Without

---

[17] *Removing Barriers*, at ¶ 37.

installation of the proposed site in support of the wider Project, these conditions would persist.

As stated above in section III.g., Additional Information Provided Regarding Drive Tests-NOIs, of this document, no drive tests have been conducted for the proposed site.

    3.  Network Map

Refer to section VII., Overview Map of Crown Castle's Existing And Proposed Network, of this document for the overview map of the applicant's network within the city's jurisdictional and territorial boundaries that shows (1) all the existing wireless facilities that applicant currently owns and/or operates and (2) all future wireless facilities that are reasonably foreseeable within two years of the application submission.

<u>V. CONCLUSION</u>

Crown Castle respectfully presents its Wireless Permit applications for wireless communications facility nodes for the Network.  Crown Castle's representatives are available to answer any questions.

VI.    <u>GEOGRAPHIC MAP OF COVERAGE IMPROVEMENT WITH NEW SERVICE</u>



500' RADIUS OF COVERAGE WITH NEW SITE INSTALLED AT LOCATION

## VII.    OVERVIEW MAP OF CROWN CASTLE'S EXISTING AND PROPOSED NETWORK



Alternative Site Analysis

# City of San Mateo
## Primary Candidate for Trousdale

| Node | Latitude | Longitude | Structure Type | Address | Zoning district designation | Structure Height | Antenna Centerline |
|------|----------|-----------|----------------|---------|----------------------------|------------------|--------------------|
| CA_SF_SANMATEO_245M2 | 37.572725 | -122.343308 | Wood Pole | 124 Warren Rd, San Mateo, CA 94401 | R1A | 34' 0" | 19' 11" |



Legend

 Proposed Node


PROPRIETARY & CONFIDENTIAL
April 2024 | PAGE 1

# City of San Mateo
## Primary Candidate for Trousdale

| Node | Latitude | Longitude | Structure Type | Address | Zoning district designation | Structure Height | Antenna Centerline |
|------|----------|-----------|----------------|---------|----------------------------|------------------|--------------------|
| CA_SF_SANMATEO_245M2 | 37.572725 | -122.343308 | Wood Pole | 124 Warren Rd, San Mateo, CA 94401 | R1A | 34' 0" | 19' 11" |

This alternative, as designed, complies with all codes as adopted by the local government authorities.

- California building code CBD-2019
- California Administrative Code. (Incl. Titles 24 & 24) 2019
- ANS/EIA-22-F Life Safety Code NFPA
- Building Officials and code Administrators (BOCA)
- California Electrical Code CEC-2019
- California Mechanical Code CMC-2019
- California Plumbing Code CPC-2019
- Local Building Code(s)
- County and/or County ordinances
- Must comply to latest California Fire Code (and latest municipal fire code)
- California General Order 09 and 128
- San Mateo Municipality Code, Chapter 17



# Trousdale

## Primary and Alternate Candidates for **CA_SF_SANMATEO_245M2**



Legend

📍 Proposed Node

🟠 Wood Pole

⭘ 500ft Radius

⭕ 200ft Radius

- 19 Alternate Sites Evaluated



PROPRIETARY & CONFIDENTIAL
April 2024 | PAGE 3

# Trousdale

## Existing Wireless Facilities within 500' radius



**Legend**

Proposed Node

Existing Wireless Facility

500ft Radius

200ft Radius

• There is NO existing wireless facility within the 500' radius.



PROPRIETARY & CONFIDENTIAL
April 2024 | PAGE 4

# Trousdale

## Primary and Alternative Candidates for CA_SF_SANMATEO_245M2

| Node | Latitude | Longitude | Structure Type | Address | Zoning district designation | Structure Height | Antenna Centerline | Reason for Being Acceptable or Unacceptable |
|---|---|---|---|---|---|---|---|---|
| CA_SF_SANMATEO_245M2 | 37.572725 | -122.343308 | Wood Pole | 124 Warren Rd, San Mateo, CA 94401 | R1A | 34' 0" | 19' 11" (Side-arm mount w/ cylinder shroud) | Will meet the coverage objective. |
| ALT 01 | 37.573026 | -122.344932 | Wood Pole | 1641 Carol Ave, Burlingame, CA 94010 | Town of Hillsborough | 42' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 01 does not meet our RF requirements as it is located ~484ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 02 | 37.572353 | -122.34425 | Wood Pole | 150 Warren Rd, San Mateo, CA 94401 | R1A | 38' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 02 does not meet our RF requirements as it is located ~306ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 03 | 37.57247 | -122.343927 | Wood Pole | 140 Warren Rd, San Mateo, CA 94401 | R1A | 30' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 03 does not meet our RF requirements as it is located ~202ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 04 | 37.572614 | -122.343541 | Wood Pole | 136 Warren Rd, San Mateo, CA 94401 | R1A | 34' | N/A | • Will not work because the pole is within 1ft of residential driveway violating PG&E standards (027911 Rev 15 Section B–B (Driveway or Road without Curb) and associated notes on Page 9). |
| ALT 05 | 37.572809 | -122.342789 | Wood Pole | 114 Warren Rd, San Mateo, CA 94401 | R1A | 36' | N/A | • Will not work because the pole has transformer violating PG&E standards (027911 Rev 15 General Information – Note 5).<br>• Will not work because the pole has fuse switch violating PG&E standards (027911 Rev 15 General Information – Note 5). |
| ALT 06 | 37.572892 | -122.342517 | Wood Pole | 110 Warren Rd, San Mateo, CA 94401 | R1A | 37' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 06 does not meet our RF requirements as it is located ~238ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 07 | 37.572999 | -122.342251 | Wood Pole | 110 Warren Rd, San Mateo, CA 94401 | R1A | 35' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 07 does not meet our RF requirements as it is located ~322ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 08 | 37.573169 | -122.341839 | Wood Pole | Across 726 Hurlingham Ave, San Mateo, CA 94402 | R1A | 41' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 08 does not meet our RF requirements as it is located ~455ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |



# Trousdale

## Primary and Alternative Candidates for CA_SF_SANMATEO_245M2

| Node | Latitude | Longitude | Structure Type | Address | Zoning district designation | Structure Height | Antenna Centerline | Reason for Being Acceptable or Unacceptable |
|---|---|---|---|---|---|---|---|---|
| ALT 09 | 37.572593 | -122.341851 | Wood Pole | Across 718 Hurlingham Ave, San Mateo, CA 94402 | R1A | 45' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 09 does not meet our RF requirements as it is located ~424ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 10 | 37.572168 | -122.341844 | Wood Pole | Across 709 Hurlingham Ave, San Mateo, CA 94402 | R1A | 37' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 10 does not meet our RF requirements as it is located ~469ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 11 | 37.57218 | -122.344592 | Wood Pole | 166 Warren Rd, San Mateo, CA 94401 | R1A | 32' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 11 does not meet our RF requirements as it is located ~423ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 12 | 37.572003 | -122.344536 | Wood Pole | 159 Warren Rd, San Mateo, CA 94401 | R1A | 27' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 12 does not meet our RF requirements as it is located ~443ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 13 | 37.573231 | -122.344446 | Wood Pole | 1545 Carol Ave (On Barroilhet ave), Burlingame, CA 94010 | Town of Hillsborough | 33' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 13 does not meet our RF requirements as it is located ~380ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 14 | 37.573417 | -122.344017 | Wood Pole | 1536 Barroilhet Ave, Burlingame, CA 94010 | Town of Hillsborough | 32' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 14 does not meet our RF requirements as it is located ~322ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 15 | 37.573656 | -122.343464 | Wood Pole | 4 E Carol Ave (On Barroilhet ave), Burlingame, CA 94010 | Town of Hillsborough | 30' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 15 does not meet our RF requirements as it is located ~343ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 16 | 37.573835 | -122.343036 | Wood Pole | 1514 Barroilhet Ave, Burlingame, CA 94010 | Town of Hillsborough | 44' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 16 does not meet our RF requirements as it is located ~413ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 17 | 37.573756 | -122.343498 | Wood Pole | 4 E Carol Ave E, Burlingame, CA 94010 | Town of Hillsborough | 43' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 17 does not meet our RF requirements as it is located ~381ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |



# Trousdale

## Primary and Alternative Candidates for CA_SF_SANMATEO_245M2

| Node | Latitude | Longitude | Structure Type | Address | Zoning district designation | Structure Height | Antenna Centerline | Reason for Being Acceptable or Unacceptable |
|------|----------|-----------|----------------|---------|-----------------------------|-------------------|--------------------|---------------------------------------------|
| ALT 18 | 37.57388 | -122.343975 | Wood Pole | 12 E Carol Ave E, Burlingame, CA 94010 | Town of Hillsborough | 36' | N/A | Will not work because the pole is too far away from our targeted coverage and capacity relief area. ALT 18 does not meet our RF requirements as it is located ~462ft away from our primary node. The technical limitations of small wireless facilities may result in limited viable options for their placement as the 5G signal travels ~200ft with line of sight based on the surroundings. Moving a node too far (greater than 200ft) from its proposed location will result in an inability to meet coverage objectives and thereby impair the Network. |
| ALT 19 | 37.572694 | -122.34277 | Wood Pole | 121 Warren Rd, San Mateo, CA 94401 | R1A | 23' | N/A | • Will not work as there is no space on the pole to place the radio above existing telecoms (does not meet GEO-95 standards - Rule 94.4 Clearances (A-G), Figure 94.1, Table 2, Case 21, A-H). |



<u>Variance Memo</u>

# Introduction

This memo serves to demonstrate the Required Findings in support of a Limited Exception pursuant to San Mateo Municipal Code (SMMC) 17.10.070(d).

# Required Findings

The following statements are made to satisfy the Required Findings.

(A) the proposed wireless facility qualifies as a "personal wireless service facility" as defined in 47 United States Code (U.S.C.) § 332(c)(7)(C)(ii), as may be amended or superseded; and

Per 47 U.S.C. § 332(c)(7)(C)(ii), personal wireless service facilities are defined as, "facilities for the provision of personal wireless services" and personal wireless services are defined as, "commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services". As demonstrated by submitted Attachment 10 – Project Purpose and Technical Objectives, the proposed facility would provide commercial mobile services and qualifies as a personal wireless service facility.

(B) the applicant has provided the Director with a reasonable and clearly defined technical service objective to be achieved by the proposed wireless facility; and

As demonstrated by submitted Attachment 10 – Project Purpose and Technical Objectives, the proposed facility would add new personal wireless service capacity to an area in which the licensee currently provides personal wireless service coverage.

(C) the applicant has provided the Director with a written statement that contains a detailed and fact-specific explanation as to why the proposed wireless facility cannot be deployed in compliance with the applicable provisions in SMMC Chapter 17.10 and these Design Standards and Application Requirements; and

Accessory Equipment Horizontal Projection - SMMC Chapter 17.10 requires compliance with the *2021 Design Standards, Application Requirements, Conditions of Approval for Wireless Facilities in the Public Right-of-Way* ("Standards"). The Standards require that accessory equipment be located in a vertical arrangement on pole to the maximum extent feasible and that side-mounted antennas not project more than 2 feet from the support structure[1]. The proposed installation is oriented in the only arrangement that meets PG&E and GO95 standards. A minimum standoff of 36" from the center of pole to the antennas is required for this installation. (GO95 Rule 84.7-B) A vertical installation on this pole would not comply with GO95 standards. (GO95 Rule 94.4-E)

Side Arm Road Overhang, Down Guy Wires – SMMC Chapter 17.10 requires compliance with the *2021 Design Standards, Application Requirements, Conditions of Approval for Wireless Facilities in the Public Right-of-Way* ("Standards"). The Standards require that side-mounted antennas shall not project over any roadway for vehicular travel[2]. The

---

[1] Standards Section 2, Design Standards 6 and 16.
[2] Standards Section 2, Design Standard 16.

proposed wireless facility requires projection over the adjacent roadway as there are existing down guy wires from the pole on the side away from the roadway. *General Order 95, Rules for Overhead Electric Line Construction* (GO95), Rule 38 requires 24-inch radial clearance between guy wires and antenna equipment. This clearance cannot be met with the proposed side arm projecting away from the street. To address what is understood to be the intent of the Standards requirement that facilities not project over roadways, avoiding the obstruction of roadways to ensure public safety, the installation as proposed meets all GO95 height requirements for projection over a roadway (GO95 Rule 37, Minimum Clearances of Wires above Railroads, Thoroughfares, Buildings, Etc.).

Antenna Location - SMMC Chapter 17.10 requires compliance with the *2021 Design Standards, Application Requirements, Conditions of Approval for Wireless Facilities in the Public Right-of-Way* ("Standards"). The Standards require that antennas be placed at the top of the pole to the maximum extent feasible[3]. Due to GO95 spacing requirements there is no available space to attach to pole top on the existing pole. (GO95 Rule 94.4-C) Rearrangement of existing utility lines to create space at the top of the pole is not possible due to the spacing requirements of attachments and the available vertical space on the pole. (GO95 Rule 37 & Rule 38)

Pole Owner Structural Authorization - SMMC Chapter 17.10 requires compliance with the *2021 Design Standards, Application Requirements, Conditions of Approval for Wireless Facilities in the Public Right-of-Way* ("Standards"). The Standards require that installations on utility poles provide a pole owner authorization that indicates that the pole is structurally sound for additional loads[4]. In their normal course of business, the pole owners (PG&E or AT&T) do not provide a statement of structural soundness in their attachment application approval documents. PG&E and AT&T each perform their own, internal structural analysis of the pole with proposed attachments. Their approval of the attachment application implies structural soundness of the pole under the proposed condition; application approval would not be provided for an unsound proposed condition. Additionally, Crown Castle has performed a structural analysis of the proposed attachment condition which is provided in Appendix A for reference. This analysis utilizes software, documentation, and professional standards as widely accepted in the utility industry and shows structural soundness of the proposed condition.

Overhead Utility Lines and Service Drops - SMMC Chapter 17.10 requires compliance with the *2021 Design Standards, Application Requirements, Conditions of Approval for Wireless Facilities in the Public Right-of-Way* ("Standards"). The Standards require that no new overhead utility lines or service drop be installed because undergrounding would increase project costs[5]. No new overhead utility lines are proposed under this permit application package. If required, all overhead utility connections are proposed, permitted, and installed by others. Where required, general industry practice would propose to upgrade existing lines, overlash new lines to existing strand lines, or install new aerial strand lines in this preferential order. New overhead strand is minimized to the maximum feasible extent as industry practice. Where required, new power service

---

[3] Standards Section 2, Design Standard 13.
[4] Standards Section 5, Table 5.1 – Design Standards for Installations on Streetlight Poles.
[5] Standards Section 2, Design Standard 20.

to PG&E or jointly owned wood utility poles must be installed overhead. Please find this information with additional references in a letter from PG&E which is included in Appendix B.

(D) the applicant has provided the Director with a meaningful comparative analysis with the factual reasons why all alternative locations and/or designs identified in the administrative record (whether suggested by the applicant, the City, public comments or any other source) are not technically feasible or potentially available to reasonably achieve the applicant's reasonable and clearly defined technical service objective to be achieved by the proposed wireless facility; and

> As demonstrated by submitted Attachment 11 – Alternative Sites Analysis, the proposed site is the preferred location to meet the coverage objective of providing new personal wireless service capacity to an area in which the licensee currently provides personal wireless service coverage.

(E) the applicant has demonstrated to the Director that the proposed location and design is the least non-compliant configuration that will reasonably achieve the applicant's reasonable and clearly defined technical service objective to be achieved by the proposed wireless facility, which includes without limitation a meaningful comparative analysis into multiple smaller or less intrusive wireless facilities dispersed throughout the intended service area.

> The proposed facility is compliant with the Standards with the exception of being designed with horizontal projection to meet GO95 requirements, horizontal projection over a roadway, mid-mounted equipment, structural soundness not specifically stated by the pole owner, and overhead utility lines not included within this permit application but permitted and installed by others where required. The submitted Attachment 11 – Alternative Sites Analysis demonstrates that the proposed site is the preferred site to achieve the stated technical service objective. As the proposed facility is otherwise compliant with the Standards and is demonstrated to be the preferred site to meet the technical service objective, the proposed facility is the least non-compliant configuration that will achieve the technical service objective.

Appendix A

**O-Calc® Pro  *Analysis - GO 95***

| | | | | | | |
|---|---|---|---|---|---|---|
| Pole Num: | **110074648** | Pole Length / Class: | **40 / 4** | Code: | **GO 95** | Structure Type: | **Guyed Tangent** |
| Aux Data 1 | **Unset** | Species: | **DOUGLAS FIR** | GO 95 Rule: | **At Replace (Existing)** | Pole Strength Factor: | **0.38** |
| Aux Data 2 | **Unset** | Setting Depth (ft): | **6.0** | Construction Grade: | **A** | Transverse Wind LF: | **1.00** |
| Aux Data 3 | **Unset** | G/L Circumference (in): | **36.00** | Loading District: | **Light** | Wire Tension LF: | **1.00** |
| Aux Data 4 | **Unset** | G/L Fiber Stress (psi): | **7,600** | Ice Thickness (in): | **0.00** | Vertical LF: | **1.00** |
| Aux Data 5 | **Unset** | Allowable Stress (psi): | **2,753** | Wind Speed (mph): | **55.90** | Pole Factor of Safety: | **3.72** |
| Aux Data 6 | **Unset** | Fiber Stress Ht. Reduc: | **No** | Wind Pressure (psf): | **8.00** | Vertical Factor of Safety: | **115.94** |
| Latitude: | **37.572725** | Longitude: | **-122.343308** | Elevation: | **-19.6M** | Bending Factor of Safety: | **3.79** |





| Pole Capacity Utilization (%) Crossarm allowance 300 lbs | | Height (ft) | Wind Angle (deg) |
|---|---|---|---|
| Maximum | **71.6** | 0.0 | 74.8 |
| Groundline | **71.6** | 0.0 | 74.1 |
| Vertical | **2.3** | 21.2 | 207.5 |

| Pole Moments (ft-lb) Crossarm allowance 300 lbs | | Load Angle (deg) | Wind Angle (deg) |
|---|---|---|---|
| Max Cap Util | **23,828** | 96.8 | 74.8 |
| Groundline | **23,828** | 96.8 | 74.1 |
| GL Allowable | **33,885** | | |
| Overturn | **24,500** | | |

**O-Calc® Pro  Analysis - GO 95**

| Guy System Component Summary | | | | | Load From Worst Wind Angle on Pole | | Individual Maximum Load With Overload Applied | |
|---|---|---|---|---|---|---|---|---|
| Description | Lead Length (ft) | Lead Angle (deg) | | Height (ft) | Nominal Capacity (%) | Wind Angle (deg) | Max* Load Capacity (%) | Wind Angle (deg) |
| ▸ Anchor | 155.0 | 80.0 | | | 0.0 | 74.8 | 0.0 | 0.0 |
| ● EHS 3/8 (Span/Head) | | | | 12.0 | 0.0 | 74.8 | 0.0 | 0.0 |
| ▸ Anchor - 22.5M | 10.7 | 335.0 | | | 12.3 | 74.8 | 15.4 | 166.7 |
| ● EHS 7/16 (Sidewalk) | | | | 20.8 | 7.1 | 74.8 | 9.2 | 170.0 |
| ○ Sidewalk Strut | 10.7 | 335.0 | | 12.2 | 7.8 | 74.8 | 9.8 | 170.0 |
| ● EHS 7/16 (Sidewalk) | | | | 21.8 | 7.3 | 74.8 | 9.3 | 170.0 |
| ● EHS 7/16 (Sidewalk) | | | | 26.0 | 12.4 | 74.8 | 15.0 | 160.0 |
| System Capacity Summary: | | | | | Adequate | | Adequate | |

| Groundline Load Summary - Reporting Angle Mode: Load - Reporting Angle: 96.8° | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shear Load* (lbs) | Applied Load (%) | Bending Moment (ft-lb) | Applied Moment (%) | Pole Capacity (%) | Bending Stress (+/- psi) | Vertical Load (lbs) | Vertical Stress (psi) | Total Stress (psi) | Pole Capacity (%) |
| Powers | 326 | 19.9 | 7,908 | 33.2 | 23.3 | 770 | 141 | 1 | 771 | 28.0 |
| Comms | 975 | 59.7 | 20,091 | 84.3 | 59.3 | 1,956 | 60 | 1 | 1,957 | 71.1 |
| GuyBraces | 33 | 2.0 | -8,946 | -37.5 | -26.4 | -1,379 | 2,228 | 22 | -1,358 | -49.3 |
| GenericEquipments | 42 | 2.5 | 741 | 3.1 | 2.2 | 72 | 184 | 2 | 74 | 2.7 |
| Pole | 191 | 11.7 | 2,715 | 11.4 | 8.0 | 264 | 937 | 9 | 273 | 9.9 |
| Crossarms | 45 | 2.8 | 1,043 | 4.4 | 3.1 | 102 | 100 | 1 | 102 | 3.7 |
| Risers | 21 | 1.3 | 256 | 1.1 | 0.8 | 25 | 47 | 0 | 25 | 0.9 |
| Insulators | 1 | 0.1 | 21 | 0.1 | 0.1 | 2 | 18 | 0 | 2 | 0.1 |
| Pole Load | 1,634 | 100.0 | 23,828 | 100.0 | 70.3 | 1,812 | 3,715 | 36 | 1,848 | 67.1 |
| Pole Reserve Capacity | | | 10,057 | | 29.7 | 941 | | | 905 | 32.9 |

Pole ID:Pole_SANMATEO_245M2_pplx.pplx    Case 3:25-cv-04890-JD    Document 14-1    Filed 07/01/25    Page 226 of 230    Wednesday, August 30, 2023 5:31 PM

O-Calc® Pro *Analysis - GO 95*

**Load Summary by Owner - Reporting Angle Mode: Load - Reporting Angle: 96.8°**

| | Shear Load* (lbs) | Applied Load (%) | Bending Moment (ft-lb) | Applied Moment (%) | Pole Capacity (%) | Bending Stress (+/- psi) | Vertical Load (lbs) | Vertical Stress (psi) | Total Stress (psi) | Pole Capacity (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Power, UTILITY | 327 | 20.0 | 7,928 | 33.3 | 23.4 | 772 | 144 | 1 | 773 | 28.1 |
| Telco, COMMUNICATION | 211 | 12.9 | 4,140 | 17.4 | 12.2 | 403 | 38 | 0 | 403 | 14.7 |
| CATV | -1 | 0.0 | -6 | 0.0 | 0.0 | -1 | 20 | 0 | 0 | 0.0 |
| CCI | 836 | 51.2 | 17,091 | 71.7 | 50.4 | 1,664 | 269 | 3 | 1,667 | 60.5 |
| PG&E, UTILITY | 0 | 0.0 | 4 | 0.0 | 0.0 | 0 | 21 | 0 | 1 | 0.0 |
| PG&E | 33 | 2.0 | -8,950 | -37.6 | -26.4 | -1,380 | 2,207 | 21 | -1,358 | -49.3 |
| Pole | 191 | 11.7 | 2,715 | 11.4 | 8.0 | 264 | 937 | 9 | 273 | 9.9 |
| <Undefined> | 37 | 2.3 | 907 | 3.8 | 2.7 | 88 | 78 | 1 | 89 | 3.2 |
| **Totals:** | 1,634 | 100.0 | 23,828 | 100.0 | 70.3 | 1,812 | 3,715 | 36 | 1,848 | 67.1 |

**Detailed Load Components:**

| Power | | Owner | Height (ft) | Horiz. Offset (in) | Cable Diameter (in) | Sag at Max Temp (ft) | Cable Weight (lbs/ft) | Lead/Span Length (ft) | Span Angle (deg) | Wire Length (ft) | Tension (lbs) | Tension Moment* (ft-lb) | Offset Moment* (ft-lb) | Wind Moment* (ft-lb) | Moment at GL* (ft-lb) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Secondary | 1/0 (7) CU LT | Power, UTILITY | 28.85 | 25.79 | 0.3684 | 1.19 | 0.326 | 155.0 | 80.0 | 155.0 | 1,430 | 23,960 | 23 | -9 | 23,974 |
| Secondary | 1/0 (7) CU LT | Power, UTILITY | 28.85 | 25.79 | 0.3684 | 0.27 | 0.326 | 70.0 | 250.0 | 70.0 | 1,430 | -22,342 | 10 | 6 | -22,326 |
| Secondary | 1/0 (7) CU LT | Power, UTILITY | 28.85 | 42.03 | 0.3684 | 1.19 | 0.326 | 155.0 | 80.0 | 155.0 | 1,430 | 23,960 | 22 | -9 | 23,973 |
| Secondary | 1/0 (7) CU LT | Power, UTILITY | 28.85 | 42.03 | 0.3684 | 0.27 | 0.326 | 70.0 | 250.0 | 70.0 | 1,430 | -22,342 | 10 | 6 | -22,327 |
| Service | 1/0 AAC N-SD TPX | Power, UTILITY | 28.85 | 42.03 | 0.9200 | 2.34 | 0.340 | 120.0 | 160.0 | 122.0 | 75 | 591 | 17 | 573 | 1,182 |
| Secondary | 1/0 (7) CU LT | Power, UTILITY | 28.85 | 42.03 | 0.3684 | 1.19 | 0.326 | 155.0 | 80.0 | 155.0 | 1,430 | 23,960 | -18 | -9 | 23,933 |
| Secondary | 1/0 (7) CU LT | Power, UTILITY | 28.85 | 42.03 | 0.3684 | 0.27 | 0.326 | 70.0 | 250.0 | 70.0 | 1,430 | -22,342 | -8 | 6 | -22,345 |
| Service | 1/0 AAC N-SD TPX | Power, UTILITY | 28.85 | 42.03 | 0.9200 | 0.89 | 0.340 | 60.0 | 315.0 | 61.1 | 35 | -481 | -7 | 173 | -316 |
| | | | | | | | | | | Totals: | 4,965 | 48 | 736 | 5,749 |

| Comm | | Owner | Height (ft) | Horiz. Offset (in) | Cable Diameter (in) | Sag at Max Temp (ft) | Cable Weight (lbs/ft) | Lead/Span Length (ft) | Span Angle (deg) | Wire Length (ft) | Tension (lbs) | Tension Moment* (ft-lb) | Offset Moment* (ft-lb) | Wind Moment* (ft-lb) | Moment at GL* (ft-lb) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overlashed Bundle | 1" Communication Bundle | Telco, COMMUNICATION | 24.00 | 6.54 | 0.2420 | 0.43 | 0.104 | 155.0 | 80.0 | 155.0 | 1,653 | 23,037 | 1 | -10 | 23,028 |
| CATV | Catv | CATV | 23.96 | 6.54 | 0.7500 | | 0.070 | 155.0 | 80.0 | 155.0 | | | 1 | -10 | -9 |

**O-Calc® Pro  Analysis - GO 95**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overlashed Bundle | 1" Communication Bundle | Telco, COMMUNICATION | 24.00 | 6.54 | 0.2420 | 0.09 | 0.104 | 70.0 | 250.0 | 70.0 | 1,654 | -21,496 | 0 | 6 | -21,489 |
| CATV | Catv | CATV | 23.96 | 6.54 | 0.7500 | | 0.070 | 70.0 | 250.0 | 70.0 | | | 0 | 6 | 7 |
| Overlashed Bundle | 1.5" Communication Bundle | Telco, COMMUNICATION | 23.00 | 6.61 | 0.2420 | 0.53 | 0.104 | 155.0 | 80.0 | 155.0 | 1,652 | 22,071 | 1 | -8 | 22,064 |
| CATV | Catv | CATV | 22.96 | 6.61 | 0.6250 | | 0.109 | 155.0 | 80.0 | 155.0 | | | 1 | -8 | -7 |
| Overlashed Bundle | 1.5" Communication Bundle | Telco, COMMUNICATION | 23.00 | 6.61 | 0.2420 | 0.11 | 0.104 | 70.0 | 250.0 | 70.0 | 1,654 | -20,600 | 0 | 5 | -20,594 |
| CATV | Catv | CATV | 22.96 | 6.61 | 0.6250 | | 0.109 | 70.0 | 250.0 | 70.0 | | | 0 | 5 | 6 |
| Fiber | ADSS Fiber (84-144) | CCI | 25.00 | 6.47 | 0.7640 | 1.09 | 0.209 | 155.0 | 80.0 | 155.0 | 800 | 11,616 | 3 | -16 | 11,602 |
| | | | | | | | | | | **Totals:** | **14,629** | | **7** | **-29** | **14,607** |

| GenericEquipment | | Owner | Height (ft) | Horiz. Offset (in) | Offset Angle (deg) | Rotate Angle (deg) | Unit Weight (lbs) | Unit Height (in) | Unit Depth (in) | Unit Diameter (in) | Unit Length (in) | Offset Moment* (ft-lb) | Wind Moment* (ft-lb) | Moment at GL* (ft-lb) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Box | Tesco CAT 703 | CCI | 8.25 | 7.30 | 315.0 | 0.0 | 40.00 | 21.60 | 4.30 | -- | 8.70 | -12 | 55 | 43 |
| Cylinder | (3) 6705 Top of Standoff | CCI | 19.92 | 49.33 | 165.0 | 0.0 | 134.00 | 29.00 | -- | 18.00 | -- | 124 | 325 | 449 |
| Cylinder | 1" FIBER CONDUIT_ | CCI | 21.83 | 4.70 | 285.0 | 0.0 | 10.00 | 72.00 | -- | 1.00 | -- | -2 | 49 | 47 |
| | | | | | | | | | | **Totals:** | **110** | **429** | **539** |

| Crossarm | | Owner | Height (ft) | Horiz. Offset (in) | Offset Angle (deg) | Rotate Angle (deg) | Unit Weight (lbs) | Unit Height (in) | Unit Depth (in) | Unit Length (in) | Offset Moment* (ft-lb) | Wind Moment* (ft-lb) | Moment at GL* (ft-lb) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Normal | Crossarm | | 28.85 | 5.45 | 75.0 | 75.0 | 50.00 | 4.50 | 3.50 | 96.00 | 13 | 624 | 637 |
| Standoff | STANDOFF ARM | CCI | 18.42 | 6.44 | 75.0 | 75.0 | 22.00 | 4.63 | 4.00 | 39.96 | 7 | 92 | 99 |
| Normal | CROSSARM 3-1/2 X 4-1/2 X 4 | | 25.25 | 5.71 | 165.0 | 165.0 | 28.00 | 4.50 | 3.50 | 48.00 | 3 | 19 | 22 |
| | | | | | | | | | **Totals:** | **22** | **736** | **758** |

| Riser | | Owner | Height (ft) | Horiz. Offset (in) | Offset Angle (deg) | Rotate Angle (deg) | Unit Weight (lbs) | Unit Height (in) | Unit Depth (in) | Unit Diameter (in) | Unit Length (in) | Offset Moment* (ft-lb) | Wind Moment* (ft-lb) | Moment at GL* (ft-lb) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.25" POWER AND GROUNDING CONDUIT 315.0° H:18.42 | 1.25" POWER AND GROUNDING CONDUIT | CCI | 18.42 | 5.87 | 315.0 | 315.0 | 18.42 | 221.04 | 1.25 | 1.25 | 221.04 | -4 | 92 | 88 |
| 1/2" POWER CONDUIT 335.0° H:28.83 | 1/2" POWER CONDUIT | CCI | 28.83 | 5.87 | 335.0 | 335.0 | 28.83 | 345.96 | 0.50 | 0.50 | 345.96 | -4 | 102 | 98 |
| | | | | | | | | | | **Totals:** | **-9** | **194** | **186** |

| Insulator | | Owner | Height (ft) | Horiz. Offset (in) | Offset Angle (deg) | Rotate Angle (deg) | Unit Weight (lbs) | Unit Diameter (in) | Unit Length (in) | Offset Moment* (ft-lb) | Wind Moment* (ft-lb) | Moment at GL* (ft-lb) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Spool | Spool Insulator - 20 kV | Power, UTILITY | 28.85 | 24.00 | 152.2 | 0.0 | 1.00 | 2.50 | 2.12 | 0 | 5 | 5 |
| Spool | Spool Insulator - 20 kV | Power, UTILITY | 28.85 | 42.00 | 157.6 | 126.3 | 1.00 | 2.50 | 2.12 | 0 | 5 | 5 |

Pole ID:Pole_SANMATEO_245M2_pplx.pplx    Case 3:25-cv-04890-JD    Document 14-1    Filed 07/01/25    Page 228 of 230    Wednesday, August 30, 2023 5:31 PM

O-Calc® Pro *Analysis - GO 95*

| Spool | Spool Insulator - 20 kV | Power, UTILITY | 28.85 | -42.00 | 352.4 | 126.3 | 1.00 | 2.50 | 2.12 | 0 | 5 | 5 |
| Bolt | Single Bolt | Telco, COMMUNICATION | 24.00 | 0.00 | 165.0 | 75.0 | 5.00 | 3.00 | 0.10 | 0 | 0 | 0 |
| Bolt | Single Bolt | Telco, COMMUNICATION | 23.00 | 0.00 | 165.0 | 75.0 | 5.00 | 3.00 | 0.10 | 0 | 0 | 0 |
| Bolt | Single Bolt | Telco, COMMUNICATION | 25.00 | 0.00 | 165.0 | 75.0 | 5.00 | 3.00 | 0.10 | 0 | 0 | 0 |
| | | | | | | | | | Totals: | 0 | 15 | 15 |

### Guy Wire and Brace

| Guy Wire and Brace | | Owner | Attach Height (ft) | End Height (ft) | Lead/Span Length (ft) | Wire Diameter (in) | Percent Solid (%) | Lead Angle (deg) | Incline Angle (deg) | Wire Weight (lbs/ft) | Rest Length (ft) | Stretch Length (in) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EHS 3/8 | Span/Head | PG&E, UTILITY | 11.97 | 11.97 | 155.00 | 0.375 | 75.00 | 80.0 | 0.0 | 0.273 | 154.21 | 0.00 |
| EHS 7/16 | Sidewalk | PG&E | 20.83 | 0.00 | 10.65 | 0.438 | 75.00 | 335.0 | 38.8 | 0.399 | 31.12 | 0.09 |
| EHS 7/16 | Sidewalk | PG&E | 21.83 | 0.00 | 10.65 | 0.438 | 75.00 | 335.0 | 41.9 | 0.399 | 31.79 | 0.09 |
| EHS 7/16 | Sidewalk | PG&E | 26.00 | 0.00 | 10.65 | 0.438 | 75.00 | 335.0 | 52.0 | 0.399 | 34.93 | 0.19 |

### Guy Wire and Brace (Loads and Reactions)

| Guy Wire and Brace (Loads and Reactions) | | Elastic Modulus (psi) | Rated Tensile Strength (lbs) | Guy Strength Factor | Allowable Tension (lbs) | Initial Tension (lbs) | Loaded Tension[2] (lbs) | Maximum Tension[2] (lbs) | Applied Tension[3] (lbs) | Vertical Load (lbs) | Shear Load In Guy Dir (lbs) | Shear Load At Report Angle (lbs) | Proportional Moment at GL[3] (ft-lb) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EHS 3/8 | Span/Head | 2.30e+7 | 15,400 | 0.50 | 7,700 | 700 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| EHS 7/16 | Sidewalk | 2.30e+7 | 20,800 | 0.50 | 10,400 | 700 | 959 | 959 | 735 | 460 | 572 | -301 | -2,049 |
| EHS 7/16 | Sidewalk | 2.30e+7 | 20,800 | 0.50 | 10,400 | 700 | 967 | 967 | 755 | 504 | 562 | -296 | -2,250 |
| EHS 7/16 | Sidewalk | 2.30e+7 | 20,800 | 0.50 | 10,400 | 700 | 1,563 | 1,563 | 1,293 | 1,019 | 796 | -419 | -4,651 |
| | | | | | | | | | Totals: | 1,984 | 1,931 | -1,017 | -8,946 |

### Anchor/Rod Load Summary

| Anchor/Rod Load Summary | | Owner | Rod Length AGL (in) | Lead Length (ft) | Lead Angle (deg) | Strength of Assembly (lbs) | Anchor/Rod Strength Factor | Allowable Load (lbs) | Max Load[2] (lbs) | Load at Pole MCU[3] (lbs) | Max Required Capacity[2] (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Anchor | | | 6.00 | 155.00 | 80.0 | 20,000 | 0.50 | 10,000 | 0 | 0 | 0.0 |
| Anchor - 22.5M | | PG&E | 6.00 | 10.65 | 335.0 | 45,000 | 0.50 | 22,500 | 3,470 | 2,767 | 15.4 |

### Pole Buckling

| Buckling Constant | Buckling Column Height* (ft) | Buckling Section Height (% Buckling Col. Hgt.) | Buckling Section Diameter (in) | Minimum Buckling Diameter at GL (in) | Diameter at Tip (in) | Diameter at GL (in) | Modulus of Elasticity (psi) | Pole Density (pcf) | Ice Density (pcf) | Pole Tip Height (ft) | Buckling Load Capacity at Height (lbs) | Buckling Load Applied at Height (lbs) | Buckling Load Factor of Safety |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.71 | 21.20 | 33.90 | 10.45 | 4.48 | 6.69 | 11.46 | 2.38e+6 | 60.00 | 57.00 | 34.00 | 158,961 | 1615.10 | 43.48 |

Appendix B



November 12, 2024

# Installing New Service to Wood Poles

This letter is to inform all parties of the different service options depending on pole type and ownership, pursuant to the various PG&E Standard Documents. For PG&E solely owned poles and jointly owned wood poles, new services are designed following Standard 027911 Rev #15. The new service must be installed overhead and connected via one of the methods shown on page 8, Figures 2-4 and metered as shown on page 9 in Figure 5. The new communication equipment installed on the pole must also follow the 027911 Rev #15 requirements, and metering must follow the accompanying Standard Document 094675.

For non-PG&E owned wood poles, the new services may be installed overhead or underground as shown on PG&E Standard 094679. Installing new overhead service is typically the most efficient and preferred design. The clearances and various G.O. 95 requirements outlined in Standard 027911 Rev #15 do still apply, as well as the metering requirements outlined in Standard Document 094675. If the proposed pole is going to be a newly installed customer owned pole, there is also a separate Standard Document 025055 Rev #21 that outlines specific requirements to follow for the pole type, installation, etc.

If you have any questions, please call me at (408) 318-4827

Sincerely,

*Mark Anderson*

Mark Anderson
PG&E Electric Program Manager, Expert